Robert L. Begleiter (RB-7052)
Lloyd Constantine (LC-8465)
Mitchell C. Shapiro (MS-1019)
Jeffrey I. Shinder (JS-5719)
Leslie F. Spasser (LS-3943)
Eliot Spitzer (ES-9830)
CONSTANTINE & PARTNERS
909 Third Avenue, 10th Floor
New York, NY  10022
(212) 350-2700
Attorneys for Plaintiffs Wal-Mart Stores, Inc., The Limited, Inc. and
All Similarly Situated Persons

**CV 96 5238**

BARTELS, J

MANN, M.J.

CLERK
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK
OCT 25 9 41 AM '96
FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                            :

WAL-MART STORES, INC., and       :    CLASS ACTION
THE LIMITED, INC.,             :    COMPLAINT
on Behalf of Themselves and      :    AND JURY DEMAND
All Similarly Situated Persons    :
                 Plaintiffs,    :    __ Civ. _____
                            :
                v.           :
                            :
VISA USA, INC.                 :
              Defendant.    :
                            :
-----------------------------------------------------------------X

     Plaintiffs Wal-Mart Stores, Inc. ("Wal-Mart") and The Limited, Inc., ("The

Limited") by their attorneys, allege for their complaint, upon knowledge with respect to their

own acts and upon information and belief with respect to all other matters, as follows.

# I.
## INTRODUCTION

1.    Plaintiffs Wal-Mart and The Limited own and operate thousands of retail stores throughout the United States.  Similar to more than three million United States retail establishments, Wal-Mart and The Limited accept Visa credit cards as a form of payment along with cash, checks, travelers checks and other plastic credit, debit and "travel and entertainment" cards.

2.    Plaintiffs' acceptance of each of these forms of payment is voluntary, with the exception of two.  Plaintiffs must accept the so-called "*Visa Check*" debit card and a similar debit card called "*MasterMoney*," issued by members of the Visa and MasterCard bank card associations.  Wal-Mart and The Limited are forced to accept the *Visa Check* debit card as a condition of being able to accept the ubiquitous and dominant Visa credit card, without which, neither they nor virtually any retailer can operate successfully.

3.    Wal-Mart and The Limited, on behalf of themselves and a national class of retailers, who accept the Visa credit card, and are therefore forced to accept *Visa Check*, challenge this tying arrangement under the antitrust laws.  The tying arrangement forces members of the class to accept the *Visa Check* card.  The arrangement forces Plaintiffs to pay supra-competitive, exorbitant and fixed prices for acceptance of this involuntary payment system and raises the prices paid by all of their retail customers.  The arrangement also limits Plaintiffs' ability to accept and receive the forms of payment which they deem cost effective and efficient for themselves and their customers.

4.    Visa's longstanding and coercive practice of tying *Visa Check* to the Visa credit card has now become particularly costly as Visa has embarked upon an aggressive national advertising campaign for the *Visa Check* card.  The tying arrangement and this campaign has

resulted in the rapidly escalating use of the *Visa Check* card and has forced Plaintiffs and Class members to accept this debit card and pay fees which are supra-competitive, exorbitant and fixed. The tying arrangement is alleged to violate Sections 1 and 2 of the Sherman Act and the analogous provisions of the Donnelly Act, New York's antitrust law.

5.      Plaintiffs seek declaratory relief, injunctive relief and damages to redress these violations of federal and state law.

## II.
## JURISDICTION AND VENUE

6.      This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act 15, U.S.C. §§1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. Claims arising under the Donnelly Act, New York General Business Law §§ 340-347 are also stated herein. This Court has jurisdiction of the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331 and 1337. Jurisdiction of the state antitrust claims is vested in this Court pursuant to the principles of pendent jurisdiction, in that they arise out of the same operative facts as the federal antitrust claims.

7.      Defendant transacts business and is found in this District. In particular, tens of thousands of retail establishments located in this District accept the Visa credit card and are forced to accept the *Visa Check* plastic debit card. Hundreds of bank members of Visa located in this District issue and/or "acquire" retail merchant transactions for the Visa credit card and the *Visa Check* debit card. The interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District. The acts complained of have had, and will have, substantial anticompetitive effects in this District.

Plaintiffs Wal-Mart and The Limited own and operate retail stores in this District. Venue in this

District is proper under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22 and 26.

## III.
### DEFINITIONS

8.   As used in this Complaint, the following terms are defined as:

a.   "Automated Teller Machine" ("ATM") is a machine used for banking

services including withdrawals from deposit accounts and/or cash

advances against a line of credit, after access by the account holder using

either a debit card or credit card.

b.   "Point of Sale" ("POS") means a point of sale location for goods or

services such as a retail store, hotel, airline ticket counter, gasoline service

station, etc.

c.   "Electronic Funds Transfer" ("EFT") is a method of direct transfer of

funds by electronic means from one bank account to another using

computer and/or telecommunications.

d.   "Credit Card" is an access device, usually a plastic card, enabling the

holder to (i) effect transactions on credit for goods and services purchased,

which are paid on behalf of the holder by the issuer of such device or (ii)

obtain cash with credit extended by the issuer. Examples of credit cards

are the Visa credit card issued by members of the Visa bank card

association, the MasterCard credit card issued by members of the

MasterCard bank card association, as well as the *Discover*, *Bravo* and

*Private Issue* cards issued by Dean Witter, Discover & Co. and the *Optima*

cards issued by American Express.

e.    "Charge Card" or "Travel and Entertainment Card" or "T&E Card" is an access device, usually a plastic card, enabling the holder to purchase goods and services on credit to be paid on behalf of the holder by the issuer of such device.  Typically, the contractual terms of such cards require that payment from the holder to the issuer be made in full each month, for all payments made on behalf of the cardholder by the issuer during the preceding month.  The issuer does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment.  Examples of T&E cards are the American Express, green, gold, and platinum cards as well as the *Diners Club* and *Carte Blanche* cards issued by Citibank.

f.    "Debit Card" is an access device, usually a plastic card, enabling the holder, among other things, to effect a cash withdrawal from the holder's bank account at an ATM or make a purchase at a point of sale which is debited against one or more of the holder's bank accounts.

g.    "ATM Card" is an access device enabling the holder, among other things, to obtain cash at an ATM which is debited against the holder's deposit account or line of credit.  An ATM Card is a debit card used at ATMs.

h.    "POS Debit Card" is a debit card used at retail points of sale to purchase goods and services.  The *Visa Check* card is a POS Debit Card.

i.    "Plastic Card" means a device which enables the holder to perform the functions or obtain the access provided by one or more of the cards

defined above, *i.e.*, credit cards, charge cards, T&E cards and debit cards (ATM and/or POS).

j.    "Bug" means the imprint of a proprietary trademark or logo on a plastic card denoting that the card may be used to perform the functions or obtain the access associated with that specific logo or trademark in addition to the functions available from the issuer of the card. A bank-issued ATM card may contain the bugs of several ATM networks such as *Plus*, *Cirrus*, *NYCE* and *MAC* which will permit the holder to access funds at any ATM associated with those networks. Certain ATM networks such as *NYCE* and *MAC* also operate POS debit programs. An ATM card bearing the bug of such a network will allow the holder to use her ATM card as a POS debit card at retail stores which accept the debit cards of such network.

k.    "On-line POS debit transaction" means a debit transaction in which (similar to a cash withdrawal from an ATM) the cardholder's funds are electronically segregated or moved out of her account during the transaction and then contemporaneously or later the same day electronically deposited into the retailer's account. *NYCE, MAC, MOST, HONOR, BankMate, Pulse, Shazam, Maestro* and *Interlink* are among the many on-line POS debit card networks. On-line debit transactions are sometimes referred to in the industry as "single message" transactions because a single electronic message both authorizes the sales transaction and moves money from the cardholder's bank account into the retailer's bank account.

l.    "Off-line POS debit transaction" means a debit transaction in which funds

are typically moved electronically from the cardholder's bank account to

the retailer's account one to five days after the date of the sales transaction.

