Robert L. Begleiter (RB-7052)      Lloyd Constantine (LC-8465)      Amy N. Roth (AR-4534)
Stacey Anne Mahoney (SM-5425)      Mitchell C. Shapiro (MS-1019)
Jeffrey I. Shinder (JS-5719)       Gordon Schnell (GS-2567)
CONSTANTINE & PARTNERS, P.C.
477 Madison Avenue - 11th Floor
New York, NY  10022
(212) 350-2700
Attorneys for Plaintiffs Wal-Mart Stores, Inc., The Limited, Inc., Sears Roebuck and Company,
Inc., Safeway Inc., Circuit City Stores, Inc., and All Similarly Situated Persons, The International
Mass Retail Association, The National Retail Federation, and The Food Marketing Institute

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

IN RE                                                    :

VISA CHECK/MASTERMONEY ANTITRUST         :
LITIGATION
                                                         :
---------------------------------------------------------------------x

This Document Relates To:                                :

WAL-MART STORES, INC., THE LIMITED, INC.,    :
SEARS ROEBUCK AND COMPANY, INC., SAFEWAY :
INC. and CIRCUIT CITY STORES, INC., on Behalf    :
of Themselves and All Similarly Situated Persons,
THE INTERNATIONAL MASS RETAIL                    :
ASSOCIATION, THE NATIONAL RETAIL
FEDERATION and THE FOOD MARKETING        :
INSTITUTE,                                               :

                                                         :
                        Plaintiffs,                      :
             v.                                          :

VISA U.S.A. INC. and                                     :
MASTERCARD INTERNATIONAL, INC.,                  :

                                                         :
                        Defendants.                      :

---------------------------------------------------------------------x

MASTER FILE NO.
CV-96-5238
(Gleeson, J.) (Mann, M.J.)

**THIRD AMENDED
CLASS ACTION
COMPLAINT
AND JURY DEMAND**


Plaintiffs Wal-Mart Stores, Inc. ("Wal-Mart"), The Limited, Inc. ("The Limited"),

Sears Roebuck and Company, Inc. ("Sears"), Safeway Inc. ("Safeway"), Circuit City Stores, Inc.

("Circuit City"), The International Mass Retail Association ("IMRA"), The National Retail

Federation ("NRF") and The Food Marketing Institute ("FMI") by their attorneys, Constantine &

Partners, allege for their complaint against Visa U.S.A. Inc. ("Visa"), and MasterCard

2567.2

International, Inc. ("MasterCard"), upon knowledge with respect to their own acts and upon information and belief with respect to all other matters, as follows:

## I.
## INTRODUCTION

1.     Plaintiffs Wal-Mart, The Limited, Sears, Safeway and Circuit City (the "Retailer Plaintiffs") own and operate thousands of retail stores throughout the United States. Similar to more than three million United States retail establishments, the Retailer Plaintiffs accept Visa and MasterCard credit cards as a form of payment along with cash, checks, travelers checks and other plastic credit, debit and "travel and entertainment" cards.

2.     The Retailer Plaintiffs' acceptance of each of these forms of payment is voluntary, with the exception of two. They are forced to accept two debit cards, the so-called "*Visa Check*" and "*MasterMoney*" cards, issued by members of the Visa and MasterCard bankcard associations. The Retailer Plaintiffs are forced to accept these debit cards as a condition of being able to accept the ubiquitous and dominant Visa and MasterCard credit cards. Without these credit cards, neither they nor virtually any retailer can operate successfully.

3.     Wal-Mart, The Limited, Sears, Safeway and Circuit City, on behalf of themselves and a national class of retailers, who accept Visa and MasterCard credit cards and are therefore forced to accept *Visa Check* and *MasterMoney*, and NRF, IMRA and FMI, three trade associations of retailers whose members and affiliates have annual sales of more than $2 trillion (the "Trade Association Plaintiffs"), challenge these tying arrangements under the antitrust laws. The tying arrangements force members of the class to accept *Visa Check* and *MasterMoney* cards. These arrangements force retailers to pay supra-competitive, exorbitant and fixed prices for acceptance of these involuntary payment systems and raise the prices paid by all of their retail customers. The arrangements also limit retailers' ability to accept and receive the forms of payment which they deem cost effective and efficient for themselves and their customers.

2567.2

4.     Visa and MasterCard's longstanding and coercive practice of tying *Visa Check* and *MasterMoney* to Visa and MasterCard credit cards has now become particularly costly as Visa and MasterCard have embarked upon aggressive national advertising campaigns for the *Visa Check* and *MasterMoney* cards.  The tying arrangements have resulted in the rapidly escalating use of the *Visa Check* and *MasterMoney* debit cards and have forced the Retailer Plaintiffs and class members to accept them and pay fees which are supra-competitive, exorbitant and fixed.  The tying arrangements are alleged to violate Sections 1 and 2 of the Sherman Act and the analogous provisions of the Donnelly Act, New York's antitrust law.

5.     All of the Plaintiffs seek declaratory and injunctive relief, and the Retailer Plaintiffs also seek damages to redress these violations of federal and state law.

## II.
## JURISDICTION AND VENUE

6.     This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  Claims arising under the Donnelly Act, New York General Business Law §§ 340-347 are also stated herein.  This Court has jurisdiction of the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331, 1337, 2201 and 2202.  Jurisdiction of the state antitrust claims is vested in this Court pursuant to the principles of pendent jurisdiction, in that they arise out of the same operative facts as the federal antitrust claims.

7.     Defendants transact business and are found in this District.  In particular, tens of thousands of retail establishments located in this District accept Visa and MasterCard credit cards and are forced to accept *Visa Check* and *MasterMoney* plastic debit cards.  Hundreds of bank members of Visa and/or MasterCard located in this District issue and/or "acquire" retail merchant transactions for Visa and/or MasterCard credit cards and *Visa Check* and *MasterMoney* debit cards.  The interstate trade and commerce involved and affected by the alleged violations of

3

the antitrust laws was and is carried on in part within this District. The acts complained of have had, and will have, substantial anticompetitive effects in this District. Plaintiffs Wal-Mart, The Limited and Sears own and operate retail stores in this District. Venue in this District is proper under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22 and 26.

