Visa and its members were actively taking measures to prevent the use of faster, safer and far less costly regional on-line POS debit cards. Visa rejected Wal-Mart's demand and in substance questioned why Visa would allow Wal-Mart to receive a cheaper (regional on-line) POS debit card when it could make Wal-Mart accept *Visa Check* with its much higher fee.

107.    Wal-Mart, The Limited, Sears, Safeway, Circuit City and Class members did not and do not want to accept *Visa Check* and *MasterMoney* because the fees charged for these products are exorbitant, fixed and maintained at supra-competitive levels through the coercive force of the tying arrangements.

### The Tying Arrangements Catapult *Visa Check* And *MasterMoney* Into Dominance and Effectively Foreclose Competition in the POS Debit Card Market

108.    When Visa and MasterCard initiated the *Visa Check* and *MasterMoney* programs in or about 1979, the number and dollar amount of such transactions were relatively small, accounting for under one-tenth of 1% of all Visa and MasterCard transactions. *Visa Check* and *MasterMoney* transactions represented a small minority of the transactions in the nascent POS debit card market.

109.    Over the years, Visa and MasterCard carefully, relentlessly and stealthily fostered the domination of *Visa Check* and *MasterMoney* over faster, safer and far less costly on-line POS debit networks.

110.    From 1992 to 1996, the number of *Visa Check/MasterMoney* cards annually increased by an average of 56%. In or around 1996, Visa announced that *Visa Check* transactions had "increased nearly 800%" during "the last five years."

111.    By the end of 1996, there were more than 47 million *Visa Check/MasterMoney* cards in circulation issued by more than 4,400 Visa/MasterCard members. In 1996, *Visa Check/MasterMoney* cards were used in approximately 1.2 billion retail transactions, comprising a dollar volume of approximately $46 billion. These figures have been projected to increase to 3.9

31

billion transactions comprising $179 billion in retail sales for the year 2000, and $586 billion in retail sales for the year 2005.

112.    Over the years, the cumulative loss to retailers for the much slower transfer of well over $100 billion in consumers' funds into the stores' bank accounts (one day or less for on-line POS debit versus one to seven days for *Visa Check/MasterMoney)* has been substantial in and of itself.

113.    This substantial loss, however, is dwarfed by the losses suffered through forced payment of *Visa Check/MasterMoney* interchange fees. As noted, in 1996 retailers were forced to pay approximately $580 million in *Visa Check/MasterMoney* interchange fees compared with approximately $90 million that they would have paid for typical on-line POS debit systems, such as *NYCE, MAC* and *MOST,* or for receiving cash, checks or travelers checks.

114.    In a free and unrestrained market, *Visa Check* and *MasterMoney* would gain minuscule acceptance and market share given their exorbitant, fixed and supra-competitive prices, and their pronounced inferiority relative to their competitors. However, the synergistic effect of the Visa/MasterCard tying arrangements and the anti-discrimination rules, which prohibit a retailer from asking for another form of payment when *Visa Check* or *MasterMoney* is proffered (and when the retailer can ascertain that it is receiving a *Visa Check* or *MasterMoney* debit card rather than a credit card), was intended, and has proven to be, a powerful engine for market foreclosure.

115.    As noted, *Visa Check/MasterMoney* transactions initially represented a small percentage of the overall market for POS (retail) debit transactions. By the end of 1995, the foreclosing effects of the tying arrangements and anti-discrimination rules had catapulted the inferior and exorbitantly-priced *Visa Check/MasterMoney* systems into a dominant position in the market. In 1995, the number of *Visa Check/MasterMoney* transactions grew 80% over the previous year, compared to a 40% growth rate for the safer, faster and much less costly on-line POS debit systems. This trend continued in 1996, with the riskier, slower and far more costly

2567.2

*Visa Check/MasterMoney* debit cards once again gaining market share against the on-line POS debit systems.

116.   At the end of 1996, the *Visa Check/MasterMoney* share of the national general purpose POS debit card market was approximately 65%. *Visa Check* alone commanded a share of approximately 56% of this market.

117.   In 1996, the approximately 37 competing regional on-line POS debit networks, such as *NYCE*, *MAC* and *MOST*, collectively secured approximately 26% of the market despite offering safer, faster and far less costly services. (As noted, the lowest 1996 *Visa Check* and *MasterMoney* interchange fees on a $100 transaction were $1.10 and $1.31, respectively, compared to the 1996 average regional network fee of approximately $.07.) For a $40 retail transaction, the 1996 *Visa Check/MasterMoney/*regional on-line POS network comparison was $.476 versus $.524 versus $.07. The comparison for supermarkets with a $40 transaction was $.36-*Visa Check* versus $.44-*MasterMoney* versus $.07-typical on-line POS debit.

118.   The faster and safer, but "untied," on-line POS debit systems owned by Visa and MasterCard -- *Maestro*, priced at 16% of *MasterMoney*, and *Interlink*, priced in 1996 at 38% of *Visa Check* -- have collectively garnered approximately 9% of the POS debit market. Without the foreclosing power of the tying arrangements employed for *Visa Check* and *MasterMoney*, these systems are subjected to real head-to-head competition on the merits.

