# UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

———————————

August Term, 2004

(Argued: August 25, 2004)                    Decided: January 4, 2005)

Docket Nos. 04-0344-cv, 04-1052-cv, 04-0514-cv, 04-1055-cv, 04-2105-cv

———————————

WAL-MART STORES, INC., THE LIMITED, INC., SEARS ROEBUCK AND CO., SAFEWAY INC., AUTO-LAB OF FARMINGTON HILLS, BERNIE'S ARMY-NAVY STORE, BURLINGTON COAT FACTORY WAREHOUSE CORPORATION, CIRCUIT CITY STORES, INC., THE COFFEE STOP, INC. d/b/a TORREO COFFEE & TEA COMPANY, COMPUTER SUPPLIES UNLIMITED, DENTURE SPECIALISTS, INC., PAYLESS SHOESOURCE, INC., SHOES ETC., INC. d/b/a ARNOLD'S SHOES, SCRUB SHOP, INC., SPORTSTOP, INC., GENEVA WHITE, D.M.D., UCC KWIK DOC., INC., f/k/a UCC EXPRESS, INC., INTERNATIONAL MASS RETAIL ASSOCIATION, NATIONAL RETAIL FEDERATION, and FOOD MARKETING INSTITUTE,

*Plaintiffs-Appellees,*

CONSTANTINE & PARTNERS PC, et al.,

*Class Counsel-Appellees-Cross-Appellants,*

DOW JONES AND COMPANY, INC.,

*Intervenor-Plaintiff-Appellee,*

— v. —

VISA U.S.A. INC. and MASTERCARD INTERNATIONAL, INC.,

*Defendants-Appellees,*

CITIGROUP, INC., PULSE EFT ASSOCIATION, and EDGAR, DUNN AND COMPANY,

*Interested Parties,*

1

— v. —

Reyn's Pasta Bella LLC, Jeffrey Ledon DeWeese, M.D., Barry Leonard d/b/a Critter Fritters, Hat-In-The-Ring, Inc. d/b/a Eddie Rickenbacker's,

*Objectors-Appellants*,

NuCity Publications, Inc.,

*Objector-Appellant*,

Lupita Llamas Martinez d/b/a Del Yaqui Restaurant, Armenta's Mexican Food, Inc.,

*Objectors-Appellants*,

Leonardo's Pizza By The Slice, Inc., 710 Corp.,

*Objectors-Appellants-Cross-Appellees*,

Roman Buholzer d/b/a The Continental Garden Restaurant,

*Objector-Cross-Appellee*,

Preston Center Personal Training, Inc., UCC Kwik Doc., Inc., f/k/a UCC Express, Inc., Duke Products, Inc., Southern Network Services, Inc., Sound Deals, Inc., Digital Solutions, Inc., Village Fabrics and Furnishings, Inc., Rental Solutions, Inc., Rent Tech, Inc., G & G Enterprises, NSG Enterprises, Inc., S & GJ Enterprises, Inc., Jac Vaca, Inc., John Wenturine, Y.P.I., Inc., Mobil Town USA, Inc., Young Pioneers, Inc., Digital Playroom, Inc., Wagner's Bakery, Inc., Beaches N Cream, Kickers' Corner of the Americas, Inc., MSV Records & Production, Inc., Southern Lady Flowers, Round House, Inc., Ron Jen, Inc., d/b/a The Boathouse, and Ron Fred, Inc.,

*Objectors.*

———————————

2

Before:

CABRANES AND WESLEY, *Circuit Judges.*[*]

————————

1

2     Appeal from an order of the United States District Court for the Eastern District of New

3     York (Gleeson, J.), dated December 19, 2003, approving class settlement and awarding

4     attorneys' fees.

5     AFFIRMED.

6     ————————————

7     Richard J. Archer, Archer & Hanson, Occidental, CA (James A. Kopcke, Golden
8         Kopcke, LLP, San Francisco, CA, *on the brief*) *for Objectors-Appellants*
9         *Reyn's Pasta Bella, LLC, Jeffrey Ledon DeWeese, M.D., Barry Leonard*
10        *d/b/a Critter Fritters, and Hat-In-The-Ring, Inc. d/b/a Eddie*
11        *Rickenbacker's.*
12
13    Stanley M. Grossman (H. Adam Prussin, John Balestriere, Murielle J. Steven
14        Walsh, *on the brief*), Pomerantz Haudek Block Grossman & Gross, LLP,
15        New York, NY (Howard Langer, John Grogan, Langer and Grogan, P.C.,
16        Philadelphia, PA, *on the brief*; Joseph Goldberg, Sara Berger, Alexandra
17        Freedman Smith, Zachary Ives, Freedman Boyd Daniels Hollander
18        Goldberg & Cline, P.A., Albuquerque, NM, *on the brief*) *for Objector-*
19        *Appellant Nu-City Publications, Inc.*
20
21    John Rasmussen (Dale W. Robinson, *on the brief*), Johnson, Rasmussen, Robinson &
22        Allen, P.L.C., Mesa, AZ *for Objectors-Appellants Armenta's Mexican Food, Inc.*
23        *and Lupita Llamas Martinez d/b/a Del Yaqui Restaurant.*
24
25    N. Albert Bacharach, Jr., Gainesville, FL *for Objectors-Appellants-Cross-*
26        *Appellees Leonardo's Pizza By the Slice, Inc. and 710 Corp. Inc.*

————————————

[*] Because the Honorable Chester J. Straub recused himself prior to oral argument, this case was decided by a two-judge panel.  *See Murray v. NBC*, 35 F.3d 45 (2d Cir. 1994).

3

1
2    M. Laurence Popofsky (Stephen V. Bomse, Marie L. Fiala, Peggy J. Williams,
3           Russell P. Cohen, *on the brief*), Heller Ehrman White & McAuliffe LLP,
4           San Francisco, CA (Philip H. Curtis, Robert C. Mason, Arnold & Porter
5           LLP, New York, NY, *on the brief*; Kevin J. Arquit, Joseph F. Tringali,
6           Mariya S. Treisman, Simpson Thacher & Bartlett LLP, New York, NY, *on*
7           *the brief*; Kenneth A. Gallo, Paul, Weiss, Rifkind, Wharton & Garrison
8           LLP, New York, NY, *on the brief*; Keila D. Ravelo, Clifford Chance US
9           LLP, New York, NY *on the brief*) *for Defendants-Appellees.*
10
11   Lloyd Constantine (Robert L. Begleiter, Matthew L. Cantor, Stacey Anne Mahoney,
12          Michelle A. Peters, Amy N. Roth, Gordon Schnell, Jonathan Shaman, Jeffrey I.
13          Shinder, *on the brief*), Constantine & Partners, New York, NY *for Class Counsel-*
14          *Appellees-Cross-Appellants*
15
16   Lawrence W. Schonbrun, Law Offices of Lawrence W. Schonbrun, Berkeley, CA
17          *on submission for Objector-Cross-Appellee Roman Buholzer d/b/a The*
18          *Continental Garden Restaurant.*
19
20   _____

21   WESLEY, *Circuit Judge*:

22          Appellants challenge the district court's approval of a class action settlement, including

23   the award of attorneys' fees.  The class action involved approximately five million merchants and

24   alleged, *inter alia*, that defendants Visa U.S.A. Inc. and MasterCard International Inc. tied

25   merchant use of defendants' debit products to use of defendants' credit cards, in violation of the

26   Sherman Act.  Plaintiffs contended that Visa and MasterCard used their power in the credit card

27   market to force merchants to accept an artificially-inflated transaction fee when accepting

28   payment from consumers using debit cards operated by Visa or MasterCard.  Plaintiffs further

29   alleged that defendants employed a scheme of anti-competitive conduct to bar competition in the

30   debit card market.  In this bitterly contested lawsuit fought by expert counsel on all sides, the

31   parties agreed to settle just before trial commenced.  The resulting settlement was the largest in

4

1    the history of antitrust law.  As part of the settlement, defendants agreed not to tie their debit and

2    credit products together and to pay more than $3 billion to plaintiffs in exchange for the release

3    of any and all claims that were or could have been filed against defendants or their member

4    banks (non-parties in this action) based on the conduct alleged.

5         On appeal, appellants contest the validity of the settlement's release of non-parties, the

6    adequacy of class representation, the adequacy of notice, the fairness of settlement, and the

7    reasonableness of attorneys' fees.  We **AFFIRM** the district court's order in all respects.

8
9                                         **BACKGROUND**

10        This case involves a clash of commercial titans.  Plaintiffs, a class of merchants

11   approximately five million strong led by Wal-Mart, the world's largest retailer, and several other

12   large and sophisticated merchants, including The Limited, Sears, and Safeway, filed suit on

13   October 25, 1996 against Visa U.S.A. Inc. and MasterCard International, Inc. ("Visa" and

14   "MasterCard," respectively),[1] seeking damages amounting to tens of billions of dollars for

15   alleged violations of Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1, 2.[2]  First,

16   plaintiffs claimed that the defendants' "Honor All Cards" policy, which forced merchants who

17   accepted Visa and MasterCard credit cards to accept Visa and MasterCard debit cards, was an

---

[1]  Visa and MasterCard are national bank card associations.  Their members include more than 6,000 banks.  *See* 2d Am. Compl. ¶¶ 30-31, 43.

[2]  The district court described plaintiffs' claims, and the factual basis for those claims, in its resolution of the parties' motions for summary judgment, *In re Visa Check/Mastermoney Antitrust Litig.*, No 96-CV-5238, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ("*Visa Check I*"), and its decision to certify the instant class, *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000) ("*Visa Check II*"), *aff'd*, 280 F.3d 124 (2d Cir. 2001).  We assume familiarity with those decisions and with the decision by the district court giving rise to this appeal, *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ("*Visa Check III*").

1    illegal "tying arrangement" that violated Section One of the Sherman Act.[3]  Second, plaintiffs

2    alleged that defendants used their Honor All Cards policy in conjunction with other anti-

3    competitive conduct to monopolize the debit market, in violation of Section Two of the Sherman

4    Act.  As a consequence, plaintiffs claimed that they incurred supra-competitive "interchange

5    fees" (described in the next subheading) during every debit and credit transaction made between

6    October 1992 and June 2003.

7    **A.      Visa and MasterCard Transactions**

8              Essentially, every debit or credit card transaction using a Visa or MasterCard product

9    involves five entities: (1) Visa or MasterCard, (2) a "card-issuing" bank, (3) an "acquiring" bank,

10   (4) a consumer, and (5) a merchant.  At the outset, either Visa or MasterCard, each an

11   association, grants a license to a member bank to issue credit and debit cards with its brand

12   name.  A "card-issuing" member bank then issues a credit or debit card to a cardholder with

13   either the Visa or MasterCard brand name.  An "acquiring" bank, a member of Visa and

14   MasterCard, contracts with a merchant to accept payment through Visa and MasterCard.  When a

15   cardholder makes a purchase with either a Visa or MasterCard product, the acquiring institution

16   reimburses the merchant for the cardholder's purchase, less a "discount fee."  The discount fee is

17   determined by the acquiring institution.  The card-issuing bank charges an "interchange fee" each

18   time it provides funds to the acquiring bank as payment to a merchant for the cardholder's

19   purchase.  Visa and MasterCard set the interchange fee that all card-issuing banks charge.

