**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
IN RE                                                              :     **MASTER FILE NO.**
                                                                   :     **CV-96-5238**
VISA CHECK/MASTERMONEY ANTITRUST                                   :     **(Gleeson, J.) (Mann, M.J.)**
LITIGATION                                                         :
-------------------------------------------------------------------x
This Document Relates To:                                          :
All Actions                                                        :
                                                                   :
-------------------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S APPLICATION FOR AN ORDER TO SHOW CAUSE

Lead Counsel Constantine Cannon respectfully submits this memorandum of law in support of its application for an order to show cause to protect the Class and the Common Fund established by the Settlements in the above-captioned action.

## PRELIMINARY STATEMENT

A class action settlement recovery firm, Spectrum Settlement Recovery ("Spectrum"), is using fraudulent and misleading solicitations to entice Class Members to retain Spectrum to prepare and file their Claim Forms.[1]  Spectrum is also intentionally spreading misinformation to confuse Class Members and complicate the allocation process in an attempt to create a need for its "services."  Class Members that fall prey to Spectrum's tactics have agreed to cede a substantial portion of their cash payment from the Settlement Fund in return for a promise that Spectrum will increase their recovery.  The likelihood that the actual recovery of any Class Member will increase because it contracts with Spectrum is significantly diminished by the fact that Spectrum's fee is 30% of the Class Member's payment.

The litany of falsehoods in Spectrum's statements include: (i) "[a] large majority of the businesses eligible to recover money in the $3 billion VISA/MasterCard class action settlement will miss their opportunity for a refund;" (ii) the estimated cash payment that will be set forth in most Claim Forms is merely an "offer" or "partial 'offer'" generated by Visa and MasterCard; (iii) the database that will be used to calculate estimated cash payments does not distinguish between off-line debit and credit card transactions; (iv) Class Members that do not challenge their estimated cash payments will

---

[1] Several other class action refund firms also have been soliciting Class Members to assist them in the preparation of their Claim Forms.  While it has concerns about those firms as well, Lead Counsel has not seen fraudulent or misleading solicitations from them.

1

not receive allocations for the period 1992-1996; (v) Class Members that do not challenge their estimated cash payments will not receive allocations for on-line debit; (vi) Class Members' challenges under the Plan of Allocation (the "Plan") will not be fairly adjudicated; (vii) the Fisher Allocation Methodology provides Class Members with a "lowest common denominator" recovery; (viii) "[a]n eleventh hour determination not to use MasterCard data to identify eligible transactions and claimants is further complicating the settlement notification process;" and (ix) Spectrum has a superior "algorithm" that will maximize Class Members' recovery from the Settlement Fund.[2]

In reliance on these blatant misrepresentations, approximately 211 Class Members – including some of the largest merchants in the United States – have agreed to relinquish a substantial portion of their Settlement Fund recovery to Spectrum. To further injure Class Members and the Class, Spectrum promises to file challenges for Class Members that are nothing more than untimely and unwarranted objections to the underlying basis for the Court-approved Plan. The time for such objections has long since passed. Moreover, Spectrum's "challenges" will harm its "clients" by unnecessarily delaying their payments and those of the entire Class by imposing an unnecessary tax on the Common Fund.

Because Spectrum threatens to deprive Class Members of their full settlement recovery and deplete the Common Fund with formulaic and unnecessary challenges, Spectrum will interfere with this Court's jurisdiction over and management of the

---

[2] Representative samples of Spectrum's solicitations are attached to the accompanying Declaration of Lloyd Constantine (hereinafter "Constantine Decl.") as Exhibit C. A list of the Class Members that have retained Spectrum, which includes some of the largest merchants in the country, is attached to the Constantine Decl. as Exhibit D. A representative sample of Spectrum's agency agreements is attached to the Constantine Decl. as Exhibit E. A press release issued by Spectrum on September 9, 2005 is attached to the Constantine Decl. as Exhibit H.

2

Settlements. Lead Counsel respectfully requests that the Court (a) declare Spectrum's fraudulently-induced contracts with Class Members void, or in the alternative (b) declare that Lead Counsel and the Claims Administrator are under no obligation to mail Claim Forms and Cash Payments to Spectrum, and need only mail Claim Forms and Cash Payments directly to Class Members. Moreover, we request that the Court enjoin Spectrum from soliciting Class Members in the manner described more fully below, and require Spectrum to correct its misstatements (at Spectrum's expense). These corrective measures are necessary to protect the Class and the Common Fund, as well as the operation of the Plan and the claims administration process ordered by this Court.

