UNITED STATES DISTRICT COURT  FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X

IN RE VISA CHECK/MASTERMONEY
ANTITRUST LITIGATION                           MEMORANDUM AND
                                               ORDER INCLUDING
                                                 INJUNCTION
---------------------------------------------------------X       CV-96-5238 (JG)

A P P E A R A N C E S:

    JEFFREY ISSAC SHINDER
    CONSTANTINE CANNON, P.C.
        477 Madison Avenue
        11th Floor
        New York, NY 10022
        Attorney for Petitioner, Lead Counsel for the Plaintiff Class

    WENDY H. SCHWARTZ
    REED SMITH LLP
        599 Lexington Avenue
        New York, NY 10022
        Attorneys for Spectrum Settlement Recovery, LLC

JOHN GLEESON, United States District Judge:

        In an application dated February 15, 2006, lead counsel for the plaintiff class, Constantine Cannon ("Lead Counsel"), moved for injunctive relief against Spectrum Settlement Recovery LLC ("Spectrum"), a claim filing and fund recovery service for commercial class actions. According to Lead Counsel, Spectrum has been using false and misleading statements to entice class members to retain Spectrum to administer their claims and, more recently, to purchase their claims outright.

        For the reasons set forth below, the motion is granted.

BACKGROUND

A.  The Settlements, the Plan of Allocation
    and the Distribution of Settlement Funds

In this antitrust action, a class of approximately five million merchants alleged, among other things, that defendants Visa U.S.A. Inc. ("Visa") and MasterCard International, Inc. ("MasterCard") illegally tied their debit products to their credit cards, in violation of the Sherman Act. On the brink of trial in June of 2003, the plaintiffs entered into settlement agreements with each of the defendants, providing for, *inter alia*, the creation of a $3.05 billion settlement fund. On December 19, 2003, I approved those agreements and the plan of allocation for distributing the settlement funds.

Annual payments are to be made by the defendants over a ten-year period. The plan of allocation (which was amended in August 2005 and is referred to here as the "Amended Plan") sets forth a method for estimating the damages of each class member and allocating settlement funds accordingly. Class members are to receive monetary awards that are directly proportional to their debit and credit purchase volume (as well as online debit transactions)[1] during the class period, *i.e.*, from October 25, 1992 to June 21, 2003. The deadline for submitting claims was December 28, 2005 for the vast majority of the class.

The first round of payments will be mailed out on a rolling basis. The remainder of the allocation process will depend on whether the settlement funds are reduced to a lump sum, either through securitization or through pre-payment by one or both of the defendants. If the

---

[1] The allocation system uses a different method of calculation for off-line debit and credit card charges than it does for calculating on-line debit charges, and also distinguishes between those merchants who appear in the Visa Transactional Database, which includes extensive records of credit and debit card transactions between October 1996 and July 2003, and those who do not. See Nov. 2, 2005 R&R at 6-11. The differences in calculation methodology are not material to the issue presently before me.

2

funds are reduced to a lump sum, each claimant will receive a second check payable in the amount designated by the claims administrator on a pro rata basis. Amended Plan, Section 12.1. Lead Counsel estimate that no pro rata payments will be made prior to the end of 2007. Tr. at 4-5.[2] If the funds are not reduced to a lump sum, multiple payments may be made to class members through 2013. In that event, the claims administrator will apply each merchant's pro rata share of the total damages to the portion of the settlement funds received in any year to determine the amounts to be sent annually to class members. Amended Plan, Section 12.2.

Finally, if additional settlement funds remain after all approved claims have been paid, an additional pro rata distribution may be paid to all class members who received and cashed their checks. Amended Plan, Section 12.5.

B.  Spectrum

Spectrum describes itself as the nation's largest claim filing and fund recovery service for commercial and securities class action settlements. For a fee, it acts as an administrator of a merchant's claim to participate in the settlement. Its contracts with merchants that provide for this service are referred to here as "agency contracts." Beginning in mid-December 2005, it expanded its service to the class members in this case to include the outright purchase of the merchants' claims, pursuant to contracts referred to here as "claim purchasing contracts." As of March 1, 2006, about 4,800 merchants had entered into agency contracts with Spectrum. Three had agreed to claim purchasing contracts.

