# EXHIBIT A

May 8, 2006

Constantine Cannon
450 Lexington Avenue, 17th Floor
New York, NY 10017
Attention: Lloyd Constantine, Esq.

Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Attention: George W. Sampson, Esq.

Gentlemen:

This letter agreement ("Engagement Agreement") confirms the engagement, pursuant to the terms and conditions hereof, by Constantine Cannon ("Constantine") and Hagens Berman Sobol Shapiro, LLP ("Hagens Berman" and together with Constantine, the "Client"), solely in their capacity as Co-lead Counsel for the Members of the Class (the "Plaintiffs' Class") in the Litigation (as defined below), of Deutsche Bank Securities Inc. ("DBSI") as a Placement Agent, Structuring Agent, Joint Bookrunning Manager and Arranger (in such capacity, an "Arranger") in connection with any and each issuance in a transaction commonly referred to as a "term securitization" by any special purpose corporation, trust or other entity (each, an "Issuer") of any securities backed or secured by, or representing an interest in, obligations owing from Visa U.S.A. ("Visa") or MasterCard International ("MasterCard", and together with Visa, "Obligors") to Plaintiffs' Class. The obligations arise under settlement agreements of the *In Re: Visa Check/Mastermoney Antitrust Litigation* (the "Litigation") between the Plaintiffs' Class and the Obligors, under the terms of which settlement agreements Visa and MasterCard agreed, among other things, to pay to the Plaintiffs' Class $2.025 billion and $1.025 billion, respectively, over ten (10) years (the "Visa Obligations" and "MasterCard Obligations," respectively, and collectively, the "Settlement Assets").

The parties hereto agree as follows:

1. **Securities.** It is contemplated that securities will be structured and issued as two discrete transactions backed by either the Visa Obligations or MasterCard Obligations, as applicable. The engagement of DBSI hereunder with respect to each transaction is independent of the other and the obligations of each of DBSI and Client with respect to each transaction is separate and distinct (except where expressly otherwise provided herein). The securities are referred to herein as "Visa Obligation Securities" and "MasterCard Obligation Securities," respectively, and collectively as "Securities", and each placement thereof, whether by public offering or private placement (whether under Rule 144A promulgated under the Securities Act of 1933 ("Rule 144A"), Section 4(2) of the Securities Act of 1933 ("Section 4(2)") or other private placement) is herein referred to as a "Securitization" and collectively, the "Securitizations". The Joint Arrangers (as defined below) and the Client, working together, shall determine the manner in which Securities are issued and resold to investors (*i.e.*, under Section 4(2) or Rule 144A).

2. **Joint Arrangers.** It is understood by DBSI that Client anticipates engaging an additional firm as a Joint Arranger (collectively with DBSI, "Joint Arrangers") and may also engage two additional firms as Co-managers in connection with the syndication of the Securities. Subject to the terms hereof, the Client hereby designates DBSI as a lead Structuring Agent and a joint bookrunning manager in connection with the structuring and distribution of the MasterCard Obligation Securities. It is understood

by DBSI that the other firm engaged to act as the other Joint Arranger shall be designated by the Client as a lead Structuring Agent and a joint bookrunning manager with DBSI in connection with the structuring and distribution of the Visa Obligation Securities. The Joint Arrangers shall act jointly in making any determinations in relation to either Securitization, regardless of which of them is the lead Structuring Agent with respect thereto. However, it is understood by DBSI that the Client will select, in consultation with the Joint Arrangers, one of the Joint Arrangers to have primary responsibility for interfacing with the rating agencies with respect to the Securities, provided, however, that the other Joint Arranger and a representative of the Client shall participate in conference calls with the rating agencies on a commercially reasonable basis as determined by this selected Joint Arranger; provided, however, that such participation of a representative shall not violate any non-disclosure agreement with Visa or MasterCard entered into by the Joint Arrangers or such representative. It is contemplated that all outstanding Visa Obligations and MasterCard Obligations at the time of the Securitizations will be securitized and DBSI will appear on the left of the offering materials with respect to the MasterCard Obligation Securities. The Client agrees that no other Arranger other than the Joint Arrangers and the two selected Co-managers will be engaged with respect to the Securitizations. DBSI will be entitled with respect to each transaction to the (i) Structuring Fee, (ii) Placement Fee, and (iii) Break-up Fee as outlined in Section 8 below, and such amounts shall be equal to the structuring fee, placement fee and break-up fee payable to the additional firm engaged as a Joint Arranger with respect to each Transaction pursuant to a separate engagement agreement anticipated to be entered into by the Client and such other additional firm. Co-managers will be entitled to portions of the Placement Fee as outlined in the same Section 8 below.