*Visa Check* is an off-line POS debit card.  MasterCard's similar off-line

POS debit card is called *MasterMoney*.  Off-line debit transactions are

sometimes referred to in the industry as "double message" transactions

because one electronic message authorizes the sales transaction and a

second electronic message moves money from the cardholder's account

into the retailer's account.

m.    "Bank card issuing institution" means a bank or other financial institution

member of Visa and/or MasterCard that issues Visa and/or MasterCard

branded plastic cards to consumers for their use as payment systems and

access devices.

n.    "Bank card acquiring institution" or "bank card merchant institution"

means a bank or other financial institution member of Visa and/or

MasterCard that establishes agreements with retailers whereby such

retailers will accept Visa and/or MasterCard branded plastic cards as

payment for the goods and services which they sell.

o.    "Interchange fee" means a fee which the bankcard acquiring institution

pays to the card issuing institution for each retail transaction where the

issuer's card is used as a payment device at one of the acquirer's retail store

accounts.  The following example illustrates how the Visa and MasterCard

interchange fees work.  Bank A issues a Visa Credit card to Consumer X

7

who purchases a garment for $100 at Store Y, which was "acquired" for Visa by Bank B. Visa rules mandate that Bank B must pay Bank A an interchange fee of 1.25% of the amount of the transaction, *i.e.,* $1.25. Bank B will charge Store Y a "discount fee" higher than $1.25 in order to recover the mandated interchange fee and earn a profit for itself. Thus, Bank B may charge a discount fee of 1.60% of the transaction amount (or $1.60) to Store Y. When Store Y presents Consumer X's $100 Visa transaction to Bank B, the bank will credit Store Y's account for $98.40, send the $1.25 interchange fee to Bank A and keep the $.35 balance of the "discount fee" for itself. When the same bank is both the issuing and acquiring institution, it keeps the entire interchange fee and discount fee. Therefore, if Bank B both had issued the Visa Credit card to Consumer X and had acquired Store Y for the Visa system, it would keep the entire $1.60 discount fee, including the $1.25 interchange fee. Such transactions are referred to in the industry as "on us" transactions. In addition, both the issuing and acquiring institutions of both Visa and MasterCard must pay Visa or MasterCard a fee for each retail transaction in which they are either the issuing or acquiring institution. Visa and MasterCard, thus, receive part of the interchange and discount fees from the issuing and acquiring institutions. Visa and MasterCard interchange fees are charged to the retailer along with the balance of the discount fee by the acquiring institution and then paid by the "acquirer" to the "issuer." In other networks, interchange fees may be paid in the other direction, that is, from

issuers to acquirers, as is the case in ATM and certain on-line POS debit networks.

p.     "Discount fee" means the fee charged by Visa and/or MasterCard acquiring institutions to their retail store clients for acquiring Visa transactions as described and discussed in the above definition of "interchange fee."

## IV.
## THE PARTIES

9.     Plaintiff, Wal-Mart, is a Delaware corporation with its principle place of business in Bentonville, Arkansas.  Wal-Mart, with annual sales of approximately $105 billion, owns and operates thousands of Wal-Mart and SAM'S Club retail stores throughout the United States, including this District.

10.     Plaintiff, The Limited is a Delaware Corporation with its principal place of business in Columbus, Ohio.  The Limited is the nation's premier specialty retailer, with sales of approximately $8 billion annually through over 5,000 stores under the following brands: Express, Lerner New York, Lane Bryant, The Limited Stores, Victoria's Secret, Structure, The Limited Too, Abercrombie & Fitch, Henri Bendel, Bath & Body Works, Cacique, Galyan's and Penhaligon's.  The Limited also distributes apparel internationally through Victoria's Secret Catalogue.

11.     Defendant Visa USA, Inc. ("Visa"), a Delaware corporation, is a national bank card association whose members include more than 6,000 banks.  Visa's principal place of business is San Francisco, California. Visa is doing business and transacts business in this judicial district.

**V.**
## CO-CONSPIRATORS

12.     Various persons, firms, corporations, organizations and other business entities,

some unknown and others known, have participated as co-conspirators in the violations alleged

and have performed acts in furtherance of the conspiracies.  Co-conspirators whose identities are

presently known include, but are not limited to, the following:   Approximately 2,800 banks that

have issued both Visa credit cards and *Visa Check* debit cards are co-conspirators.  Certain

banks, that are members of the board of directors of Visa adopted and agreed to impose the tying

arrangement challenged in this case upon retailers, are co-conspirators.  Approximately 1,000

banks, that are acquiring members of *both* the Visa and MasterCard associations and have

contemporaneously agreed with Visa to require merchants to accept *Visa Check* as a condition of

their ability to accept the Visa credit card while agreeing with MasterCard to require merchants

to accept *MasterMoney* as a condition of their ability to accept MasterCard credit cards, are co-

conspirators.  Approximately 900 banks, that are members of both the Visa and MasterCard

associations and are simultaneously issuing the Visa credit card, the MasterCard credit card and

the *MasterMoney* debit card are co-conspirators.

**VI.**
## CLASS ACTION ALLEGATIONS

13.     Plaintiffs bring this action as a class action under Rule 23(b)(1), (2) and (3),

Fed. R. Civ. P., for violations of, *inter alia*, 15 U.S.C. §§ 1 and 2 and New York's Donnelly Act.

The class is comprised of all persons and business entities who have accepted the Visa credit

card and therefore are required to accept *Visa Check* debit cards under the challenged tying

arrangement, during the fullest period permitted by the applicable statutes of limitations (the

"Class"). The Class does not include the named Defendant, its directors, officers or members of their families.

14.     The tying arrangement has harmed and continues to harm the interests of millions of retailers throughout the United States. The members of the Class are so numerous that joinder of all members is impracticable.

15.     Defendant's relationships with the Class members and Defendant's enforcement of the tying arrangement with respect to Class members has been substantially uniform. Questions of law and fact will predominately be common to the Class.

16.     Plaintiffs have no conflicts of interest with Class members and have retained counsel competent and experienced in federal and state antitrust litigation. Plaintiffs and their counsel will fairly and adequately represent the interests of the Class.

17.     Defendant has acted, continues to act, refused to act and continues to refuse to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

18.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation, and therefore it is highly impractical for such Class members to attempt redress of the wrongful tying arrangement individually.  There will be no extraordinary difficulty in the management of this Class action.  Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class, many of which cannot be seriously disputed, are the following:

(a)     Whether the Defendant and its co-conspirators tie the acceptance of *Visa Check* to retailers' acceptance of the Visa credit card?

(b)     Whether Defendant's tying arrangement is *per se* unlawful because Visa and its dual Visa/MasterCard members possess and exercise power (either market power, economic power sufficient to make forcing probable, or monopoly power) in the markets alleged in this complaint?

(c)     The amount of interchange and discount fees members of the Class have been forced to pay for *Visa Check* transactions, which they neither sought nor willingly accepted?