## III.
## DEFINITIONS

8.   As used in this Complaint, the following terms are defined as:

   a.   "Automated Teller Machine" ("ATM") is a machine used for banking services including withdrawals from deposit accounts and/or cash advances against a line of credit, after access by the account holder using either a debit card or credit card.

   b.   "Point of Sale" ("POS") means a point of sale location for goods or services such as a retail store, hotel, airline ticket counter, gasoline service station, etc.

   c.   "Electronic Funds Transfer" ("EFT") is a payment systems industry term used to describe a broad range of technologies involving the electronic transfer of funds among financial institutions, typically using computers and telecommunications.

   d.   "Credit Card" is an access device, usually a plastic card, enabling the holder to (i) effect transactions on credit for goods and services purchased, which are paid on behalf of the holder by the issuer of such device or (ii) obtain cash with credit extended by the issuer. Examples of credit cards are the Visa and MasterCard credit cards issued by members of the defendant bank card associations, as well as the *Discover*, *Bravo* and *Private Issue* cards issued by Morgan Stanley, Dean Witter & Co. and the *Optima* cards issued by American Express.

4

e.     "Charge Card" or "Travel and Entertainment Card" or "T&E Card" is an access device, usually a plastic card, enabling the holder to purchase goods and services on credit to be paid on behalf of the holder by the issuer of such device. Typically, the contractual terms of such cards require that payment from the holder to the issuer be made in full each month, for all payments made on behalf of the cardholder by the issuer during the preceding month. The issuer does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment. Examples of T&E cards are the American Express, Green, Gold, and Platinum cards as well as the *Diners Club* and *Carte Blanche* cards issued by Citibank.

f.     "Debit Card" is an access device, usually a plastic card, enabling the holder, among other things, to effect a cash withdrawal from the holder's bank account at an ATM or make a purchase at a point of sale which is debited against one or more of the holder's bank accounts.

g.     "ATM Card" is an access device enabling the holder, among other things, to obtain cash at an ATM which is debited against the holder's deposit account or line of credit. An ATM Card is a debit card used at ATMs.

h.     "POS Debit Card" is a debit card used at retail points of sale to purchase goods and services. The *Visa Check* and *MasterMoney* cards are POS debit cards. A bank or other financial institution may issue a single plastic card which will function as both a POS debit card and an ATM card.

i.     "Plastic Card" means a device which enables the holder to perform the functions or obtain the access provided by one or more of the cards defined above, *i.e.*, credit cards, charge cards, T&E cards and debit cards (ATM and/or POS).

5

2567.2

j.    "Bug" means the imprint of a proprietary trademark or logo on a plastic card denoting that the card may be used to perform the functions or obtain the access associated with that specific logo or trademark, in addition to the functions available from the issuer of the card.  A bank-issued ATM card may contain the bugs of several ATM networks, such as *Plus*, *Cirrus*, *NYCE*, *MAC* and *MOST*, which will permit the holder to access funds at any ATM associated with those networks.  Certain ATM networks, such as *NYCE* and *MAC*, also operate POS debit programs.  An ATM card bearing the bug of such a network will allow the holder to use her ATM card as a POS debit card at retail stores which accept the debit cards of such network.

k.    "On-line POS debit transaction" means a debit transaction in which (similar to a cash withdrawal from an ATM) the bank that issued the cardholder's on-line debit card verifies that there are sufficient funds in the cardholder's account to cover the amount of the retail purchase and electronically "puts a hold" on those funds in her account (reducing the amount available) during the retail transaction.  The funds are then typically removed from the cardholder's account and deposited into the retailer's account in one day or less.  *NYCE, MAC, MOST, Honor, Pulse, Shazam, Star, Maestro* and *Interlink* are among the many on-line debit card networks.

l.    "Off-line POS debit transaction" means a debit transaction in which, contrasting with an on-line transaction, the debit card issuing bank may or may not verify that there are sufficient funds in the cardholder's account to cover the amount of the retail purchase and may or may not put a hold on such funds during the course of the retail transaction.  With an off-line

6

2567.2

transaction, funds are typically moved electronically from the cardholder's bank account to the retailer's account one to seven days after the date of the sales transaction. *Visa Check* and *MasterMoney* are off-line POS debit cards.

m.  "Bank card issuing institution" means a bank or other financial institution member of Visa and/or MasterCard that issues Visa and/or MasterCard branded plastic cards ("bankcards") to consumers for their use as payment systems and access devices.

n.  "Bank card acquiring institution" or "bank card merchant institution" means a bank or other financial institution member of Visa and/or MasterCard that establishes agreements with retailers whereby such retailers will accept Visa and/or MasterCard branded plastic cards as payment for the goods and services which they sell.

o.  "Interchange fee" means a fee that the bankcard acquiring institution pays to the card issuing institution for each retail transaction where the issuer's card is used as a payment device at one of the acquirer's retail store accounts. The following example illustrates how the Visa and MasterCard interchange fees work. Bank A issues a Visa credit card to Consumer X, who purchases a garment for $100 at Store Y, which was "acquired" for Visa by Bank B. Visa rules mandate that Bank B must pay Bank A an interchange fee of 1.25% of the amount of the transaction, *i.e.,* $1.25. Bank B will charge Store Y a "discount fee" higher than $1.25 in order to recover the mandated interchange fee and other fees that Visa rules mandate Bank B to pay Visa on each and every Visa credit card (and debit card) transaction and to earn a profit for itself. Thus, Bank B may charge a discount fee of 1.60% of the transaction amount (or $1.60) to Store Y.

7

2567.2

When Store Y presents Consumer X's $100 Visa transaction to Bank B, the bank will credit Store Y's account for $98.40, send the Visa mandated $1.25 interchange fee to Bank A and retain the $.35 balance of the "discount fee." (When the same bank is both the issuing and acquiring institution, it retains the entire discount fee. Therefore, if Bank B both had issued the Visa credit card to Consumer X and had acquired Store Y for the Visa system, it would retain the entire $1.60 discount fee, including the $1.25 interchange fee. Such transactions are referred to in the industry as "on us" transactions.) Thereafter, both the issuing and acquiring institutions of both Visa and MasterCard must pay Visa or MasterCard fees for each retail transaction in which they are either the issuing or acquiring institution. In the foregoing example, Bank A pays part of its $1.25 and Bank B part of its $.35 to Visa. Visa and MasterCard thus receive part of the interchange and discount fees from the issuing and acquiring institutions. Visa and MasterCard interchange fees and other Visa and MasterCard mandated fees are precisely passed along to the retailer, along with the balance of the discount fee, by the acquiring institution and the interchange is then paid by the "acquirer" to the "issuer." Then the acquirer and issuer both pay Visa or MasterCard its share. In other networks, interchange fees may be paid in the other direction, that is, from issuers to acquirers, as is the case in ATM and certain on-line POS debit networks.

p.  "Discount fee" means the fee charged by Visa and MasterCard acquiring institutions to their retail store clients for acquiring Visa and MasterCard transactions as described and discussed in the above definition of "interchange fee."