119.   In 1996, for example, Visa's *Interlink* (which is not subject to a tying arrangement) lost a large portion of its market share to the *Explore* (now known as *Star*) POS debit network, because *Interlink's* interchange fee of $.18 compared unfavorably with *Explore's* rate of $.075 (on a typical $40 transaction - at higher transaction amounts the price disparity was much greater). At the same time, *Explore* and the other regional on-line POS debit networks actually lost market share to *Visa Check* and *MasterMoney* where, as noted, the price disparity is still greater, *i.e.*, $.075-*Explore* versus $.476-*Visa Check* versus $.524-*MasterMoney*. The tying arrangements

33

powerfully foreclose competition and marginalize the market participation of superior and far less expensive POS debit networks.

120. Visa and MasterCard have not tied *Interlink* and *Maestro* to their dominant credit cards, in part because they have little desire to increase usage of these faster, safer and less expensive systems and thereby depress the supra-competitive profits earned by the tied *Visa Check* and *MasterMoney* cards.

121. Visa's overall share of the POS debit card market is above 62% (approximately 56% for *Visa Check* and approximately 6% for *Interlink*). MasterCard's overall share is 12% (approximately 9% for *MasterMoney* and approximately 3% for *Maestro*). Visa dual members have thus secured a debit card market share of approximately 74%.

122. *Visa Check* and *MasterMoney*, which are inferior and far more costly products, have quickly moved from a minority share of the market to dominance. *Visa Check's* market share alone far exceeds that of all of the approximately 37 competing regional on-line POS debit networks combined, all offering faster and safer services at a tiny fraction of the price charged for *Visa Check* or *MasterMoney*. The tying arrangements have effectively and substantially foreclosed the market and virtually eliminated the efficacy of competition on the merits.

## VII.
## RELEVANT MARKETS

123. General purpose credit cards are the product dimension of a relevant market. The geographic dimension of this market is the United States ("Credit Card Market").

124. General purpose credit cards and T&E cards are the product dimension of a relevant market. The geographic dimension of this market is the United States ("Credit and T&E Market").

125. General purpose POS debit cards is the product dimension of a relevant market. The geographic dimension of this market is the United States ("POS Debit Card Market").

2567.2

126.   Point of Sale ("POS") plastic cards, credit, debit and T&E, permit retail consumers to pay for goods and services at retail stores.

127.   Credit cards permit consumers to borrow the money for a retail purchase from the card issuer and to repay the debt over time, according to the provisions of a revolving credit agreement with the issuer.

128.   Both credit cards and T&E cards permit a consumer to borrow the money for a retail purchase from a card issuer and to repay the debt without incurring interest charges during a "grace period," according to the provisions of an agreement with the issuer.

129.   POS debit cards permit consumers to pay for retail purchases with funds from their depository accounts.

130.   Only "credit-worthy" consumers can obtain credit cards.  The criteria employed by issuers of T&E cards such as *American Express, Diner's Club* and *Carte Blanche* also involve credit-worthiness, but are not identical to the criteria employed by issuers of revolving line credit cards.  The divergence in the criteria for issuing credit and T&E cards became more pronounced after *American Express* lost hundreds of million of dollars on the bad debts of *Optima* credit cardholders, who had been proven "credit-worthy" holders of American Express T&E cards (Green, Gold and Platinum).

131.   Consumers who use credit cards for retail payment either want to or have to borrow money, which they can either repay to the card issuer without interest during a grace period or repay over time according to a revolving credit agreement.

132.   Consumers who use T&E cards for retail payment either want to or have to borrow money which they can repay to the card issuer, without interest, according to the terms of their agreement with the card issuer.

133.   Consumers who use debit cards for retail payment either want to or have to make contemporaneous payment for their purchases with funds in their depository accounts.  These consumers either do not want to borrow money or cannot do so (e.g., because they do not hold a

35

2567.2

credit or T&E card accepted by the retailer, or because they are not deemed credit-worthy and therefore cannot obtain a credit or T&E card).

134.    Additionally, POS debit cards are used by consumers either wanting or needing to make contemporaneous payment for retail purchases, for example, when the retailer will not accept checks and/or currency (*e.g.*, Federal Express); when for safety or other reasons the consumer does not want to make a "significant" retail purchase with cash; or, when the consumer merely wants the speed and convenience of a plastic card transaction.

135.    General purpose plastic cards (credit, debit and T&E) can be used at all types of retail establishments, in contrast to proprietary cards, such as those issued by department stores or gasoline retailers, solely for use at the issuer's retail outlets.

136.    Credit cards are a unique product and bundle of services.  Many consumers do not consider other payment systems suitable substitutes for their use of credit cards, nor would they substitute other payment systems for credit cards nor would they do so even in response to a significant, non-transitory increase in the price of credit cards.

137.    T&E cards are a unique product and bundle of services.  Many consumers do not consider other payment systems suitable substitutes for their use of T&E cards, nor would they substitute other payment systems for T&E cards, nor would they do so even in response to a significant, non-transitory increase in the price of T&E cards.

138.    Retailers consider credit and T&E cards to be suitable substitutes for each other. They do not consider other payment systems suitable substitutes for credit and T&E cards, nor would they substitute other payment systems for credit and T&E cards, nor would they do so even in response to a significant, non-transitory increase in the price of credit and T&E cards.

139.    POS debit cards are a distinct product and bundle of services.

2567.2

## FIRST CLAIM FOR RELIEF

### ALL PLAINTIFFS AGAINST VISA,
### SHERMAN ACT SECTION ONE,
### CONTRACT, COMBINATION, CONSPIRACY
### AND AGREEMENT IN RESTRAINT OF TRADE,
### PER SE UNLAWFUL AND UNREASONABLE (RULE OF REASON) TYING

140.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 139 with the same force and effect as if here set forth in full.