20   Economics demands that the discount fee be greater than the interchange fee the acquiring

---

[3] "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'"  *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56 (2d Cir. 1980) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)).

6

1    institution must pay to the card-issuing institution.  *See Visa Check II*, 192 F.R.D. at 72.  The

2    following illustrates this network of transactions:

3           Bank A issues a Visa credit card to Consumer X, who purchases a garment for
4           $100 at Store Y, which was "acquired" for Visa by Bank B. Visa rules mandate
5           that Bank B must pay Bank A an interchange fee of 1.25% of the amount of the
6           transaction, *i.e.*, $1.25. Bank B will charge Store Y a "discount fee" higher than
7           $1.25 in order to recover the mandated interchange fee and other fees that Visa
8           rules mandate Bank B to pay Visa on each and every Visa credit card (and debit
9           card) transaction and to earn a profit for itself. Thus, Bank B may charge a
10          discount fee of 1.60% of the transaction amount (or $1.60) to Store Y. When
11          Store Y presents Consumer X's $100 Visa transaction to Bank B, the bank will
12          credit Store Y's account for $98.40, send the Visa mandated $1.25 interchange fee
13          to Bank A and retain the $.35 balance of the "discount fee."

14

15   2d Am. Compl. ¶ 8(o).

16   **B.    Procedural History**

17          Plaintiffs originally filed their complaint on October 26, 1996.  The district court certified

18   plaintiffs as a class in February 2000.  *See Visa Check II*, 192 F.R.D. at 71.  The class includes

19   "all persons and business entities who have accepted Visa and/or MasterCard credit cards and

20   therefore have been required to accept Visa[]Check and/or MasterMoney debit cards under the

21   challenged tying arrangements during the fullest period permitted by the applicable statute of

22   limitations," *id.* at 90, which is the period from October 25, 1992 through June 21, 2003, *Visa*

23   *Check III*, 297 F. Supp. 2d at 514 n.12, 519.  Plaintiffs' discovery included "a review of

24   approximately five million pages of documents, almost 400 depositions, discovery from roughly

25   200 non parties, 54 expert reports, and 21 expert depositions."  *Id.* at 511 n.8.  In June 2002,

26   plaintiffs sent a notice of pendency to all class members.  On April 30, 2003, "after complete and

27   exhaustive discovery, summary judgment proceedings, and substantial mediation," *id.* at 511,

28   Visa and MasterCard each signed a memorandum of understanding setting forth a preliminary

1    settlement agreement with plaintiffs, *id.* at 508.  The final settlement agreements were signed on

2    June 4, 2003 (collectively, the "Settlement").[4]  Later that month, the district court approved the

3    notice of settlement, which described the terms of settlement and quoted the Settlement's release

4    verbatim.  *Visa Check III*, 297 F. Supp. 2d at 509 n.5, 516; Notice of Settlement ¶¶ 14, 18-19.[5]

5    Eighteen merchants, in this class of approximately five million, filed objections to the Settlement

6    and the allocation plan.  *Id.* at 509.  In September 2003, the district court held a fairness hearing

7    during which it offered each objector the opportunity to be heard.  *Id.*  On December 19, 2003,

8    after considering these objections, the district court issued a Memorandum and Order (a)

9    approving the proposed settlement agreements between plaintiffs and Visa and MasterCard and

10   the plan of allocation to distribute funds to class members, and (b) awarding attorneys' fees.  *Id.*

11   at 507, 526.  The court entered final judgments on January 30, 2004.  Each appellant filed a

---

[4] Although the first page of each settlement agreement states that the agreement was made "as of the 4th day of June 2003," the district court found that the agreements were dated June 5, 2003.  We do not know the basis on which the court concluded that the settlement agreements were dated June 5th, but this discrepancy is inconsequential to the issues before us.

[5] In pertinent part, the release states:

> [T]he Released Parties shall be released and forever discharged from all manner of claims . . . against the Released Parties . . . that any Releasing Party ever had, now has or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the Complaint or any of the complaints consolidated therein, including, without limitation, claims which have been asserted or could have been asserted in this litigation which arise under or relate to any federal or state antitrust, unfair competition, unfair practices, or other law or regulation, or common law, including, without limitation, the Sherman Act, 15 U.S.C. § 1 et seq.

*Visa Check III*, 297 F. Supp. 2d at 512 (citing settlement agreements) (emphasis added in cited case and removed here).  The "Released Parties" include Visa, Visa International Service Association, MasterCard, and the member financial institutions of Visa and MasterCard.  *Id.* (citing settlement agreements).

8

1   timely appeal.

2   **C.   The Settlement**

3          The Settlement is the culmination of approximately seven years of hard-fought litigation

4   and represents "the largest antitrust settlement in history." *Id.* at 508.  The district court

5   described the Settlement as providing for, among other things:

6          (1)     the cessation, as of January 1, 2004, of defendants' "Honor All Cards"
7                  rules, by which the defendants' debit card services to merchants were tied
8                  to their credit card services;
9
10         (2)     the creation of a $3.05 billion settlement fund;
11
12         (3)     the creation of clear, conspicuous and uniform visual identifiers on Visa
13                 and MasterCard debit cards by January 1, 2007 (80% by July 1, 2005), so
14                 merchants and consumers can distinguish these products from credit cards;
15
16         (4)     the lowering, by roughly one third, of the interchange rates on debit
17                 products for the period from August 1, 2003, through December 31, 2003;[6]
18
19         (5)     other injunctive relief, such as the provision of signage from defendants to
20                 merchants communicating the merchants' acceptance of defendants'
21                 untied debit products; and a prohibition on defendants enacting any rules
22                 that prohibit merchants from encouraging or steering customers to use
23                 forms of payment other than defendants' debit cards, including by
24                 discounting other forms of payment;
25
26         (6)     the Court's continuing jurisdiction to ensure compliance with the
27                 Settlement; and
28
29         (7)     the release of Visa and MasterCard from claims arising out of the conduct
30                 at issue in the action prior to January 1, 2004.

31  *Id.* (internal citations and footnote omitted).  Visa and MasterCard will make cash payments

32  totaling $2,025,000,000 and $1,025,000,000, respectively, in annual installments during the next

33  ten years.  *Id.*  The district court concluded that "[t]he discounted present value of the total

---

[6] This reduction caused a savings to the class of approximately $846 million. *Id.* at 509.

1    compensatory relief . . . amounts to $3,383,400,000." *Id.* at 509.

2    **D.    Issues on Appeal**

3          **1.    Scope of the Release and Adequacy of Representation**

4          At the district court, five of the eighteen objecting merchants challenged the scope of the

5    release provided in the Settlement.  All five of these merchants appealed.  They are Reyn's Pasta

6    Bella, LLC, Jeffrey Ledon DeWeese, M.D., Barry Leonard d/b/a Critter Fritters, and Hat-In-The-

7    Ring, Inc. d/b/a Eddie Rickenbacker's (collectively, "Pasta Bella"), and NuCity Publications, Inc.

8    The Settlement's release precludes actions for conduct occurring prior to January 1, 2004 that

9    was or could have been alleged in the complaint.  If approved by this Court, the release will bar

10   class actions previously filed by Pasta Bella and NuCity.

11         Pasta Bella, purporting to represent a class, initiated an action against Visa and

12   MasterCard and three member banks (collectively, the "*Reyn's* defendants") in the United States

13   District Court for the Northern District of California on June 24, 2002.  *Reyn's Pasta Bella, LLC*

14   *v. Visa U.S.A., Inc.*, 259 F. Supp. 2d 992 (N.D. Cal. 2003) ("*Reyn's*").[7]  Prior to the fairness

15   hearing in this case, the California district court dismissed all but one of the *Reyn's* claims.  *Id.* at

16   1004.  The surviving claim alleged that the *Reyn's* defendants fixed credit card interchange fees

17   charged by issuing banks to acquiring banks, which, in turn, set merchant discount fees charged

18   by acquiring banks to merchants.  *See id.* at 998.  On March 4, 2004, the District Court for the

19   Northern District of California dismissed *Reyn's* with prejudice, finding that the Settlement

20   released the *Reyn's* defendants from further liability.

---

[7] For the purpose of discussing the effect of the Settlement on *Reyn's* claimants, this opinion assumes that the putative *Reyn's* class was certified even though *Reyn's* was dismissed before a motion for class certification had been filed.

10

1          NuCity initiated a putative class action in the United States District Court for the

2   Southern District of New York on November 13, 2001.  *In re Visa/MasterCard Membership*

3   *Rules Antitrust Litigation*, No. 01-CV-10027 ("*Membership Rules*").[8]  *Membership Rules* arose

4   out of *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *modified by* 183

5   F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd* 344 F.3d 229 (2d Cir. 2003), *cert. denied*, 125 S.Ct. 45

6   (2004) ("*Government's Membership Rules*").  In *Government's Membership Rules*, the

7   Government established that Visa and MasterCard's "exclusionary rules" (also known as

8   "membership rules"), which prohibited member banks from issuing competing payment cards,

9   such as American Express or Discover, constituted an illegal boycott and an unreasonable

10  restraint of trade in the credit card market.[9]  *Government's Membership Rules*, 344 F.3d at 229.

11  NuCity filed *Membership Rules* on behalf of merchants injured by the boycott proven in

12  *Government's Membership Rules*.  Pursuant to an order by the district court in that case,

13  *Membership Rules* remains in limbo pending the outcome of this appeal.

14         On appeal, Pasta Bella and NuCity argue that the release is overbroad.  Alternatively, they

15  argue that the release is not valid with respect to them because their interests were inadequately

16  represented during settlement.  Issues involving the release of claims are discussed in Part I of

---

[8] For the purpose of discussing the effect of the Settlement on *Membership Rules* claimants, this opinion assumes that the putative class in *Membership Rules* is certified even though a motion for class certification has not yet been filed.