## BACKGROUND

*(i)    The Plan*

The Plan, as approved by the Court, will work as follows.[3] Class Members will receive cash payments associated with the three sources of damages asserted by the Class in this case – overcharges for off-line debit, credit and on-line debit card transactions. Class Members' cash payments will be based on their pro rata share of the off-line debit, credit and on-line debit card purchase volume accepted by the Class between October 25, 1992 and June 21, 2003 (the "Class Period"). The Plan principally utilizes the Visa Transactional Database to calculate Class Members' off-line debit, credit and on-line debit card purchase volumes during the Class Period.[4] Once Class Members' purchase

---

[3]    The Plan was initially submitted on August 18, 2003, and approved by the Court on December 19, 2003. *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d. 503, 518-520 (E.D.N.Y. 2003), *aff'd by Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005). On June 30 and August 2, 2005, the Court granted leave to amend the Plan, which amendment was thereafter submitted on August 16, 2005. The Amended Plan is attached to the Constantine Decl. as Exhibit A.

[4]    For Class Members not identified in the Visa Transactional Database, the Plan utilizes the Visa Payment Systems Panel Study to estimate their purchase volume. Since the Visa Transactional Database covers virtually all merchants that accepted Visa transactions between October 1, 1996 and July 31, 2003,

3

volumes are calculated, the Fisher Allocation Methodology will be applied to those volumes to estimate Class Members' cash payments from the Settlements.[5]

The Visa Transactional Database includes the Visa off-line debit and credit card purchase volumes for merchants in the United States that accepted Visa transactions between October 1, 1996 and July 31, 2003.  This database represents the only central source that provides comprehensive purchase volumes for the vast majority of Class Members for the bulk of the Class Period and that accurately distinguishes Visa debit from Visa credit purchase volumes.  In addition, using methodologies developed by the Class' economist, Dr. Fisher, this database can be used to estimate Class Members' MasterCard debit and credit card purchase volumes, volumes for the Class Period 1992-96, and on-line debit card volumes.[6]

Class Members identified in the Visa Transactional Database will receive a Claim Form with an estimated cash payment for overcharges associated with Visa and MasterCard off-line debit and credit card transactions.  Because the Visa Transactional Database covers the period October 1, 1996 to July 31, 2003, the vast majority of the Class will receive such Claim Forms.  This estimate also will cover the period 1992-1996, as volumes for that period will be estimated from the Class Members' purchase volumes from the Visa Transactional Database.  If a Class Member did not accept on-line debit and does not challenge its estimated cash payment, it merely has to submit the

---

the Panel Study will be principally used to calculate volumes for Class Members who went out of business or stopped accepting Visa before October 1, 1996.

[5] For a more detailed discussion of the Plan and the Fisher Allocation Methodology that explains how the Visa Transactional Database can be used to estimate MasterCard, pre-1996 and on-line debit card purchase volumes, see Constantine Decl. at Exhibits A, F, and G.

[6] *See* Fisher Allocation Declarations attached to the Constantine Decl. as Exhibits F and G.

Claim Form within 60 days and it will receive the cash payment detailed on its Claim Form. To simplify the process and relieve Class Members of the burden of compiling processor statements and merchant contracts dating back to 1992, Class Members do not have to submit any documentation with their Claim Form to receive their cash payment.[7]

If a Class Member accepted on-line debit, it must indicate as such on its Claim Form and detail when it began and completed the installation of PIN pads. With that information, it will receive a revised Claim Form that will include an estimated cash payment for on-line debit. If it does not challenge that estimate, it merely has to submit its revised Claim Form to receive an allocation for on-line debit overcharges. As with allocations for off-line debit and credit card damages, the Class Member does not have to submit any documentation to claim its share of the Settlement Fund for on-line debit.