C.  The Earlier Misrepresentations by Spectrum

This is the second time Lead Counsel have sought relief based on statements by

---

[2]  Citations in the form Tr. at ___ refer to the transcript of the oral argument held on Feb. 22, 2006.

Spectrum to class members. The first such application was filed on September 9, 2005. In that application, Lead Counsel accused Spectrum of using fraudulent and misleading solicitations to entice class members to execute agency contracts. Spectrum was accused of "intentionally spreading misinformation to confuse Class members and complicate the allocation process in an attempt to create a need for its services." Dec. 13, 2005 Order. At that time, Lead Counsel sought, among other things, a declaration that any contracts between Spectrum and class members were void and an injunction prohibiting Spectrum from soliciting class members and requiring it to correct the misstatements it made to class members.

   I referred that application to Special Master Robin M. Wilcox, who, in a report dated November 2, 2005, found that the following statements made by Spectrum in its communications with class members were incorrect or misleading: (1) that the Visa Transactional Database failed to distinguish between credit card and off-line debit transactions; (2) that class members "may be eligible to collect significant top line revenue from $100,000 to $6,000,000;" (3) that the claims administrator would become "adversarial" with respect to the merchants and "is obligated to rely only on the questionable information provided by MasterCard and Visa;" and (4) that the estimated cash payment sent to class members was an "offer" or "partial offer." Nov. 2, 2005 R&R at 24-29.

   I adopted Special Master Wilcox's findings and her recommendation that I refrain, at that time, from granting the injunctive relief against Spectrum that Lead Counsel had requested. However, Lead Counsel were directed to (1) publish a notice on the case website correcting Spectrum's statements; and (2) send the same corrective notice to all class members with whom Spectrum had communicated. A copy of that notice is attached hereto as Appendix

B.  I directed further that the notice be sent, in effect, at the expense of the settlement fund, without prejudice to a renewed application by Lead Counsel to impose the costs on Spectrum after the mailing had been completed and upon a demonstration of the actual costs incurred.  *See* Dec. 13, 2005 Order.

D.      The Misrepresentations Now Alleged

On February 2, 2006, the *Wall Street Journal* reported that the United States government had filed a claim to participate in the settlement.  The article asserted that the government's claim could be worth as much as $100 million, and that Lead Counsel had expressed serious concerns about the government's eligibility to participate in the settlement.

In the instant motion, Lead Counsel assert that "Spectrum is once again using misrepresentations -- this time that the U.S. government's potential claim will delay payments to class members -- to gin up business."  Lead Counsel's Feb. 15, 2006 Mem. at 2.  According to Lead Counsel, the resolution of the United States' claim will have no impact on the processing of the claims currently pending before the claims administrator.  *Id.* at 2-3.  Rather, the government's claim would at most impact the pro rata distribution, which, as mentioned above, Lead Counsel estimates will take place no earlier than late 2007.  Tr. at 4-5.

Since my order of December 13, 2005, Spectrum's e-mail and written solicitations have included the following statements, all of which Lead Counsel assert are false and/or misleading:

- "the government has filed a hefty claim (100 mil) and that [sic] push back the payout date as well and affect the residual." Shinder Decl. Ex. F; Contaxes Decl. Ex. B.

- "[b]ecause there's a set amount of money to be distributed to the class as a whole,

5

> **the government's claim, if validated, will reduce the amount of your recovery**." Contaxes Decl. Ex.. A (emphasis in original).

- "the claim by the government for $100 million is going to delay" payment to the merchants. Zola Decl. Ex. A.

- "the federal government has entered into the picture, which may cause distributions to be delayed." Shinder Decl. Ex. F.