This Engagement Agreement is not a commitment or agreement, express or implied, on the part of any Bookrunning Manager, any Placement Agent, or DBSI in any other capacity, to purchase or place any Securities or to commit any capital. Notwithstanding any other provisions hereof, DBSI shall not have any obligation, express or implied, to act as Joint Arranger, Joint Bookrunning Manager, Placement Agent or in any other capacity with respect to any or all Securitizations if, in its sole judgment, DBSI deems it inadvisable, impracticable or not in its business interest.

    3.    **Responsibilities.** DBSI hereby accepts the engagement and agrees to:

a) advise and consult with the Client and Client's counsel regarding the structure of the Securitizations contemplated hereby;

b) prepare, with the assistance of the Client and Client's counsel, any communications necessary to arrange for the Securitizations, including presentations to the rating agencies, whether in the form of letter, circular, notice or otherwise (subject, in the case of presentations to the rating agencies, to the primacy of the Joint Arranger selected by the Client to be primary interface with the rating agencies);

c) assist the Client and Client's counsel in the preparation of an offering document (each, an "Offering Document") for each Securitization and each issuance of the Securities which will be drafted by counsel and which will describe the Client, the Settlement Assets (including the Obligors) and the Securities;

d) advise the Client in the selection and terms of engagement of any necessary service providers to be engaged by the Client directly or in conjunction with each Securitization (*e.g.*, trustee, servicer, etc.);

e) assist the Client in obtaining credit ratings on one or more classes of the Securities from one or more nationally recognized statistical rating agencies (collectively, the "Rating Agencies") in

connection with each Securitization, including, but not limited to, the preparation of informational material;

f) advise the Client with respect to cash reserve accounts, financial guarantees, subordination, overcollateralization or other forms of credit enhancement, or a combination of the foregoing, if applicable;

g) assist the Client and Client's counsel in coordinating efforts to achieve timely and efficient documentation and closing of the Securitizations;

h) serve as joint bookrunning manager (in such capacity, a "Bookrunning Manager" and, collectively with the additional firm, the "Joint Bookrunning Managers") in connection with the sale of the Securities for each Securitization, subject, among other things, to (i) the execution by DBSI of a final, definitive placement agreement or purchase agreement, as applicable, satisfactory to DBSI and the Client (including with respect to the representations, warranties, covenants, indemnification provisions and closing conditions contained therein), (ii) satisfactory completion by DBSI of its due diligence with respect to the Settlement Assets (including the Obligors), the Securitizations, the Offering Documents and the Client and (iii) receipt by DBSI of all necessary internal approvals; and

i) advise and assist the Client in any other matter reasonably requested by the Client to facilitate the closing of the Securitizations.

4. **Cooperation; Information.** Client shall fully cooperate with the Joint Arrangers in their efforts to consummate any and each Securitization (the "Proposed Transactions"). Such cooperation shall include providing all relevant information relating to the Client, any Issuer and any affiliate thereof (collectively, the "Issuer Entities") and the Settlement Assets which any of the Joint Arrangers reasonably deem to be appropriate and providing the Joint Arrangers with reasonable access to the appropriate representatives, accountants, and other advisors of the Issuer Entities (collectively, the "Representatives"). Such cooperation shall also include the preparation of any necessary informational memoranda or similar documents and complying with any reasonable requests for information or other reasonable requests that any Joint Arranger may make. In addition, the Client shall promptly use reasonable efforts to pursue due diligence information with respect to Visa and MasterCard as reasonably requested by the Joint Arrangers, and to the extent practicable, and at Client's sole cost and expense, to seek an order (the "Required Materials Order") of the court administering the settlement agreements (the "Court") to compel Visa and/or MasterCard to provide such financial and other information and customary covenants, representations and warranties, certifications, legal opinions, accountants cold comfort letters and other supporting materials (in form and substance satisfactory to the Joint Arrangers) as is necessary or appropriate for use in connection with the offering of the Securities under Rule 144A or Section 4(2) (the "Required Materials"). The Client, on behalf of the Plaintiffs' Class, represents, warrants and covenants to the Joint Arrangers that all written information prepared and provided and to be prepared and provided by them or the Representatives in connection with this Engagement Agreement and/or the Proposed Transactions will not contain any untrue statement of a material fact or omit any material fact that is necessary in order to make such information not materially misleading in light of the circumstances under which such information is provided. Client and Joint Arrangers will develop a list of such information for which such representation, warranty and covenant shall be applicable. The Client acknowledges, agrees and confirms that (i) DBSI will rely solely on such information in the performance of the services contemplated by this Engagement Agreement without assuming responsibility for independent investigation or verification thereof and (ii) DBSI assumes no responsibility for the accuracy or completeness of such information or any information regarding the Issuer Entities, the Obligors or the Settlement Assets. Client agrees to advise the Joint Arrangers of all developments materially affecting