## VII.
## FACTUAL ALLEGATIONS

19.     Visa is a national bank card association whose members include banks, regional banking associations and other financial institutions. Visa was established by its members to develop, promote and operate national bank credit card networks. MasterCard is another bank card association with virtually identical purposes and members. Visa and MasterCard are herein collectively referred to as the "Associations."

20.     Visa and MasterCard evolved from regional and local credit card systems formed during the 1960's.

21.     Visa's predecessor, BankAmericard, was the local credit card program of the Bank of America, based in California. In 1970, the program was introduced throughout the United States under the name, National Bank Americard, Inc. ("NBI"). In 1977, NBI changed its name to Visa.

22.     MasterCard is the successor to MasterCharge, which was created in 1967 when the Interbank Card Association of New York banks merged with the Western States Bankcard Association.

## Duality

23.     Under their original rules, the Visa and MasterCard Associations were distinct. Members of Visa could not issue MasterCard credit cards to their customers. In 1976, Visa's rules were amended to permit "Duality." Thereafter, banks could be members of both Visa and MasterCard and issue both brands of plastic credit cards. Banks could also "acquire" retail stores for both Visa and MasterCard. Every major bank in the United States is a member of both Visa and MasterCard, and there is currently more than 95% overlap in the Associations' memberships. Furthermore, virtually every retail store which accepts Visa credit cards as a form of payment also accepts MasterCard credit cards. There are very few exceptions to Duality among the approximately 6,000 financial institutions which issue Visa and/or MasterCard credit cards, and the approximately 1000 financial institutions which acquire retail stores for Visa and/or MasterCard.

24.     Duality accelerated two trends which have characterized and dominated the development of the Associations. First, because their memberships are virtually identical, the Associations coordinate much of their activity through joint programs, consciously parallel activity and tacit collusion. Duality also facilitated a high degree of uniformity in interest rates and fees charged by the Associations' members to consumer plastic cardholders, and discount rates charged by the Associations' members to merchants accepting Visa and MasterCard plastic cards.

25.     The trend towards uniformity in pricing among dual Visa/MasterCard members has also been facilitated and exacerbated because Visa bank members collectively fix the Visa interchange fees and then turn around and, acting as MasterCard members, collectively fix the MasterCard interchange fees.  These interchange fees are the bulk of the final "discount fees" charged to retailers who accept Visa and MasterCard plastic cards.

26.     Visa bank members also jointly adopted the arrangement tying *Visa Check* to Visa Credit and then turned around and adopted the arrangement tying *MasterMoney* to MasterCard Credit.  These collective acts are all manifestations of Duality and the parallel and interdependent behavior it has spawned.

## Visa and Its Dual Members Dominant In Credit Cards Turn To POS Debit Cards

27.     By 1979, Visa and its dual members, which issued both Visa and MasterCard credit cards, dominated the credit card industry.  Their share of the national market for general purpose credit cards (not including T&E cards and not including single purpose proprietary cards issued by individual merchants such as department stores) was already above 90%.  Their share of a market defined as general purpose credit cards and T&E cards (such as American Express, *Diners Club* and *Carte Blanche* which do not offer revolving lines of credit) was already above 70%.  It is now above 77%.

28.     By this time, credit cards had become a necessity for retailers.  Few if any stores could remain viable without accepting credit cards and, in particular, the dominant Visa credit card.

29.     Visa and its dual members' dominance of the credit card market posed formidable barriers to new entrants, and these barriers were raised even higher by collective conduct aimed at suppressing new competition and making entry as difficult as possible.

30.     Visa members collectively adopted a rule barring their members from issuing any plastic cards competitive with Visa cards.  This rule exempted MasterCard, permitting Visa's dual members to continue issuing MasterCard plastic cards.  Visa members then turned around and, acting as MasterCard members, adopted the same non-competition rule. The effect of these rules was to deprive existing and new competitors of a marketing outlet at the 6000 largest and most appropriate vendors of their products, *i.e.*, the dual bank members of Visa and MasterCard. The actions were tantamount to requiring a manufacturer of a product primarily sold in department stores to build 6000 department store chains.  These collective actions increased considerably the "sunk costs" required to enter the market.

31.     By depriving new entrants of a means for efficient and speedy card issuance, the Associations also dissuaded stores from accepting competing credit cards, since retailer acceptance of a card is premised on widespread issuance of that card.

32.     When a competitor persisted and entered the market despite the barriers posed by the Associations' dominance and their pre-emptive exclusionary conduct, the Associations resorted to overt predation.

33.     In 1987 when American Express entered the revolving credit card market with the *Optima* card, Visa's Chief Executive Officer sent a telegram to 5,500 bank members of both Visa and MasterCard calling upon them to boycott American Express and it products, such as American Express travelers checks.

34.     Once Visa and its dual members consolidated their control of the credit card market, they began to pursue other payment systems as sources of revenue.  These included travelers checks, ATM networks (Visa and MasterCard acquired the two largest national ATM networks: Plus and Cirrus) and POS debit cards.

35.    Point of sale ("POS") debit cards, which are distinct from credit cards, are plastic cards which access a cardholder's depository bank account(s). If a retailer accepts a particular POS debit card, the money for a retail purchase is electronically transferred from the cardholder's bank account into the retailer's account. In an "on-line" POS debit card transaction, the money can be transferred instantaneously while the cardholder is at the sales desk, or the transfer may occur later the same day. A single electronic message both "authorizes" the transaction and the transfer of money from the cardholder's bank account to the retailer's bank account. Popular on-line systems in this judicial district include *NYCE, MAC, MOST,* Visa's *Interlink* and MasterCard's *Maestro.* Other popular on-line POS debit networks in other regions include *PULSE, HONOR, BankMate* and *Shazam.* In so-called "off-line" debit transactions, the electronic transfer of money from the consumer's bank account to the retailer's account typically occurs one to five days after the sales transaction. Off-line POS debit transactions are less secure than on-line transactions for retailers and consumers alike. Among the greater risk factors associated with an off-line transaction is the use of a cardholder signature rather than an alpha-numeric "PIN" (personal identification number) which results in greater fraud losses for both retailers and consumers. In off-line transactions, one electronic message authorizes the transaction and a second electronic message transfers the funds between accounts. *Visa Check* and *MasterMoney* are off-line POS debit cards.

36.    A retailer's decision to accept or refuse a particular POS debit card or any other form of payment is based upon a combination of factors, including: safety, convenience and the cost of accepting each form of payment ("payment system"). Retailers also consider whether acceptance of a particular payment system will facilitate sale transactions that might not otherwise occur. For example, acceptance of plastic cards with revolving lines of credit such as

the Visa credit card, *Discover* and *Optima* facilitate purchases by consumers who want to buy something, but will only do so if they can borrow money and pay over time. Such "revolving" credit cards as well as T&E cards also facilitate "convenience" transactions by consumers who will only make a purchase if they can borrow money for a short time, and pay within the "grace" periods permitted by T&E and revolving credit line cards.

37.    In order to capture these revolving credit and convenience transactions, which might not otherwise occur, Plaintiffs and the Class will pay the discount fees associated with credit and T&E cards. These discount fees currently range from approximately 1.4% to 4.5% of the transaction amount. The bulk of the discount fees charged by Visa members are the "interchange fees" which the bank members of Visa collectively fix and require the Visa acquiring members to collect from retailers as part of the discount fee, and then pay to the Visa issuing members. Both the issuing and acquiring institutions must pay a portion of these fees to Visa for each and every transaction.