8

2567.2

## IV.
## THE PARTIES

9.     Plaintiff Wal-Mart is a Delaware corporation with its principal place of business in Bentonville, Arkansas.  Wal-Mart, with annual sales of approximately $105 billion, owns and operates thousands of Wal-Mart retail stores throughout the United States, including this District.

10.     Plaintiff The Limited is a Delaware Corporation with its principal place of business in Columbus, Ohio.  The Limited is the nation's premier specialty retailer, with sales of more than $8 billion annually through over 5,000 stores under the following brands: Express, Lerner New York, Lane Bryant, The Limited stores, Victoria's Secret, Structure, The Limited Too, Henri Bendel, Bath & Body Works, and Galyan's.  The Limited also distributes apparel internationally through Victoria's Secret Catalogue.

11.     Plaintiff Sears is a New York corporation with its principal place of business in Hoffman Estates, Illinois.  Sears owns and operates thousands of retail stores throughout the United States, including this District.  Sears' domestic annual sales are approximately $23 billion.

12.     Plaintiff Safeway is a Delaware corporation with its principal place of business in Pleasanton, California.  Safeway, founded in 1926, operated more than 1000 stores at the end of 1996.  Safeway's stores offer consumers a wide selection of both food and general merchandise and feature a variety of specialty departments, such as bakery, deli and floral.  Safeway's stores, located throughout the United States, had sales of approximately $17 billion in 1996 and held the number one or number two Market Share position in each of its nine geographical operating areas.  In support of its retail operations, Safeway has an extensive network of distribution, manufacturing and food processing facilities.

13.     Plaintiff Circuit City is a Virginia corporation with its principal place of business in Richmond, Virginia.  Circuit City is the nation's largest retailer of brand-name consumer electronics and major appliances and a leading retailer of personal computers and music software.  Circuit City operates 444 superstores, 45 mall-based Circuit City Express stores, and

2567.2

five consumer electronics-only stores.  These stores are located throughout the United States, including this District.

14.     Plaintiff IMRA is a New York not-for-profit corporation with its principal place of business in Arlington, Virginia.  IMRA is a trade association of mass retailers whose members operate more than 62,000 stores employing more than 2 million people in the United States, with annual sales of approximately $294 billion.

15.     IMRA's Retail-Members ("IMRA members") account for the overwhelming majority of sales by the nation's major mass merchandisers, such as discount department stores, specialty discount stores, home centers, catalogue showrooms, membership warehouse clubs, deep discount drugstores, and off-price stores.

16.     IMRA's purpose and mission is to protect, promote, foster and advance the interests of its members, the mass retailing business and consumers who shop at IMRA members' retail stores.  IMRA is empowered by its members and its Bylaws, through the action of its Board of Directors, to engage in lawful acts necessary, suitable and useful to the attainment of IMRA's mission.

17.     Having found that IMRA's members are suffering injury, and threatened injury, to their business and property as a result of the challenged tying arrangements, in January 1997, IMRA's Board of Directors voted to join in this action as a Plaintiff and to seek declaratory and injunctive relief under the antitrust laws on behalf of IMRA members who accept Visa and/or MasterCard credit cards and are therefore forced to accept *Visa Check* and/or *MasterMoney* debit cards, because of the challenged tying arrangements.

18.     Most of the 62,000 stores operated by IMRA members accept Visa and/or MasterCard credit cards and therefore are forced and coerced to receive *Visa Check* and *MasterMoney* debit cards because of the tying arrangements.

19.     IMRA's members operate retail businesses which offer low prices and deep discounts to retail consumers.  IMRA members seek to eliminate excess and wasteful expense

10

2567.2

from the merchandise they sell through automation and the employment and purchase of the most efficient and cost effective retail systems, including the most efficient retail payment systems.

20.     IMRA's retailer-members operate on very low profit margins, relying upon high volume for profitability.  IMRA and its Board of Directors allege that the challenged tying arrangements illegally, anticompetitively and unfairly raise significantly the price of doing business for IMRA members and the prices all consumers must pay for the merchandise sold by IMRA members.

21.     Plaintiff NRF is the world's largest retail trade association with membership that includes the leading department, specialty and independent stores as well as discount and mass merchandise retailers and 32 national and 50 state associations.  Directly, and through NRF's state and national associations, NRF represents more than 50,000 retailers.

22.     NRF's purpose and mission are to foster and advance the interests of retailers. NRF is lawfully empowered, and acts through its Board of Directors, to engage in activities which will advance the interests of retailers represented by NRF.

23.     The NRF has determined that retailers represented by NRF are suffering injury and threatened injury to their business and property as a result of the challenged tying arrangements.  Therefore, in January 1997, NRF's Board of Directors voted to participate in this action  and to seek declaratory and injunctive relief under the antitrust laws on behalf of retailers represented by NRF who accept Visa and/or MasterCard credit cards and are therefore forced to accept *Visa Check* and/or *MasterMoney* debit cards, because of the challenged tying arrangements.

24.     The overwhelming majority of retailers represented by NRF accept Visa and/or MasterCard credit cards and therefore are forced and coerced to receive *Visa Check* and/or *MasterMoney* transactions, because of the tying arrangements.

2567.2

25.   NRF alleges that the challenged tying arrangements illegally, anticompetitively and unfairly raise significantly the cost of doing business for retailers represented by NRF and the prices all consumers must pay for the merchandise sold by these retailers.

25(a)   Plaintiff FMI is a non-profit association incorporated with its principal place of business in the District of Columbia.  FMI conducts programs in research, education, industry relations and public affairs on behalf of its 1,500 food retailer and wholesaler members.  FMI's United States members operate approximately 21,000 retail food stores with a combined annual sales volume of $220 billion -- more than half of all the grocery store sales in the United States. FMI's retail membership is composed of large multiple store chains, small regional firms and independent supermarkets.

25(b)   FMI's purpose and mission is to foster and advance the interest of its members and their customers.  FMI is lawfully empowered, and acts through its Board of Directors, to engage in activities which will advance the interests of retailers who are members of FMI.