141.    Beginning in or about 1979, the exact date unknown to Plaintiffs, and continuing thereafter until the filing of this Complaint, Defendant Visa and co-conspirators have continually engaged in an unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, including forced and coerced contracts and agreements with retailers requiring them to accept *Visa Check*.

142.    The contract, combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among Visa and co-conspirators, and forced contracts and agreements with the Retailer Plaintiffs, the Class of retailers and retailers represented by the Trade Association Plaintiffs, the substantial terms of which have been to limit the sale of a distinct "tying" product, Visa Credit Card services (including the right to accept Visa credit cards), to retailers who agree, albeit under coercion and/or unwittingly, to buy a second distinct "tied" product, *Visa Check* services (including the obligation to accept *Visa Check* cards).

143.    At all times, Visa and co-conspirators had monopoly power and/or market power and/or economic power in the relevant Credit Card and Credit and T&E Markets, sufficient to force Retailer Plaintiffs, their Class and retailers represented by the Trade Association Plaintiffs, to purchase and accept *Visa Check*.

144.    *Visa Check* entered a market in which several safer, faster and far less expensive POS debit networks were already operating. *Visa Check* was an inferior form of an established

37

2567.2

product from inception. The mechanisms adopted by *Visa Check* to obtain market share were the tying arrangement and concealment campaign, as detailed above.

145. The continued employment of the tying arrangement achieves no legitimate efficiency benefit to counterbalance its demonstrated anticompetitive effect of foreclosing merit competition in the POS Debit Card market.

146. The Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, were forced to buy and accept *Visa Check* at fixed and supra-competitive prices.

147. The ability of the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, to buy, accept and receive superior and less costly payment systems, including on-line POS debit cards, was effectively and substantially reduced, limited and foreclosed.

148. The ability of competing on-line POS debit card networks, to compete effectively with *Visa Check* on the merits was substantially reduced, limited and foreclosed.

149. The contract, combination, conspiracy and agreement has been effectuated by the means and overt acts set forth above, among others.

150. Visa and co-conspirators and others acting in concert with them intended by their actions to:

      a.      force the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, into buying, accepting and receiving *Visa Check*;

      b.      reduce, limit and foreclose merit competition in the POS Debit Card Market; and

      c.      injure and eliminate competition in the POS Debit Card Market.

151. The contract, combination, conspiracy and agreement has had and/or is likely to have among other things, the following effects:

      a.      actual and potential competition in the POS Debit Card Market has been injured, limited, reduced, restrained, suppressed and effectively foreclosed;

2567.2

b.   retailers who buy, accept and receive *Visa Check* have paid or are likely to pay artificially inflated prices;

c.   actual and potential competitors of *Visa Check*, including on-line POS debit card systems, have been effectively foreclosed from competing on the merits with *Visa Check* and injured in their business and property; and

d.   the customers of the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, have paid higher prices for all retail merchandise and have been deprived of the benefits of a free, open, competitive and unrestrained POS Debit Card Market.

152.   As a result of Visa and co-conspirators' violations of Section 1, the Retailer Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

153.   Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

### SECOND CLAIM FOR RELIEF

**ALL PLAINTIFFS AGAINST MASTERCARD,**
**SHERMAN ACT SECTION ONE,**
**CONTRACT, COMBINATION, CONSPIRACY**
**AND AGREEMENT IN RESTRAINT OF TRADE,**
**PER SE UNLAWFUL AND UNREASONABLE (RULE OF REASON) TYING**

154.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 153 with the same force and effect as if here set forth in full.

155.   Beginning in or about 1979, the exact date unknown to Plaintiffs, and continuing thereafter until the filing of this Complaint, Defendant MasterCard and co-conspirators have continually engaged in an unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, including forced and coerced contracts and agreements with retailers requiring them to accept *MasterMoney*.

156.   The contract, combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among MasterCard and co-conspirators, and forced contracts

2567.2

and agreements with the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, the substantial terms of which have been to limit the sale of a distinct "tying" product, MasterCard credit card services (including the right to accept MasterCard credit cards), to retailers who agree, albeit under coercion and/or unwittingly, to buy a second distinct "tied" product, *MasterMoney* services (including the obligation to accept *MasterMoney* cards).

157.   At all times MasterCard and co-conspirators had monopoly power and/or market power and/or economic power in the relevant Credit Card and Credit and T&E Markets, sufficient to force Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, to purchase and accept *MasterMoney*.

158.   *MasterMoney* entered a market in which several safer, faster and far less expensive POS debit networks were already operating. *MasterMoney* was an inferior form of an established product from inception. The mechanisms adopted by *MasterMoney* to obtain market share were the tying arrangement and concealment campaign as detailed above.

159.   The continued employment of the tying arrangement achieves no legitimate efficiency benefit to counterbalance its demonstrated anticompetitive effect of foreclosing merit competition in the POS Debit Card market.

160.   The Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, were forced to buy and accept *MasterMoney* at fixed and supra-competitive prices.

161.   The ability of the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, to buy, accept and receive superior and less costly payment systems, including on-line POS debit cards, was effectively and substantially reduced, limited and foreclosed.

162.   The ability of competing on-line POS debit card networks to compete effectively with *MasterMoney*, on the merits, was substantially reduced, limited and foreclosed.