[9] The exclusionary rules are described in Visa By-law 2.10(e) and MasterCard's Competitive Programs Policy ("CPP").  Visa By-law 2.10(e) provides in pertinent part: "the membership of any member shall automatically terminate in the event it, or its parent, subsidiary or affiliate, issues, directly or indirectly, Discover Cards or American Express Cards, or any other card deemed competitive by the Board of Directors."  *Visa U.S.A., Inc.*, 163 F. Supp. 2d at 379 (emphasis added in cited case and removed here).  MasterCard's CPP states that "members of MasterCard may not participate either as issuers or acquirers in competitive general purpose card programs" other than with Visa.  *Id.* at 381.

11

1    the Discussion section of this opinion.

2        **2.      Notice to the Class**

3        The Settlement established a notice plan that required mailing the settlement notice to

4    class members and publishing a condensed version of the settlement notice in numerous widely-

5    distributed publications (collectively, the settlement notice and summary notice are referred to as

6    the "Settlement Documents").  As part of the notice plan, plaintiffs' counsel provided direct

7    notice via first class mail to 8,148,276 class members and published notices in publications with

8    a combined circulation of more than 151 million.[10]  All of this information was printed in English

9    only.

10       On appeal, Pasta Bella and NuCity argue that they were denied due process because the

11   Settlement Documents did not specifically apprise class members that approval of the Settlement

12   would release the pending claims in *Reyn's* and *Membership Rules*.

13       Armenta's Mexican Food, Inc. and Lupita Llamas Martinez d/b/a Del Yaqui Restaurant

14   (collectively, "Armenta's"), argue that the Settlement Documents and notice plan did not afford

15   them due process or comply with Federal Rule of Civil Procedure 23.  Armenta's claims that it

16   learned of the Settlement by observing a summary notice in an English-language magazine.[11]

17   Afterward, it retained counsel, filed its objections to the Settlement and also filed a motion to

---

[10] This group of more than eight million included not only the original class members, but also "new merchants" who began accepting Visa and MasterCard after June 20, 2002 and who self-registered after the class notice was distributed.  Lead Counsel Status Report, dated September 18, 2003, at 2.

[11] Armenta's claims that it never received the settlement notice in the mail.  Class counsel disputes this claim, arguing that Armenta's was among the approximately 8 million class members to receive settlement notices.  Regardless, whether Armenta's received personal notice is of no importance to the analysis in this opinion.  At the very least, it received actual notice by publication.

12

1    intervene.   Counsel for Armenta's appeared and argued at the September 2003 fairness hearing

2    in support of its client's objections to the Settlement.   The district court's approval of the

3    Settlement implicitly denied the motion to intervene; Armenta's appealed.

4         These notice arguments are discussed in Part II of the Discussion section of this opinion.

5         **3.        Fairness of the Settlement**

6         Pasta Bella, Armenta's, 710 Corp., Inc., and Leonardo's Pizza by the Slice, Inc. challenge

7    the fairness of the Settlement.   NuCity seeks limited discovery to determine whether class

8    counsel independently valued the *Membership Rules* claims, and, if so, the amount of that

9    valuation.   Pasta Bella argues that the parties should be judicially estopped from asserting the

10   release against the *Reyn's* claims because Visa and MasterCard failed to comply with Rule 3-13

11   of the Local Rules of Practice in Civil Proceedings before the United States District Court for the

12   Northern District of California ("Northern District of California Local Rule 3-13"), which

13   required that they file a notice of pendency in that court concerning the instant action.   Part III of

14   the Discussion section of this opinion examines all of these issues.

15        **4.        Attorneys' Fees**

16        Class counsel submitted a fee petition to the district court seeking $609,012,000 in fees.

17   The court found this request "excessive," "fundamentally unreasonable, and wholly out of

18   character for a group of counsel whose commitment to the corner store merchants they represent

19   has, until now, been admirable and unflagging."  *Visa Check III*, 297 F. Supp. 2d at 522-23.

20   Choosing between awarding fees under the "lodestar" method or the "percentage of the fund"

21   method, *id.* at 520-21, the court awarded plaintiffs' attorneys 6.5% of the Settlement's

22   compensatory relief under the "percentage of the fund" method, *id.* at 524.   This amounted to a

13

1   fee award of $220,290,160.44.  *Id.* at 507, 524-26.  The court granted counsel an additional

2   $18,716,511.44 in costs and expenses.  *Id.*  Objectors 710 Corp., Inc. and Leonardo's Pizza by

3   the Slice, Inc. (collectively, "Leonardo's") appealed the fee award on the ground that it was too

4   high.  Class counsel cross-appealed on the ground that the award was too low.  Roman Buholzer

5   d/b/a The Continental Garden Restaurant responded in opposition to class counsel's cross-appeal.

6   The district court's fee award is examined in Part IV of the Discussion section of this opinion.

7                               **DISCUSSION**[12]

8                                   **PART I**
9                          **THE RELEASE IS VALID**
10
11          Broad class action settlements are common, since defendants and their cohorts would

12   otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the

13   country.  Practically speaking, "[c]lass action settlements simply will not occur if the parties

14   cannot set definitive limits on defendants' liability."  *Stephenson v. Dow Chem. Co.*, 273 F.3d

15   249, 254 (2d Cir. 2001), *aff'd in part by an equally divided court and vacated in part*, 539 U.S.

16   111 (2003).

17          Plaintiffs in a class action may release claims that were or could have been pled in

18   exchange for settlement relief.  Plaintiffs' authority to release claims is limited by the "identical

19   factual predicate" and "adequacy of representation" doctrines.  Together, these legal constructs

20   allow plaintiffs to release claims that share the same integral facts as settled claims, provided that

21   the released claims are adequately represented prior to settlement.  Adequate representation of a

---

[12] We review questions of law raised in this appeal *de novo*.  *Abrahamson v. Bd. of Educ.*, 374 F.3d 66, 71 (2d Cir. 2004).  We review the district court's approval of the instant class action settlement for abuse of discretion.  *Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000).  The district court's fee award is also subject to review under the abuse of discretion standard. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

1    particular claim is established mainly by showing an alignment of interests between class

2    members, not by proving vigorous pursuit of that claim.

3    **A.    Identical Factual Predicate Doctrine**

4           The law is well established in this Circuit and others that class action releases may

5    include claims not presented and even those which could not have been presented as long as the

6    released conduct arises out of the "identical factual predicate" as the settled conduct. *TBK*

7    *Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982).[13]

8           **1.    Identical Factual Predicate Doctrine Permits Release of *Membership Rules***
9                  **Claims**
10
11          The Settlement precludes lawsuits relating to any conduct that was alleged in the

12   complaint or was, or could have been, asserted in this litigation.  NuCity argues that the district

13   court strayed from the identical factual predicate rule by approving release of the *Membership*

14   *Rules* claims based simply on the court's recognition of the similarities between the claims in this

15   case and those in *Membership Rules*.[14]  We disagree.

_____

[13] The Eighth Circuit notes, "There is no impropriety in including in a settlement a description of claims that is somewhat broader than those that have been specifically pleaded.  In fact, most settling defendants insist on this." *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 805 (8th Cir. 2004).  The Fifth Circuit has noted, "The weight of authority establishes that . . . a court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. Apr. 1981) (quoting *Patterson v. Stovall*, 528 F.2d 108, 110 n.2 (7th Cir. 1976)).  The Third Circuit has found that refusing to grant a broad settlement release would undermine multi-district class settlements because defendants would be concerned that their exposure to liability would be too great. *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366-67 (3d Cir. 2001); *see also City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1044 (1st Cir. 1996) (discussing the identical factual predicate doctrine); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287-88 (9th Cir. 1992) (same).

[14] The district court found that "*Reyn's* is a virtual clone of the centerpiece of this case." *Visa Check III*, 297 F. Supp. 2d at 513.  Pasta Bella does not challenge this conclusion or

15

1    The plaintiffs in *Membership Rules* alleged that Visa and MasterCard's exclusionary

2    rules, which prohibited member banks from issuing or providing services to other credit cards

3    (such as Discover or American Express), inflated the cost of credit card transactions, in violation

4    of Section One of the Sherman Act.  *Id.* at 515.  As part of their tying claim, plaintiffs in the case

5    before us claimed that the exclusionary rules solidified Visa and MasterCard's power in the

6    credit card market, enabling Visa and MasterCard to force plaintiffs to accept their debit cards.

7    *Id.*  Thus, the "exclusionary rules have been central to this case from its inception." *Id.*[15]  In fact,

8    in January 2000, more than one year before it approved the Settlement, the district court had

9    concluded that this action and *Government's Membership Rules* – the precursor to *Membership*

10   *Rules* – alleged common claims.  *In re Visa Check/MasterMoney Antitrust Litig.*, 190 F.R.D.

11   309, 312, 315 (E.D.N.Y. 2000).  Finding that *Government's Membership Rules* involved

12   "essentially the same issues" as the case at bar, Judge Gleeson granted the Government's motion

13   to intervene so that plaintiffs' discovery could be used to assist the Government in its case.  *Id.* at

14   315; *see id.* at 315 n.3 (describing the Government's contention that the exclusionary rules were

---

plaintiffs' right under the identical factual predicate doctrine to release the *Reyn's* claims against
defendants in this action.

[15] In describing the exclusionary rules, the complaint alleged that:

Visa members collectively adopted a rule barring their members from issuing any
plastic cards competitive with Visa cards.  This rule exempted MasterCard,
permitting Visa's dual members to continue issuing MasterCard plastic cards.
Visa members then turned around and, acting as MasterCard members, adopted
the same non-competition rule.  The effect of these rules was to deprive existing
and new competitors of a marketing outlet at the 6,000 largest and most
appropriate vendors of their products., *i.e.*, the dual bank members of Visa and
MasterCard.

2d Am. Compl. ¶ 50.  Another part of the complaint alleged that Visa and MasterCard asked
members to boycott American Express and Discover cards.  *Id.* ¶¶ 52-54.

16

1    a common issue between both cases).

2         NuCity stresses the difference between the elements of an antitrust tying case – this case –

3    and a horizontal boycott case – *Membership Rules* – to argue that the same factual predicate does

4    not underlie both.  Specifically, NuCity argues that

5         [p]laintiffs' own description of their damage theory indicates that the damages
6         they sought to recover stemmed from the effects of the illegal tying arrangement
7         and [the effects] other associated anticompetitive conduct (which may or may not
8         include the exclusionary rules) had in retarding the development of "regional *debit*
9         networks" from entering the market – not the exclusion of major competing *credit*
10        card brands like American Express and Discover.

11
12   NuCity Br. at 31 (emphasis added).

13        NuCity misses the mark.  When considering the permissibility of a release, the overlap

14   between elements of *claims* is not dispositive.  Class actions may release claims, even if not pled,

15   when such claims arise out of the same factual predicate as settled class claims.  *TBK Partners*,

16   675 F.2d at 460; *see In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir.