The Plan enables Class Members to challenge their estimated cash payments if they submit documentation showing that the purchase volumes used by the Claims Administrator to calculate their payment from the Settlement Fund differ from the volumes of off-line debit, credit and/or on-line debit they actually received. To give Class Members a meaningful opportunity to challenge their estimated cash payment, the purchase volumes used to calculate these payments will be disclosed to Class Members, along with details regarding whether those volumes are actual figures from the Visa Transactional Database or estimates derived from that database or from the Visa Payment Systems Panel Study. Class Members, therefore, will be able to compare those figures to data in any processor statements they may have and institute challenges when they are warranted. Lead Counsel and the Claims Administrator have consistently explained these

---

[7] Lead Counsel may later ask certain merchants for documentation, such as a merchant contract, to ensure that they are entitled to a share of the Net Settlement Funds.

5

rights to Class Members and advised them to retain any documentation they may have that might substantiate their challenges. (Constantine Decl. at ¶ 10 and Exhibit A)

### *(ii)  Spectrum's Misrepresentations Regarding the Plan*

Even though the Plan clearly details otherwise, Spectrum falsely claims that: (i) "[a] large majority of the businesses eligible to recover money in the $3 billion VISA/MasterCard class action settlement will miss their opportunity for a refund;"(ii) the estimated cash payment that will be set forth in most Claim Forms is merely an "offer" or "partial 'offer'" generated by Visa and MasterCard; (iii) the Visa Transactional Database that will be used to calculate estimated cash payments does not distinguish between off-line debit and credit card transactions; (iv) Class Members that do not challenge their estimated cash payments will not receive allocations for the period 1992-1996; (v) Class Members that do not challenge their estimated cash payments will not receive allocations for on-line debit; (vi) Class Members' challenges under the Plan will not be fairly adjudicated; (vii) the Fisher Allocation Methodology provides Class Members with a "lowest common denominator" recovery; (viii) "[a]n eleventh hour determination not to use MasterCard data to identify eligible transactions and claimants is further complicating the settlement notification process;" and (ix) Spectrum has a superior "algorithm" that will maximize Class Members' recovery from the Settlement Fund. (Constantine Decl. at Exhibits C and H)

Spectrum claims that Class Members will receive less than their full share if they do not retain Spectrum to challenge their allocation. For example, Spectrum's solicitations include the following misstatements and scare tactics:

- "We basically create a recovery maximized algebraic algorithm to challenge the lowest common denominator algorithm from the

6

>Franklin Fischer [sic] formula in the Plan of Allocation."

- "Those claimants who challenge the partial 'offer' and maximize their recovery value will have a proportionately higher distribution of the remaining unclaimed pool." (emphasis omitted)

- "Trust their 'databases' and leave a good share of your claim recovery on the table." (emphasis omitted)

*See* Constantine Decl. at ¶ 8 and Exhibit C.

Spectrum bases its claimed ability to increase Class Members' cash payments on the patently false assertion that the Visa Transactional Database does not break out Class Members' off-line debit and credit card volumes. It also uses the equally false assertions that allocations for 1992-1996 and for on-line debit will not be made to Class Members that do not file challenges. And to create concern and confusion, Spectrum is telling merchants that they will be receiving "offers from Visa and MasterCard." A sample of these misstatements include the following:

- "Clearly, if you had significant debit card volume, and especially offline debit card transactions in 1992-1996, there is a high probability the Administrator's estimate will be low."

- "You may file a claim based solely on the 'offer' generated by MasterCard and Visa. In this case you will receive considerably less than 100% of what is owed to you and will result in the following: a) You will not receive any funds for 1992-1996 since Visa and MasterCard databases only go back to 1996. Yet, the court approved claim period begins in 1992. b) You will not receive any funds for the 'on-line' debit portion of your claim since Visa and MasterCard have admitted that they do not have this data in their databases. c) You will rely solely on the incomplete and inaccurate Visa and MasterCard 'database'. You will waive your court granted right to amend your claim to include transactions that were missed and mis-categorized." (emphasis omitted)

- "All types of transactions for 1992-1996 and non-signature (PIN) debit card data for 1992-2003 do not even exist in the various databases AND there is no distinction between credit card and the much higher value signature debit card transactions either!!!" (emphasis omitted)

7

- "Visa and MasterCard insist that they have no access to any data or records between the years of 1992 through 1996 which could cause them to omit a very substantial part of your recovery; therefore, Spectrum has developed relationships with processors, gateways, acquiring and issuing banks, other banks, et al, in order to assist it's [sic] clients with filing a comprehensive claim…."

- "[T]he fact that the Visa and MasterCard databases are incomplete and not fully accurate is not even mentioned [in the Plan]."