- "[i]f the legal proceedings related to the U.S. Government's eligibility continue we should expect to see some further delay in the payment dates to the class." Schwartz Decl. Ex. C.

- "[n]ow that the Federal government is a claimant any further delays should come as a surprise to no one, especially in light of the unprecedented size of the class, the complexity of the Plan of Allocation, and the resistence of Lead Counsel to the Fed's participation as reported in the attached WSJ article." Schwartz Decl. Ex. D.

- "securitization of the settlement funds has not yet occurred, which may cause distributions to be delayed." Shinder Decl. Ex. F.

Lead Counsel argue that these statements are misleading and are part of a deliberate campaign by Spectrum to convince class members that their distributions from the settlement funds face lengthy delays in order to induce them to immediately sell their claims to Spectrum. They seek (1) an order requiring Spectrum to send a corrective notice at its own expense; and (2) an order providing class members who were misled by Spectrum's solicitations the right to void their contracts with Spectrum.

For the reasons stated below, Lead Counsel's motion is granted. Spectrum's application for a stay of the relief is denied.

## DISCUSSION

A. <u>The Court's Power</u>

In response to Lead Counsel's first application, Spectrum asserted that this Court

6

lacked subject matter jurisdiction "to ... void individual contracts already agreed between Spectrum and individual merchants."  Nov. 2, 2005 R&R at 13.  Special Master Wilcox disagreed, concluding that "this Court has subject matter jurisdiction to order [injunctive] relief."  *Id*. at 30.  Over Spectrum's objection to this conclusion, I adopted the Special Master's report, including the recommendation that I not exercise the authority by ordering the injunctive relief sought by Lead Counsel at that time.  Dec. 13, 2005 Order.

Spectrum now reiterates the argument.  There is no jurisdiction to grant the relief sought, Spectrum argues, because "such contracts and disputes do not affect this Court's ability to administer the settlement and distribute the settlement funds."  Mar. 1, 2006 Schwartz Reply Letter at 2.  I disagree.

The All Writs Act, 28 U.S.C. § 1651(a) (1982), does not itself create jurisdiction, *see Stephenson v. Dow Chem. Co.*, 346 F.3d 19, 21 (2d Cir. 2003) (citing *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28 (2002)), but it authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained."  *U.S. v. New York Tel. Co.*, 434 U.S. 159, 172 (1977).

Where, as here, a district court retains exclusive jurisdiction over settlement agreements and distribution of settlement funds pursuant to those agreements, it may issue orders necessary to protect the settlement from threats by both parties and non-parties.  *See In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litigation),* 770 F.2d 328, 336

7

(2d Cir. 1985) ("the findings of the district court that the injunction was necessary to preserve its jurisdiction and protect its judgments, if sustainable, would be sufficient to justify the issuance of the injunction under the All-Writs Act."). Spectrum's argument that this jurisdiction does not extend to its communications and contracts with class members is unpersuasive.

I have presided over this action since 1996. With the express consent of all parties, I played an active role in the settlement discussions and have maintained an active role in the administration of the settlement. I recognize that Spectrum and firms like Spectrum can provide a valuable service to class members who seek assistance in filing their claims or wish to liquidate those claims. Such firms are a natural and welcome feature of the settlement landscape. But this is not a run-of-the-mill business environment, subject solely to market forces and the principles of contract and tort law that control behavior in that environment. The fact that the merchant class is huge does not alter the nature of the Court's relationship with its members. The settlement of a long, hard-fought case has given those class members a tangible interest in settlement funds. I have an affirmative obligation to protect those interests. If a merchant chooses to sell its claim or pay someone else to process its claim, that is fine with the Court. It is also fine for firms like Spectrum to solicit merchants to use their claim processing or claim purchasing services. The nature of the Court's interest is as simple as it is strong: the class members must not be misled. Where false or misleading statements are used to solicit business from them, I have no intention to sit by and relegate them to a cause of action for breach of contract or fraud. To do otherwise – that is, to say that I am powerless to take steps, both proactive and reactive, to protect each class member's interest in the settlement funds, even when I know they are being misled – would be an abdication of responsibility. It would also erode the

8

class members' and the public's respect for the settlements themselves, and for the process that produced them.