the Issuer Entities or any of the information provided by Issuer Entities, its affiliates or the Representatives in connection with this Engagement Agreement and/or the Proposed Transactions. The foregoing provisions notwithstanding, DBSI acknowledges and agrees that (i) DBSI shall not have access to such representatives, accountants, and other advisors of the individual or corporate members of the Plaintiffs' Class; (ii) information regarding the Obligors under the Visa Obligations and MasterCard Obligations to which Client has access may be limited to information which is generally available to the public or which such Obligors are willing or compelled to provide, and DBSI may have access to information regarding such Obligors that is not available to Client; and (iii) Client will make available to DBSI any information which Client is able to obtain regarding such Obligors, and Client's representations and warranties with respect to such information is limited to a representation and warranty that (A) Client has made available all information regarding such entities which it has received and (B) such information is, to the best of Client's knowledge and belief, true and accurate. Nothing in this Engagement Agreement shall prevent the Client from seeking reimbursement for its costs and expenses from the Court.

5. **Court Approval.** Client acknowledges that they are engaging DBSI on behalf of the Plaintiffs' Class and, upon execution of this Engagement Agreement, the Client shall promptly request the Court's approval of this Engagement Agreement and all the terms hereof (the "Engagement Agreement Order") and in connection with seeking the Engagement Agreement Order, Client shall use its best efforts to seek the Court's approval for the payment of all reasonable fees, expenses and compensation as set forth in Sections 7, 8 and 12, as applicable. The effective date of this Engagement Agreement shall be the date set forth on page 1. This Engagement Agreement is subject to the condition subsequent of approval by the Court under the Engagement Agreement Order.

6. **Litigation Reserve Account.** The Client and DBSI agree that the greater of $12 million or one percent of the original principal amount of each of the Visa Obligation Securities and MasterCard Obligation Securities shall be deposited into a litigation reserve account (collectively, the "Litigation Reserve Accounts") established as of the date(s) of the closings of the Securitizations under separate escrow agreements. The escrow agent retained under the escrow agreements shall be selected by mutual agreement of the parties hereto and shall be a financial institution that is unrelated to and independent of the parties hereto. Such amounts (including interest earned on the initial deposit described above) held in the Litigation Reserve Accounts shall not be pledged as collateral for the Visa Obligation Securities and MasterCard Obligation Securities and shall be available to be used by the Joint Arrangers in certain circumstances as described below.

The Client agrees to (a) reimburse DBSI for any and all losses, claims, damages, expenses or liabilities ("Claims") to which DBSI may become subject arising in any manner out of or in connection with the rendering of services by DBSI hereunder, unless it is finally judicially determined that such Claims resulted directly from the gross negligence, bad faith or willful misconduct of DBSI alone, and (b) reimburse DBSI promptly upon demand for any legal or other expenses reasonably incurred by them in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuits, investigations, claims or other proceedings arising in any manner out of or in connection with the rendering of services by DBSI hereunder (including, without limitation, in connection with the enforcement of this Engagement Agreement (provided, however, that such lawsuit, investigation, claim or other proceeding is not filed or initiated by the Client)), provided, however, that in the event a final judicial determination is made to the effect specified in subparagraph (a) above, Client shall not be obligated for such reimbursement and, if any such reimbursement shall have theretofore been made, DBSI will remit to the Litigation Reserve Accounts any amounts reimbursed under this subparagraph (b), and further provided, however, that Client's obligation to DBSI under this Section 6 is limited exclusively to amounts held in the Litigation

Reserve Accounts, and such Litigation Reserve Accounts shall be cross-collateralized and available to make reimbursements described herein.