38.    Interchange and discount rates vary depending upon the degree of electronic automation possessed by a particular retailer at its payment stations. A retailer with state of the art computerized POS terminals will pay lower interchange and discount fees than a small store which manually runs its plastic cards through a "credit card imprinter" and places a telephone call to a bank or card processor for voice authorization.

39.    Discount fees also vary among competing plastic cards. American Express has traditionally charged higher discount fees than Visa member banks and asserts that it attracts more affluent consumers to the stores which accept its *American Express* cards.

17

40.     With the exception of *Visa Check* and *MasterMoney*, each retailer can choose the payment systems it will accept based upon all of these factors, all the while recognizing that the cost of each payment system is ultimately reflected in the prices paid by all consumers.

41.     In or about 1979, POS debit cards became very attractive to the Associations. While credit cards were the Visa banks' most profitable, and in many cases only profitable, line of business, more than 90% of all retail transactions were paid for with cash and checks.

42.     POS (retail) debit cards, which in 1979 had already been in sparse circulation for more than a decade, promised a "Cashless Society." Debit transactions could replace many, and potentially most, cash and check retail transactions with plastic card transactions, which were safer, more convenient and less costly for banks, and also *potentially* more efficient for consumers and retailers as well.

### Visa Ties Its *Visa Check* Debit Card
### to The Dominant Visa Credit Cards

43.     Visa has never hidden its intention to be dominant, stating that it intends to be "the number one payment system in the world." In or about 1979, after Visa and its dual members had consolidated their control of the credit card market, they moved to convert cash and check retail transactions to debit transactions, but to do so in a manner most profitable for them and most costly and inefficient for retail stores and consumers. Visa initiated the "off-line" POS debit cards now known as *Visa Check*. Contemporaneously, MasterCard initiated the off-line debit card now known as *MasterMoney*.

44.     From the outset Visa and MasterCard tied *Visa Check* and *MasterMoney* to their credit cards, forcing retailers to accept the debit cards if they wanted to continue accepting the dominant, ubiquitous and essential Visa and MasterCard credit cards.

18

45.     From the outset Visa, MasterCard and their dual members charged retailers the same fees for *Visa Check* and *MasterMoney* as for their credit cards.

46.     Visa charged the same fee for the *Visa Check* debit card as for its credit card, despite the fact that the costs and risks associated with credit cards are far greater than for debit cards.  Debit transactions do not involve any extension of credit, let alone the highly risky extension of credit with temporally open-ended revolving lines.  (American Express entered the revolving credit card market with the *Optima* Card in 1987, and wrote off $265 million in *Optima* losses by 1991.)  The risk of fraud is also far greater for credit cards than for debit cards.

47.     In a free and unrestrained market, these higher costs and risks translate into interchange and discount fees which are much higher for credit cards than for POS debit cards.  Currently, the interchange fees for a $100 retail transaction at a store with the most advanced electronic environment (and hence the lowest possible rates) are:

| | | |
|---|---|---|
| Visa Credit | - | $1.25 (1.25% of transaction amount) |
| *Visa Check* (debit) | - | $1.10 (1.04% of transaction amount + $.06) |
| *NYCE* (debit) | - | $.075 ($.075 per transaction) |
| *MAC* (debit) | - | $.065 ($.065 per transaction) |
| *Most* (debit) | - | $.05 ($.05 per transaction) |
| *Pulse* (debit) | - | $.05 ($.05 per transaction) |
| *Shazam* (debit) | - | $.05 ($.05 per transaction) |
| *Honor* (debit) | - | $.05 ($.05 per transaction) |
| *BankMate* (debit) | - | $.05 ($.05 per transaction) |
| *Explore* (debit) | - | $.075 ($.075 per transaction) |
| *Maestro* (debit) | - | $.095 ($.095 per transaction) |

48.     The lowest *Visa Check* interchange fee for a $100 retail transaction is more than 14 times the rate for a *NYCE* transaction and nearly 17 times the rate for a *MAC* transaction.

49.     The typical *Visa Check* retail purchase transaction is approximately $40.00. The interchange fee comparisons among *Visa Check* and typical competing on-line regional POS debit networks for a $40.00 retail purchase transaction using the lowest possible *Visa Check* interchange rate is:

| | | |
|---|---|---|
| *Visa Check* | - | $.476 (1.04% of transaction amount + $.06) |
| *NYCE* | - | $.075 ($.075 per transaction) |
| *MOST* | - | $.05 ($.05 per transaction) |
| *Pulse* | - | $.05 ($.05 per transaction) |
| *Shazam* | - | $.05 ($.05 per transaction) |
| *Honor* | - | $.05 ($.05 per transaction) |
| *BankMate* | - | $.05 ($.05 per transaction) |
| *Explore* | - | $.075 ($.075 per transaction) |
| *Maestro* | - | $.095 (.095 per transaction) |

50.     No retailer would willingly pay these fixed, supra-competitive and extortionate rates and none *willingly* do. Plaintiffs and their Class have no choice. They must accept any proffered *Visa Check* card if they want to continue accepting the Visa credit card. They must honor the dominant Visa credit card if they are to remain viable.

51.     Under Visa's so-called, "anti-discrimination rules," retailers are even prohibited from asking a consumer whether she would not mind using a different payment system, including a debit card such as *NYCE* or *MAC*, which will cost the retailer a small fraction of the fees charged for *Visa Check*. Virtually every consumer holding a *Visa Check* card also holds a

plastic card bearing the "bugs" of one or more regional POS debit card networks such as *NYCE* and *MAC*. Indeed, most *Visa Check* cards *currently* bear such regional POS debit network bugs.

52.     Recognizing that regional on-line systems are cheaper, faster and safer for all parties to the transaction, Visa members have suggested that the competition they potentially pose be eliminated through boycott. At the September 1995 American Bankers Association meeting, the President of a prominent Visa and MasterCard member bank recommended to the assembled dual Visa/MasterCard membership that they follow the lead of his bank and issue *Visa Check* and *MasterMoney* cards without regional on-line debit network bugs.  Such activities further exacerbate the purposeful tendency of the tying arrangement to foreclose competition from far less expensive and superior payment systems.

53.     When a consumer presents a *Visa Check* card as her chosen method of payment, she has the money for a purchase and wants to use that money for that purpose.  If the retailer could refuse these cards, the consumer is likely instead to pay with a check, cash (which can be obtained from an ATM frequently in or adjacent to the retail store) or with a regional on-line debit card.  Thus, were retailers free to reject *Visa Check* or even free to request a different form of payment, there is virtually no possibility that they would lose the sale.  All they would lose are the exorbitant fees that are forced upon them by the Visa tying arrangement.

54.     When Wal-Mart and The Limited are forced to accept *Visa Check* for a $100 purchase, the interchange fee costs Plaintiffs at least $1.10.

55.     If Plaintiffs could reject the proffered *Visa Check* card or request payment with a check, cash or with a *NYCE, MAC, MOST* or other on-line POS debit card, which virtually every *Visa Check* cardholder carries, the savings to the Plaintiffs, and ultimately their customers, would amount to well over $1.00 on every $100.00 transaction and approximately $.40 on every $40.00

transaction. However, Plaintiffs can neither refuse to accept *Visa Check* nor suggest a different payment system to the customer. Consequently, faster, safer and far less costly payment systems are effectively foreclosed from selling their services to Plaintiffs and the Class.

56.     In 1995, *Visa Check* cards were used in approximately 556 million retail transactions, comprising a dollar volume of approximately $22 billion.