25(c)   FMI has determined that the food retailers who are members of FMI are suffering injury and threatened injury to their business and property as a result of the tying arrangements and associated business activity described and challenged in the complaint in the *Wal-Mart Action* and in *In Re Visa Check*.   Therefore, in 1997, the Executive Committee of FMI's Board of Directors voted to file this complaint and seek consolidation with the *Wal-Mart Action* and *In Re Visa Check* and to seek declaratory and injunctive relief under the antitrust laws on behalf of retailers represented by FMI who accept Visa and/or MasterCard credit cards and therefore are forced to accept *Visa Check* and/or *MasterMoney* debit cards.

25(d)   Most of the approximately 21,000 stores operated by food retailers who are members of FMI accept Visa and/or MasterCard credit cards and therefore are forced and coerced to accept *Visa Check* and/or *MasterMoney* transactions, because of the tying arrangements.

12

25(e)   FMI alleges that the challenged tying arrangements illegally, anticompetitively and unfairly raise significantly the cost of doing business for food retailers that are members of FMI and the prices all consumers must pay for the groceries and other merchandise sold by these retailers.

26.   Defendant Visa, a Delaware corporation, is a national bank card association whose members include more than 6,000 banks.  Visa's principal place of business is San Francisco, California. Visa is doing business and transacts business in this judicial district.

27.   Defendant MasterCard, a Delaware corporation, is also a national bank card association whose members include more than 6,000 banks.  MasterCard's principal place of business is Purchase, New York.  MasterCard is doing business and transacts business within this judicial district.

**V.**

**CO-CONSPIRATORS**

28.   Various persons, firms, corporations, organizations and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies.  Co-conspirators whose identities are presently known include, but are not limited to, the following: Approximately 4,400 banks that have issued Visa and/or MasterCard credit cards and also issued *Visa Check* and/or *MasterMoney* debit cards are co-conspirators.  Certain banks, that are members of the boards of directors of Visa or MasterCard, adopted and agreed to impose the challenged tying arrangements upon retailers.  These banks are co-conspirators.  Approximately 1,000 banks, that are acquiring members of *both* the Visa and MasterCard associations and have contemporaneously agreed with Visa to require merchants to accept *Visa Check* as a condition of their ability to accept the Visa credit card while agreeing with MasterCard to require merchants to accept *MasterMoney* as a condition of their ability to accept MasterCard credit cards, are co-conspirators.

13

## VI.
## CLASS ACTION ALLEGATIONS

29.    The Retailer Plaintiffs bring this action as a class action under Rule 23(b)(1), (2) and (3), Fed. R. Civ. P., for violations of, *inter alia*, 15 U.S.C. §§ 1 and 2 and New York's Donnelly Act.  The class is comprised of all persons and business entities who have accepted Visa and/or MasterCard credit cards and therefore are required to accept *Visa Check* and/or *MasterMoney* debit cards under the challenged tying arrangements, during the fullest period permitted by the applicable statutes of limitations (the "Class").  The Class does not include the named Defendants, their directors, officers or members of their families.

30.    The tying arrangements have harmed and continue to harm the interests of the vast majority of retailers throughout the United States.  The members of the Class are so numerous that joinder of all members is impracticable.

31.    Defendants' relationships with the Class members and Defendants' enforcement of the tying arrangements with respect to Class members have been substantially uniform.  Questions of law and fact will predominately be common to the Class.

32.    The Retailer Plaintiffs have no conflicts of interest with Class members and have retained counsel competent and experienced in federal and state antitrust litigation.  The Retailer Plaintiffs and their counsel will fairly and adequately represent the interests of the Class.

33.    Defendants have acted, continue to act, refused to act and continue to refuse to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

34.    This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to attempt redress of the wrongful tying arrangements individually.  There will be no extraordinary

14

2567.2

difficulty in the management of this Class action.  Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to the Class, many of which cannot be seriously disputed, are the following:

      (a)      Whether Defendants and their co-conspirators tie the acceptance of *Visa Check* and *MasterMoney* to retailers' acceptance of Visa and MasterCard credit cards?

      (b)      Whether Defendants' tying arrangements are *per se* unlawful because Visa, MasterCard and their dual members possess and exercise market power, economic power sufficient to make forcing probable, or monopoly power in the markets alleged in this complaint?

      (c)      The amount of interchange fees and other Visa/MasterCard mandated fees and assessments that members of the Class have been forced to pay for *Visa Check* and *MasterMoney* transactions, which they neither sought nor willingly accepted?

## VII.
## FACTUAL ALLEGATIONS

35.     Visa and MasterCard (collectively, the "Associations") are national bank card associations whose members include banks, regional banking associations and other financial institutions.  Visa and MasterCard were established by their members to develop, promote and operate national bank credit card networks.

36.     Visa and MasterCard evolved from regional and local credit card systems formed during the 1960's.

37.     Visa's predecessor, BankAmericard, was the local credit card program of the Bank of America, based in California.  In 1970, the program was introduced throughout the United

2567.2

States under the name, National Bank Americard, Inc. ("NBI"). In 1977, NBI changed its name to Visa.

38.    MasterCard is the successor to MasterCharge, which was created in 1967 when the Interbank Card Association of New York banks merged with the Western States Bankcard Association.

## Duality

39.    Under their original rules, the Visa and MasterCard Associations were distinct. Members of Visa could not issue MasterCard credit cards to their customers. In 1976, Visa's rules were amended to permit "Duality." Thereafter, banks could be members of both Visa and MasterCard and issue both brands of plastic credit cards. Banks could also "acquire" retail stores for both Visa and MasterCard. Every major bank in the United States is a member of both Visa and MasterCard, and there is currently more than 95% overlap in the Associations' memberships. Furthermore, virtually every retail store that accepts Visa credit cards as a form of payment also accepts MasterCard credit cards. There are very few exceptions to Duality among the approximately 6,000 financial institutions that issue Visa and/or MasterCard credit cards, and the approximately 1000 financial institutions that acquire retail stores for Visa and/or MasterCard.

40.    Duality accelerated two trends that have characterized and dominated the development of the Associations. First, because their memberships are virtually identical, the Associations coordinate much of their activity through joint programs, consciously parallel activity and tacit collusion. Duality also facilitated a high degree of uniformity in interest rates and fees charged by the Associations' owner-members to consumer plastic cardholders, and discount rates charged by the Associations' owner-members to merchants accepting Visa and MasterCard plastic cards.

41.    The trend towards uniformity in pricing among dual Visa/MasterCard members has also been facilitated and exacerbated because Visa bank members collectively fix the Visa interchange fees and contemporaneously, acting as MasterCard members, collectively fix the

16

MasterCard interchange fees. These price fixed interchange fees are the bulk of the final "discount fees" charged to retailers who accept Visa and MasterCard plastic cards.