2567.2

163.     The contract, combination, conspiracy and agreement has been effectuated by the means and overt acts set forth above, among others.

164.     The intended, likely and actual effects of these acts are the same as those set forth in paragraphs 150 and 151, herein.

165.     As a result of MasterCard and co-conspirators' violations of Section 1, the Retailer Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

166.     Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

**ALL PLAINTIFFS AGAINST VISA AND MASTERCARD,
SHERMAN ACT SECTION ONE,
CONTRACT, COMBINATION, CONSPIRACY
AND AGREEMENT IN RESTRAINT OF TRADE,
PER SE UNLAWFUL AND UNREASONABLE (RULE OF REASON) TYING**

167.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 166 with the same force and effect as if here set forth in full.

168.     Beginning in or about 1979, the exact date unknown to Plaintiffs, and continuing thereafter until the filing of this Complaint, Defendants Visa and MasterCard and co-conspirators have continually engaged in an unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, including forced and coerced contracts and agreements with retailers requiring them to accept *Visa Check* and/or *MasterMoney*.

169.     The contract, combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among Visa, MasterCard and co-conspirators, and forced agreements with the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, the substantial terms of which have been to limit the sale of two distinct

41

2567.2

"tying" products, Visa Credit Card services and MasterCard Credit Card services (including the right to accept Visa and MasterCard credit cards), to retailers who agree, albeit under coercion and/or unwittingly, to buy two other distinct "tied" products, *Visa Check* services and *MasterMoney* services (including the obligation to accept *Visa Check* and *MasterMoney* cards).

170.    At all times Visa, MasterCard and co-conspirators had monopoly power and/or market power and/or economic power in the relevant Credit Card and Credit and T&E Markets, sufficient to force Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs to purchase and accept *Visa Check* and *MasterMoney*.

171.    *Visa Check* and *MasterMoney* entered a market in which several safer, faster and far less expensive POS debit networks were already operating. *Visa Check* and *MasterMoney* were inferior forms of an established product from their inception. The mechanisms adopted by *Visa Check* and *MasterMoney* to obtain market share were the tying arrangements and concealment campaigns, detailed above.

172.    The continued employment of the tying arrangements achieves no legitimate efficiency benefits to counterbalance their demonstrated anticompetitive effects, including the foreclosure of merit competition in the POS Debit Card Market.

173.    The Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, were forced to buy and accept *Visa Check* and *MasterMoney* at fixed and supra-competitive prices.

174.    The ability of the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, to buy, accept and receive superior and less costly payment systems, including on-line POS debit cards, was effectively and substantially reduced, limited and foreclosed.

175.    The ability of competing on-line POS debit card networks to compete effectively with *Visa Check* and *MasterMoney,* on the merits, was substantially reduced, limited and foreclosed.

2567.2

176.   The contract, combination, conspiracy and agreement has been effectuated by the means and overt acts set forth above, among others.

177.   The intended, likely and actual effects of these acts are the same as those set forth in paragraphs 150 and 151.

178.   As a result of Visa, MasterCard and co-conspirators' violations of Section 1, the Retailer Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

179.   Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF

### ALL PLAINTIFFS AGAINST VISA,
### SHERMAN ACT SECTION TWO,
### ATTEMPT TO MONOPOLIZE

180.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 179 with the same force and effect as if here set forth in full.

181.   In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Visa and co-conspirators have knowingly, intentionally and with specific intent to do so, attempted to monopolize the POS Debit Card Market.

182.   The attempt to monopolize this market has been effectuated by the means and the overt acts set forth above, among others.

183.   Visa and co-conspirators intended by their actions to:

a.   control the supply and price of POS debit card services;

b.   eliminate, reduce, limit and foreclose actual and potential competition in the POS Debit Card Market;

c.   exclude and foreclose other persons from participating in or entering said market; and

d.   injure and eliminate competition in said market.

43

184.   As a result of the conduct alleged herein, Visa and co-conspirators control such a substantial share of the POS Debit Card Market that, when coupled with Visa and Visa dual members' power in the Credit Card and Credit and T&E Markets and Visa's anticompetitive conduct, including the arrangement tying *Visa Check* to Visa credit cards and the collective fixing of debit interchange fees, a dangerous likelihood exists that Visa will monopolize the POS Debit Card Market.

185.   The attempt to monopolize has had, or is likely to have, among other things, the following effects:

    a.   actual and potential competition in the POS Debit Card Market has been limited, reduced, restrained, suppressed and effectively foreclosed;

    b.   retailers who buy, accept and receive *Visa Check* have paid or are likely to pay artificially inflated prices;

    c.   actual and potential competitors of *Visa Check*, including on-line POS debit card systems, have effectively been foreclosed from competing on the merits with *Visa Check* and injured in their business and property;

    d.   the customers of the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs have paid higher prices for all retail merchandise and have been deprived of the benefits of a free, open, competitive and unrestrained POS Debit Card Market; and

    e.   instead of a free, open and competitive POS Debit Card Market, a monopoly, or dominant position dangerously likely to become a monopoly, has been established and maintained.

186.   As a result of Visa and the Visa co-conspirators' violations of Section 2, Retailer Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

187.   Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

2567.2

## FIFTH CLAIM FOR RELIEF

### ALL PLAINTIFFS AGAINST VISA AND MASTERCARD,
### SHERMAN ACT SECTION TWO,
### ATTEMPT TO MONOPOLIZE

188.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 187 with the same force and effect as if here set forth in full.