17   Apr. 1981) ("[A] court may release not only those claims alleged in the complaint and before the

18   court, but also claims which 'could have been alleged by reason of or in connection with any

19   matter or fact set forth or referred to in' the complaint." (quoting *Patterson v. Stovall*, 528 F.2d

20   108, 110 n.2 (7th Cir. 1976)).[16]

---

[16] NuCity also argues that the parties' conduct prior to settlement displays their clear understanding that the *Membership Rules* claims and the instant claims were distinct.  As proof, NuCity highlights the fact that defendants did not move to consolidate *Membership Rules* and this action pursuant to the multidistrict litigation statute, 28 U.S.C. § 1407, or to dismiss one of the cases on the ground that one cause of action had been split into two cases.  NuCity's retelling of the procedural facts is not accurate.  In fact, class plaintiffs sought collateral estoppel against defendants based on the guilty verdict in *Government's Membership Rules*, *see* Status Conference Transcript, dated June 21, 2002, and the district court chose to delay briefing and argument on the estoppel issue until *Government's Membership Rules* was concluded on appeal, Order, dated June 24, 2002.  Since this Circuit decided the appeal of *Government's Membership Rules* months after the parties signed the settlement agreement, the need to brief the estoppel

1    Based on the foregoing, the district court did not abuse its discretion by concluding that

2    the claims in *Membership Rules* are based on the identical factual predicate as the claims in this

3    case.

4    **2.    Identical Factual Predicate Doctrine Permits Release of Non-Parties**

5    Even though the *Reyn's* claims may be released with respect to Visa and MasterCard,

6    Pasta Bella objects to the release of the member banks, since they were not parties to this action.

7    However, "class action settlements have in the past released claims against non-parties where, as

8    here, the claims against the non-party being released were based on the same underlying factual

9    predicate as the claims asserted against the parties to the action being settled." *In re Lloyd's Am.*

10   *Trust Fund Litig.*, No. 96 Civ. 1262, 2002 WL 31663577, at *11 (S.D.N.Y. Nov. 26, 2002); *see,*

11   *e.g.*, *In re Holocaust Victims Assets Litig.*, 105 F. Supp. 2d 139, 143, 160-65 (E.D.N.Y. 2000)

12   (approving class settlement with broad releases against non-parties, including insurance carriers,

13   other banks, and Swiss governmental entities); *see also* 4 ALBA CONTE & HERBERT B.

14   NEWBERG, NEWBERG ON CLASS ACTIONS § 12:16, at 318 (4th ed. 2002) ("NEWBERG") ("A

15   settlement may . . . seek to discharge parties who have not been served with process and are

16   therefore not before the court."). The district court did not, therefore, err by finding that the non-

17   party banks could be released from liability for conduct premised on the identical factual

18   predicate of claims alleged in this action.

19   The banks' settlement contributions further support the district court's conclusion. The

20   banks "not only contributed to the Settlement[], but virtually all of the relief comes from them."

21   *Visa Check III*, 297 F. Supp. 2d at 514. They agreed to lower temporarily their interchange rates,

___

issue never arose. *See Government's Membership Rules*, 344 F.3d 229 (publishing decision on
September 17, 2003).

1    notify merchants of the cessation of the tying arrangement, and reconfigure their debit cards.  *Id.*

2    Moreover, the banks' membership fees may contribute to the compensatory relief paid by Visa

3    and MasterCard.  *Id.*  We cannot find that the district court abused its discretion by releasing

4    nonparties, particularly where, as here, those nonparties are members of the defendants and have

5    contributed to the settlement.  Indeed, it is hard to imagine that defendants would have settled

6    without also releasing their member banks from liability; to do so would have invited relitigation

7    of the same factual allegations against the banks.

8    **B.      Due Process Requires that Released Claims be Adequately Represented**[17]

9           A determination that all of the settled claims arose from the same factual predicate does

10   not necessarily end the inquiry.  Claims arising from a shared set of facts will not be precluded

11   where class plaintiffs have not adequately represented the interests of class members.

12   On appeal, Pasta Bella interprets the adequacy of representation doctrine to require that "settled

13   claims of absent class members [be] adequately represented as a matter of fact before they can be

14   barred."  Pasta Bella Br. at 23.  Consequently, Pasta Bella presses that the Settlement

15   inadequately represents the *Reyn's* claims because it does not require payment from the member

16   banks who were defendants in *Reyn's*.  In the same vein, NuCity argues that *Membership Rules*

17   seeks damages for billions of dollars stemming from the boycott of credit cards, whereas the

18   Settlement is based merely on damages stemming from alleged tying arrangements in the debit

19   card market and the concomitant effect on interchange rates.  Respondents counter that these

---

[17] "Due process requires adequate representation at all times throughout the litigation . . . ."  *Stephenson*, 273 F.3d at 260 (internal quotation marks omitted).  "Before the bar of claim preclusion may be applied to the claim of an absent class member, it must be demonstrated that invocation of the bar is consistent with due process . . . ."  *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1226 (11th Cir. 1998).

1    arguments amount to baseless allegations that the plaintiffs "left significant claims on the

2    table."[18]  We agree.  Adequate representation is not solely an assessment of effort.  Rather, an

3    examination of the interests of the settling plaintiffs and of the Settlement's effect on those who

4    would be bound by it leads us to the conclusion that lead plaintiffs, who are also members of the

5    classes led by Pasta Bella and NuCity, adequately represented the claims asserted in *Reyn's* and

6    *Membership Rules* in this case.

7            As support for its claim that adequate representation requires vigorous pursuit of class

8    claims, Pasta Bella cites *Stephenson*.  *Stephenson* involved two Vietnam War veterans who sued

9    several chemical manufacturers for Agent Orange-related injuries.  Their injuries manifested

10    after a $180 million class action settlement – involving the same manufacturers and similar

11    allegations – was exhausted.  *Stephenson*, 273 F.3d at 251-52.  The settlement purported to

12    resolve all future claims, but only provided for recovery for those individuals whose exposure-

13    related death or disability was discovered prior to 1994.  *Id.* at 260.  Since the settlement covered

14    class members who had not yet manifested injury, *id.* at 252, the defendants argued that the

15    settlement barred the *Stephenson* plaintiffs from recovery, *id.* at 256.  This Circuit held that the

16    claims of the *Stephenson* plaintiffs had not been adequately represented in the earlier action

17    because, at the time of the Agent Orange settlement, future claims had not been considered

18    separate from claims involving current injury.  *Id.* at 261 ("[A] class which purports to represent

19    both present and future claimants may encounter internal conflicts.").  Thus, the plaintiffs could

20    proceed with their action.  *Id.* at 258.

21            *Stephenson* is not directly on point, however, because that case involved future claimants,

---

[18] Since the interests of class counsel and defendants are, in essence, aligned in this appeal, both parties are collectively referred to as "respondents" in this opinion.

1   whereas this case does not.  Here, injured parties may obtain remuneration from the settlement

2   fund if they accepted Visa or MasterCard within a finite period – October 25, 1992 through June

3   21, 2003.  *Visa Check III*, 297 F. Supp. 2d at 514 n.12, 519.  Conduct occurring after December

4   31, 2003 is not precluded from being the subject of a future suit.  *See supra* n.5 (quoting relevant

5   portion of release).  Thus, the essential question in determining whether the Settlement complies

6   with the adequate representation doctrine is whether the interests that were served by the

7   Settlement were compatible with those of Pasta Bella and NuCity when plaintiffs negotiated a

8   release of the *Reyn's* and *Membership Rules* claims.

9        *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981)

10   ("*Super Spuds*"), guides the first step in our inquiry to determine whether class representatives

11   impermissibly sacrificed the interests of current class claims in exchange for settlement.  *Super*

12   *Spuds* was a class action seeking damages for the loss in value to potato futures contracts as a

13   result of the defendant's wrongful conduct.  *Id.* at 11.  The class was composed of plaintiffs who

14   held liquidated long positions in potato futures.  *Id.*  However, a subset of the class also held

15   unliquidated contracts.  The subset did not receive additional settlement proceeds in exchange for

16   the release of their unliquidated contracts.  *Id.* at 16.  We reversed approval of the settlement,

17   holding that a settlement could not be fair where "a class member holding one liquidated and one

18   unliquidated contract receives no more than another class member holding only one liquidated

19   contract." *Id.* at 19.

20        *Super Spuds* is inapposite to the instant case, however, because *Super Spuds* hinged on

21   the fact that the class representatives did not possess the unliquidated futures.  *Id.* at 17.  On this

22   basis, we held, "The named plaintiffs in a class action 'cannot represent a class of whom they are

21

1    not a part.'" *Id.* (quoting *Bailey v. Patterson*, 369 U.S. 31, 32-33 (1962) (per curiam)).  Here,

2    every member of the *Reyn's* class and every member of the *Membership Rules* class is a member

3    of the instant class.  *See Visa Check III*, 297 F. Supp. 2d at 514 n.12.  Thus, the lead plaintiffs are

4    necessarily a part of the *Reyn's* and *Membership Rules* classes and their interests are, therefore,

5    aligned with the interests of those classes.

6          In *Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000), we considered whether a subset of a

7    class can ever lack adequate representation when the lead plaintiffs of that class possess the

8    claims of that subset.  *Joel A.* arose when objectors to a class action settlement filed a separate

9    class action for redress of the particular harms they claimed to have endured.  The class in the

10   first action, *Marisol A. ex. rel. Forbes v. Giuliani*, 929 F. Supp. 662 (S.D.N.Y. 1996) ("*Marisol*

11   *A.*"), was composed of New York City children at risk of neglect or abuse.  *Id.* at 669-72.  The

12   class in *Joel A.*, objectors in *Marisol A.*, was composed of homosexual children contending that

13   the *Marisol A.* settlement discriminated against them.  *Joel A.*, 218 F.3d at 137.  In *Marisol A.*,

14   plaintiffs alleged that the City and State of New York deprived them of appropriate child welfare

15   services.  After two years of discovery, the *Marisol A.* class negotiated settlement agreements

16   that provided for a variety of administrative improvements designed to improve care for *all* class

17   members.  *Id.* at 137, 140-41.  The settlement released the City and State of New York from

18   related lawsuits for approximately two years.  *Id.* at 137, 144.  Dissatisfied with the general relief

19   provided in the *Marisol A.* settlement, homosexual members of the *Marisol A.* class commenced

20   *Joel A.* seeking redress of their particular grievances.  *Id.* at 137-138.  They argued that the

21   *Marisol A.* settlement could not have adequately represented their interests because they were

22   victims of "bias-related violence, harassment and discrimination at the hands of their

22

1    heterosexual peers" in the class.  *Id.* at 137-38.  They sought "concrete relief for bias-related

2    victimization by their peers[] and systemic discrimination based on sexual orientation."  *Id.*

3    (internal quotation marks omitted).