- "Spectrum will distinguish credit from debit to gain the highest recovery and detect transactions that have been misreported and therefore incorrectly categorized by your processor and ultimately VMC."

*See* Constantine Decl. at ¶ 11 and Exhibit C.

Spectrum's solicitations also indicate that the Claims Administrator will be acting against Class Members' interests, and will categorically reject any and all challenges that may be made by Class Members. For example, Spectrum states:

- "You will be dependent on the settlement administrator, a clerical mail notification house working on hundreds of cases at the same time. The settlement administrator is obligated to rely only on the questionable information provided by MasterCard and Visa. You will get no special treatment from them. Their interests are not aligned with yours." (emphasis omitted)

- "Please keep in mind that once the estimates are mailed, the settlement administrator goes into defense mode and becomes adversarial. They are paid to defend the Visa/MasterCard estimate."

- "The settlement administrator is not compensated and has no incentive to passively accept your processor's records in lieu of their reliance on the Visa and MasterCard databases. This is why there will be many dogfights. Spectrum has the specialized legal knowledge and courtroom experience to win these dogfights." (emphasis omitted)

- "Who will challenge the settlement administrator's rejection of your own data? Most legal departments do not have a class action specialist on staff."

8

- "SPECTRUM'S INTERESTS BEGIN AND END 100% ALIGNED WITH YOURS."  (emphasis omitted)

*See* Constantine Decl. at ¶ 9 and Exhibit C; *see also generally* the accompanying Affidavit of Neil L. Zola.  Contrary to Spectrum's assertions, the Claims Administrator has every incentive not to categorically reject Class Members' challenges because the Claims Administrator is paid by the hour.  Thus, the Claims Administrator's compensation *increases* the more challenges there are and the more effort it puts into them.

Finally, Spectrum's solicitations clearly demonstrate its intent to immerse the claims process in unnecessary "litigation" in lieu of the challenge mechanism built into the Plan.

- "We take the litigation-cost-risk to get all that your company is entitled to."

- "On behalf of the Class, SPECTRUM is also committed to filing *amicus curiae* briefs to extend deadlines or challenge allocation interpretations."

- "Spectrum's legal team brings the knowledge, substantive and procedural, of anti-trust and class action law to its clients.  Spectrum also brings to its clients the experience of arguing briefs and motions in federal as well as state court.  Spectrum has already spent close to a thousand labor hours researching the federal Visa/MasterCard anti-trust case so that you don't have to."  (emphasis omitted)[8]

- "SPECTRUM mitigates the management time required to keep your claims active by assigning a Claims Specialist who employs a series of pre-designed legal templates and more importantly deploys a dedicated attorney *licensed to practice in your state and able to specifically file for federal class action cases*." (emphasis in original)

---

[8]    Despite having "spent close to a thousand labor hours researching" this litigation, Spectrum incorrectly states that it was consolidated with *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001).  *See* Constantine Decl. at Exhibit C.

9

- "We can assist with pleadings and discovery issues, prepare claims assessments, critique the Administrator's challenges and appear as an expert witness in court."

*See* Constantine Decl. at ¶ 7 and Exhibit C.

In reliance on these misrepresentations, 211 Class Members have agreed to cede 30% of their cash payments from the Settlement Fund to Spectrum.[9] These Class Members include some of the largest merchants in the United States. (Constantine Decl. at n. 4 and Exhibit D) Moreover, under Spectrum's agency agreements with Class Members, the Claim Form and cash payments for the merchants that have retained Spectrum are to be sent to Spectrum and not to the Class Member. (Constantine Decl. at ¶ 3 and Exhibit D)

## ARGUMENT

Consistent with this Court's continuing jurisdiction over the Settlement Agreements, Rule 23(d) of the Federal Rules of Civil Procedure gives this Court, acting as a fiduciary and guardian of the rights of the Class, "broad powers to make 'appropriate orders' to ensure efficient and fair proceedings in a class action." *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1239, 1242 (N.D. Cal. 2000). The Court's protective powers include the authority to regulate communications with Class Members under Rules 23(d)(2) and (5), in order to prevent injury to Class Members from misleading and/or false communications.[10]

---

[9] Spectrum's agreements give it 30% of the Class Member's overall recovery. *See, e.g.,* Constantine Decl. at ¶¶ 3, 14 and Exhibit B.