Because Spectrum's contracts with class members plainly affect the administration of the settlements and the distribution of the settlement funds, the All Writs Act authorizes the relief sought by Lead Counsel.[3] "The power conferred by the Act extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." *U.S. v. New York Tel. Co.*, 434 U.S. 159, 174 (1977). *See also In re Chambers Development Co., Inc.*, 148 F.3d 214, 223 n.6 (3d Cir. 1998); *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation,* 369 F.3d 293, 297 (3d Cir. 2004); *In re Baldwin-United Corp.,* 770 F.2d at 328.

In sum, I conclude that this Court has even greater authority than that necessary to grant the relief sought by the instant motion. It may prohibit communications with class members entirely, compel communications correcting misleading statements, and declare contracts between third parties and class members void. *See, e.g., In re McKesson HBOC, Inc.*, 126 F. Supp. 1239, 1242 (N.D. Ca 2000); *In re Synthoid Marketing Litig.*, 197 F.R.D. 607, 610 (N.D. Ill. 2000). It is certainly within this Court's power, therefore, to order that the contracts in

---

[3] The Second Circuit has held that Fed. R. Civ. P. 23(d), like the All Writs Act, does not create independent substantive rights or remedies enforceable in federal court. *See In re Baldwin-United*, 770 F.2d at 335. While Rule 23(d) may preserve jurisdiction in the context of administering a settlement agreement (also like the All Writs Act), I need not decide that question here. *See Georgine v. Amchem Products, Inc.*, 160 F.R.D. 478, 498 (E.D.Pa. 1995) (finding that Rule 23 enables courts to enter remedial orders in the conduct of class actions without a findings of actual harm: "[a] remedy is appropriate if the communications at issue create a 'likelihood' of abuse, confusion, or an adverse effect on the administration of justice." (citations omitted)).

question are voidable at the option of the merchants. The only question is whether, on the facts presented, such relief is appropriate.

B.     The Disputed Statements

The statements at issue relate primarily to the effect the government's claim to a portion of the settlements funds will have on the timing of payments to class members. As discussed below, a common sense reading of Spectrum's marketing materials and e-mails would easily lead a member of the plaintiff class to believe that there will be a significant impact on the timing of all payments by the claims administrator -- including the initial payment. In fact, the initial payments to class members will not be affected at all, either in amount or in the timing of payment. The timing of any subsequent, pro rata distributions will not likely be affected. The amount of those subsequent payments could be affected if the government's claim is allowed, but the outcome of that claim is speculative at best.

On February 3, 2006, a Spectrum settlement specialist sent an e-mail solicitation to up to 300 class members. The subject was "This can push back the payment date on your claim - good article in WSJ." The text of the e-mail, which included an offer to purchase the merchants' claims, stated that it "[l]ooks like the Government has filed a hefty claim (100 mil) and that (sic) push back the payout date as well and affect the residual." Shinder Decl., Ex. F. A reasonable merchant could obviously read that e-mail as a statement by Spectrum that the government's claim will delay both the initial payment to the merchant and the subsequent residual payments as well. No one disputes that such a statement would be wrong.

Spectrum says that Lead Counsel is complaining about a mere "typographical error," *i.e.*, the sender of the e-mail "exclud[ed] the word 'could' before 'push back the payout

10

date as well and (sic) the residual.'" Spectrum Mem. at 10 n.6.  Though Spectrum seems to regard its mistake as inconsequential, I do not.  A merchant reading the e-mail for its common sense meaning could conclude (erroneously) that the initial payment will be delayed and decide, on that erroneous basis, to contract with Spectrum, either to administer the merchant's claim or to purchase it.[4]  It is hardly unreasonable to expect -- and indeed require -- Spectrum to get the facts right when it solicits business from class members.  If it fails to do, through "typos" or otherwise, Spectrum will bear the cost of its errors.[5]

Spectrum's other marketing materials are misleading as well.  An attachment to widely distributed e-mails, entitled "The Unpredictable Nature of Your Payment," states that, as a result of the government's claim, "we should expect to see some further delay in the payment dates to the class."  Schwartz Decl. Ex. C.  But that is not true; as mentioned above, there will be *no* delay in the initial payments.  Spectrum admitted its mistake at oral argument and offered to correct it.  Tr. at 14.