The Client agrees that the reimbursement commitments set forth above shall apply whether or not DBSI is a formal party to any such lawsuits, claims or other proceedings, and that such commitments shall extend upon the terms set forth in this paragraph to any controlling person, affiliate, director, officer, employee or agent of DBSI (each, with DBSI, a "Covered Person"). The Client further agrees that, without the prior written consent of DBSI, which consent shall not be unreasonably withheld, it will not enter into any settlement of a lawsuit, claim or other proceeding arising out of the transactions contemplated by this Engagement Agreement unless such settlement includes an explicit and unconditional release from the party bringing such lawsuit, claim or other proceeding of all Covered Persons, does not include any findings of fact or culpability as to the Covered Party and the parties agree that the terms of such settlement shall remain confidential.

The Client and DBSI agree that if any reimbursement sought pursuant to the preceding paragraph is judicially determined to be unavailable for a reason other than the gross negligence, bad faith or willful misconduct of DBSI alone, then, whether or not DBSI is the Covered Person, the Client and DBSI shall contribute to the Claims for which such reimbursement is held unavailable: (i) in such proportion as is appropriate to reflect the relative benefits to the Client on the one hand, and DBSI on the other hand, in connection with the transactions to which such indemnification or reimbursement relates; or (ii) if the allocation provided by clause (i) above is judicially determined not to be permitted, in such proportion as is appropriate to reflect, not only the relative benefits referred to in clause (i) above, but also the relative faults of the Client on the one hand, and DBSI on the other hand, as well as any other equitable considerations; provided, however, that in no event shall the amount to be contributed by (i) DBSI pursuant to this paragraph exceed the amount of the fees actually received by DBSI hereunder and (ii) the Client pursuant to this paragraph exceed the amount available under the Litigation Reserve Accounts.

Provided that no lawsuit, claim or other proceeding is pending or threatened against the Client or DBSI with respect to the Securitizations, amounts held in the Litigation Reserve Accounts shall be released by the escrow agent to the Client upon payment in full of the Securities.

7. **Expenses.** Client will be responsible for, and shall pay upon demand and upon being provided reasonably satisfactory documentation therefor, all reasonable out-of-pocket fees and expenses incurred by any and all of DBSI, or any affiliate thereof, and their respective agents and representatives, in connection with the preparation, execution and delivery of this Engagement Agreement, such party's evaluation of the possible consummation of the Proposed Transactions and the negotiation and preparation of definitive documentation with respect to the Proposed Transactions, including but not limited to all reasonable legal fees and expenses incurred by counsel to be mutually agreed upon and retained by the Joint Arrangers with the consent of the Client (which shall not be unreasonably withheld) and travel expenses; provided, however, that such counsel shall provide DBSI and Client with an invoice on a monthly basis of its legal fees and expenses incurred to date. Customary and ordinary expenses for any amounts which, in the aggregate, are reasonably expected (on a pre-incurrence basis) to exceed $25,000, excluding legal fees and expenses and expenses incurred by DBSI in connection with the Securitizations shall require Client's prior written approval. Should the Proposed Transactions not be consummated for any reason whatsoever, Client shall nonetheless be responsible for, and shall, subject to final approval by the Court, pay upon demand and upon being provided reasonably satisfactory documentation therefor, all such reasonable out-of-pocket fees and expenses of each of DBSI, or any affiliate thereof, and the reasonable out-of-pocket fees and expenses of any and all third party credit enhancement providers, independent accountants and trustees, including, in the case of each of the foregoing entities, their respective agents and representatives, in each case, engaged either by DBSI with

the prior written consent, if applicable, of Constantine on behalf of Client, or engaged by the Client. DBSI shall have no liability whatsoever to any third party credit enhancement providers, independent accountants and trustees, including, in the case of each of the foregoing entities, their respective agents and representatives.