57.     Retailer Class members would have realized virtually every dollar of the $22 billion in sales volume, without acceptance of *Visa Check* through consumer use of cash, checks, travelers checks or on-line POS debit cards, each costing retailers a small fraction of the fees charged by Visa and its members.

58.     In 1995, the average *Visa Check* retail purchase transaction was approximately $40.00. In 1995, the lowest possible *Visa Check* interchange fees for a non-supermarket retailer, such as The Limited, was 1.05% of the transaction amount plus $.03. (The lowest rates, as stated, are now 1.04% plus $.06.)  Therefore, in 1995, the lowest possible interchange rate on a typical $40.00 transaction was $.45. Even retailers as large as The Limited and Wal-Mart pay much higher rates on many of their transactions. Indeed, Wal-Mart, the world's largest retailer pays higher interchange fees on approximately 12% of its *Visa Check* transactions.

59.     The total 1995 *Visa Check* interchange fees computed at the *lowest possible* rate for these 556 million *Visa Check* transactions was approximately $250,000,000.00.

60.     In 1995, Class members who accept on-line POS debit cards would have paid less than $33,000,000.00 in interchange fees for the same transactions processed by on-line POS debit networks, which are more secure and which transfer money to retailer accounts much more speedily.  If these purchases were paid for with cash, checks and/or travelers checks, the costs to retailers would have been well below this figure of $33,000,000.

22

61.     Wal-Mart and The Limited's experience with this involuntarily received debit card is typical of the Class' experience.

62.     Wal-Mart and The Limited have, since 1979, and more specifically, during the last four years, been forced to accept *Visa Check* as payment in tens of millions of retail transactions.

63.     Plaintiffs paid tens of millions of dollars in *Visa Check* interchange fees in excess of what they would have paid for the acceptance of checks, currency, travelers checks or on-line POS debit cards on the same retail transactions.

64.     During this period, Plaintiffs were prevented and foreclosed from rejecting *Visa Check* and from requesting that their customers instead use other superior and far less costly forms of payment.

### Visa Concealed The Existence And
### Use Of *Visa Check* From Retailers

65.     In fact, most retailers could not have asked for another form of payment even if Visa rules permitted this; because they were, and some still are, unaware that they "accept" *Visa Check* transactions and have been forced to do so for more than 16 years.

66.     From the outset Visa adopted elaborate measures to deceive retailers into believing that they were receiving the Visa credit card when in fact they were receiving *Visa Check* from consumers neither needing nor wanting to buy on credit.

67.     Visa designed *Visa Check* so that the card would be visually and electronically indistinguishable from a Visa credit card.  Visa also instructed its members to avoid communications with retailers which might disclose the true identity and the fixed and supra-competitive fee structure of *Visa Check*.

68.     Visa's "Debit Card Training Materials and Customization Guide" urges Visa banks to avoid and deflect retailers' questions about the *Visa Check* discount rate.  This Visa Guide notes that the "inability to tell the difference between Visa Debit and a Visa Credit card" may result in confusion.  Visa's solution for this is to design the cardholder's statement in a manner that will clearly distinguish the two distinct forms of payment.  However, the Guide counsels that the retailer can be kept in the dark about these visually indistinguishable plastic cards.  The Guide poses the following hypothetical question from a cardholder to a customer service representative:  "Do I need to tell the merchant that I am using a debit card?"  The Visa Guide's suggested answer is: "There's no need to provide a detailed explanation.  Simply tell the merchant that you want to use the Visa card.  He or she will handle the transaction like any other Visa payment."

69.     Another measure which purposefully concealed the *Visa Check* debit card and the arrangement tying it to the Visa credit card was the manner in which Visa members priced *Visa Check* transactions to retailers.

70.     From *Visa Check's* inception, bank members collectively fixed the identical interchange fee for *Visa Check* as they fixed for Visa Credit, further reducing the possibility that a retailer would detect the different products.

71.     Visa dual members then turned around and, acting as MasterCard members, collectively fixed the same interchange fee for *MasterMoney* as they collectively fixed for MasterCard credit.

72.     After approximately 15 years, *i.e.*, in April 1994, Visa members collectively adopted a *Visa Check* interchange fee which was slightly different from the interchange fee they collectively fixed for Visa Credit cards.  The *Visa Check* interchange fee is now 1.04% of the

transaction amount plus $.06 compared to the Visa Credit interchange fee of 1.25% of the transaction amount (both excepting slightly different rates for certain large supermarkets, which can be higher or lower than the rates applicable to other retailers depending upon the dollar amounts of the sales transactions). This means that the interchange fee is slightly higher for *Visa Check* in retail transactions of less than $28.57 and slightly higher for Visa Credit in retail transactions greater than $28.57.

**Visa Has Refused Retailer Demands
to Cease the Tying Arrangements**

73.     Despite Visa's campaign of concealment, certain sophisticated retailers such as Wal-Mart, The Limited and Nordstrom became aware that they were being forced to take *Visa Check* at exorbitant and fixed prices. These retailers explicitly demanded that Visa cease the tying arrangement and allow them to refuse *Visa Check*. As explained below, these demands were explicitly rejected.

74.     In 1983 Nordstrom, a national chain of department stores detected that it had been unwittingly accepting *Visa Check* cards for an undetermined period of time.

75.     Visa's concealment techniques had effectively prevented Nordstrom from detecting when it first began to receive *Visa Check* and the number of involuntary *Visa Check* transactions. At that time (1983) Nordstrom complained that: "Visa Debit Cards are usually issued in a form that does not identify the card as a debit card, so that a merchant cannot distinguish a Visa debit card from a Visa credit card. Visa charges the same merchant discount fee for debit card transactions as it does for credit card transactions."

76.     When Nordstrom discovered its involuntary receipt of *Visa Check*, it stopped honoring the card.

77.     Thereafter, in March 1983, Visa and First Interstate Bank, Nordstrom's Visa merchant bank, notified Nordstrom that its contractual right to accept Visa Credit cards would terminate in 30 days unless it resumed accepting *Visa Check*.

78.     Nordstrom's resistance to the tying arrangement continued for a while, but it eventually capitulated because it could not successfully operate without Visa Credit cards.

79.     In or about 1991, plaintiff The Limited became aware that it was involuntarily accepting *Visa Check*.

80.     In June 1991, The Limited wrote to Visa demanding that it cease the tying arrangement and permit The Limited to refuse acceptance of *Visa Check*.

81.     Visa rejected The Limited's demand.

82.     In or about November 1995, plaintiff Wal-Mart explicitly demanded that Visa cease the tying arrangement and allow Wal-Mart to reject *Visa Check* cards.  Wal-Mart also protested that Visa and its members were actively taking measures to prevent the use of faster, safer and far less costly regional on-line POS debit cards.  Visa rejected Wal-Mart's demand and in substance questioned why Visa would allow Wal-Mart to receive a cheaper (regional on-line) POS debit card when it could make Wal-Mart accept *Visa Check* with its much higher fee.

83.     Wal-Mart, The Limited and Class members did not and do not want to accept *Visa Check* because the fees charged for *Visa Check* are exorbitant, fixed and maintained at supra-competitive levels only through the coercive force of the tying arrangement.

**The Tying Arrangement Catapults *Visa Check***
**Into Dominance and Effectively Forecloses Competition in the POS Debit Card Market**

84.     When Visa initiated the *Visa Check* program in or about 1979, the number and dollar amount of such transactions were relatively small, accounting for under one-tenth of 1% of

all Visa transactions.  *Visa Check* transactions represented a small minority of the transactions in the nascent POS debit card market.