42.    Visa bank members also jointly adopted the arrangement tying *Visa Check* to Visa Credit and contemporaneously adopted the arrangement tying *MasterMoney* to the MasterCard credit card. These collective acts are all manifestations of Duality and the parallel and interdependent behavior it has spawned.

### Visa/MasterCard, Dominant In Credit Cards, Turn To POS Debit Cards

43.    By 1979, Visa and MasterCard and their dual members dominated the credit card industry. Their share of the national market for general purpose credit cards (not including T&E cards and not including single purpose proprietary cards issued by individual merchants such as department stores) was already above 90%. Their share of a market defined as general purpose credit cards and T&E cards (such as American Express, *Diners Club* and *Carte Blanche,* which do not offer revolving lines of credit) was already above 70%. It is now above 75%.

44.    By this time, credit cards had become a necessity for retailers. Few if any stores could remain viable without accepting credit cards and, in particular, the dominant Visa and MasterCard credit cards.

45.    Visa/MasterCard domination of the credit card market posed formidable barriers to new entrants, and these barriers were raised even higher by collective conduct aimed at suppressing new competition and making entry as difficult as possible.

46.    Visa members collectively adopted a rule barring their members from issuing any plastic cards competitive with Visa cards. This rule exempted MasterCard, permitting Visa's dual members to continue issuing MasterCard plastic cards. Visa members then turned around and, acting as MasterCard members, adopted the same non-competition rule. The effect of these rules was to deprive existing and new competitors of a marketing outlet at the 6,000 largest and most appropriate vendors of their products, *i.e.,* the dual bank members of Visa and MasterCard. The actions were tantamount to requiring a manufacturer of a product primarily sold in department

17

stores to build 6,000 department store chains. These collective actions increased considerably the "sunk costs" required to enter the market.

47.     By depriving new entrants of a means for efficient and speedy card issuance, the Associations also dissuaded stores from accepting competing credit cards, since retailer acceptance of a card is premised on widespread issuance of that card.

48.     When a competitor persisted and entered the market despite the barriers posed by the Associations' dominance and their pre-emptive exclusionary conduct, the Associations resorted to overt predation.

49.     In 1986, when Sears introduced the *Discover* card, the first national general-purpose credit card to enter the market in a generation, Visa and its members organized a boycott of *Discover* card processing. Sears responded by establishing its own state-of-the-art and lower-priced processing services and offering these to retailers for all of their plastic card transactions. Visa then prohibited any Visa member from allowing Sears to acquire retailers for Visa, adding expense and complexity to a retailer's choice to consolidate its plastic card processing business with Sears. (The *Discover Card* is now issued by Morgan Stanley, Dean Witter & Co., which is neither owned nor affiliated with Sears.)

50.     In 1987, when American Express entered the revolving credit card market with the *Optima* card, Visa's Chief Executive Officer sent a telegram to 5,500 bank members of both Visa and MasterCard calling upon them to boycott American Express and its products, such as American Express travelers checks.

51.     Once Visa/MasterCard and their dual members consolidated their control of the credit card market, they began to pursue other payment systems as sources of revenue. These included travelers checks, ATM networks (Visa and MasterCard acquired the two largest national ATM networks: Plus and Cirrus) and POS debit cards.

52.     Point of sale ("POS") debit cards, which are distinct from credit cards, are plastic cards which access a cardholder's depository bank account(s). If a retailer accepts a particular

18

POS debit card, the money for a retail purchase is electronically transferred from the cardholder's bank account into the retailer's bank account. In an "on-line" POS debit card transaction, the cardholder's account is debited and the retailer's account is credited in one day or less. Popular on-line systems in this judicial district include *NYCE, MAC, MOST,* Visa's *Interlink* and MasterCard's *Maestro.* Popular on-line POS debit networks in other regions include *Pulse, Honor, Star* and *Shazam.* In so-called "off-line" debit transactions, the electronic transfer of money from the consumer's bank account to the retailer's account typically occurs one to seven days after the sales transaction. Off-line POS debit transactions are less secure than on-line transactions for retailers and consumers alike. Among the greater risks associated with an off-line transaction is the use of a cardholder signature rather than an alpha-numeric "PIN" (personal identification number), which results in greater fraud losses for both retailers and consumers. *Visa Check* and *MasterMoney* are "off-line" POS debit cards.

53.     A retailer's decision to accept or refuse a particular POS debit card or any other form of payment ("payment system") is based upon a combination of factors, including the safety, convenience and cost of accepting each payment system. Retailers also consider whether acceptance of a particular payment system will facilitate sale transactions that might not otherwise occur. For example, acceptance of plastic cards with revolving lines of credit such as Visa/MasterCard credit, *Discover* and *Optima* facilitate purchases by consumers who want to buy something, but will only do so if they can borrow money and pay over time. Such "revolving" credit cards, as well as T&E cards, also facilitate "convenience" transactions by consumers who will only make a purchase if they can borrow money for a short time and pay within the "grace" periods permitted by T&E and revolving credit line cards.

54.     In order to capture these revolving credit and convenience transactions, which might not otherwise occur, the Retailer Plaintiffs and the Class will pay the discount fees associated with credit and T&E cards. For retailers other than large supermarkets, these discount fees currently range from approximately 1.4% to 4.5% of the transaction amount. The bulk of the

19

discount fees charged by Visa and MasterCard members are the "interchange fees" and other Visa/MasterCard mandated fees and assessments that the bank members of the Associations collectively fix and which are then precisely passed along by the Visa and MasterCard acquiring members and collected from retailers as part of the discount fee. In this manner, as well as others, Visa and MasterCard share with their owner-members the collectively fixed interchange and other Visa/MasterCard mandated fees and assessments charged to retailers.

55.     Interchange and discount rates vary depending upon the degree of electronic automation possessed by a particular retailer at its payment stations. A retailer with state of the art computerized POS terminals will pay lower interchange and discount fees than a store that manually runs its plastic cards through a "credit card imprinter" and places a telephone call to a bank or card processor for voice authorization.

56.     Discount fees also vary among plastic cards. American Express has traditionally charged higher discount fees than Visa/MasterCard banks and asserts that it attracts more affluent consumers to the stores that accept its American Express cards.

57.     *Discover* has consistently charged retailers lower discount fees than Visa/MasterCard members, yet is steadily losing market share to the defendants, due to the predatory conduct described herein as well as other abusive exercises of Visa/MasterCard market power.