189.    In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Visa, MasterCard and co-conspirators have knowingly, intentionally and with specific intent to do so, attempted to monopolize the POS Debit Card Market.

190.    The attempt to monopolize this market has been effectuated by the means and the overt acts set forth above, among others.

191.    Visa, MasterCard and co-conspirators intended by their actions to restrain trade in the relevant markets in the manner specified in paragraph 183.

192.    As a result of the conduct alleged herein, Visa, MasterCard and their dual members control such a substantial share of the POS Debit Card Market, that when coupled with Visa, MasterCard and their dual members' power in the Credit and Credit and T&E markets and the anticompetitive conduct alleged herein, including the arrangements tying *Visa Check* to Visa credit cards and *MasterMoney* to MasterCard credit cards and the collective fixing of debit interchange fees, a dangerous likelihood exists that Visa and MasterCard and their dual members will monopolize the POS Debit Card Market.

193.    The attempt to monopolize has had, or is likely to have, among other things, the effects specified in paragraph 185.

194.    As a result of Visa, MasterCard and co-conspirators' violations of Section 2, Retailer Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

2567.2

195.   Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### SIXTH CLAIM FOR RELIEF

**ALL PLAINTIFFS AGAINST VISA,
SHERMAN ACT SECTION TWO,
CONSPIRACY TO MONOPOLIZE**

196.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 195 with the same force and effect as if here set forth in full.

197.    In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Visa and co-conspirators have willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the POS Debit Card Market.

198.    The combination and conspiracy to monopolize this market has been effectuated by the means and the overt acts set forth above, among others.

199.    Visa and co-conspirators intended by their actions to restrain trade in the relevant markets in the manner specified in paragraph 183.

200.    As a result of the conduct alleged herein, Visa and its dual members control price, have and are able to exclude competitors and competition and have and are able to charge supra-competitive prices in the POS Debit Card Market.

201.    The combination and conspiracy to monopolize has had, or is likely to have, among other things, the effects specified in paragraph 185.

202.    As a result of Visa and co-conspirators' violations of Section 2, Retailer Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

203.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

2567.2

## SEVENTH CLAIM FOR RELIEF

### ALL PLAINTIFFS AGAINST VISA AND MASTERCARD, SHERMAN ACT SECTION TWO, CONSPIRACY TO MONOPOLIZE

204.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 203 with the same force and effect as if here set forth in full.

205.    In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Visa, MasterCard and co-conspirators have willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the POS Debit Card Market.

206.    The combination and conspiracy to monopolize this market has been effectuated by the means and the overt acts set forth above, among others.

207.    Visa, MasterCard and co-conspirators intended by their actions to restrain trade in the relevant markets in the manner specified in paragraph 183.

208.    As a result of the conduct alleged herein, Visa, MasterCard and their dual members control price, have and are able to exclude competitors and competition and have and are able to charge supra-competitive prices in the POS Debit Card Market.

209.    The combination and conspiracy to monopolize has had, or is likely to have, among other things, the effects detailed in paragraph 185.

210.    As a result of Visa, MasterCard and co-conspirators' violations of Section 2, Retailer Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

211.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

2567.2

## EIGHTH CLAIM FOR RELIEF

### ALL PLAINTIFFS AGAINST VISA,
### THE DONNELLY ACT,
### COMBINATION IN RESTRAINT OF TRADE,
### PER SE UNLAWFUL AND UNREASONABLE (RULE OF REASON) TYING

212.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 211 with the same force and effect as if here set forth in full.

213.    Beginning in or about 1979, the exact date unknown to Plaintiffs, and continuing thereafter until the filing of this Complaint, Defendant Visa and co-conspirators have continually engaged in an unlawful contract, agreement, combination, arrangement and conspiracy in unreasonable restraint of the trade and commerce of New York State, in violation of the Donnelly Act, New York General Business Law § 340, including forced and coerced contracts and agreements with retailers requiring them to accept *Visa Check*.

214.    The combination has consisted of a continuing agreement, understanding and concert of action among the conspirators and forced agreements with the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, the substantial terms of which have been to limit the sale of a distinct "tying" product, Visa Credit Card services (including the right to accept Visa credit cards), to retailers who agree, albeit under coercion and/or unwittingly, to buy a second distinct "tied" product, *Visa Check Card* services (including the obligation to accept *Visa Check* cards).

215.    At all times Visa and co-conspirators had monopoly power and/or market power and/or economic power in the relevant Credit Card and Credit and T&E Markets, sufficient to force Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, to purchase and accept *Visa Check*.

216.    *Visa Check* entered a market in which several safer, faster and far less expensive POS debit networks were already operating. *Visa Check* was an inferior form of an established

2567.2

product from inception.  The mechanisms adopted by *Visa Check* to obtain market share were the tying arrangement and concealment campaign as detailed above.

217.    The continued employment of the tying arrangement achieves no legitimate efficiency benefit to counterbalance its demonstrated anticompetitive effects, including the foreclosure of merit competition in the POS Debit Card market.

218.    Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, were forced to buy and accept *Visa Check* at fixed and supra-competitive prices.

219.    The ability of Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, to buy, accept and receive superior and less costly payment systems, including on-line POS debit cards, was effectively and substantially reduced, limited and foreclosed.

220.    The ability of competing on-line POS debit card networks, to compete effectively with *Visa Check* on the merits was substantially reduced, limited and foreclosed.