4         The *Joel A.* panel found that the *Marisol A.* class adequately represented the *Joel A.* class.

5    *Id.* at 144.  While the remedy contemplated in the *Marisol A.* settlements was broader than the

6    relief sought by the *Joel A.* sub-class, the remedy provided in the *Marisol A.* settlement was

7    "likely to deal with these complaints."  *Id.* at 142.  We held that "our precedents do not dictate

8    that the settlement be invalidated because [the *Joel A.* class] claims are subsumed within a more

9    generalized claim."  *Id.*  That is precisely the case here.

10        NuCity hopes that *In re Auction Houses Antitrust Litigation*, No. 00-Civ.-0648, 2001 WL

11   170792 (S.D.N.Y. Feb. 22, 2001) ("*Auction Houses*"), *aff'd* 42 Fed. Appx. 511 (2d Cir. 2002),

12   will persuade us that *Joel A.* does not end our inquiry into the adequacy of representation.[19]  In

13   *Auction Houses*, auction patrons filed class actions against auction houses that allegedly

14   conspired to fix auction terms.  *Id.* at *1.  Shortly before the parties reached settlement, new class

15   actions arose involving foreign auctions affected by the same alleged conspiracy.  *Id.* at *2.

16   Thereafter, the parties to the initial action reached a settlement that included a release of all

17   claims that could be brought in U.S. courts or foreign courts under U.S. law.  *Id.* at *2-*3, *11.

18   Realizing that the proposed settlement would preclude U.S.-law claims involving foreign

19   auctions, the district court refused to approve the settlement as long as it required the release of

20   those claims.  *Id.* at *18.  The court reasoned that a class could not settle its claims by sacrificing

21   other claims of class members that "were not within the description of claims assertable by the

---

[19] Pasta Bella did not raise this argument.

23

1    class." *Id.* at *12 (quotation marks omitted).  "[T]he key point is that an expanded release

2    requires the allocation of at least some of the settlement consideration to the holders of the claims

3    prejudiced by the expansion unless the class action judgment would bar the released claims by

4    application of principles of former adjudication." *Id.* at *13.[20]

5           Respondents, however, distinguish *Auction Houses*, and, for that matter, *Super Spuds*, by

6    explaining that, in those cases, marginalized groups did not receive any benefit in exchange for

7    the releases contemplated, whereas here, every claimant in *Membership Rules* benefits from the

8    settlement.  *Visa Check III*, 297 F. Supp. 2d at 514.  They argue, therefore, that the central issue

9    in determining adequacy of representation is the alignment of class members' interests.  Since

10   Wal-Mart, the world's largest retailer, and other large and sophisticated lead plaintiffs, such as

11   The Limited, Sears, and Safeway, stood to gain from damages for the *Membership Rules* claims,

12   respondents contend there is no basis to conclude that plaintiffs did not seek to obtain the best

13   settlement by obtaining the highest possible amount for the exclusionary rules claims.

14          A recent Eighth Circuit case, *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d

15   800 (8th Cir. 2004) ("*General American*"), supports respondents' position.  In *General*

16   *American*, plaintiff brought an action in the state court of New Mexico against General American

17   Life Insurance Company even though she had participated in a class action (the "*General*

18   *American Class Action*") against the same defendant in the Eastern District of Missouri that

19   obtained a minimum of $55,000,000 in settlement proceeds.  *Id.* at 802.  The *General American*

20   plaintiff brought her action against the insurer based on alleged omissions and non-disclosures

---

[20] By the time it issued its opinion, the district court had already dismissed the foreign
auction claims, *see id.* at *11, leaving only the opportunity to bring those claims in foreign
courts.  Concluding that the foreign auction claims therefore lacked significant value, the district
court nonetheless refused to approve even this minimal sacrifice without due consideration.  *Id.*

24

1    concerning particular aspects of its billing procedures, while the *General American Class Action*

2    had pursued recovery for more general claims concerning the same conduct.  *Id.*

3           The Eighth Circuit found that the language used in the class action settlement agreement

4    encompassed the *General American* plaintiff's state court claims as a subset of the claims

5    released.  *Id.* at 803.  Since the notice to the class in *General American Class Action* was clear

6    and fair – providing class members the opportunity to opt out if they wished – the court found

7    that releasing certain claims was not problematic.  *Id.*  Thus, the court affirmed the dismissal of

8    *General American* plaintiff's claim on the ground that the *General American Class Action*

9    settlement agreement and the class notice clearly articulated a release of future claims.  *Id.* at 803.

10   In light of the valid and "very broad" settlement release in the class action, which included

11   known and unknown causes of action, the court held that "[w]e have no difficulty in concluding

12   that the [class] judgment bars the New Mexico action."  *Id.*  The court articulated the give-and-

13   take nature of the settlement process and the court's role in scrutinizing the efforts of lead

14   plaintiffs:

15          The release of [a particular] category of claims was one of a series of benefits
16          conferred on the defendant by the class as part of the settlement.  On the other
17          side, defendant conferred benefits on the plaintiff class, including a monetary
18          settlement, from which the plaintiff in this [related] case has benefitted, and a . . .
19          procedure that could produce additional relief.  No part of the consideration on
20          either side is keyed to any specific part of the consideration of the other.  Each
21          side gives up a number of things.  This is the way settlements usually work.  It
22          was the judgment of the class representative that [a particular category of claims],
23          known and unknown, was a proper thing to give up to obtain the benefits offered
24          by [the defendant] . . . . [W]e have no way to criticize the judgment of the class
25          representative.  Accordingly, we hold that the representation afforded was
26          adequate, and that the provisions of Fed. R. Civ. P. 23 were fully met.
27
28   *Id.* at 805.

29          The Eighth Circuit's analysis of the settlement process is especially compelling here,

25

1    where class representatives possessed the released claims and did not agree to preclude lawsuits

2    arising out of similar conduct in the future.  We agree with respondents that due process does not

3    require that all class claims be pursued.  Instead, where different claims within a class involve the

4    identical factual predicate, adequate representation of a particular claim is determined by the

5    alignment of interests of class members, not proof of vigorous pursuit of that claim.  Thus, the

6    district court did not err in ruling that plaintiffs' release of the *Reyn's* and *Membership Rules*

7    claims did not violate due process, where plaintiffs are members of the *Reyn's* and *Membership*

8    *Rules* classes and the release was part of the consideration necessary to obtain the largest antitrust

9    settlement in history.  *Visa Check III*, 297 F. Supp. 2d at 508, 524; *see Joel A.*, 218 F.3d at 142

10   (release may include "claims [that] are subsumed within a more generalized claim").[21]

11       Like the plaintiff in *General American*, who complained that "the class representative

12   gave away all modal-billing claims (in the release) and received nothing in exchange for them,"

13   357 F.3d at 805, Pasta Bella and NuCity seek greater compensation for the claims asserted in

14   their respective lawsuits.  Their contention that they were inadequately represented is more

15   appropriately cast as a challenge to the Settlement's fairness than as a due process claim, since

16   their positions are grounded in the notion that the Settlement resulted in a class recovery that was

17   too low.

18                                              **PART II**
19                       **NOTICE TO CLASS MEMBERS WAS ADEQUATE**
20
21       The standard for the adequacy of a settlement notice in a class action under either the

---

[21] Defendants argue that the release is "no broader than the effect of *res judicata* from the district court's judgment."  Case No. 04-0344, Defs. Br. at 31 n.11; Case No. 04-1052, Defs. Br. at 33 n.16.  We need not consider this argument because we conclude that the Settlement validly released the non-party banks.

1    Due Process Clause or the Federal Rules is measured by reasonableness.  *See Soberal-Perez v.*

2    *Heckler*, 717 F.2d 36, 43 (2d Cir. 1983); Fed. R. Civ. P. 23(e).  There are no rigid rules to

3    determine whether a settlement notice to the class satisfies constitutional or Rule 23(e)

4    requirements; the settlement notice must "fairly apprise the prospective members of the class of

5    the terms of the proposed settlement and of the options that are open to them in connection with

6    the proceedings." *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982) (internal quotation

7    marks and brackets omitted).  Notice is "adequate if it may be understood by the average class

8    member."  4 NEWBERG § 11:53, at 167.

9

10   **A.      Pasta Bella Received Adequate Notice**

11           Since the class notice did not name the banks as parties and the settlement notice did not

12   specifically inform class members that the *Reyn's* claims would be included in the Settlement,

13   Pasta Bella argues that it was denied due process because class members were not given the

14   opportunity to opt out after the settlement notice was issued.  Although Pasta Bella forfeited this

15   contention by failing to preserve it at the district court, *see Krumme v. WestPoint Stevens Inc.*,

16   238 F.3d 133, 142 (2d Cir. 2000), we note that even if it had been preserved, the argument cannot

17   prevail.  The Ninth Circuit's decision in *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th

18   Cir. 1992), is directly on point.  That case involved class action claims arising from the default of

19   $2.25 billion in bonds issued to finance power plants in the State of Washington.  *Id.* at 1273.

20   Pursuant to a settlement between the parties, the State obtained a release in that action even

21   though it was not a party and was not mentioned in the notice of pendency.  *Id.* at 1288, 1290-91.

22   On appeal, the Ninth Circuit affirmed the district court's approval of settlement by determining

23   that a federal court may release a claim "based on the identical factual predicate as that

27

1    underlying the claims in the settled class action even though the claim was not presented *and*

2    *might not have been presentable in the class action*." *Id.* at 1287 (quoting *TBK*, 675 F.2d at 460

3    (emphasis added in *Class Plaintiffs*)).  Since the parties had been given notice of the action, the

4    opportunity to opt out, notice of the proposed settlement, and the opportunity to object, the court

5    held that it was not required to grant those who objected to the proposed settlement a second

6    opportunity to opt out.  *Id.* at 1289.

7           Here, although the member banks were not named as defendants, the complaint described

8    "[a]pproximately 4,400 banks that have issued Visa and/or MasterCard credit cards and also

9    issued *Visa Check* and/or *MasterMoney* debit cards" as co-conspirators.  2d Am. Compl. ¶ 32.