[10] Specifically, Rule 23(d)(2) and (5) state: "In the conduct of actions to which this rule applies, the court may make appropriate orders: … (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, … [and] (5) dealing with similar procedural matters."

In addition, the All Writs Act, 28 U.S.C. § 1651(a), grants this Court broad authority to issue writs that are "necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." Moreover, "[t]he power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977) (citing cases); *see also United States v. International Brotherhood of Teamsters*, 266 F.3d 45, 50 (2d Cir. 2001) ("*IBT*") (where a third party interferes with a court's administration of justice, that court may enjoin the third party under the All Writs Act from continuing to do so); *In re Synthroid Mktg. Litig.*, 197 F.R.D. 607, 610 (N.D. Ill. 2000) (All Writs Act powers extend to third parties).

### A. The Court Should Exercise Its Jurisdiction Over the Settlements to Void Spectrum's Contracts with Class Members

To lure Class Members, Spectrum is using false and/or misleading statements about the Plan, the Visa Transactional Database, the claims process and the integrity of the Claims Administrator. Spectrum was aware of the falsity of these claims, as virtually all of them can be refuted from a cursory review of the Plan. At least 211 Class Members relied on these statements to enter into fraudulently-induced agency agreements with Spectrum. Such merchants likely would not have agreed to cede 30% of their potential cash payment if they had not been convinced that the Plan had been rigged to minimize their recovery, and that using Spectrum to dispute their claims was the only way to protect their rights. Given the fraudulent inducement of these contracts, they should be

11

declared void.[11]

This conclusion is reinforced by a review of some of the patently false statements that Spectrum has used to confuse and scare Class Members into giving away a portion of their cash payment. For example, Spectrum's solicitations imply that Class Members will not receive the full amount of their recovery if they do not retain Spectrum to litigate their claims. Spectrum states that "[w]e have a mutually aligned interest in maximizing your refund, and getting the full amount;" and "[t]rust their 'databases' and leave a good share of your claim recovery on the table." *See* Constantine Decl. at ¶ 8 and Exhibit C (emphasis omitted).

Spectrum's solicitations also falsely accuse the Claims Administrator of acting against Class Members' interests. Spectrum asserts that the Claims Administrator will categorically reject any and all challenges that may be made by Class Members. For example, Spectrum states, "[p]lease keep in mind that once the estimates are mailed, the settlement administrator goes into defense mode and becomes adversarial. They are paid to defend the Visa/MasterCard estimate;" "[t]he settlement administrator is not compensated and has no incentive to passively accept your processor's records in lieu of their reliance on the Visa and MasterCard databases. This is why there will be many dogfights. Spectrum has the specialized legal knowledge and courtroom experience to win these dogfights;" and "[w]ho will challenge the settlement administrator's rejection of your own data? Most legal departments do not have a class action specialist on staff." *See* Constantine Decl. at ¶ 9 and Exhibit C (emphasis omitted).

---

[11] Under New York law, fraud in the inducement requires a plaintiff to demonstrate that "(1) the defendant made a representation; (2) as to a material fact; (3) which was false; (4) and known to be false by the defendant; (5) for the purpose of inducing the other party to rely on it; (6) the other party rightfully

Contrary to these claims, the estimated cash payment that will be sent to Class Members is not a "Visa/MasterCard estimate." Also contrary to Spectrum's claims, the Claims Administrator has every incentive to approach the challenge process with integrity, particularly because rejected challenges can be appealed to the Court. Moreover, as described above, the Claims Administrator's compensation *increases* the more challenges there are and the more effort it puts into them.

Spectrum also blatantly mischaracterizes the Visa Transactional Database and the way the Plan will allocate shares for the 1992-96 period and for on-line debit. For example, Spectrum states that "*there is no distinction between credit card and the much higher value signature debit card transactions*…." (emphasis added); and that "Spectrum will distinguish credit from debit to gain the highest recovery and detect transactions that have been misreported and therefore incorrectly categorized by your processor and ultimately VMC." *See* Constantine Decl. at ¶ 11 and Exhibit C. Moreover, Spectrum incorrectly tells Class Members that "[y]ou will not receive any funds for 1992-1996 since Visa and MasterCard databases only go back to 1996. … You will not receive any funds for the 'on-line' debit portion of your claim since Visa and MasterCard have admitted that they do not have this data in their databases;" and "[a]n eleventh hour determination not to use MasterCard data to identify eligible transactions and claimants is further complicating the settlement notification process. Only the VISA data information is being used." *See* Constantine Decl. at ¶ 11 and Exhibits C and H.