In further defense of that and other statements warning of delayed payments,[6] Spectrum asserts that it treats all payments to the merchants "as a whole."  Tr. at 18; *see also* Spectrum Mem. at 11.  "[W]e don't ever talk about just the initial payment when we talk about purchasing a claim from someone," Spectrum's general counsel asserted at oral argument.  Tr. at

---

[4] On February 9, 2006, a class member e-mailed the claims administrator, stating that "Spectrum settlement is stating that the claim by the government for $100 million is going to delay our payment, so we should take Spectrum's offer to be paid now.  Is this true?"  Zola Decl. ¶ 2 & Ex. A.

[5] Even with the inclusion of the qualifier Spectrum says was inadvertently omitted, Spectrum's written solicitations would erroneously suggest that the *initial* payments to merchants might be delayed by the government's potential claim.

[6] The "Unpredictable Nature of Your Payment" solicitation includes three separate assertions about delays in payment.

18. Thus, Spectrum suggests, if there is a prospect that a residual payment may be delayed years from now, it is appropriate for Spectrum to warn merchants to expect delays in the payments due to the class.

I reject that suggestion. Spectrum may consider the multiple payments to each merchant as a whole, but the merchants may not, and Spectrum has no right to hide its assumptions from the class members. It must be more careful. If the initial payment will not be affected by the government's claim, Spectrum cannot suggest otherwise.

At oral argument, Spectrum acknowledged that even the residual payment may not be affected by the government's claim. Tr. at 12 ("[w]e can't know whether or not the back end payment is going to be delayed."). If the government successfully asserts a claim, it is conceivable that each merchant's share of the settlement funds may be affected, but any effect on the timing of those payments remains entirely speculative.

In short, as Spectrum concedes, it was "not as careful with the wording" of its communications to class members as "[the Court] would have liked." Tr. at 18. Spectrum must now be held accountably for its carelessness.

C. The Appropriate Relief

1. The Corrective Notice

At oral argument on February 22, 2006, I directed Lead Counsel and Spectrum to try to agree upon the content of a corrective notice and to whom it should be sent. To their credit, they have done so, agreeing on a form of corrective notice to be sent to every class member who has been solicited by Spectrum to sell its claim to Spectrum. The corrective notice, in the form agreed to by Lead Counsel and Spectrum, is attached as Appendix A. It shall be sent

to those class members by Lead Counsel and posted on the case web site.

  2.  <u>Spectrum's Voluntary Commitments</u>

In a laudable attempt to prevent similar errors from being made in the future, Spectrum has voluntarily agreed to: (1) provide the corrective notice to any class member prior to the execution of a claim purchase contract; (2) include in all additional claim purchasing contracts the right to rescind the agreement for any reason within 14 days of execution; (3) meet and confer with Lead Counsel at least two days prior to the dissemination of any additional marketing materials; and (4) cease to mention the Wall Street Journal article and/or the potential claim by the United States government until such time as the issue is resolved in a way that may affect the timing or quantum of the distribution of funds to class members.

These commitments will help ensure that class members are receiving complete information.  Spectrum is therefore expected to comply with them.