8. **Compensation.** Subject to final approval by the Court, as compensation for acting as Joint Arranger and Joint Bookrunning Manager in connection with each Securitization pursuant to a private placement under Rule 144A (subject to the terms hereof), the Client shall pay to DBSI the sum of (x) a structuring fee (the "Structuring Fee") equal to the product of (i) 0.25% *times* (ii) the principal amount (as of the closing date) of Visa Obligation Securities or MasterCard Obligation Securities, as applicable, issued *times* (iii) 50%, and (y) a placement fee equal to the product of (i) 0.25% *times* (ii) the principal amount (as of the closing date) of Visa Obligation Securities or MasterCard Obligation Securities, as applicable, issued *times* (iii) 40%, in each case, non-refundable and payable in immediately available funds on the closing date of each Securitization. For the avoidance of doubt, fees for each Securitization shall be calculated and paid separately.

In addition, each of the two Co-managers will receive a placement fee equal to the product of (i) 0.25% *times* (ii) the principal amount (as of the closing date) of Visa Obligation Securities or MasterCard Obligation Securities, as applicable, issued *times* (iii) 10%, in each case, non-refundable and payable in immediately available funds on the closing date of each Securitization, with a minimum of $400,000 only if both Securitizations are completed. Collectively, the placement fee referred to in the preceding paragraph to be paid to DBSI and the placement fee referred to in the preceding sentence to be paid to the two Co-managers is referred to herein as the "Placement Fee."

For any Securitization which is completed pursuant to an offering under Section 4(2), the parties shall negotiate to determine the appropriate number of basis points to be used in calculating a structuring fee and a placement fee, provided that the aggregate number of basis points used to calculate such structuring fee and placement fee for such Securitization shall be equal to seventy-five (75) basis points.

In the event that Visa prepays its obligations on a discounted basis agreed to by the Client, DBSI shall be entitled to a payment in an amount equal to $666,000. In the event that MasterCard prepays its obligations on a discounted basis agreed to by the Client, DBSI shall be entitled to a payment in an amount equal to $333,000. Both such payments are payable on the closing date of such prepayment.

In the event that the Joint Arrangers have distributed a placement memorandum to potential investors and are marketing the Visa Obligation Securities, and during such marketing effort Visa prepays its obligations on a discounted basis agreed to by the Client, DBSI shall be entitled to a payment in an amount equal to $2,830,000 (and such amount shall be in lieu of the $666,000 payment described in the preceding paragraph), payable on the closing date of such prepayment. In the event that the Joint Arrangers have distributed a placement memorandum to potential investors and are marketing the MasterCard Obligation Securities, and during such marketing effort MasterCard prepays its obligations on a discounted basis agreed to by the Client, DBSI shall be entitled to a payment in an amount equal to $1,420,000 (and such payment shall be in lieu of the $333,000 payment described in the preceding paragraph), payable on the closing date of such prepayment. (Each such amount identified in this paragraph and the preceding paragraph is referred to herein as a "Break-up Fee" and collectively as the "Break-up Fees".) The payment of all Break-Up Fees shall be subject to final approval by the Court.

9. **Exclusivity.** On and after the date hereof (a) Client will not, and will ensure that each Issuer Entity will not, directly or indirectly, through any representative or otherwise, solicit or entertain

offers from, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any person other than the Joint Arrangers relating to the Proposed Transactions or any transactions similar to the Proposed Transactions, and (b) Constantine, on behalf of Client, will immediately notify the Joint Arrangers upon its knowledge of any contact of the type referred to in (a) above involving any Issuer Entity or the Representatives regarding any such offer or proposal or any related inquiry. For the avoidance of doubt, but without limitation to any other provision hereof, Client agrees that, except as otherwise permitted under Section 9 hereof, Client will not commence or participate in any transaction or arrangement with any party (other than DBSI, acting as Joint Arranger and Joint Bookrunning Managers as contemplated herein) if such transaction or arrangement is the Proposed Transactions or substantially similar to the Proposed Transactions, unless Client first obtains the written consent of both Joint Arrangers and Joint Bookrunning Managers with respect thereto. Notwithstanding the foregoing, DBSI acknowledges that the Client has retained at its sole cost and expense Cannonade Capital LLC (*i.e.*, Joshua Slovik) as its financial advisor and Brown Rudnick Berlack Israels LLP ("Brown Rudnick") as its counsel for the Proposed Transactions.