85.     Over the years, Visa carefully, relentlessly and stealthily fostered the domination of *Visa Check* over faster, safer and far less costly on-line POS debit networks.

86.     Since 1992, the number of *Visa Check* cards has annually increased by an average of 56%.  The average annual rate of increase in the number of *Visa Check* transactions during this period was 60%.  Last year alone, the number of transactions increased by 80%.  The dollar volume of these debit transactions has increased annually during this period at an average rate of 46%.

87.     By the end of 1995, there were approximately 32 million *Visa Check* cards in circulation issued by 2,800 Visa members.  In 1995, *Visa Check* cards were used in approximately 556 million retail transactions, comprising a dollar volume of approximately $22 billion.

88.     Over these years, the cumulative loss to retailers for the much slower transfer of billions of dollars in consumers' funds into the stores' bank accounts (same day for on-line POS debit versus one to five days for *Visa Check)* has been substantial in and of itself.

89.     This substantial loss, however, is dwarfed by the losses suffered through forced payment of *Visa Check* interchange fees.  As noted, in 1995 retailers were forced to pay approximately $250 million in *Visa Check* interchange fees compared with $33 million for typical on-line POS debit systems, such as *NYCE, MAC* and *MOST.*  Moreover, their costs would have been even lower for receiving cash, checks or travelers checks.

90.     In a free and unrestrained market, *Visa Check* would gain minuscule acceptance and market share, given its exorbitant, fixed and supra-competitive price and the pronounced

27

inferiority of *Visa Check* relative to its competitors. However, the synergistic effect of the Visa tying arrangement and the anti-discrimination rules, which prohibit a retailer from even suggesting another form of payment when *Visa Check* is proffered, was intended, and has proven, to be a powerful engine for market foreclosure.

91.    As noted, *Visa Check* transactions initially represented a small percentage of the overall market for POS (retail) debit transactions. By the end of 1995, the foreclosing effects of the tying arrangement and anti-discrimination rules had catapulted the inferior and exorbitantly-priced *Visa Check* into a dominant position in the market. In 1995, the number of *Visa Check* transactions grew 80% over the previous year compared to a 40% growth rate for the safer, faster and much less costly on-line POS debit systems.

92.    At the end of 1995, the *Visa Check* share of the national general-purpose POS debit card market was 51%. By employing an identical arrangement tying *MasterMoney* to the MasterCard credit card, the dual Visa members who issue both Visa and MasterCard have secured a 9% market share for their secondary brand off-line debit card, *MasterMoney*. *MasterMoney* secured this market share, second only to the *Visa Check*, with virtually no promotional effort, and at prices even higher than the exorbitant, fixed and supra-competitive *Visa Check* prices.

93.    The 25 competing regional on-line POS debit networks, such as *NYCE, MAC* and *MOST,* have collectively secured a 30% market share despite offering safer, faster and far less costly services. (As noted, the *Visa Check* interchange fee on a $100 transaction is $1.10 compared to the average regional network fee of $.06. For a $40.00 transaction, the fees are $.45 and $.06, respectively.)

94.     The faster and safer, but "untied," on-line POS debit networks owned by Visa and MasterCard -- *Interlink*, priced at 38% of *Visa Check* and *Maestro*, priced at 16% of *MasterMoney* -- have collectively garnered only 10% of the POS debit market. Without the foreclosing power of the tying arrangements employed for *Visa Check* and *MasterMoney* these systems are subjected to real head-to-head competition on the merits.

95.     Visa has not tied *Interlink* to its dominant Visa credit card in part because it has little desire to increase usage of this faster, safer and less expensive system and thereby, to depress the supra-competitive profits earned by the tied *Visa Check* card.

96.     Visa's overall share of the POS debit card market is 61% (51% for *Visa Check* and 10% for *Interlink*), MasterCard's overall share is 9%, virtually all of this for *MasterMoney*. Visa's "dual" members have thus secured a market share of roughly 70%.

97.     *Visa Check*, an inferior and far more costly product, has quickly moved from a minority share of the market to dominance. The tying arrangement has effectively and substantially foreclosed the market and virtually eliminated the efficacy of competition on the merits.

## VII.
## RELEVANT MARKETS

98.     General purpose credit cards are the product dimension of a relevant market. The geographic dimension of this market is the United States ("Credit Card Market").

99.     General purpose credit cards and T&E cards are the product dimension of a relevant market. The geographic dimension of this market is the United States ("Credit and T&E Market").

100.    General purpose POS debit cards is the product dimension of a relevant market. The geographic dimension of this market is the United States ("POS Debit Card Market").

101.    Point of Sale ("POS") plastic cards, credit, debit and T&E, permit retail consumers to pay for goods and services at retail stores.

102.    Credit cards permit consumers to borrow the money for a retail purchase from the card issuer and to repay the debt over time, according to the provisions of a revolving credit agreement with the issuer.

103.    Both credit cards and T&E cards permit a consumer to borrow the money for a retail purchase from a card issuer and to repay the debt without incurring interest charges during a "grace period," according to the provisions of an agreement with the issuer.

104.    POS debit cards permit consumers to pay for retail purchases with funds from their depository accounts.

105.    Only "credit-worthy" consumers can obtain credit cards.  The criteria employed by issuers of T&E cards such as *American Express, Diner's Club* and *Carte Blanche* also involve credit-worthiness, but are not identical to the criteria employed by issuers of revolving line credit cards.  The divergence in the criteria for issuing credit and T&E cards became more pronounced after *American Express* lost hundreds of million of dollars on the bad debts of *Optima* cardholders, who had been proven "credit-worthy" holders of American Express T&E cards (green, gold and platinum).

106.    Consumers who use credit cards for retail payment either want to or have to borrow money, which they can either repay to the card issuer without interest during a grace period, or repay over time according to a revolving credit agreement.

107.    Consumers who use T&E cards for retail payment either want to or have to borrow money which they can repay to the card issuer, without interest, according to the terms of their agreement with the card issuer.

30

108.    Consumers who use debit cards for retail payment either want to or have to make contemporaneous payment for their purchases with funds in their depository accounts. Such consumers either do not want to borrow money, or cannot do so, because they do not hold a credit or T&E card accepted by the retailer, or because they are not deemed credit-worthy and therefore cannot obtain a credit or T&E card.

109.    Additionally, debit cards are used by consumers either wanting or needing to make contemporaneous payment for retail purchases where the retailer will not accept checks and/or currency (e.g., Federal Express); when for safety or other reasons the consumer does not want to make a "significant" retail purchase with cash; or, when the consumer merely wants the speed and convenience of a plastic card transaction.

110.    General purpose plastic cards (credit, debit and T&E) can be used at all types of retail establishments, in contrast to proprietary cards such as those issued by department stores or gasoline retailers solely for use at the issuer's retail outlets.

111.    Credit cards are a unique product and bundle of services.  Many consumers do not consider other payment systems suitable substitutes for their use of credit cards, nor would they substitute other payment systems for credit cards nor would they do so even in response to a significant, non-transitory increase in the price of credit cards.

112.    T&E cards are a unique product and bundle of services.  Many consumers do not consider other payment systems suitable substitutes for their use of T&E cards, nor would they substitute other payment systems for T&E cards, nor would they do so even in response to a significant, non-transitory increase in the price of T&E cards.

113.    Retailers consider credit and T&E cards to be suitable substitutes for each other. They do not consider other payment systems suitable substitutes for credit and T&E cards, nor

31

would they substitute other payment systems for credit and T&E cards, nor would they do so even in response to a significant, non-transitory increase in the price of credit and T&E cards.