58.     With the exception of Visa and MasterCard, and most specifically, *Visa Check* and *MasterMoney*, each retailer can choose the payment systems it will accept based upon all of these factors, all the while recognizing that the cost of each payment system is ultimately reflected in the prices paid by all consumers.

### Visa and MasterCard Tie Their *Visa Check* and *MasterMoney* Debit Cards to Their Dominant Credit Cards

59.     In or about 1979, POS debit cards became very attractive to the Associations. While credit cards were the Visa/MasterCard banks most profitable, and in many cases only

2567.2

profitable, line of business, more than 90% of all retail transactions were paid for with cash and checks.

60.     POS (retail) debit cards, which had already been in use for several years, promised a "Cashless Society." Debit transactions could replace many, and potentially most, cash and check retail transactions with plastic card transactions, which were safer, more convenient and less costly for banks, and also *potentially* more efficient for consumers and retailers as well.

61.     Visa has never hidden its intention to be dominant, stating that it intends to be "the number one payment system in the world." In or about 1979, after Visa/MasterCard dual members had consolidated their control of the credit card market, they moved to convert cash, check and traveler's check retail transactions to POS debit transactions, but to do so in a manner most profitable for them and most costly and inefficient for retail stores and consumers. Visa initiated the "off-line" POS debit card now known as *Visa Check*. Contemporaneously, MasterCard initiated the off-line debit card now known as *MasterMoney*.

62.     From the outset, Visa and MasterCard tied *Visa Check* and *MasterMoney* to their credit cards, forcing retailers to accept these debit cards if they wanted to continue accepting the dominant, ubiquitous and essential Visa and MasterCard credit cards.

63.     From the outset Visa, MasterCard and their dual members charged retailers the same fees for their *Visa Check* and *MasterMoney* debit cards as for their credit cards.

64.     Each Association charged the same fees for its debit card as for its credit card, despite the fact that the costs and risks associated with credit cards are far greater than for debit cards. Debit transactions do not involve any extension of credit, let alone the highly risky extension of credit with temporally open-ended revolving lines. (American Express entered the revolving credit card market with the *Optima* Card in 1987, and wrote off $265 million in *Optima* losses by 1991.)

65.     In a free and unrestrained market, these higher costs and risks would translate into interchange and discount fees which are much higher for credit cards than for POS debit cards. In

2567.2

1996, the interchange fees for a $100 retail transaction at a non-supermarket retail store with the most advanced electronic environment (and hence the lowest possible rates) were:

| | | |
|---|---|---|
| Visa Credit | - | $1.25 (1.25% of transaction amount) |
| *Visa Check* (debit) | - | $1.10 (1.04% of transaction amount + $.06) |
| MasterCard Credit | - | $1.31 (1.31% of transaction amount) |
| *MasterMoney* (debit) | - | $1.31 (1.31% of transaction amount) |
| *NYCE* (debit) | - | $.075 ($.075 per transaction) |
| *MAC* (debit) | - | $.065 ($.065 per transaction) |
| *MOST* (debit) | - | $.05 ($.05 per transaction) |
| *Pulse* (debit) | - | $.05 ($.05 per transaction) |
| *Shazam* (debit) | - | $.05 ($.05 per transaction) |
| *Honor* (debit) | - | $.05 ($.05 per transaction) |
| *BankMate* (debit) | - | $.05 ($.05 per transaction) |
| *Explore* (debit) | - | $.075 ($.075 per transaction) |
| *Maestro* (debit) | - | $.095 ($.095 per transaction) |

66.    In 1996, the lowest *Visa Check* interchange fee for a $100 retail transaction was more than 14 times the rate for a *NYCE* transaction and nearly 17 times the rate for a *MAC* transaction.  The lowest *MasterMoney* interchange fee was more than 17 times the rate of *NYCE* and more than 20 times the rate of *MAC*.

67.    The typical *Visa Check/MasterMoney* retail purchase transaction is approximately $40.  In 1996, the interchange fee comparisons among *Visa Check, MasterMoney,* and typical competing on-line regional POS debit networks for such $40 non-supermarket retail purchase transactions using the lowest possible *Visa Check/MasterMoney* interchange rates were:

| | | |
|---|---|---|
| *Visa Check* | - | $.476 (1.04% of transaction amount + $.06) |
| *MasterMoney* | - | $.524 (1.31% of transaction amount) |
| *NYCE* | - | $.075 ($.075 per transaction) |

22

2567.2

| *MOST* | - | $.05 ($.05 per transaction) |
| *Pulse* | - | $.05 ($.05 per transaction) |
| *Shazam* | - | $.05 ($.05 per transaction) |
| *Honor* | - | $.05 ($.05 per transaction) |
| *BankMate* | - | $.05 ($.05 per transaction) |
| *Maestro* | - | $.095 (.095 per transaction) |
| *Explore* | - | $.075 ($.075 per transaction) |

68.    Visa/MasterCard dual members have collectively fixed slightly different interchange fees for large supermarkets, such as Plaintiff Safeway. In 1996, both Associations and their dual members charged supermarkets a 1.10% (lowest) interchange fee for credit card transactions. In 1996, MasterCard also charged supermarkets the same 1.10% (lowest) interchange fee for *MasterMoney* debit transactions. In 1996, Visa charged supermarkets a flat $.36 (lowest) interchange fee for *Visa Check* debit card transactions. For a $40 transaction, this $.36 fee equates to .9%. For a $20 supermarket transaction, the $.36 fee equates to a 1.8% interchange fee. Therefore, the *Visa Check* interchange fees for supermarkets are higher or lower than those charged to non-supermarket retailers depending upon the amount of the transaction, although for typical transactions, they are somewhat lower. In 1996, the supermarket interchange fee comparisons among *Visa Check, MasterMoney* and typical competing on-line regional POS debit networks for a $40 transaction using the lowest possible *Visa Check/MasterMoney* interchange rates were:

| *Visa Check* | - | $.36 ($.36 per transaction) |
| *MasterMoney* | - | $.44 (1.10% of transaction amount) |
| *NYCE* | - | $.075 ($.075 per transaction) |
| *MOST* | - | $.05 ($.05 per transaction) |
| *Pulse* | - | $.05 ($.05 per transaction) |
| *Shazam* | - | $.05 ($.05 per transaction) |

23

2567.2

| | | |
|---|---|---|
| *Honor* | - | $.05 ($.05 per transaction) |
| *BankMate* | - | $.05 ($.05 per transaction) |
| *Maestro* | - | $.095 ($.095 per transaction) |
| *Explore* | - | $.075 ($.075 per transaction) |

69.     Retailers would not willingly pay these fixed, supra-competitive and extortionate *Visa Check and Master Money* rates.  The Retailer Plaintiffs and their Class have no choice.  They must accept any proffered *Visa Check* or *MasterMoney* card if they want to continue receiving Visa and MasterCard credit transactions.  Once retailers initially accept Visa and MasterCard credit cards, they must continue to honor these dominant credit cards if they are to remain viable.