221.    The combination has been effectuated by the means and overt acts set forth above, among others.

222.    The intended, likely and actual effects of these acts are the same as those set forth in paragraphs 150 and 151.

223.    As a result of Visa and co-conspirators' violations of the Donnelly Act, Retailer Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

224.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

2567.2

## NINTH CLAIM FOR RELIEF

### ALL PLAINTIFFS AGAINST MASTERCARD,
### THE DONNELLY ACT,
### COMBINATION IN RESTRAINT OF TRADE,
### <u>PER SE UNLAWFUL AND UNREASONABLE (RULE OF REASON) TYING</u>

225. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 224 with the same force and effect as if here set forth in full.

226. Beginning in or about 1979, the exact date unknown to Plaintiffs, and continuing thereafter until the filing of this Complaint, Defendant MasterCard and co-conspirators have continually engaged in an unlawful contract, agreement, combination, arrangement and conspiracy in unreasonable restraint of the trade and commerce of New York State, in violation of the Donnelly Act, including forced and coerced contracts and agreements with retailers requiring them to accept *MasterMoney*.

227. The combination has consisted of a continuing agreement, understanding and concert of action among MasterCard and co-conspirators, and forced agreements with the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, the substantial terms of which have been to limit the sale of a distinct "tying" product, MasterCard Credit Card services (including the right to accept MasterCard credit cards), to retailers who agree, albeit under coercion and/or unwittingly, to buy a second distinct "tied" product, *MasterMoney* services (including the obligation to accept *MasterMoney* cards).

228. At all times MasterCard and its dual members had monopoly power and/or market power and/or economic power in the relevant Credit Card and Credit and T&E Markets, sufficient to force the Retailer Plaintiffs, their Class and retailers represented by the Trade Association Plaintiffs, to purchase and accept *MasterMoney*.

229. *MasterMoney* entered a market in which several safer, faster and far less expensive POS debit networks already operated. *MasterMoney* was an inferior form of an established

2567.2

product from inception. The mechanisms adopted by *MasterMoney* to obtain market share were the tying arrangement and concealment campaign as detailed above.

230. The continued employment of the tying arrangement achieves no legitimate efficiency benefit to counterbalance its demonstrated anticompetitive effects, including foreclosure of merit competition in the POS Debit Card Market.

231. The Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, were forced to buy and accept *MasterMoney* at fixed and supra-competitive prices.

232. The ability of Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, to buy, accept and receive superior and less costly payment systems, including on-line POS debit cards, was effectively and substantially reduced, limited and foreclosed.

233. The ability of competing on-line POS debit card networks to compete effectively with *MasterMoney*, on the merits, was substantially reduced, limited and foreclosed.

234. The combination has been effectuated by the means and overt acts set forth above, among others.

235. The intended likely and actual effects of these acts are the same as those set forth in paragraphs 150 and 151.

236. As a result of MasterCard and co-conspirators' violations of the Donnelly Act, Retailer Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

237. Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

2567.2

### TENTH CLAIM FOR RELIEF

**ALL PLAINTIFFS
AGAINST VISA AND MASTERCARD,
THE DONNELLY ACT,
COMBINATION IN RESTRAINT OF TRADE,
PER SE UNLAWFUL AND UNREASONABLE (RULE OF REASON) TYING**

238.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 237 with the same force and effect as if here set forth in full.

239.    Beginning in or about 1979, the exact date unknown to Plaintiffs, and continuing thereafter until the filing of this Complaint, Defendants Visa, MasterCard, and co-conspirators have continually engaged in an unlawful contract, agreement, combination, arrangement and conspiracy in unreasonable restraint of the trade and commerce of New York State, in violation of the Donnelly Act, including forced and coerced contracts and agreements with retailers requiring them to accept the *Visa Check* and/or *MasterMoney* debit cards.

240.    The combination has consisted of a continuing agreement, understanding and concert of action among Visa, MasterCard and co-conspirators and forced agreements with the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, the substantial terms of which have been to limit the sale of two distinct "tying" products, Visa Credit Card services and MasterCard Credit Card services (including the right to accept Visa and MasterCard credit cards), to retailers who agree, albeit under coercion and/or unwittingly, to buy two other distinct "tied" products, *Visa Check* and *MasterMoney* services (including the obligation to accept *Visa Check* and *MasterMoney* cards).

241.    At all times Visa, MasterCard and their dual members had monopoly power and/or market power and/or economic power in the relevant Credit Card and Credit and T&E Markets, sufficient to force Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, to purchase and accept *Visa Check* and *MasterMoney*.

2567.2

242.    *Visa Check* and *MasterMoney* entered a market in which several safer, faster and far less expensive POS debit networks were already operating. *Visa Check* and *MasterMoney* were inferior forms of established products from their inception. The mechanisms adopted by *Visa Check* and *MasterMoney* to obtain market share were the tying arrangements and concealment campaigns, as detailed above.

243.    The continued employment of the tying arrangements achieves no legitimate efficiency benefits to counterbalance their demonstrated anticompetitive effects, including the foreclosure of merit competition in the POS Debit Card Market.

244.    The Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs, were forced to buy and accept *Visa Check* and *MasterMoney* at fixed and supra-competitive prices.

245.    The ability of the Retailer Plaintiffs, their Class, and retailers represented by the Trade Association Plaintiffs to buy, accept and receive superior and less costly payment systems, including on-line POS debit cards, was effectively and substantially reduced, limited and foreclosed.