10   The notice of pendency, which incorporated the allegations in the complaint, alleged a conspiracy

11   between Visa, MasterCard, and "their member banks."  Notice of Pendency ¶ 3.  Attempting to

12   distinguish the *Reyn's* claims from those in the instant action, Pasta Bella's amended complaint

13   in *Reyn's* states, "Plaintiffs do not contest in this action, as averred in other litigation, any tying

14   arrangement, of the VISA and MASTERCARD debit charges with other charges."  *Reyn's* 1st

15   Am. Compl. ¶ 11.  Yet, Pasta Bella's attempt to distinguish the claims in *Reyn's* from the claims

16   in the instant action does not alter the fact that the claims in both cases arise out of the identical

17   factual predicate.  Indeed, Pasta Bella's artful language belies its recognition of the potential for

18   overlap between the two lawsuits.  Thus, Pasta Bella cannot reasonably argue that it was not on

19   notice of the possibility that, pursuant to settlement in this action, the banks would be released

20   from future claims.  Pasta Bella was required to opt out at the class notice stage if it did not wish

21   to be bound by the Settlement.

22   **B.     NuCity Received Adequate Notice**

1          NuCity argues that the settlement notice denied the *Membership Rules* class due process

2   because it failed to disclose:

3       1.      the judgment against Visa and MasterCard in *Government's Membership Rules*;
4       2.      the pending claims in *Membership Rules*;
5       3.      the prospect that the Settlement's contemplated release would extinguish all
6                claims in *Membership Rules*;
7       4.      the value attributed by plaintiffs' counsel to the *Membership Rules* claims; and
8       5.      the value received by the class in exchange for release of the *Membership*
9                *Rules* claims.
10

11          NuCity points to the notice of settlement in *Auction Houses* and argues that the settlement

12   notice in this case comes up short.  In *Auction Houses*, the notice explicitly informed class

13   members that the settlement would permanently bar them from pursuing claims based on

14   auctions held outside the U.S., and that class members with potential claims arising out of

15   foreign auctions "should consider whether or not to forego the benefits of the proposed

16   settlement."  *Auction Houses*, 2001 WL 170792, at *3.  In this case, NuCity asserts that the need

17   to include cautionary language in the settlement notice was especially great, since the notice of

18   pendency also lacked an explanation of the action's impact on *Membership Rules*.  NuCity

19   further asserts that since the *Membership Rules* class was not yet certified, *see supra* note 8,

20   claimants could not have been expected to intuit that their *Membership Rules* claims would be

21   released by the Settlement.  Thus, NuCity contends class members did not know they were

22   releasing live claims in an already-filed action seeking billions in damages when they neglected

23   to opt out of the class or object to the Settlement.

24          Underscoring the need for additional disclosure, NuCity relies on *In re Nissan Motor*

25   *Corp. Antitrust Litigation*, 552 F.2d 1088 (5th Cir. 1977) ("*Nissan Motor*"), where the Fifth

26   Circuit found that the class notice serves as the class members' "primary, if not exclusive, source

1    of information for deciding how to exercise their rights under rule 23." *Id.* at 1104. *Nissan*

2    *Motor* required that class members be given "information reasonably necessary to make a

3    decision [whether] to remain a class member and be bound by the final judgment or opt out of

4    the action," though the notice need not include "every material fact" or be "overly detailed." *Id.*

5    at 1104-05. In light of this standard, the Fifth Circuit held that, where a partial settlement was

6    proposed between plaintiffs and a group of defendants before notice of a class action had been

7    sent to class members, the notice must apprise class members of the proposed partial settlement,

8    because the relief obtained in the proposed settlement would be an "essential factor" in an absent

9    class member's decision whether to opt out of the class. *Id.* at 1105.

10           In this case, the settlement notice quoted verbatim the Settlement's release. Respondents

11   argue that (1) the law does not require parties to describe pending actions covered by a release in

12   a proposed settlement notice, and, in any event, (2) quoting a release word for word in the

13   settlement notice is sufficient to inform class members of the scope and effect of the release. In

14   support of its approval of the settlement notice, the district court relied on *Weinberger*, 698 F.2d

15   at 70, for the proposition that the law merely requires a class notice to describe effectively the

16   scope of a release. *Visa Check III*, 279 F. Supp. 2d at 516. Since the release was quoted in its

17   entirety, the court concluded that "the expansive reach of the release[] could not have been

18   clearer. This is all that was required." *Id.* We agree with the district court and do "not believe

19   that due process requires further explanation of the effects of the release provision in addition to

20   the clear meaning of the words of the release." *O'Brien v. Nat'l Prop. Analysts Partners*, 739 F.

21   Supp. 896, 902 (S.D.N.Y. 1990). *Accord Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1317-18 (3d

1    Cir. 1993); *Maher v. Zapata Corp.*, 714 F.2d 436, 452-53 (5th Cir. 1983).[22]

2    **C.    Armenta's Lacks Standing to Challenge its Notice**

3         Armenta's appeals the district court's approval of the Settlement on the ground that the

4    English-only Settlement Documents violated due process and Federal Rule of Civil Procedure 23

5    because an identifiable class – Spanish-speaking class members who could not read and

6    understand the English-only Settlement Documents – was not afforded notice.[23]

7         Armenta's does not provide sufficient evidence that it represents an identifiable subclass

8    of claimants who could not comprehend the Settlement Documents.  While the representatives of

9    the purported subclass describe a significant preference for Spanish, they do not claim that they

10   cannot read English or that they cannot conduct business in English.  *See* Armenta Aff. ¶¶ 4-5;

11   Martinez Aff. ¶¶ 4-5.  Further, the statistics provided by Armenta's to the district court –

12   statistics concerning the number of Spanish-speaking families and businesses in the United States

13   – even if taken as true, do not establish that Spanish-speaking class members could not

14   understand the Settlement Documents.  Thus, we do not find error in the district court's

15   conclusion that "a lack of comfort [in the English language] does not mean there was a

16   significant defect in the notice."  *Visa Check III*, 297 F. Supp. 2d at 517.

17                                          **PART III**
18                              **THE SETTLEMENT IS FAIR**

---

[22] We note, however, that class notices do sometimes include specific reference to pending actions.  *See, e.g.*, *Auction Houses*, 2001 WL 170792, at *3-4; *Fradette v. Am. Serv. Corp.*, No. 76-6373-Civ-CA, 1979 WL 1756, *1 (S.D. Fla. Aug. 29, 1979) (finding information concerning "related litigation" in class notice to be material to a reasonable person).  Obviously, this information is helpful to class members.  We strongly encourage the inclusion of such information in the future.

[23] As previously defined, "Settlement Documents" is the term used in this opinion to refer collectively to the settlement notice and the summary notice.

1    **A.        The Settlement is Entitled to a Presumption of Fairness**

2              A court may approve a class action settlement if it is "fair, adequate, and reasonable, and

3    not a product of collusion." *Joel A.*, 218 F.3d at 138.  A court determines a settlement's fairness

4    by looking at both the settlement's terms and the negotiating process leading to settlement.

5    *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001).  A "presumption of fairness,

6    adequacy, and reasonableness may attach to a class settlement reached in arm's-length

7    negotiations between experienced, capable counsel after meaningful discovery." *Manual for*

8    *Complex Litigation, Third*, § 30.42 (1995).  We are mindful of the "strong judicial policy in favor

9    of settlements, particularly in the class action context." *In re PaineWebber Ltd. P'ships Litig.*,

10   147 F.3d 132, 138 (2d Cir. 1998).  "The compromise of complex litigation is encouraged by the

11   courts and favored by public policy."  4 NEWBERG § 11:41, at 87.

12             In the instant case, the district court rightly praised the efforts of plaintiffs' lead counsel.

13   *Visa Check III*, 297 F. Supp. 2d at 524.  "Constantine & Partners is a premiere plaintiffs'

14   litigation firm, specializing in antitrust litigation particularly and complex commercial litigation

15   generally."  *Id.*  Counsel for the class took and defended approximately 400 depositions,

16   including 21 expert depositions, and reviewed more than 5 million pages of documents during

17   approximately seven years of litigation, *id.* at 507-08, 511 n.8.  Clearly, counsel conducted

18   meaningful discovery.  Of course, "the quality of representation is best measured by results."

19   *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 55 (2d Cir. 2000).  Here, plaintiffs' counsel

20   "produced the largest antitrust settlement ever." *Visa Check III*, 297 F. Supp. 2d at 524.  The

21   Settlement includes $3,383,400,000 in compensatory relief, plus additional injunctive relief

22   valued at $25 to $87 billion or more.  *Id.* at 509, 512.  According to settlement mediator Eric

32

1    Green, "the court system and the mediation process worked exactly as they are supposed to work

2    at their best; a consensual resolution was achieved based on full information and honest

3    negotiation between well-represented and evenly balanced parties."  Green Decl. ¶ 12.

4    Concluding that "there could not be any better evidence of procedural integrity" than the

5    aggressive litigation spanning nearly a decade and the impassioned settlement negotiations that

6    produced an agreement on the brink of trial, the district court affirmed Green's sentiments by

7    finding that "[c]ollusion or coercion could not conceivably have tainted the process." *Visa Check*

8    *III*, 297 F. Supp. 2d at 510.

9          We agree with this assessment and conclude that the district court did not abuse its

10   discretion in determining that a presumption of fairness arose.

11   **B.    The Settlement is Substantively Fair**

12         When reviewing a district court's approval of a settlement, a "trial judge's views are

13   accorded 'great weight . . . because he is exposed to the litigants, and their strategies, positions

14   and proofs. . . . Simply stated, he is on the firing line and can evaluate the action accordingly.'"

15   *Joel A.*, 218 F.3d at 139 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 454 (2d Cir.

16   1974)).

17         In this Circuit, courts examine the fairness, adequacy, and reasonableness of a class

18   settlement according to the "*Grinnell* factors." *Id.* at 138.  The factors are:

19             (1) the complexity, expense and likely duration of the litigation;
20             (2) the reaction of the class to the settlement;
21             (3) the stage of the proceedings and the amount of discovery completed;
22             (4) the risks of establishing liability;
23             (5) the risks of establishing damages;
24             (6) the risks of maintaining the class action through the trial;
25             (7) the ability of the defendants to withstand a greater judgment;
26             (8) the range of reasonableness of the settlement fund in light of the best possible

33

1        recovery;

2        (9) the range of reasonableness of the settlement fund to a possible recovery in

3             light of all the attendant risks of litigation.

4

5    *Grinnell*, 495 F.2d at 463 (citations omitted).

6        **1.**      **Complexity, Expense and Likely Duration of Litigation**

7        Federal antitrust cases are complicated, lengthy, and bitterly fought.  *See Weseley v.*

8    *Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y.1989).  "Few areas of federal antitrust

9    law are more confusing than the law that governs tying arrangements."  Herbert Hovenkamp,

10    *Tying Arrangements and Class Actions*, 36 VAND. L. REV. 213, 213 (1983).  The district court

11    concluded that this case would have taken three months to try and several years for appellate

12    review.  *Visa Check III*, 297 F. Supp. 2d at 510.  None of the appellants argue that this case was

13    uncomplicated or would have resulted in a short trial.