Unlike the false picture painted by Spectrum, the Plan principally uses the Visa Transactional Database because it is the only database that accurately distinguishes

---

relied on it; (7) in ignorance of its falsity; and (8) to his or her injury." *Clarke v. Max Advisors, LLC*, 235 F. Supp. 2d 130, 142 (N.D.N.Y. 2002).

between the vast majority of Class Members' off-line debit and credit card purchase volumes over a substantial portion of the Class Period.  In addition, this database covers virtually all Class Members and all Visa off-line debit and credit card transactions (with the exception of *de minimus* "on-us" transactions) for October 1, 1996 through July 31, 2003.  As this Court has recognized, by relying on this database the Plan avoids imposing on Class Members the difficult, and for many impossible, burden of producing records dating back to 1992.  *See In re Visa Check*, 297 F. Supp. 2d at 519 ("This system relieves the Class of an enormous (and perhaps insurmountable) burden because, as Lead Counsel have represented, the merchants cannot reasonably produce the necessary records of transactions."); *see also* Constantine Decl. at ¶ 18.  Moreover, Spectrum's false solicitations avoid telling Class Members that because the Visa Transactional Database will be used to estimate Class Members' purchase volumes for the 1992-1996 period, and for on-line PIN debit and MasterCard purchase volumes, Class Members do not need to initiate challenges to receive allocations for those damages.  *See* Constantine Decl. at ¶ 12.

      Spectrum's solicitations also misleadingly inform Class Members that if they accepted Visa and/or MasterCard debit and credit cards during the Class Period, and they enlist Spectrum's services, they are guaranteed to collect anywhere between $100,000 and $6,000,000 in recovery.  *See* Constantine Decl. at ¶ 13 and Exhibit C.  Class Members' recoveries may or may not be within that range; yet if Class Members utilize Spectrum as their agent, they will be required to sacrifice 30% of their cash payments, whatever amounts they ultimately recover.  *See* Constantine Decl. at ¶ 14 and Exhibit B.

14

Spectrum further states that "[s]adly, the Plan of Allocation currently only provides for 30 days to file your claim." *See* Constantine Decl. at Exhibit C. This is false. Under the Plan, Class Members have 60 days to submit their Claim Forms. *See* Constantine Decl. at ¶ 17 and Exhibit A at Sections 8.5 and 8.6.

Finally, Spectrum employs deceptive scare tactics to confuse Class Members. For example, its materials state that "the Plan admits that '[d]espite extensive efforts by Lead Counsel, more than 80 major Visa/MasterCard owner/member financial institutions as well as Visa and MasterCard admit that undoubtedly there will be Class Members who have not been identified.' Those are not very reassuring words." *See* Constantine Decl. at ¶ 19 and Exhibit C (emphasis omitted).

Once again, Spectrum is misleading Class Members. Because the Plan recognizes that no database covers the entirety of this massive Class (which includes many Class Members that went out of business prior to October 1996), the Plan created an alternative methodology using the Visa Payment Systems Panel Study to provide such Class Members a way to submit their claims. This alternative methodology will not be used to calculate the shares of the vast majority of the Class who are identified in the Visa Transactional Database. Spectrum, nonetheless, has targeted its solicitations to Class Members that in fact are identified in the Visa Transactional Database, and has used the fact that Class Members who are no longer in business are not identified in order to entice them to retain Spectrum's services. This misleading tactic is clearly designed to confuse Class Members and scare them into entering agreements under which they will unnecessarily give away a substantial portion of their cash recovery to Spectrum. *See* Constantine Decl. at ¶ 19 and Exhibit B.