  3.  <u>Voidability of Contracts</u>

Lead Counsel asserts that additional remedial action beyond the corrective notice is necessary to protect the rights of the approximately 4800 class members who have entered into agency contracts and the much smaller number (only three as of February 22, 2006) who have entered into claim purchasing contracts.  Those class members, Lead Counsel argues, "feel they are held hostage to their agreement with Spectrum [and] need additional relief from the Court." Mar. 1, 2006 Shinder Letter at 1-2.  After the initial corrective notice was sent pursuant to my order dated December 13, 2005, Lead Counsel "heard repeatedly from Class Members ... who have expressed concerns about legal ramification from Spectrum should they wish to rescind their agreement." *Id*. at 1.

13

Spectrum argues that I do not have the authority to issue such an order. As discussed above, I disagree. It further argues there must be an individual showing of actual reliance -- subject to challenge by Spectrum -- by any class member wishing to void a contract before I can order that contract voidable. At oral argument on February 22, 2006, I implied as much. *See* Tr. at 26-27. Upon further reflection, however, I believe that equity requires that class members be authorized to rescind their contracts without having to litigate reliance, provided they state under oath that they entered into their contract with Spectrum in reliance on its false or misleading statements.

First, requiring Spectrum to allow the merchants to rescind their contracts simply directs Spectrum to do what it says it will do anyway. Spectrum asserted at oral argument that it is willing to voluntarily void contracts at merchants' request. Tr. at 22-23 ("we let [class members] know that if they didn't want to use us as agent anymore that we would let them out of their contracts."); *see also* Mar. 1, 2006 Schwartz Reply Letter at 2 ("32 class members have approached Spectrum seeking relief from their contract, and Spectrum has acceded to each such request").

Second, given its repeated dissemination of false and misleading information, it would be both unfair and inefficient to permit Spectrum to challenge a merchant's claim of reliance. The prospect of such litigation would no doubt cause some merchants who in fact relied on the misstatements to refrain from seeking to void their contracts. Indeed, that concern has already been expressed by some merchants to Lead Counsel in the wake of the first corrective notice. I acknowledge a small risk that a *non*relying merchant might seek to rescind, but I have little difficulty imposing that risk on Spectrum, which has created it by twice disseminating bad

14

information in its zeal to generate business.

I conclude that any class member who has entered into either an agency or a claim purchasing contract with Spectrum may void that contract by stating in a notarized document addressed to Spectrum and copied to Lead Counsel that it that relied on misleading marketing materials in entering the contract. The letter must be postmarked within 30 days of the merchant's receipt of the notice of their right to void their contracts. Spectrum and Lead Counsel are directed to confer and, if possible to reach agreement on the form of that notice. The notice shall contain a form the recipient may use to exercise the right. Any dispute in that regard shall be brought to my attention by no later than April 11, 2006.

My decision does not abridge Spectrum's right "to question and challenge elements of the settlement," Schwartz letter dated March 1, 2006, at 1, or require it "to vet everything [it says to the class] through Lead Counsel or the Court." Tr. at 17. It requires only that Spectrum not make false or misleading statements when it solicits the business of class members. I expect that of everyone. Those who fail to abide by that simple rule will be held accountable.

Finally, I believe the rights of the class members will be prejudiced by the imposition of a stay of the relief ordered here. Thus, Spectrum's motion for a stay is denied.

## CONCLUSION

For the foregoing reasons, it is hereby ordered as follows:

1. Lead Counsel shall send the corrective notice (Appendix A) to all class members who have received Spectrum's solicitations to enter claim purchasing contracts as soon as practicable. The same notice shall be posted on the case website.

15

    2. On or before April 21, 2006, Lead Counsel shall mail to all class members who have entered into contracts with Spectrum a notice that the contract may be voided by the merchant without legal ramification in the manner and within the time period prescribed above;

    Spectrum's application that I defer ruling on Lead Counsel's request for costs and attorney's fees is granted.  Such an application, as well as Lead Counsel's renewed application for costs and fees incurred in connection with the first corrective notice, shall be directed in the first instance to Special Master Wilcox.  Any such application shall separately identify and calculate disbursements and attorneys fees.

              So Ordered.


              JOHN GLEESON, U.S.D.J.

Dated: March 31, 2006
    Brooklyn, New York