    10.    **Entire Agreement and Prior Documents.** This Engagement Agreement constitutes the entire understanding among the parties hereto with respect to the Proposed Transactions, supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the Proposed Transactions, and cannot be amended or modified except in writing executed by each of the parties hereto. Except as otherwise provided herein, nothing contained herein, and no action or inaction by any of DBSI, or any affiliate thereof in connection with the Proposed Transactions, shall in any way alter or diminish any of the rights, remedies, privileges or entitlements which any of DBSI, or any affiliate thereof shall have under applicable law.

    11.    **No Commitment.** It is agreed that (a) this Engagement Agreement does not constitute a letter of intent to pursue the Proposed Transactions, or an offer by or a commitment of DBSI or any affiliate thereof to consummate the Proposed Transactions, place any Securities, or provide any other financing arrangement, and (b) the Proposed Transactions are subject in all respects to (i) DBSI's due diligence and internal approvals, (ii) the execution of documentation (and delivery of legal opinions) satisfactory to DBSI, (iii) there not having occurred any material adverse change or any development involving a prospective material adverse change in the business, operations, condition (financial or otherwise) or prospects of Issuer Entities or Obligors, whether or not arising in the ordinary course of business, or with respect to the Settlement Assets or the beneficial interests therein, which would, in the judgment of DBSI or, exercised in its respective sole and absolute discretion, make it inadvisable or impracticable to proceed with any Proposed Transaction and (iv) there not having occurred any material adverse change in general economic, political, or financial conditions, or in the credit and debit card payment processing industry or business in particular, which, in the judgment of DBSI exercised in its sole and absolute discretion, would make it inadvisable or impracticable to proceed with any Proposed Transaction.

    12.    **Survival and Termination.** Either party may terminate the engagement hereunder, with respect to the Securitization of the Visa Obligations or with respect to the Securitization of the MasterCard Obligations, or in its entirety at any time for any reason by giving the other party at least ten (10) days' written notice. Provided, however, subject to final approval by the Court, if within one year of the date of such termination by the Client, Visa or MasterCard prepay their obligations on a discounted basis agreed to by the Client or the Client executes the Securitization(s) or an alternative form of financing for the Settlement Assets, DBSI shall be entitled to a payment in an amount equal to $1,000,000 payable on the closing date of such prepayment or financing, unless the Client specifies in a written notice to DBSI that it terminated the engagement because of an inability of DBSI to close the Securitization(s) due to the degree of assistance and cooperation in the due diligence, disclosure and rating agency process by the Obligors and the Client subsequently executes the Securitization or an alternative form of

financing for the Settlement Assets within one year of the date of termination with the same degree of assistance and cooperation from the Obligors as offered to DBSI; in such event, DBSI and the Client may negotiate a reasonable fee to be paid to DBSI for its efforts in the Proposed Transaction(s), the payment of which shall also be subject to final approval by the Court. Regardless of which party terminates this Engagement Agreement, the provisions of Sections 7, 8, 12, 13, 14 and 20 shall survive such termination.

13. **Construction.** THIS ENGAGEMENT AGREEMENT SHALL, IN ACCORDANCE WITH SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY OTHER PRINCIPLES OF CONFLICTS OF LAW. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF THIS ENGAGEMENT AGREEMENT OR CONDUCT IN CONNECTION WITH THIS ENGAGEMENT AGREEMENT IS HEREBY WAIVED. EACH PARTY HERETO HEREBY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE FEDERAL AND NEW YORK STATE COURTS LOCATED IN THE CITY OF NEW YORK IN CONNECTION WITH ANY DISPUTE RELATED TO THIS ENGAGEMENT AGREEMENT OR ANY OF THE MATTERS CONTEMPLATED HEREBY.