114.    POS debit cards are a distinct product and bundle of services.

**FIRST CLAIM FOR RELIEF**
**SHERMAN ACT SECTION ONE**
**COMBINATION AND CONSPIRACY IN RESTRAINT OF TRADE**
**PER SE UNLAWFUL AND UNREASONABLE TYING**

115.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 114 with the same force and effect as if here set forth in full.

116.    Beginning in or about 1979, the exact date unknown to Plaintiffs, and continuing thereafter until the filing of this Complaint, Defendant Visa, Visa member banks which issue and/or acquire for Visa Credit and *Visa Check* and bank members of the Visa board of directors (the "Visa conspirators") and co-conspirators have continually engaged in an unlawful contract, combination and conspiracy in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

117.    The combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the Visa conspirators, and forced agreements with the Class of retailers, the substantial terms of which have been to limit the sale of a distinct product, Visa Credit card services (including the right to accept Visa Credit cards), to retailers who agree, albeit under coercion and/or unwittingly, to buy a second distinct product, *Visa Check* services (including the obligation to accept *Visa Check* cards).

118.    At all times, the Visa conspirators had monopoly power and/or market power and/or economic power in the relevant Credit card and Credit and T&E Markets, sufficient to force Plaintiffs and their Class to purchase and accept *Visa Check*.

32

119.    *Visa Check* entered a market in which several safer, faster and far less expensive POS debit networks were already operating.  *Visa Check* was an inferior form of an established product from inception.  The mechanisms adopted by *Visa Check* to obtain market share were the tying arrangement and concealment campaign, as detailed above.  Since *Visa Check's* entry, many more on-line POS debit networks offering safer, faster and far less expensive services have entered the market.

120.    The continued employment of the tying arrangement achieves no legitimate efficiency benefit to counterbalance its demonstrated anticompetitive effect of foreclosing merit competition in the POS Debit Card market.

121.    Plaintiffs and their Class were forced to buy and accept *Visa Check* at fixed and supra-competitive prices.

122.    The ability of Plaintiffs and their Class to buy, accept and receive superior and less costly payment systems, including on-line POS debit cards, was effectively and substantially reduced, limited and foreclosed.

123.    The ability of competing payment systems, including on-line POS debit cards, to compete effectively with *Visa Check* on the merits was substantially reduced, limited and foreclosed.

124.    The combination and conspiracy has been effectuated by the means and overt acts set forth above, among others.

125.    The Visa conspirators and others acting in concert with them intended by their actions to:

    a.    Force Plaintiffs and their Class into buying, accepting and receiving *Visa Check*;

33

      b.    reduce, limit and foreclose merit competition in the POS Debit Card Market; and

      c.    injure and eliminate competition in the POS Debit Card Market.

126.    The combination and conspiracy has had and/or is likely to have among other things, the following effects:

      a.    Actual and potential competition in the POS Debit Card Market has been limited, reduced, restrained, suppressed and effectively foreclosed;

      b.    retailers who buy, accept and receive *Visa Check* have paid or are likely to pay artificially inflated prices;

      c.    actual and potential competitors of *Visa Check*, including on-line POS debit card systems have been effectively foreclosed from competing on the merits with *Visa Check* and injured in their business and property; and

      d.    the customers of Plaintiffs and the Class and the public have paid higher prices for all retail merchandise and have been deprived of the benefits of a free, open, competitive and unrestrained POS Debit Card Market.

127.    As a result of Visa's and Visa conspirators' violations of Section 1, Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of million of dollars, prior to trebling.

128.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
## SHERMAN ACT SECTION TWO
## <u>ATTEMPT TO MONOPOLIZE</u>

129.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 128 with the same force and effect as if here set forth in full.

130.   In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Visa, the Visa conspirators and co-conspirators, have knowingly, intentionally and with specific intent to do so, attempted to monopolize the POS Debit Card Market.

131.   The attempt to monopolize this market has been effected by the means and the overt acts set forth above, among others.

132.   Visa, the Visa conspirators and co-conspirators intended by their actions to:

      a.   control the supply and price of POS debit card services;

      b.   eliminate, reduce, limit and foreclose actual and potential competition in the POS Debit Card Market;

      c.   exclude and foreclose other persons from participating in or entering said market; and

      d.   injure and eliminate competition in said market.

133.   As a result of the conduct alleged herein, Visa and the Visa conspirators control such a substantial share of the POS Debit Card Market that, when coupled with Visa's anticompetitive conduct, including the arrangement tying *Visa Check* to Visa Credit cards and the collective fixing of debit interchange fees, a dangerous likelihood exists that Visa will monopolize the POS Debit Card Market.

134.   The attempt to monopolize has had, or is likely to have, among other things, the following effects:

a.  Actual and potential competition in the POS Debit Card Market has been limited, reduced, restrained, suppressed and effectively foreclosed;

b.  retailers who buy, accept and receive *Visa Check* have paid or are likely to pay artificially inflated prices;

c.  actual and potential competitors of *Visa Check*, including on-line POS debit card systems, have effectively been foreclosed from competing on the merits with *Visa Check* and injured in their business and property;

d.  the customers of Plaintiffs and the Class and the public have paid higher prices for all retail merchandise and have been deprived of the benefits of a free, open, competitive and unrestrained POS Debit Card Market; and

e.  instead of a free, open and competitive POS Debit Card Market, a monopoly, or dominant position dangerously likely to become a monopoly, has been established and maintained.

135.  As a result of Visa's and the Visa conspirators' violations of Section 2, Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of million of dollars, prior to trebling.

136.  Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
### SHERMAN ACT SECTION TWO
### CONSPIRACY TO MONOPOLIZE

137.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 136 with the same force and effect as if here set forth in full.

138.    In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Visa, the Visa conspirators and co-conspirators, have willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the POS Debit Card Market.

139.    The combination and conspiracy to monopolize this market has been effected by the means and the overt acts set forth above, among others.

140.    Visa, the Visa conspirators and co-conspirators intended by their actions to restrain trade in the relevant markets in the manner specified in paragraph 132.

141.    As a result of the conduct alleged herein, Visa and the Visa conspirators control price, have and are able to exclude competitors and competition and have and are able to charge supra-competitive prices in the POS Debit Card Market.

142.    The combination and conspiracy to monopolize has had, or is likely to have, among other things, the effects specified in paragraph 134.

143.    As a result of Visa's and the Visa conspirators' violations of Section 2, Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of million of dollars, prior to trebling.

144.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF
### THE DONNELLY ACT
### COMBINATION IN RESTRAINT OF TRADE
### PER SE UNLAWFUL AND UNREASONABLE TYING

145.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 144 with the same force and effect as if here set forth in full.

146.    Beginning in or about 1979, the exact date unknown to Plaintiffs, and continuing thereafter until the filing of this Complaint, Defendant Visa, Visa member banks which issue and/or acquire for Visa Credit and *Visa Check*, and bank members of the Visa board of directors (the "Visa conspirators") and co-conspirators have continually engaged in an unlawful contract, agreement, combination, arrangement and conspiracy in unreasonable restraint of the trade and commerce of New York State, in violation of the Donnelly Act, New York General Business Law § 340.

147.    The combination has consisted of a continuing agreement, understanding and concert of action among the conspirators and forced agreements with the Class of retailers, the substantial terms of which have been to limit the sale of a distinct product, Visa Credit card services (including the right to accept Visa Credit cards), to retailers who agree, albeit under coercion and/or unwittingly, to buy a second distinct product, *Visa Check* services (including the obligation to accept *Visa Check* cards).