70.     Under Visa/MasterCard's so-called "anti-discrimination rules," retailers are even prohibited from asking a consumer whether she would not mind using a different payment system, including a debit card such as *NYCE* or *MAC,* which will cost the retailer a small fraction of the fees charged for *Visa Check* or *MasterMoney*.  Virtually every consumer holding a *Visa Check* or *MasterMoney* card also holds a plastic card bearing the "bugs" of one or more regional POS debit card networks such as *NYCE* and *MAC*.  Indeed, most *Visa Check/MasterMoney* cards *currently* bear such regional POS debit network bugs.

71.     Recognizing that regional on-line systems are cheaper, faster and safer for all parties to a retail sales transaction, Association members have suggested that the competition that on-line POS debit cards potentially pose be eliminated through boycott.  At the September 1995 American Bankers Association meeting, the President of a prominent Visa and MasterCard member bank signaled the assembled dual Visa/MasterCard membership to follow the lead of his bank and issue *Visa Check* and *MasterMoney* cards without regional on-line debit network bugs. Other Association members have delivered similar signals, which have been followed by numerous dual Visa/MasterCard member banks removing on-line POS debit network bugs from their *Visa Check* and/or *MasterMoney* cards.  Such activities further exacerbate the purposeful

2567.2

tendency of these tying arrangements to foreclose competition from far less expensive and superior payment systems.

72.     When a consumer presents a *Visa Check* or *Master Money* card as her chosen method of payment, she has the money for a purchase and wants to use that money for that purpose.  If the retailer could refuse these cards, the consumer is likely instead to pay in another manner.  She may pay with cash, which can be obtained from an ATM frequently in or adjacent to the retail store.  She may pay with a "good" check.  (Consumers who habitually write "bad" checks continue to do so, whether or not they carry debit cards.  Moreover, habitual "passers" of bad checks, by and large, are not issued off-line debit cards under the Associations' guidelines.) She may pay with a regional on-line POS debit card.  She may pay with a travelers check.  Thus, were retailers free to reject *Visa Check* and *MasterMoney* or even free to request a different form of payment, there is virtually no possibility that they would lose the sale.  All they would lose are the exorbitant fees and the less secure *Visa Check* or *MasterMoney* transaction that is forced upon them by the Visa and MasterCard tying arrangements.

73.     When Wal-Mart, The Limited, Sears and Circuit City are forced to accept *Visa Check* for a $100 purchase, the interchange fee costs them at least $1.10.  When they are forced to accept the *MasterMoney* card, the interchange fee is at least $1.31 for a $100 transaction at 1996 rates.  ($1.32 effective April 1, 1997).

74.     If the Retailer Plaintiffs could reject the proffered *Visa Check/MasterMoney* cards, the savings to the non-supermarket Retailer Plaintiffs would amount to well over $1.00 on every $100.00 transaction and over $.40 on every $40 transaction.  However, the Retailer Plaintiffs cannot refuse to accept *Visa Check/MasterMoney*.  Consequently, faster, safer and far less costly payment systems are effectively foreclosed from selling their services to the Retailer Plaintiffs and the Class.

75.     In 1996, *Visa Check* and *MasterMoney* cards were used in approximately 1.2 billion retail transactions, comprising a dollar volume of approximately $46 billion.

2567.2

76.     Class members would have realized virtually every dollar of the $46 billion in sales volume without acceptance of *Visa Check/MasterMoney*, through consumer use of cash, checks, travelers checks or on-line POS debit cards, each costing retailers a small fraction of the fees charged by Visa/MasterCard and their members.

77.     In 1996, the average *Visa Check/MasterMoney* retail purchase transaction was approximately $40.  In 1996, the lowest possible *Visa Check* interchange fees for non-supermarket retailers, such as The Limited, Sears and Circuit City, were 1.04% of the transaction amount plus $.06 and 1.31% for *MasterMoney*.  Even retailers as large as the Retailer Plaintiffs pay much higher rates on many of their transactions.  Indeed, Wal-Mart, the world's largest retailer, paid higher interchange fees on approximately 10% of its *Visa Check* transactions.

78.     The total 1996 *Visa Check/MasterMoney* interchange fees, for the approximately 1.2 billion *Visa Check* and *MasterMoney* transactions, were approximately $580,000,000.

79.     In 1996, the costs and fees associated with these approximately 1.2 billion retail transactions would have been less than $90,000,000 had class members been free to reject *Visa Check/MasterMoney* and instead receive cash, checks, on-line POS debit cards and/or travelers checks.  Therefore, in 1996, Class members paid almost $500 million for *Visa Check/MasterMoney* interchange fees in excess of what they would have paid for the acceptance of cash, checks, travelers checks or on-line POS debit cards for the same retail transactions.  For the period 1992-1996, the excess *Visa Check/MasterMoney* interchange fees exceeded $1 billion and now exceeds several billion dollars in total.

80.     The Retailer Plaintiffs' experience with these involuntarily received debit cards is typical of the Class' experience.

81.     During the last four years, Wal-Mart, The Limited, Sears, Circuit City and Safeway have been forced to accept *Visa Check* and *MasterMoney* as payment in well over 100 million retail transactions.

26

2567.2

82.     During this four year period, Wal-Mart, The Limited, Sears, Circuit City and Safeway paid tens of millions of dollars in *Visa Check* and *MasterMoney* interchange fees in excess of what they would have paid for the acceptance of cash, checks, travelers checks or on-line POS debit cards on the same retail transactions.

83.     The Retailer Plaintiffs were prevented and foreclosed from rejecting *Visa Check* and *MasterMoney* and from requesting that their customers instead use other superior and far less costly forms of payment.

## Visa and MasterCard Concealed The Existence And Use Of *Visa Check* And *MasterMoney* From Retailers

84.     In fact, most retailers could not have asked for another form of payment even if Visa/MasterCard rules permitted this; because they were, and many still are, unaware that they "accept" *Visa Check/MasterMoney* transactions and have done so for more than 17 years.