246.    The ability of competing on-line POS debit card networks to compete effectively with *Visa Check* and *MasterMoney* on the merits was substantially reduced, limited and foreclosed.

247.    The combination has been effectuated by the means and overt acts set forth above, among others.

248.    The intended, likely and actual effects of these acts are the same as those set forth in paragraphs 150 and 151.

249.    As a result of Visa, MasterCard and co-conspirators' violations of the Donnelly Act, Retailer Plaintiffs and their Class have been injured in their business and property in an

53

2567.2

amount not presently known with precision but which is, at a minimum, hundreds of millions of

dollars, prior to trebling.

250.    Such violation and the effects thereof are continuing and will continue unless the

injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### ELEVENTH CLAIM FOR RELIEF

### ALL PLAINTIFFS AGAINST VISA,
### THE DONNELLY ACT,
### ATTEMPT TO MONOPOLIZE

251.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 250 with the same force and effect as if here set forth in full.

252.    In violation of the Donnelly Act, Visa and co-conspirators have knowingly,

intentionally and with specific intent to do so, attempted to monopolize the POS Debit Card

Market.

253.    The attempt to monopolize this market has been effectuated by the means and the

overt acts set forth above, among others.

254.    Visa and co-conspirators intended by their actions to restrain trade in the relevant

markets in the manner specified in paragraph 183.

255.    As a result of the conduct alleged herein, Visa and Visa dual members control such

a substantial share of the POS Debit Card Market that when coupled with Visa's anticompetitive

conduct, including the arrangement tying *Visa Check* to Visa credit cards, a dangerous likelihood

exists that Visa will monopolize the POS Debit Card Market, including the geographic portion of

said market congruent with New York State.

256.    The attempt to monopolize has had, or is likely to have, among other things, the

effects specified in paragraph 185.

257.    As a result of Visa and co-conspirators' violations of the Donnelly Act, Retailer

Plaintiffs and their Class have been injured in their business and property in an amount not

2567.2

presently known with precision but which is, at a minimum, hundreds of mil

to trebling.

258.    Such violation and the effects thereof are continuing and will continue unless the

injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### TWELFTH CLAIM FOR RELIEF

### ALL PLAINTIFFS
### AGAINST VISA AND MASTERCARD,
### THE DONNELLY ACT,
### ATTEMPT TO MONOPOLIZE

259.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 258 with the same force and effect as if here set forth in full.

260.    In violation of the Donnelly Act, Visa, MasterCard and co-conspirators have

knowingly, intentionally and with specific intent to do so, attempted to monopolize the POS Debit

Card Market, including the geographic portion of said market congruent with New York State.

261.    The attempt to monopolize this market has been effectuated by the means and the

overt acts set forth above, among others.

262.    Visa, MasterCard and co-conspirators intended by their actions to restrain trade in

the relevant markets in the manner specified in paragraph 183.

263.    As a result of the conduct alleged herein, Visa, MasterCard and their dual members

control such a substantial share of the POS Debit Card Market that when coupled with their power

in the Credit and Credit and T&E Markets and with the anticompetitive conduct alleged herein,

including the arrangements tying *Visa Check* to Visa credit cards and *MasterMoney* to

MasterCard credit cards, a dangerous likelihood exists that Visa and MasterCard and their dual

members will monopolize the POS Debit Card Market.

264.    The attempt to monopolize has had, or is likely to have, among other things, the

effects specified in paragraph 185.

2567.2

265.    As a result of Visa, MasterCard and co-conspirators' violations of the Donnelly Act, Retailer Plaintiffs and their Class have been injured in their business and property in an amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

266.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### THIRTEENTH CLAIM FOR RELIEF

### ALL PLAINTIFFS AGAINST VISA, THE DONNELLY ACT, CONSPIRACY TO MONOPOLIZE

267.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 266 with the same force and effect as if here set forth in full.

268.    In violation of the Donnelly Act, Visa and co-conspirators have willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the POS Debit Card Market, including the geographic portion of said market congruent with New York State.

269.    The combination and conspiracy to monopolize this market has been effectuated by the means and the overt acts set forth above, among others.

270.    Visa and co-conspirators intended by their actions to restrain trade in the relevant markets in the manner specified in paragraph 183.

271.    As a result of the conduct alleged herein, Visa and its dual members control price, have and are able to exclude competitors and competition and have and are able to charge supra-competitive prices in the POS Debit Card Market.

272.    The combination and conspiracy to monopolize has had, or is likely to have, among other things, the effects specified in paragraph 185.

273.    As a result of Visa and co-conspirators' violations of the Donnelly Act, Retailer Plaintiffs and their Class have been injured in their business and property in an amount not

56

2567.2

presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior

to trebling.

274.    Such violation and the effects thereof are continuing and will continue unless the

injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### FOURTEENTH CLAIM FOR RELIEF

**ALL PLAINTIFFS
AGAINST VISA AND MASTERCARD,
THE DONNELLY ACT,
CONSPIRACY TO MONOPOLIZE**

275.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 274 with the same force and effect as if here set forth in full.

276.    In violation of the Donnelly Act, Visa, MasterCard and co-conspirators have

willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to

monopolize the POS Debit Card Market, including the geographic portion of said market

congruent with New York State.

277.    The combination and conspiracy to monopolize this market has been effectuated

by the means and the overt acts set forth above, among others.