14        **2.**      **Reaction of the Class to the Settlement**

15        On the whole, the class appears to be overwhelmingly in favor of the Settlement.  Only

16    eighteen class members out of five million objected to the Settlement.  *Id.* at 511.  "If only a

17    small number of objections are received, that fact can be viewed as indicative of the adequacy of

18    the settlement."  4 NEWBERG § 11.41, at 108; *see also D'Amato*, 236 F.3d 78, 86-87 (holding that

19    the district court properly concluded that 18 objections from a class of 27,883 weighed in favor

20    of settlement).  This Court is certainly aware that "[l]ack of objection by the great majority of

21    claimants means little when the point of objection is limited to a few whose interests are being

22    sacrificed for the benefit of the majority."  *Super Spuds*, 660 F.2d at 16.  But here, the absence of

23    substantial opposition is indicative of class approval, since every member of the class in *Reyn's*

24    and *Membership Rules* is also a member of the instant class.

1    **3.      Stage of Proceedings and Amount of Discovery Completed**

2         "If all discovery has been completed and the case is ready to go to trial, the court

3    obviously has sufficient evidence to determine the adequacy of settlement."  4 NEWBERG §

4    11:45, at 129.  Here, plaintiffs entered into settlement only after a thorough understanding of

5    their case.  As noted earlier, extensive discovery proceedings spanning over seven years and

6    millions of pages of documents preceded the Settlement.  *Visa Check III*, 297 F. Supp. 2d at 511

7    n.8.  The parties also underwent summary judgment proceedings and mediation before they

8    struck a deal at the courthouse steps.  *Id.* at 508, 511.  Certainly, a substantial amount of work

9    had been completed, leaving relatively few unknowns prior to trial.

10   **4.      Risks of Class Prevailing (Establishing Liability, Establishing Damages,**
11   **         Maintaining the Class through Trial)**
12
13        Characterizing the defendants' "Honor All Cards" policy as having at least some pro-

14   competitive features, the district court concluded that establishing liability "was no sure thing"

15   for the plaintiffs.  *Id.* at 511.  "Indeed, the history of antitrust litigation is replete with cases in

16   which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only

17   negligible damages, at trial, or on appeal."  In re *NASDAQ Market-Makers Antitrust Litig.*, 187

18   F.R.D. 465, 476 (S.D.N.Y. 1998); *see*, *e.g.*, *United States Football League v. Nat'l Football*

19   *League*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986) ("[T]he jury chose to award plaintiffs only

20   nominal damages, concluding that the USFL had suffered only $1.00 in damages as a result of

21   the NFL's unlawful conduct."), *aff'd*, 842 F.2d 1335, 1377 (2d Cir. 1988).  That said, we must

22   acknowledge that the Government's successful prosecution of *Government's Membership Rules*

23   improved plaintiffs' likelihood of success in this case.  Yet, on balance, it is certainly fair to

24   conclude that even if the plaintiffs had prevailed in establishing their tying claim, they would

1    have faced significant challenges in proving damages.  *Visa Check III*, 297 F. Supp. 2d at 511.[24]

2          **5.      Ability of Defendants to Withstand a Greater Judgment**

3          The compensatory relief provided in the Settlement constitutes "the largest settlement

4    ever approved by a federal court."  *Id.* (quoting plaintiffs' expert Professor John C. Coffee, Jr. of

5    Columbia University Law School).  Additionally, the injunctive relief – valued at approximately

6    $25 to $87 billion or more, *id.* at 511-12 – adds great value to the Settlement.  Yet, Pasta Bella

7    insists that a settlement requiring payment from the banks could have been substantially higher.

8    We cannot agree with this argument.  It is hardly surprising that the district court did not make

9    explicit findings with respect to the ability of the member banks to withstand a significantly

10   greater damages award, since the banks are not defendants in this case.  Even if such a finding

11   were helpful, our concern about financial resources of member banks would be assuaged by the

12   district court's finding that virtually all of the relief in the Settlement already comes from the

13   banks.  *Id.* at 514.

14          **6.      Range of Reasonableness of Settlement Fund in Light of Best Possible**
15          **Recovery and Attendant Risks of Litigation**
16
17          [T]here is a range of reasonableness with respect to a settlement – a range which
18          recognizes the uncertainties of law and fact in any particular case and the
19          concomitant risks and costs necessarily inherent in taking any litigation to
20          completion – and the judge will not be reversed if the appellate court concludes
21          that the settlement lies within that range.

22   *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).  Here, the statistics concerning the

23   Settlement are staggering: the compensatory relief by itself constitutes the largest settlement ever

24   approved by a federal court; the injunctive relief will save the class $25 to $87 billion or more.

---

[24] The record does not include evidence concerning the likelihood of maintaining the class
through trial, though decertification is always possible as a case progresses and additional facts
are developed.  *See Visa Check II*, 192 F.R.D. at 89.

1    Since the district court found that experienced and able counsel fought this litigation

2    "aggressively" and "negotiated feverishly," *Visa Check III*, 297 F. Supp. 2d at 510, and that

3    "virtually all of the relief comes from" the banks, *id.* at 514, there is little reason to believe that

4    additional money would have been put into the settlement pot had the banks been named as

5    parties.  The banks' participation in the settlement speaks volumes of their stake in the litigation.

6    Moreover, given that the *Reyn's* and *Membership Rules* plaintiffs are substantially similar to the

7    instant plaintiffs, it cannot be said that the settlement fund was unreasonably small or particularly

8    unfair to a subset of plaintiffs.

9          Indeed, the favorable reaction of the overwhelming majority of class members to the

10   Settlement is perhaps the most significant factor in our *Grinnell* inquiry.  Having considered this

11   factor along with the others, we conclude that the district court did not err in finding the

12   Settlement substantively fair.[25]

13   **C.       NuCity is Not Entitled to Discovery**

14         NuCity appeals the district court's denial of its motion for limited discovery to examine

15   whether the Settlement included consideration for claims asserted in *Membership Rules*, the

16   value attributed to claims foregone, and the justification for such valuation.  Generally, such a

17   discovery request depends on "whether or not the District Court had before it sufficient facts

18   intelligently to approve the settlement offer.  If it did, then there is no reason to hold an

19   additional hearing on the settlement or to give appellants authority to renew discovery."

20   *Grinnell*, 495 F.2d at 462-63.

---

[25] By failing to plead it at the district court, Pasta Bella forfeited its argument that the
Settlement perpetuated illegal price-fixing because it set a fixed interchange rate during the
period from August 1, 2003 through December 31, 2003.  *See Krumme*, 238 F.3d at 142.

1    As noted by the *Grinnell* analysis described above, the district court possessed an

2    abundance of facts to make a fairness determination.  Plaintiffs were not required to bargain

3    separately for relief in exchange for the *Membership Rules* claims.  "No part of the consideration

4    on either side is keyed to any specific part of the consideration of the other.  Each side gives up a

5    number of things.  This is the way settlements usually work." *General American*, 357 F.3d at

6    805.  Thus, the district court did not abuse its discretion in denying NuCity's discovery motion.

7    **D.    The Parties are Not Judicially Estopped from Including the *Reyn's* Claims in the**
8    **Settlement**
9
10   Northern District of California Local Rule 3-13 provides that:

11   Whenever a party knows or learns that an action filed or removed to this district
12   involves all or a material part of the same subject matter and all or substantially
13   all of the same parties as another action which is pending in any other federal . . .
14   court, the party must file with the Court in the action pending before this Court . .
15   . a Notice of Pendency of Other Action . . . .

16   N.D. Cal. Civil L.R. 3-13(a).  Instead of filing the required notice in the Northern District of

17   California, Visa and MasterCard settled the instant action and then sought to dismiss *Reyn's* on

18   the ground that the claims in that case were barred by the Settlement.  Pasta Bella argues that

19   Visa and MasterCard knowingly violated Northern District of California Local Rule 3-13 to

20   escape liability for the conduct alleged in *Reyn's*.  According to Pasta Bella, if the actions are

21   related, then compliance with Rule 3-13 would have caused *Reyn's* to have been transferred to

22   the Eastern District of New York and consolidated with the instant action.  *See* N.D. Cal. Civil

23   L.R. 3-13(b)(3)(B); *cf.* 28 U.S.C. § 1407 (providing a mechanism for the transfer of "civil actions

24   involving one or more common questions of fact" pending in different districts "for coordinated

25   or consolidated pretrial proceedings").  Pasta Bella contends that if *Reyn's* had been consolidated

26   with this action, the class recovery would have been higher.  Thus, Pasta Bella urges us to estop

38

1    Visa and MasterCard from benefitting from their failure to comply with the Northern District of

2    California's local rules.

3         We have previously held that "judicial estoppel applies only when a tribunal in a prior

4    separate proceeding has relied on a party's inconsistent factual representations and rendered a

5    favorable decision." *Adler v. Pataki*, 185 F.3d 35, 41 n.3 (2d Cir. 1999) (emphasis omitted); *see*

6    *also Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).  We need

7    not determine whether defendants' alleged failure to file a notice of pendency constituted

8    "inconsistent factual representations," for there is no evidence that the Northern District of

9    California relied on that failure and "rendered a favorable decision."  Estoppel is therefore

10   inappropriate here.

11                                    **PART IV**
12               **THE DISTRICT COURT'S FEE AWARD IS REASONABLE**
13
14        At the district court, lead counsel for the plaintiffs sought a fee of $609,012,000 –

15   approximately 18% of the present value of the Settlement's compensatory relief, 2.14% of the

16   present value of the Settlement (inclusive of injunctive relief), and 9.68 times the lodestar figure

17   of $62,940,045.84.[26]  *Visa Check III*, 297 F. Supp. 2d at 522.  Seventeen merchants objected to

18   counsel's fee petition.  *Id.* at 509 n.6, 522 n.27.  The court found the fee petition excessive

19   despite the excellence of plaintiffs' representation, *id.* at 522, 524.  Assessing the fee petition

20   with a careful eye for the interests of all class members, the court awarded fees in the amount of

21   $220,290,160.44 plus an additional $18,716,511.44 in costs and expenses.  *Id.* at 507, 524-26.

22   Leonardo's argues that the district court's fee award was too high, while Constantine & Partners

---

[26] The district court described the fee award as "9.68% times the lodestar figure."  *See*
*Visa Check III*, 297 F. Supp. 2d at 522.  This is clearly a typographical error.