Given this overwhelming litany of misleading and false statements, Spectrum's contracts with Class Members should be voided (or declared voidable) pursuant to the Court's authority to protect the settlements under Fed. R. Civ. P. 23, the Settlement Agreements and the All Writs Act.[12]

### B. In the Alternative, Spectrum Should be Required to Correct its False Statements

Spectrum's solicitations to Class Members here are akin to "unauthorized opt-out campaigns," in which class members are solicited by third parties who attempt to gather opt-outs for follow-on class actions by distributing incomplete and misleading communications. For example, in *In re Synthroid*, two months after the district court preliminarily approved the Settlements, the National Prescription Association ("NPA"), a nonparty to the litigation, sent an unauthorized letter to at least 600 class members, urging them to opt out of the class. 197 F.R.D. at 608. The communication was, as NPA's counsel admitted, a confusing "botch" about the procedure class members were required to follow in order to share in the settlement proceeds. *Id.* It also falsely represented the amount of the settlement, falsely indicated that the NPA had a role in pursuing claims against the drug manufacturer, and stated that the NPA would proceed in settlement negotiations unless the class members signed an opt-out form by a certain

---

[12] Spectrum's solicitations also imply that it will automatically litigate Class Members' shares of the Settlement Fund. For example, Spectrum states that "[w]e take the litigation-cost-risk to get all that your company is entitled to;" "[o]n behalf of the Class, SPECTRUM is also committed to filing *amicus curiae* briefs to extend deadlines or challenge allocation interpretations;" and "[w]e can assist with pleadings and discovery issues, prepare claims assessments, critique the Administrator's challenges and appear as an expert witness in court." *See* Constantine Decl. at ¶ 7 and Exhibit C. To the extent that Spectrum engages in this kind of automatic petitioning, it is contrary to public policy. *See PrimeTime 24 Joint Venture v. NBC*, 219 F.3d 92, 101 (2d Cir. 2000) ("simultaneous and voluminous challenges" without regard to merits violate the antitrust laws); *USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 810 (9th Cir. 1994) ("automatic petitioning" without regard to merits violates the antitrust laws); *Don Post Studios, Inc. v. Cinema Secrets, Inc.*, 148 F. Supp. 2d 572, 574 (E.D. Pa. 2001) (noting public policy against the filing of frivolous claims).

deadline, all in exchange for a 22% fee. *Id.* at 608-09. The district court, noting that the All Writs Act gave it the authority to issue an injunction, invoked Rule 23(d)(2) and (5) to order the NPA to send corrective information regarding the settlement terms, opt out rights and deadlines, and the rights of class members, to all known recipients of the misleading letter. *In re Synthroid*, 197 F.R.D. at 610; *see also In re McKesson HBOC*, 126 F. Supp. 2d at 1244-46 (holding that a nonparty's opt-out solicitation was deceptive, misleading, and "disruptive of the orderly class action process," and requiring curative notice and opportunity for solicited shareholders to void retention agreements).

In reliance on Spectrum's misrepresentations, numerous Class Members have entered into fraudulently-induced contracts under which they are ceding a substantial portion of their settlement recovery to Spectrum. As in *In re Synthroid* and *In re McKesson HBOC*, Spectrum should likewise be required to correct its misrepresentations and give notice (at Spectrum's expense) to those Class Members with which it has entered into agency agreements. Spectrum also should be enjoined from further soliciting any Class Members with these or similar misrepresentations. *See, e.g., In re McKesson HBOC*, 126 F. Supp. 2d at 1242 (a "court's Rule 23(d) powers include the authority to enjoin communications with class members to protect them from undue interference," citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981)).

## **CONCLUSION**

Based upon the foregoing, Lead Counsel respectfully requests that this Court issue an order to show cause why the declaratory and injunctive relief sought here to protect the Class and the Settlement Fund should not be granted. Expedited resolution of Lead Counsel's request is necessary in this action because the Claims Administrator is

17

currently in the process of finalizing and printing Claim Forms, which will be mailed to Class Members between September 15 and September 29, 2005. Because Spectrum has demanded that Claim Forms for its 211 "clients" be sent to it and not to the Class Member, this dispute must be resolved before September 29th. As a result, Lead Counsel respectfully requests an expedited Order from the Court.

Dated: New York, New York
      September 9, 2005

**CONSTANTINE CANNON**

By: _Michelle A. Peters_
Robert L. Begleiter (RB-7052)
Matthew L. Cantor (MC-8183)
Lloyd Constantine (LC-8465)
Ankur Kapoor (AK-9752)
Stacey Anne Mahoney (SM-5425)
Michelle A. Peters (MP-7804)
Amy N. Roth (AR-4534)
Gordon Schnell (GS-2567)
Jonathan Shaman (JS-8481)
Jeffrey I. Shinder (JS-5719)
450 Lexington Avenue, 17th Floor
New York, New York 10017
(212) 350-2700
*Lead Counsel for the Class*