14. **Confidentiality and Information Sharing.** Client agrees that this Engagement Agreement and the terms hereof shall not be disclosed by any of the Issuer Entities or any Representative directly or indirectly, to any person or entity, except for the Issuer Entities' employees, agents, advisors, directors or shareholders who are directly involved with the Proposed Transactions and who have been informed of, and have agreed to maintain, the confidentiality thereof. It is hereby agreed that DBSI and any affiliate thereof may disclose any information related to this Engagement Agreement, the Issuer Entities, their affiliates, the Settlement Assets or the beneficial interests therein, the Proposed Transactions and any other matters contemplated hereby or thereby only (i) to its agents, accountants, attorneys, affiliates, and any rating agencies, financial insurers, sureties, or any other potential participant in a risk syndication transaction, (ii) to the extent required by law or applicable regulation, (iii) pursuant to an order entered or subpoena issued by a court of competent jurisdiction, (iv) as requested by any government or regulatory or self-regulatory body having or claiming authority to oversee any aspect of such party's business or that of its affiliates, (v) for evidentiary purposes in any relevant action, proceeding or arbitration to which such party or any of its officers, directors or shareholders or any of its affiliates or officers, directors, or shareholders of any such affiliate is a party, (vi) to the extent that such information becomes publicly available other than by reason of improper disclosure by DBSI, (vii) for purposes of establishing a "due diligence" defense, (viii) which was available to DBSI on a non-confidential basis from a source other than Client or the Issuer Entities, or (ix) has been independently acquired or developed by DBSI without violating any of its obligations under this Engagement Agreement. In addition, information with respect to this Engagement Agreement and the Proposed Transactions may only be disclosed by DBSI to the Obligors to the extent necessary to facilitate the closing of the Proposed Transactions and with the prior written consent of the Client.

15. **Matters Relating to Engagement.** Client acknowledges that DBSI has been retained solely to provide the services set forth in this Engagement Agreement. In rendering such services, DBSI shall act as an independent contractor, and any duties of DBSI arising out of its engagement hereunder shall be owed solely to Client.

Client further acknowledges and agrees that:

(a) DBSI has been engaged solely to act as an Arranger in connection with the Proposed Transactions and that no fiduciary relationship between Client, on the one hand, and DBSI, on the other hand, has been created in respect of any of the transactions contemplated by

this Engagement Agreement, irrespective of whether DBSI has advised or is advising the Client on other matters, provided however, that the foregoing does not negate DBSI's responsibilities and obligations as an Arranger for the Proposed Transactions as contemplated by this Engagement Agreement;

 (b) the pricing of the Securities will be established following discussions and arms-length negotiations with DBSI, and Client is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated by this Engagement Agreement;

 (c) it has been advised that DBSI is a full-service brokerage firm and its affiliates are engaged in a broad range of transactions with Visa or MasterCard which may involve interests that differ from those of the Plaintiffs' Class and that DBSI has an affirmative obligation to disclose in writing (a "<u>Disclosure Notice</u>") such interests and transactions to Client by virtue of any fiduciary, advisory or agency relationship as of the date hereof, and shall, during the term of this engagement, disclose in writing (also a "<u>Disclosure Notice</u>") to Client any transactions with Visa or MasterCard which may involve interests that differ from those of the Plaintiffs' Class, including all proposed investment banking transactions with Visa or MasterCard (for example, DBSI shall be obligated to deliver a Disclosure Notice to Client with respect to any proposed equity or debt capital markets issuance for Visa or MasterCard or any mergers and acquisitions advisory services provided to Visa or MasterCard) after the date hereof and obtain the prior written consent of the Client prior to entering into any such investment banking transaction for Visa or MasterCard, which consent shall not be unreasonably withheld and, in the event that Client does not deliver such written consent within five (5) business days of receipt of a Disclosure Notice, DBSI may terminate this Engagement Agreement in accordance with Section 12 and subject to (e) below. It is understood and agreed that (i) securitizations of credit card receivables originated under the Visa or MasterCard brand do not involve interests with Visa or MasterCard that differ from those of the Plaintiffs' Class and (ii) participating in its current role as a co-manager or in a lesser role in the proposed MasterCard initial public offering, does not involve interests with Visa or MasterCard that differ from those of the Plaintiffs' Class and that DBSI may enter into such transactions identified in (i) and (ii) above without any obligation of pre-notification or consent;

 (d) for any transaction by DBSI for which the Client has given its written approval as required in (c) above, it waives, to the fullest extent permitted by law, any claims it may have with respect to such transaction against DBSI for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that DBSI shall have no liability (whether direct or indirect) to Client in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or through Client, including stockholders, employees or creditors of Client; and

 (e) until the earlier of (i) three (3) months after the termination of this Engagement Agreement, (ii) the closing of the Securitizations, (iii) at any time after the Court rejects the request for the Engagement Agreement Order, or (iv) at any time after the Court rejects the request for the Required Materials Order (so long as DBSI promptly notifies Client that it is terminating this Engagement Agreement as a result of such rejection), DBSI shall remain subject to the limitations imposed by 15(c) above.