148.    At all times the conspirators had monopoly power and/or market power and/or economic power in the relevant Credit card and Credit and T&E Markets, sufficient to force Plaintiffs and their Class to purchase and accept *Visa Check*.

149.    *Visa Check* entered a market in which several safer, faster and far less expensive POS debit networks were already operating. *Visa Check* was an inferior form of an established product from inception. The mechanisms adopted by *Visa Check* to obtain market share were the tying arrangement and concealment campaign as detailed above. Since *Visa Check's* entry many more on-line POS debit networks offering safer, faster and far less expensive services have entered the market.

38

150.    The continued employment of the tying arrangement achieves no legitimate efficiency benefit to counterbalance its demonstrated anticompetitive effect of foreclosing merit competition in the POS Debit Card market.

151.    Plaintiffs and their Class were forced to buy and accept *Visa Check* at fixed and supra-competitive prices.

152.    The ability of Plaintiffs and their Class to buy, accept and receive superior and less costly payment systems, including on-line POS debit cards, was effectively and substantially reduced, limited and foreclosed.

153.    The ability of competing payment systems, including on-line POS debit cards, to compete effectively with *Visa Check* on the merits was substantially reduced, limited and foreclosed.

154.    The combination has been effectuated by the means and overt acts set forth above, among others.

155.    The intended, likely and actual effects of these acts are the same as those set forth in paragraphs 125 and 126.

156.    As a result of Visa's and the Visa conspirators' violations of the Donnelly Act, Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of million of dollars, prior to trebling.

157.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
### THE DONNELLEY ACT
### ATTEMPT TO MONOPOLIZE

158.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 157 with the same force and effect as if here set forth in full.

159.    In violation of the Donnelly Act, Visa, the Visa conspirators and co-conspirators, have knowingly, intentionally and with specific intent to do so, attempted to monopolize the POS Debit Card Market.

160.    The attempt to monopolize this market has been effected by the means and the overt acts set forth above, among others.

161.    Visa, the Visa conspirators and co-conspirators intended by their actions to restrain trade in the relevant markets in the manner specified in 132.

162.    As a result of the conduct alleged herein, Visa and the Visa conspirators control such a substantial share of the POS Debit Card Market that when coupled with Visa's anticompetitive conduct, including the arrangement tying *Visa Check* to Visa Credit cards, a dangerous likelihood exists that Visa will monopolize the POS Debit Card Market, including New York State.

163.    The attempt to monopolize has had, or is likely to have, among other things, the effects specified in paragraph 134.

164.    As a result of Visa's and the Visa conspirators' violations of the Donnelly Act, Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of million of dollars prior to trebling.

165.   Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**
**THE DONNELLY ACT**
**CONSPIRACY TO MONOPOLIZE**

166.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 165 with the same force and effect as if here set forth in full.

167.   In violation of the Donnelly Act, Visa, the Visa conspirators and co-conspirators, have willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the POS Debit Card Market, including New York State.

168.   The combination and conspiracy to monopolize this market has been effected by the means and the overt acts set forth above, among others.

169.   Visa, the Visa conspirators and co-conspirators intended by their actions to restrain markets in the manner specified in paragraph 132.

170.   As a result of the conduct alleged herein, Visa and the Visa conspirators control price, have and are able to exclude competitors and competition and have and are able to charge supra-competitive prices in the POS Debit Card Market.

171.   The combination and conspiracy to monopolize has had, or is likely to have, among other things, the effects specified in paragraph 134.

172.   As a result of Visa's and the Visa conspirators' violations of the Donnelly Act, Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of million of dollars, prior to trebling.

173.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

**SEVENTH CLAIM FOR RELIEF**
**15 U.S.C. 1666(g) -- TIE-IN**

174.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 173 with the same force and effect as if here set forth in full.

175.    Visa acts as the agent for the thousands of card issuing banks that issue the Visa credit cards, as well as the approximately 1000 banks that acquire the plaintiff retailers' credit card transactions for Visa.

176.    As agent of its member card issuing banks, Visa is considered a "card issuer" within the meaning of 15 U.S.C. § §1602(n) and 1666(g).

177.    Visa, along with its member card issuing banks, conditions the retailers' participation in the Visa credit card program upon the retailers' acceptance of the *Visa Check* off-line POS debit product.  The off-line debit transactions which take place at each retailer's locations are then processed by the retailer's acquiring bank and the Visa bankcard association for a discount fee, which includes Visa's interchange fee.

178.    The foregoing constitutes a violation of 15 U.S.C. §1666(g), entitled "Tie-in services prohibited for issuance of credit card" which provides that "Notwithstanding any agreement to the contrary, a card issuer may not require a seller, as a condition to participating in a credit card plan, to open an account with or procure any other service from the card issuer or its subsidiary or agent."

179.    As a result of Visa and its co-conspirator issuing and acquiring banks' violations of 15 U.S.C. §1666(g), Plaintiffs and their Class have been injured in their business and property

42

in an amount not presently known with precision but which is, at a minimum, hundreds of

millions of dollars, prior to trebling.

180.   Such violations and the effects thereof are continuing and will continue unless the

injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand:

A.   That the Court declare, adjudge and decree that Defendant has committed the

violations of federal and state law alleged herein;

B.   That the Court enter an order pursuant to Rule 23 of the Federal Rules of Civil

Procedure permitting this action to be maintained a class action on behalf of the Class specified

herein;

C.   That Defendant, its directors, officers, employees, agents, successors and

members be enjoined and restrained from, in any manner, directly or indirectly continuing or

maintaining the arrangement tying the sales of Visa credit card services to the purchase and

acceptance of *Visa Check* card services; that Defendant, its directors, officers, employees, agents,

successors and members be enjoined and restrained from, in any manner, directly or indirectly

committing other violations of Sections 1 and 2 of the Sherman Act and the Donnelly Act, in

which it and co-conspirators have been engaged; and that Defendant, its directors, officers,

employees, agents, successors and members be enjoined and restrained from, in any manner,

directly or indirectly, committing any other violations of statutes having a similar purpose or

effect.

D.   That the Court award damages sustained by the Plaintiffs and members of their

Class on the First, Second, Third, Fourth, Fifth, Sixth and Seventh Claims for Relief in an

amount to be proved at trial, to be trebled according to law, plus interest, attorneys' fees and costs

of suit;

      E.     That the Court award Plaintiffs their costs and prejudgment interest and such

other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

Dated: New York, New York
       October 25, 1996

**CONSTANTINE & PARTNERS**

By: _Robert L. Begleiter_
      Robert L. Begleiter
      Lloyd Constantine
      Mitchell C. Shapiro
      Jeffrey I. Shinder
      Leslie F. Spasser
      Eliot Spitzer

909 Third Avenue
New York, New York   10022
(212) 350-2700

Attorneys for Plaintiffs

G:\COMMON\VISA\TYING CMP

44

amount to be proved at trial, to be trebled according to law, plus interest, attorneys' fees and costs

of suit;

E.   That the Court award Plaintiffs their costs and prejudgment interest and such

other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

Dated: New York, New York
       October 25, 1996

                              CONSTANTINE & PARTNERS

                              By: _Robert L. Begleiter_____
                                    Robert L. Begleiter
                                    Lloyd Constantine
                                    Mitchell C. Shapiro
                                    Jeffrey I. Shinder
                                    Leslie F. Spasser
                                    Eliot Spitzer

                              909 Third Avenue
                              New York, New York   10022
                              (212) 350-2700

                              Attorneys for Plaintiffs