85.     From the outset, Visa and MasterCard adopted elaborate measures to deceive retailers into believing that they were receiving Visa/MasterCard credit cards, when in fact they were receiving *Visa Check/MasterMoney* debit cards from consumers neither needing nor wanting to buy on credit.

86.     Visa/MasterCard designed *Visa Check/MasterMoney* so that the cards would be visually and electronically indistinguishable from Visa/MasterCard credit cards. The Associations also instructed their members to avoid communications with retailers which might disclose the true identity and the fixed and supra-competitive fee structure of *Visa Check* and *MasterMoney*.

87.     Visa's "Debit Card Training Materials and Customization Guide" urges Visa banks to avoid and deflect retailers' questions about the *Visa Check* discount rate. The Visa Guide notes that the "inability to tell the difference between Visa Debit and a Visa Credit Card" may result in confusion. Visa's solution for this is to design the cardholder's statement in a manner that will clearly distinguish the two distinct forms of payment. However, the Guide counsels that the

2567.2

retailer can be kept in the dark about these visually indistinguishable plastic cards. The Guide poses the following hypothetical question from a cardholder to a customer service representative: "Do I need to tell the merchant that I am using a debit card?" The Visa Guide's suggested answer is: "There's no need to provide a detailed explanation. Simply tell the merchant that you want to use the Visa card. He or she will handle the transaction like any other Visa payment."

88.     Another measure which purposefully concealed the debit cards and the arrangements tying them to the Visa and MasterCard credit cards was the manner in which Visa/MasterCard members priced *Visa Check/MasterMoney* transactions to retailers.

89.     From *Visa Check*'s inception, Visa members collectively fixed the identical interchange fee for *Visa Check* as they fixed for Visa credit, further reducing the possibility that a retailer would detect the different products.

90.     Visa dual members, acting as MasterCard members, contemporaneously and collectively fixed the same interchange fee for *MasterMoney* as they collectively fixed for MasterCard credit.

91.     After approximately 15 years, *i.e.*, in April 1994, Visa members collectively adopted a *Visa Check* interchange fee which was slightly different from the interchange fee they collectively fixed for Visa credit cards. The lowest *Visa Check* interchange fee (in 1996 and now) is 1.04% of the transaction amount plus $.06 compared to the lowest Visa credit interchange fee in 1996 of 1.25% of the transaction amount (both excepting slightly different rates for "certified" supermarkets, such as Safeway, which, as noted, can be higher or lower than the rates applicable to other retailers depending upon the dollar amounts of the sales transactions). This means that, in 1996, the interchange fee was slightly higher for *Visa Check* than for Visa credit in retail transactions of less than $28.57 and slightly higher for Visa credit in retail transactions greater than $28.57.

92.     The introduction of slightly divergent *lowest* interchange rates for *Visa Check* and Visa credit in 1994 (the interchange rates are still identical when the lowest rates are not

28

2567.2

applicable under Visa's rules) and the aggressive national advertising campaign for *Visa Check*, begun in 1995, alerted many retailers that they were being forced to accept *Visa Check*. However, retailers still cannot determine when and how many *Visa Check* transactions they are forced to accept until they receive their processing bills, since the *Visa Check* card intentionally remains visually indistinguishable from Visa credit to retailers. The *Visa Check* card does not say "*Visa Check*" on the card, only "Visa" in the same size, positioning and format as the Visa credit card.

93.     To date, MasterCard members still collectively fix identical interchange fees for MasterCard credit and *MasterMoney*.

## Visa and MasterCard Have Refused
## Retailer Demands to Cease the Tying Arrangements

94.     Despite the Associations' campaign of concealment, certain sophisticated retailers such as Wal-Mart, The Limited, Nordstrom and Pay'n Save became aware that they were being forced to take *Visa Check* and *MasterMoney* at exorbitant and fixed prices. These retailers explicitly demanded that Visa and MasterCard cease the tying arrangements and allow them to refuse *Visa Check* and *MasterMoney*. As explained below, these demands were explicitly rejected.

95.     In 1982, Pay'n Save, a Washington based chain of several hundred retail stores in eight Western states, discovered that for a period of years, which it could not determine precisely, it had been involuntarily accepting *MasterMoney* transactions. Pay'n Save became aware of this only because Seattle-First National Bank, Pay'n Save's MasterCard acquiring bank, stopped issuing its own lower priced debit card, which had been widely used in Pay'n Save stores.

96.     When this occurred, Pay'n Save discovered the existence of *MasterMoney*, demanded the cessation of the tying arrangement and refused to accept *MasterMoney* cards.

97.     Pay'n Save was informed by MasterCard that its right to accept the MasterCard credit card would be revoked in 15 days if it did not agree to accept *MasterMoney*. After initial

2567.2

resistance, Pay'n Save found that it was unable to survive without MasterCard credit cards and capitulated.

98.    In 1983, Nordstrom, a national chain of department stores, detected that it had been unwittingly accepting *Visa Check* cards for an undetermined period of time.

99.    Visa's concealment techniques had effectively prevented Nordstrom from detecting when it first began to receive *Visa Check* and the number of involuntary *Visa Check* transactions. At that time (1983), Nordstrom complained that: "Visa Debit Cards are usually issued in a form that does not identify the card as a debit card, so that a merchant cannot distinguish a Visa debit card from a Visa credit card. Visa charges the same merchant discount fee for debit card transactions as it does for credit card transactions."

100.    When Nordstrom discovered its involuntary receipt of *Visa Check*, it stopped honoring the card.

101.    Thereafter, in March 1983, Visa and First Interstate Bank, Nordstrom's Visa merchant bank notified Nordstrom that its contractual right to accept Visa credit cards would terminate in 30 days unless it resumed accepting *Visa Check*.

102.    Nordstrom's resistance to the tying arrangement continued for a while, but it eventually capitulated because it could not successfully operate without Visa credit cards.

103.    In or about 1991, The Limited became aware that it was involuntarily accepting *Visa Check* and *MasterMoney*.

104.    In June 1991, The Limited wrote to Visa and MasterCard demanding that they cease the tying arrangements and permit The Limited to refuse acceptance of *Visa Check* and *MasterMoney*.

105.    Visa rejected The Limited's demand. Characteristically, one day later, MasterCard rejected The Limited's demand.

106.    In or about November 1995, Wal-Mart explicitly demanded that Visa cease the tying arrangement and allow Wal-Mart to reject *Visa Check* cards. Wal-Mart also protested that

30

2567.2