278.    Visa, MasterCard and co-conspirators intended by their actions to restrain trade in

the relevant markets in the manner specified in paragraph 183.

279.    As a result of the conduct alleged herein, Visa, MasterCard and their dual members

control price, have and are able to exclude competitors and competition and have and are able to

charge supra-competitive prices in the POS Debit Card Market.

280.    The combination and conspiracy to monopolize has had, or is likely to have,

among other things, the effects specified in paragraph 185.

281.    As a result of Visa, MasterCard and co-conspirators' violations of the Donnelly

Act, Retailer Plaintiffs and their Class have been injured in their business and property in an

2567.2

amount not presently known with precision but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

282.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demand:

A.    That the Court declare, adjudge and decree that Defendants have committed the violations of federal and state law alleged herein;

B.    That the Court enter an order pursuant to Rule 23 of the Federal Rules of Civil Procedure permitting this action to be maintained a class action on behalf of the Class specified herein;

C.    That Defendants, their directors, officers, employees, agents, successors and members be enjoined and restrained from, in any manner, directly or indirectly continuing or maintaining the arrangements tying the sales of Visa credit card services to the purchase and acceptance of *Visa Check* card services and tying the sale of MasterCard credit card services to the purchase and acceptance of *MasterMoney* card services; that Defendants, their directors, officers, employees, agents, successors and members be enjoined and restrained from, in any manner, directly or indirectly committing other violations of Sections 1 and 2 of the Sherman Act and the Donnelly Act, in which they and co-conspirators have been engaged; and that Defendants, their directors, officers, employees, agents, successors and members be enjoined and restrained from, in any manner, directly or indirectly, committing any other violations of statutes having a similar purpose or effect.

D.    That the Court award damages sustained by the Retailer Plaintiffs, and members of their Class, on the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth and Fourteenth Claims for Relief in an amount to be proved at trial,

2567.2

to be trebled according to law, plus interest, including prejudgment interest, attorneys' fees and costs of suit, and award damages sustained by the Retailer Plaintiffs, and members of their Class, on the Fifteenth and Sixteenth Claims for Relief as provided by law, and such other and further relief as this Court may deem just and proper;

E.    That the Court award the Trade Association Plaintiffs their attorneys' fees and costs and such other and further relief as this Court may deem just and proper.

2567.2

## JURY DEMAND

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

Dated: New York, New York
      May 26, 1999

**CONSTANTINE & PARTNERS**

By: *Lloyd Constantine*

    Robert L. Begleiter (RB-7052)
    Lloyd Constantine (LC-8465)
    Stacey Anne Mahoney (SM-5425)
    Amy N. Roth (AR-4534)
    Mitchell C. Shapiro (MS-1019)
    Jeffrey I. Shinder (JS-5719)
    Gordon Schnell (GS-2567)
477 Madison Avenue - 11th Floor
New York, New York  10022
(212) 350-2700
Attorneys for Wal-Mart, The Limited, Sears,
Safeway, Circuit City, IMRA, NRF and
FMI, and Lead Counsel for The Plaintiffs

**McDERMOTT, WILL & EMERY**
Of Counsel
Timothy Waters (TW-5208)
Lawrence I. Fox (LF-3733)
50 Rockefeller Plaza
New York, New York 10020
(212) 547-5400
Co-Counsel for IMRA

**JENNER & BLOCK**
Jerald A. Jacobs
601 Thirteenth Street, N.W.
Washington, D.C.  20005
(202) 639-6000
Co-Counsel for NRF

**MALLORY B. DUNCAN, ESQ.**
325 Seventh Street, NW
Suite 1000
Washington, D.C.  20004
(202) 783-7971
Co-Counsel for NRF

2567.2

**COLLIER, SHANNON, RILL & SCOTT**
James F. Rill
Christopher J. MacAvoy
3050 K Street, N.W.
Washington, D.C.  20007
(202) 342-8400
Co-Counsel for FMI

**GEORGE R. GREEN, ESQ.**
Vice President & General Counsel
Food Marketing Institute
800 Connecticut Avenue, N.W.
Washington, D.C.  2006-2701
(202) 452-8444
Co-Counsel for FMI

::ODMA\PCDOCS\DOCSNY\2567\2

2567.2

## CERTIFICATE OF SERVICE

STATE OF NEW YORK          )
                                                    SS.:
COUNTY OF NEW YORK    )


I, Michael Spyropoulos, hereby certify that on May 26, 1999, I caused to be served a true

and correct copy of a Third Amended Class Action Complaint and Jury Demand upon the

following:

<u>By Hand</u>
James N. Benedict, Esq.
Rogers & Wells
200 Park Avenue
New York, New York 10166

<u>By First Class Mail</u>
Brian P. Brosnahan, Esq.
Heller Ehrman White & McAuliffe
333 Bush Street
San Francisco, California  94104-2878

<u>By Hand</u>
Robert C. Mason, Esq.
Arnold & Porter
399 Park Avenue
New York, New York 10022


I hereby certify that the foregoing is true and correct this 26th day of May, 1999, subject

to the penalties of perjury.


Dated:  New York, New York
             May 26, 1999

Michael Spyropoulos, Esq.


Sworn to before me this
26th day of May, 1999


Notary Public

YANG CHEN
Notary Public, State of New York
No. 02CH5044681
Qualified in New York County
Commission Expires June 5, 19__