39

1    ("C&P"), plaintiffs' lead counsel, contends that the fee award was too low.

2    **A.    "Percentage of the Fund" is an Appropriate Method**

3        The district court utilized the "percentage of the fund" method to calculate attorneys'

4    fees. *Visa Check III*, 297 F. Supp. 2d at 524.  Courts may award attorneys' fees in common fund

5    cases under either the "lodestar" method or the "percentage of the fund" method.  *See*

6    *Goldberger*, 209 F.3d at 50.  The lodestar method multiplies hours reasonably expended against a

7    reasonable hourly rate. *Id.* at 47.  Courts in their discretion may increase the lodestar by applying

8    a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys.

9    *Id.*  The trend in this Circuit is toward the percentage method, *Visa Check III*, 297 F. Supp. 2d at

10    520, which "directly aligns the interests of the class and its counsel and provides a powerful

11    incentive for the efficient prosecution and early resolution of litigation," *In re Lloyd's Am. Trust*

12    *Fund Litig.*, 2002 WL 31663577, at *25.  In contrast, the "lodestar create[s] an unanticipated

13    disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district

14    courts to engage in a gimlet-eyed review of line-item fee audits."  *Baffa v. Donaldson Lufkin &*

15    *Jenrette Secs. Corp.*, No. 96 Civ. 0583, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002)

16    (internal quotation marks omitted).

17    **B.    The *Goldberger* Factors Confirm the Reasonableness of the Fee Award**

18        Irrespective of which method is used, the "*Goldberger* factors" ultimately determine the

19    reasonableness of a common fund fee.  They include:

20               (1)  the time and labor expended by counsel;
21               (2)  the magnitude and complexities of the litigation;
22               (3)  the risk of the litigation . . .;
23               (4)  the quality of representation;
24               (5)  the requested fee in relation to the settlement; and
25              (6)  public policy considerations.

1    *Goldberger*, 209 F.3d at 50 (citation omitted); *see, e.g.*, *Baffa*, 2002 WL 1315603, at *1 ("district

2    courts should continue to be guided by the [*Goldberger* factors]").  Recognizing that economies

3    of scale could cause windfalls in common fund cases, courts have traditionally awarded fees for

4    common fund cases in the lower range of what is reasonable.  *Goldberger*, 209 F.3d at 52; *see*

5    *also In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689, 2003 WL 22244676, at *6 (S.D.N.Y.

6    Sept. 29, 2003) ("[T]he percentage used in calculating any given fee award must follow a sliding-

7    scale and must bear an inverse relationship to the amount of the settlement.  Otherwise, those law

8    firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated

9    to the detriment of the class members they represent.").

10           The district court concluded that the *Goldberger* factors compel an "extraordinary" fee

11   under these circumstances: lead counsel devoted tremendous time and labor to this case for seven

12   years; antitrust cases, by their nature, are highly complex; this case was especially large and

13   complicated, involving almost every U.S. bank and more than five million U.S. merchants; the

14   risk of the litigation was very high; lead counsel devoted 52% of its legal staff to work on a case

15   that spanned seven years without any guarantee of recovery; plaintiffs' counsel achieved

16   extraordinary results; plaintiffs' counsel did not have the benefit of "piggybacking" off of a

17   previous case – instead, the Government piggybacked off of plaintiffs' counsel's work by using it

18   in *Government's Membership Rules*; even a very large fee award would be a small percentage of

19   the settlement fund; and the Settlement produced "significant and lasting benefits for America's

20   merchants and consumers."  *Visa Check III*, 297 F. Supp. 2d at 523-24.  Asserting its jealous

21   regard for absent class members, the court sought to compensate plaintiffs' counsel handsomely

22   and at the same time limit the percentage of the award so that plaintiffs' counsel would not

41

1    receive a windfall detrimental to the class:

2         Were the Fund not so large, dwarfing the funds in all of the cases Lead Counsel
3         have cited, a larger percentage might be appropriate.  But given the circumstances
4         as they are, my award is appropriate.  Only in comparison to the amount sought
5         can it be considered anything but generous.
6
7    *Id.* at 525 (footnote omitted).  C&P argues that the district court's fee award was insufficient

8    because (a) the fee award provides a meager percentage of the settlement fund and (b) the fee

9    award reduces the incentive to class lawyers to seek maximum relief.

10        **1.    The Fee Award is Based on a Reasonable Percentage of the Fund**

11        C&P cites *In re Linerboard Antitrust Litigation*, No. MDL 1261, 2004 WL 1221350

12   (E.D. Pa. June 2, 2004) ("*Linerboard*"), in support of its argument against a declining percentage

13   approach to large fee awards.  In that case, the court found that "the sliding scale approach is

14   economically unsound."  *Id.* at *17.  The *Linerboard* court explained that it is especially

15   important to provide appropriate incentives to attorneys pursuing antitrust actions because public

16   policy relies on private sector enforcement of the antitrust laws.  *Id.*  C&P contends that not only

17   was the court's percentage award low, but also the court did not adequately compensate counsel

18   for the substantial injunctive relief it obtained for the class.  Thus, C&P argues that the district

19   court's fee award severely inhibits the strong public policy articulated in *Linerboard* that favors

20   providing incentives to attorneys to pursue maximum relief for their clients.

21        We need not dispute whether the sliding scale approach is economically rational in the

22   context of ensuring competent and committed counsel.  Public policy concerns oftentimes

23   redefine the focus of the court.  In this case, the district court's decision in favor of protecting the

24   instant class from an excessive fee award militates against awarding attorneys' fees based purely

25   on economic incentives.  Satisfied that its ruling would not deter plaintiffs' attorneys from

1    pursuing similar claims, the district court remarked, "If [this fee award] amounts to punishment, I

2    am confident there will be many attempts to self-inflict similar punishment in future cases." *Visa*

3    *Check III*, 297 F. Supp. 2d. at 525.  We agree.

4           While courts in megafund cases often award higher percentages of class funds as fees

5    than the district court awarded in this instance, *see id.* at 525 n.33, the sheer size of the instant

6    fund makes a smaller percentage appropriate.  As a "cross-check" to a percentage award, courts

7    in this Circuit use the lodestar method.  *Goldberger*, 209 F.3d at 50.  Here, the lodestar yields a

8    multiplier of 3.5, which has been deemed reasonable under analogous circumstances.[27]  *See In re*

9    *Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001) (finding lodestar multiplier of

10   1.35 to 2.99 common in megafunds over $100 million); *NASDAQ Market-Makers*, 187 F.R.D. at

11   489 ("multipliers of between 3 and 4.5 have become common") (internal quotation marks

12   omitted).  Thus, the district court did not abuse its discretion in awarding plaintiffs' counsel a

13   generous fee based on a somewhat low percentage of the fund.

14        **2.    The District Court Was Not Required to Adhere to the Fee Agreement**
15             **Between Plaintiffs' Counsel and Lead Plaintiffs**
16
17          Plaintiffs' counsel argues that the district court was aware that class counsel had

18   negotiated a fee arrangement with five of the nation's largest merchants that exceeded the 18%

19   fee class counsel requested from the court and far exceeded the fee the court awarded.[28]  Thus,

_____

        [27] As noted in subsection A of this Part, the lodestar method calculates attorneys' fees by
multiplying hours reasonably expended against a reasonable hourly rate; courts may use their
discretion to increase the lodestar by applying a multiplier based on factors such as the riskiness
of the litigation and the quality of the attorneys.  Here, the lodestar calculation yields
$62,940,045.84, *Visa Check III*, 297 F. Supp. 2d at 522, which is approximately 29% of the
district court's award of $220,290,160.44 to class counsel, *id.* at 507.

        [28] This argument is based on an assertion made by Lloyd Constantine, managing partner
of Constantine & Partners, lead counsel, in a declaration submitted to the court.  In that

                                            43

1    class counsel argues that the district court ignored the *Goldberger* proviso that "market rates,

2    where available, are the ideal proxy for [class counsel's] compensation." *Goldberger*, 209 F.3d

3    at 52.  As further proof of class satisfaction with counsel's fee request, counsel argues that none

4    of the large and sophisticated merchants in this class action objected to its fee petition.  *But see*

5    *Goldberger*, 209 F.3d at 53 ("[Class members] have no real incentive to mount a challenge that

6    would result in only a minuscule *pro rata* gain from a fee reduction.") (internal quotation marks

7    omitted).  For the reasons discussed in the prior subsection, we cannot say that the district court

8    abused its discretion merely because it chose not to heed the terms of an agreement purportedly

9    reached between lead plaintiffs and their counsel when settlement payments to approximately

10   five million absent class members are at stake.[29]

11           A final word is in order here.  Measuring the difficulties of a large antitrust action and the

12   degree of success by counsel in forging a settlement is not an easy task.  In our view, the district

13   court carried out its responsibility with admirable care and thoroughness, and with an eye to a

14   just result.  There is no doubt this case dominated the lives of all involved for many years.  In

---

declaration, Mr. Constantine stated, "I declare that the fee arrangement embodied in [the retention agreements C&P has with its large merchant clients] is much less favorable to the Class than the fee for which C&P has applied on behalf of itself and the 29 other Class Counsel firms." Constantine Supp'l. Decl. ¶ 8.  Mr. Constantine offered to make these agreements available to the court for an inspection *in camera*. *Id.*

[29] At the district court, Leonardo's failed to contest class counsel's fee petition.  "The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, . . . waiver will bar raising the issue on appeal." *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir. 1977).  The Special Master found only one sentence addressing the fee petition in Leonardo's ten-page brief objecting to the Settlement. That sentence asked the court to "carefully consider the amount of attorneys' fees and expenses requested by class counsel, an issue which Objectors expressly reserve for further argument when the matter of fees is considered."  Special Master's Report and Recommendation, at 18.  The record is clear: Leonardo's did not preserve for appeal its challenge to the fee award.

1   approving the district court's fee award, we recognize the sacrifice and commitment plaintiffs'

2   counsel made to its clients while preserving as much as possible for those who were harmed.

3                                              **CONCLUSION**

4          The settlement release is enforceable against the claims in *Reyn's* and *NuCity* because the

5   claims in those cases arose out of the identical factual predicate as the claims in this case and

6   were adequately represented here.  The settlement notice was adequate because it fairly apprised

7   members of the terms of settlement, including the scope of the release.  Under a *Grinnell*

8   analysis, the Settlement is fair.  As a result, NuCity is not entitled to discovery.  Judicial estoppel

9   is not appropriate here, where the defendants did not benefit from any concealment.  The district

10  court's fee award is reasonable, as confirmed by the *Goldberger* factors.

11         We **AFFIRM** the district court in all respects.