 16. **Not Advisors; Independent Investigation.** Client acknowledges and agrees that DBSI and its affiliates are not, and do not hold themselves out to be, advisors as to legal, tax, accounting or regulatory matters in any jurisdiction. Client shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the risks, benefits

and suitability of the transactions contemplated by this Engagement Agreement, and DBSI, and its affiliates shall have no responsibility or liability to Client with respect thereto.

17. **Notices.** Notice given pursuant to any of the provisions of this Engagement Agreement shall be in writing and be mailed or delivered or faxed (a) to Client, c/o Constantine, at its address appearing above Attention: Messrs. Lloyd Constantine and Robert Begleiter, with copies to Joshua Slovik and Brown Rudnick, (b) to DBSI at its address as set forth on the signature page of this Engagement Agreement, Attention: CB Mulhern, Securitized Products Group.

18. **Brokers.** The Client represents and warrants to DBSI that there are no brokers, representatives or other persons which have an interest in compensation due to DBSI from any transaction contemplated herein.

19. **Successors and Assigns.** The benefits of this Engagement Agreement (including the indemnity) shall inure to the benefit of respective successors and assigns of the parties hereto and of the indemnified parties hereunder and their successors and assigns and representatives, and the obligations and liabilities assumed in this Engagement Agreement by the parties hereto shall be binding upon their respective successors and assigns. This Engagement Agreement shall not be assignable by either party without the prior written approval of the other party.

20. **Advertisements.** The Client agrees that DBSI has the right to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Client hereunder subject to the prior written approval of the Client, which shall not be unreasonably withheld. The Client also agrees that it will not communicate to third parties or to the public (including but not limited to placing any advertisements) regarding the Securitization prior to the completion of the offering of the Securities and in any event only with the prior written consent of DBSI, which consent shall be deemed given upon receipt by the Client of a letter from an authorized representative of DBSI to such effect.

21. **Disclosure.** The Client agrees that prior to the completion of the offering of each of the related Securities, any Offering Document required in connection with this Engagement Agreement shall not be publicly disclosed or made available to third parties without the prior consent of DBSI, which consent shall not be unreasonably withheld. The Client also agrees that any advice provided by DBSI shall not be publicly disclosed or made available to third parties at any time without the reasonable prior written consent of DBSI, which consent shall not be unreasonably withheld.

22. **Enforceability.** The invalidity or unenforceability of any provisions of this Engagement Agreement shall not affect the validity or enforceability of any other provision of this Engagement Agreement, which shall remain in full force and effect.

23. **Miscellaneous.** This Engagement Agreement may be executed in counterparts, which together shall be considered a single instrument. Delivery of an executed counterpart to this Engagement Agreement by facsimile shall be effective as delivery of a manually executed counterpart to this Engagement Agreement.

24. **Most Favored Nations.** In the event that the Engagement Agreement with respect to the additional firm to be hired as a Joint Arranger or Co-manager provides for a more favorable term or terms than the term or terms set forth herein, then DBSI shall be entitled to the more favorable term or terms and this Engagement Agreement shall be amended to incorporate the more favorable term or terms.

      DBSI is delighted to accept this engagement and looks forward to working with you on this assignment. Please confirm that the foregoing correctly sets forth our agreement by signing the enclosed duplicate of this Engagement Agreement in the space provided and returning it.

[Signature page to follow.]

Very truly yours,

DEUTSCHE BANK SECURITIES INC.

By: _____
Name: CB MULHERN
Title: DIRECTOR

By: _____
Name: ELIZABETH A. WHALEN
Title: DIRECTOR

[Address]

Facsimile No.: [ ]

AGREED AND ACCEPTED:
IN ITS CAPACITY AS CO-LEAD COUNSEL
FOR THE MEMBERS OF THE CLASS

CONSTANTINE CANNON

By: *[signature]*
Name: ROBERT L. BECLAISER
Title: PARTNER

DATE: MAY 12, 2006


HAGENS BERMAN SOBOL SHAPIRO LLP

By: *[signature]*
Name: GEORGE W. SAMPSON
Title: Partner

DATE: May 11, 2006


# 50222190 v15 - GALLOGBP - 023781/0002