**FILED**

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

JAN 5 2007 ★

BROOKLYN OFFICE

MEMO ENDORSED
IT IS ORDERED that counsel to whom this
Memo Endorsement is sent is responsible for
faxing a copy to all counsel and retaining
verification in the case file. Do not fax such
verification to Chambers or the Special Master.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------x

IN RE VISA CHECK/MASTERMONEY      MASTER FILE NO. CV-96-5238
ANTITRUST LITIGATION      (Gleeson, J.) (Mann, M.J.)

----------------------------------------------------x

## REPORT AND RECOMMENDATION

In this antitrust action, a class of approximately five million merchants alleged,

among other things, that defendants Visa U.S.A. Inc. ("Visa") and MasterCard

International Incorporated ("MasterCard") were illegally tying their debit products to

their credit cards, in violation of the Sherman Act. On June 4, 2003, the plaintiffs entered

into preliminary settlement agreements with the defendants, agreements that provided,

among other things, for the creation of a $3.05 billion settlement fund. By Opinion and

Order dated December 19, 2003, the Honorable John Gleeson approved both settlements

(collectively, the "Settlement Agreements"), awarded Class Counsel $220,290,160.44 in

attorneys' fees, and authorized reimbursement of costs in the amount of $18,716,511.44.

See In re: Visa Check/MasterMoney Antitrust Litigation, 297 F. Supp. 2d 503 (E.D.N.Y.

2003), aff'd, 396 F.3d 96 (2d Cir. 2005).

By Order dated February 17, 2004, Judge Gleeson appointed me Special Master

to issue reports and recommendations regarding referred disputes arising out of or

relating to the Visa and MasterCard Settlement Agreements. By Order dated September

8, 2004, Judge Gleeson referred to me for report and recommendation "any applications

for reimbursement of fees, costs and expenses incurred by plaintiffs' co-lead counsel,

Constantine & Partners and Hagens Berman, in administering the Visa Settlement and the

MasterCard Settlement."

- 1 -

By papers dated August 10, 2006, Stacey Anne Mahoney, Esq., a partner at

Constantine Cannon, P.C. (hereinafter "Lead Counsel") submitted a Declaration in

support of Lead Counsel's "request for an award of attorneys' fees incurred in connection

with services rendered to the Class . . . by [the] firm from October, 2005 through June,

2006 and for the reimbursement of costs and expenses incurred by [the] firm during that

same time period." Declaration of Stacey Anne Mahoney in Support of Supplemental

Request for Fees and Reimbursement of Costs and Expenses ("Mahoney Declaration") ¶

1. Lead Counsel's Fee Petition requests an award of legal fees in the amount of

$830,573.75 and reimbursement of costs and expenses in the amount of $792,797.64.

For the reasons set forth below, I respectfully recommend that this Court award

Lead Counsel $747,516.37 in legal fees, an amount equal to 90% of the fee award Lead

Counsel has requested.

Lead Counsel also seeks reimbursement for $158,283.83 in payments it made to

the law firm of Brown Rudnick for work completed on behalf of the Class during two

different periods: from May 16, 2003 through August 21, 2003, and from December 16,

2005 through May 31, 2006. With respect to the period from December 16, 2005 through

May 31, 2006, I respectfully recommend that this Court authorize reimbursement for the

amount Lead Counsel has requested – an amount that already reflects a 10% reduction,

negotiated by Lead Counsel, to Brown Rudnick's legal fees. With respect to the period

from May 16, 2003 through August 21, 2003, I respectfully recommend that this Court

authorize payment of an amount that reflects a similar 10% reduction. Because a 10%

reduction for the May 16, 2003 through August 21, 2003 period is not currently reflected

in Lead Counsel's reimbursement request, I hereby order Lead Counsel, within 10

- 2 -

business days following service of this Report and Recommendation, to file with this Court an amended request for reimbursement for amounts paid to Brown Rudnick, a request in which the 10% reduction already applied to Brown Rudnick's legal fees for the period from December 16, 2005 through May 31, 2006 is also applied to the firm's legal fees for the period from May 16, 2003 through August 21, 2003.

Lastly, I respectfully recommend that this Court authorize payment of $608,168.36, consisting of (1) reimbursement of $36,362.08 for payments Lead Counsel made, by order of Court, to Objectors' counsel; (2) reimbursement of the $230,825.73 Lead Counsel has requested for payments made to Noblett & Associates; (3) reimbursement of the $21,423.70 that Lead Counsel has requested for payments made to Apco Worldwide; (4) reimbursement of $237,108.96 for payments made to Charles River Associates, an amount that equals 90% of Lead Counsel's requested reimbursement amount; and (5) reimbursement of $82,447.89 for Lead Counsel's remaining costs and expenses (FedEx, hotel, Lexis, messenger, offsite storage, online research, photocopies, service of court papers, Special Master fees and expenses, telephone, travel and transportation).

## BACKGROUND

In a complaint filed on October 5, 1996, the named plaintiffs "alleged that the defendants' practice of requiring merchants who accepted defendants' credit cards to also accept their debit products . . . was an illegal tying arrangement, in violation of section 1 [of the Sherman Act]." In re: Visa Check/MasterMoney Antitrust Litigation, 297 F. Supp. 2d 503, 507 (E.D.N.Y. 2003). They "further alleged that, through these tying arrangements and other anticompetitive conduct, the defendants attempted to monopolize

the debit card market, in violation of section 2 [of the Sherman Act]." Id. This Court

certified the Class by Order dated February 22, 2000. Id. The Second Circuit affirmed

on October 17, 2001. Id. at 507-08.

After motion practice, and on the brink of trial, the plaintiffs entered into

preliminary settlement agreements with each of the defendants. Id. at 508. These

Settlement Agreements provided, among other things, for "the creation of a $3.05 billion

settlement fund." Id. at 508. With respect to the question of attorneys' fees, the

Settlement Agreements stated, among other things, as follows:

> On or before August 18, 2003, Plaintiffs' Co-Lead Counsel shall
> file a Fee and Expense Application for distribution from the Gross
> Settlement Fund of a Fee Award consisting of an award of Plaintiffs'
> attorneys' fees and reimbursement of costs and expenses. Plaintiffs' Co-
> Lead Counsel reserves the right to make additional applications for fees,
> costs, and expenses incurred in obtaining Final Settlement Approval and
> administering the Settlement.

Visa Settlement Agreement ¶ 14; see also MasterCard Settlement Agreement ¶ 14

(same).

Notice of the Settlement Agreements was mailed to Class Members. That notice,

which was dated June 13, 2003, stated (among other things):

> [O]n August 18, 2003, Class Counsel will file a petition for
> payment of attorneys' fees, costs and expenses, and may, from time to
> time thereafter, petition the Court for reimbursement of fees, costs and
> expenses from the Settlement Funds, including fees incurred by Class
> Counsel and the Administrator while providing Notice to the Class and
> while administering the Settlement Funds (including the plan of allocation
> and distribution).

June 13, 2003 Notice ¶ 17.

On August 18, 2003, Lead Counsel sought this Court's approval of the Settlement

Agreements and plan of allocation. Visa Check/MasterMoney, 297 F. Supp. 2d at 506-

- 4 -

07. Lead Counsel also sought an award of attorneys' fees in the amount of $609 million and reimbursement of expenses. Id. On September 25, 2003, this Court "held a fairness hearing in [the] ceremonial courtroom to hear arguments of th[e Objectors] and any others that might be raised." Id. at 509. On December 19, 2003, this Court issued an Opinion and Order approving the Settlement Agreements, awarding Class Counsel $220,290,160.33 in attorneys' fees, and authorizing the reimbursement of costs in the amount of $18,716,511.44. See id. at 526, aff'd, 396 F.3d 96 (2d Cir. 2005).

On February 17, 2004, this Court appointed me Special Master to issue reports and recommendations regarding referred disputes arising out of or relating to the Visa and MasterCard Settlement Agreements. By Order dated September 8, 2004, this Court referred to me for report and recommendation "any applications for reimbursement of fees, costs and expenses incurred by plaintiffs' co-lead counsel, Constantine & Partners and Hagens Berman, in administering the Visa Settlement and the MasterCard Settlement." By order dated February 9, 2005, this Court ordered Lead Counsel to publish the details of all supplemental requests for reimbursement of fees and expenses on the webpage that is dedicated to this litigation.

On November 14, 2005, Stacey Anne Mahoney, Esq., a partner at Constantine Cannon, P.C., submitted a Declaration in support of Lead Counsel's "request for an award of attorneys' fees incurred in connection with services rendered to the Class . . . by [the] firm from August, 2003 through September, 2005 and for the reimbursement of costs and expenses incurred by [the] firm from July, 2003 through September, 2005." By report and recommendation dated January 11, 2006, and by subsequent report and recommendation dated March 6, 2006, I respectfully recommended that this Court award

Lead Counsel fees in an amount equal to 95% of the amount it had requested, for a total fee award of $2,222,794.56, plus reimbursement of some – but not all – of Lead Counsel's costs and expenses. This Court adopted my recommendations.

By papers dated August 10, 2006, Ms. Mahoney submitted a Declaration in support of Lead Counsel's "request for an award of attorneys' fees incurred in connection with services rendered to the Class . . . by [the] firm from October, 2005 through June, 2006 and for the reimbursement of costs and expenses incurred by [the] firm during that same time frame." Mahoney Declaration ¶ 1. Ms. Mahoney states that, in accordance with this Court's February 9, 2005 order, Lead Counsel caused her Declaration "to be posted, on or about August 11, 2006, on the case website, www.inrevisacheckmaster moneyantitrust litigation.com" and that she "caused to be filed with the Court and served upon the parties on the service list a Notice of Intention of filing this supplemental request for fees and reimbursement of costs and expenses." Id. ¶¶ 31, 33.

In her current Declaration, Ms. Mahoney asserts that "[t]he total number of hours spent on this litigation from October 2005 through June 2006 by [the] firm is 2,785.75." Id. ¶ 5. Applying hourly attorney rates ranging from $235 (Ankur Kapoor, Esq.'s hourly rate for 2005) to $725 (the hourly rate of Lloyd Constantine, Esq., for 2006), hourly paralegal rates ranging from $100 to $125, and an hourly rate of $175 for the services of Jeffrey Shaman, who, though a lawyer, served the Class "in his capacity as an expert in technology and document management," Lead Counsel requests a total fee award of $830,573.75. Id. ¶ 5 & n.1.

Ms. Mahoney further states that, "[u]sing the same criteria as Lead Counsel and its outside auditor did in conjunction with the August 18, 2003 Petition for Fees and

Reimbursement for Costs and Expenses, [she] conducted an audit of Constantine Cannon's time records for the period that is the subject of this supplemental request," and, as a result of the audit, "unilaterally omitted fees in the amount of $23,357.50, which reflects a total deduction of 87.25 hours." Id. ¶ 6. She maintains that "[n]either these hours nor these fees are included in Lead Counsel's $830,573.75 request for fees." Id.

Lead Counsel also seeks reimbursement of its costs and expenses. Ms. Mahoney states that, not counting a "unilateral deduction of $13,452.30 in expenses" made as a result of her audit of Lead Counsel's expense records, her firm "expended a total of $792,797.64 in unreimbursed expenses in connection with the prosecution of this litigation from October of 2005 through June of 2006."[1] Id. ¶¶ 7, 9. According to Ms. Mahoney, these expenses fall into the following categories:

| ACTIVITY | AMOUNT | |
|---|---|---|
| **Counsel** | | |
| Brown Rudnick | $158,283.83 | |
| Lawrence W. Schonbrun | $6,046.59 | |
| Stephen F. Helfand | $13,700.85 | |
| Johnson, Rasmussen, Robinson | $16,614.64 | |
| **Counsel Total** | | **$194,645.91** |
| **Consulting** | | |
| Noblett & Associates | $230,825.73 | |
| Apco Worldwide | $21,423.70 | |
| Charles River Associates | $263,454.41 | |
| **Consulting Total** | | |
| | | **$515,703.84** |
| **FedEx** | | **$570.47** |
| **Hotel** | | **$472.53** |
| **Lexis** | | **$6,719.68** |

---

[1] Ms. Mahoney's Declaration states that "[t]he expenses incurred pertaining to this case are reflected in the books and records of this firm" and that "[t]hese books and records are prepared from expense vouchers and check records and are an accurate record of the expenses incurred." Id. ¶ 8.

| Messenger | $369.63 |
|---|---|
| Offsite Storage | $451.05 |
| Online Research | $546.56 |
| Photocopies | $32,318.01 |
| Service of Court Papers | $255.00 |
| Special Master | $25,053.91 |
| Telephone | $4,793.54 |
| Travel & Transportation | $675.09 |
| Westlaw | $10,222.42 |

With respect to the "Counsel" and "Consulting" expense entries listed above, Ms. Mahoney's Declaration provides the following additional details:

### Counsel Expenses

According to Ms. Mahoney, three of the four expense entries under the "Counsel" heading – specifically, the entries for Lawrence W. Schonbrun, Esq., Stephen F. Helfand, Esq., and Johnson, Rasmussen, Robinson – were for payments made to Objectors' counsel, "to whom the amounts listed were awarded by the Court as attorneys' fees and expenses, and accordingly paid by Lead Counsel." Id. ¶ 25 (citing Court orders).

The fourth "Counsel" expense entry is for the law firm of Brown Rudnick, which "was retained by Lead Counsel on behalf of the Class on May 15, 2003, in connection with the drafting of certain provisions of the Settlement Agreements to facilitate securitization (or monetization) of the payments to be made by defendants and to assist Lead Counsel in managing a process to hire an underwriter for the securitization." Id. ¶

26. According to Ms. Mahoney, "[t]he process of selecting underwriters did not conclude until the Spring of this year." She further states (id.):

> On January 27, 2006, Lead Counsel entered into a second retainer agreement with Brown Rudnick retaining that firm to represent the class as "Issuer's Counsel" in the intended securitization. As Issuer's Counsel, Brown Rudnick represents the Class with respect to the financial instruments necessary to securitize the payments due from the defendants.

According to Ms. Mahoney, Lead Counsel's unreimbursed expense from Brown Rudnick is for "work done[, and expenses incurred,] on behalf of the Class" during two different time periods: "from May 16, 2003 through August 21, 2003 and from December 16, 2005 through May 31, 2006." Id. ¶ 27. She states that "[t]he total number of hours expended by Brown Rudnick in this representation has been 328.2," at hourly billing rates that "range from $184.50/hour to $648/hour," with "[t]he bulk of the work . . . done by Brian Gallogly (at rates of $335/hour (in 2003) and $436.50/hour (in 2005 and 2006))." Id. ¶ 28. She further states that, "[f]or th[e] second period, during which approximately 75% of the unreimbursed time and expenses were incurred, Lead Counsel successfully negotiated with Brown Rudnick for Brown Rudnick to apply a ten percent discount to its legal fees." Id. ¶ 27 n.4.

According to Ms. Mahoney, Lead Counsel reviewed Brown Rudnick's invoices "to ensure that the efforts being undertaken were for the benefit of the Class" and, as a result of this review, deducted $289.40 in expenses "for lack of back-up and, in one instance, because the expense incurred was not of the type that [Lead Counsel] previously requested reimbursement for from the Settlement Funds." Applying this deduction, the total requested reimbursement amount for fees and expenses paid to Brown Rudnick is $158,283.83. Id. ¶ 29.

Lead Counsel has provided copies of Brown Rudnick's original invoices for my "*in camera* review." Id.

### Consultant Expenses

*Noblett & Associates*

Lead Counsel also seeks reimbursement for $230,825.73 it paid to Noblett & Associates ("Noblett"). According to Ms. Mahoney, this expense reflects work done by Michael McCormack on behalf of the Class from September of 2005 through May of 2006, and expenses incurred in connection with that work during that time frame. Id. ¶ 16.

Lead Counsel retained Mr. McCormack "to provide consultative services in support of the plan." Id. ¶ 17. According to Ms. Mahoney, before joining Noblett, "Mr. McCormack worked in merchant acquiring for the Wells Fargo bank." At Wells Fargo, Mr. McCormack "developed an expertise concerning the various ways acquirers and Visa capture and maintain merchant data" – an expertise that, according to Ms. Mahoney, "has proven critical to the execution of the plan of allocation and has provided a tremendous benefit to the Class." Id. She explains (id. ¶ 18):

> During this time frame, Mr. McCormack has continued to work directly with Lead Counsel and the Claims Administrator to ensure that class members were receiving the optimal amount through the distribution process. Mr. McCormack has continued to interface directly with merchants that have submitted consolidated claim forms to ensure that their consolidation captures all of their store locations and divisions. Mr. McCormack continues to undertake necessary research when presented by a merchant with a complicated claim, particularly when resolution of the issues related to the claim would benefit from his expertise and knowledge regarding how acquirers capture merchant information. Mr. McCormack continues to work with the Oasis database in order to facilitate the ongoing distribution process. Each and every one of these tasks has been for the benefit of the Class. Constantine Cannon anticipates that Noblett, through

the efforts of Mr. McCormack, will continue to be an important part of the distribution process for the foreseeable future.

According to Ms. Mahoney, "[t]he total number of hours expended by Mr. McCormack in this representation during this time frame was 764.84 (reduced from 765.75 incorrectly rounded on the invoices)" at a billing rate of $265. Id. ¶ 16. She further states that "Noblett has submitted invoices detailing on a daily basis the work done by Mr. McCormack and the time expended in completing that work, as well as the expenses incurred by Mr. McCormack in connection with his work on this matter." Id. ¶ 19. When receiving Noblett's invoices, Lead Counsel reviewed them for the purpose of ensuring "that the efforts being undertaken were for the benefit of the Class." Id. "As a result of this process, Lead Counsel has reduced its request for unreimbursed expenses paid to Noblett by $2,562.28" in order "to correct mathematical rounding errors, to eliminate expenses for which there was insufficient back up, and to eliminate time entries that were vague, duplicative and apparently did not pertain to this case." Id.

Lead Counsel has provided copies of Noblett's original invoices for my "*in camera* review." Id. ¶ 10.

### Apco Worldwide

Lead Counsel seeks reimbursement for $21,423.70 it paid to Apco Worldwide ("Apco") for work done and expenses incurred from August of 2005 through April of 2006. Id. ¶ 20. Ms. Mahoney describes Apco as "a public relations firm" that "periodically distributed merchant advisories and/or press releases to keep the Class informed of pertinent developments, like those relevant to the distributions to class members, in both Spanish and English," thereby "facilitat[ing] Lead Counsel's efforts to keep the Class apprised of material events in the case." Id. ¶ 21.

According to Ms. Mahoney, "the total number of hours expended by Apco in this representation during this time frame was 8.75, 8.0 hours of which was completed at the associate billing rate of $170/hour and .75 hours of which was completed by Kent Jarell, Senior Vice President Crisis Team, at $415/hour." Id. ¶ 20. "The bulk of the amounts contained in Apco's invoices derives from expenses that Apco incurred in connection with advertising and wire service disbursements on behalf of the Class." Id.

Ms. Mahoney further states that "Apco has submitted invoices containing dated entries by individual for time expended with descriptions of the tasks undertaken, and itemized expenses," and that, as "[a]s with the other consultants' bills, Apco's invoices were reviewed by Lead Counsel to ensure that the efforts being undertaken were for the benefit of the Class." Id. ¶ 22. "As a result of this review, Lead Counsel reduce[d] its request for reimbursement for payments made to Apco by $2,458.68 for failure to supply support for expenses." Id.

Lead Counsel has provided copies of Apco's original invoices for my "*in camera* review." Id. ¶ 10.

### Charles River Associates

The largest "Consulting" expense – $263,454.41 – is for payments made to Charles River Associates ("CRA"). According to Ms. Mahoney, CRA "provided the expert economic analysis for this Class during this case." Id. ¶ 13. She states that "CRA has continued to work closely with Lead Counsel regarding implementation of the plan of allocation and the distribution of the Settlement Funds to the Class Members" (id. ¶¶ 13-14):

> CRA continues to perform multiple functions connected to the plan
> and the distribution. For example, CRA has analyzed data to enable class

members to estimate their likely distributions.  CRA has also conducted analysis to estimate the amount of the potential residual of the Settlement Funds.  CRA has continued to work closely with the Claims Administrator to assist with the distribution process, for example, by developing a statistical program to check the accuracy of the amounts of the initial distribution by the Claim Administrator.  CRA has also assisted in the drafting of descriptions for the case website, www.inrevisacheckmaster moneyantitrustlitgation.com.  CRA has worked and continues to work with the Claims Administrator and merchants regarding challenges to the amount of the merchants' distributions.

Ms. Mahoney states that the requested reimbursement amount "reflects work done on behalf of the Class from September 3, 2005 through June 9, 2006." Id. ¶ 12. According to Ms. Mahoney, "[t]he total number of hours expended by CRA in this representation during this time frame was 846.60," at billing rates "rang[ing] from $105/hour for support staff to $530/hour for the supervisory work of Vice President Craig Romaine."  She states that "[t]he vast majority of the work was done by Stephen Kletter, a Principal at CRA (at rates ranging from $365/hour to $385/hour)," with "Mr. Kletter's effort . . . significantly assisted by work completed by associates/analysts (at rates ranging from $175/hour to $185/hour)." Id. Ms. Mahoney further asserts that "CRA also incurred $102.91 in expenses during this time frame." Id.

According to Ms. Mahoney, "CRA has submitted invoices to Constantine Cannon that contain daily entries, with a description of the work conducted and the amount of time expended, organized by person." Id. ¶ 15. Ms. Mahoney asserts that "Lead Counsel has reviewed each of [CRA's] invoices to determine whether the efforts undertaken were done for the benefit of the Class," and, "[a]s a result of the review, has reduced its request for reimbursement for fees paid to CRA by $1,053.50 (constituting 3.9 hours of deductions at rates ranging from $105/hours to $385/hour) for work done in

connection with preparing invoices and work done in excess of 22 hours on a particular day." Id. ¶ 15.

Lead Counsel has provided copies of CRA's original invoices for my "*in camera* review." Id. ¶ 10.

*   *   *

I have received no objections to Lead Counsel's Supplemental Fee and Expense Petition. By email dated September 23, 2006, Ms. Mahoney informed me that she is not aware of any objections having been filed.

## ANALYSIS

### *Lead Counsel's Legal Fees*

Lead Counsel seeks a fee award of $830,573.75 for attorney and paralegal hours that it devoted to this litigation from October 2005 to June 2006. Mahoney Declaration ¶ 5. According to Ms. Mahoney, the work for which Lead Counsel seeks a fee award "included work devoted principally to ensuring compliance with the Settlement Agreements, investing and securitizing the Settlement Funds, and relating to administering the claims process and the distribution of the Settlement Funds to Class members." Id. ¶ 4.

Because I believe that the foregoing efforts provided a significant benefit to the Class, I respectfully recommend that this Court find that Lead Counsel is entitled to an award of reasonable attorneys' fees for this time period. See Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000) (noting that, in common fund cases, "the attorneys whose efforts created the fund are entitled to a reasonable fee – set by the court – to be taken from the fund" in order to "prevent[] unjust enrichment of those benefiting

from a lawsuit without contributing to its cost"); Olick v. Parker & Parsley Petroleum Co., 145 F.3d 513, 516 (2d Cir. 1998) (district court did not abuse its discretion by granting class counsel's supplemental fee request for time spent defending settlement).

Assuming this Court agrees with my recommendation, the next inquiry regards the reasonableness of the requested amount.  Lead Counsel's fee request employs the lodestar method, pursuant to which the district court "'scrutinizes the fee petition to ascertain the number of hours reasonably billed and then multiplies the figure by an appropriate hourly rate.'"  In re Independent Energy Holdings PLC Securities Litigation, No. 00 Civ. 6689 SAS, 2003 WL 22801724, at *1 (S.D.N.Y. Nov. 24, 2003) (quoting Goldberger, 209 F.3d at 47).  "[T]he key consideration in awarding fees is what is reasonable under the circumstances."  Visa Check/MasterMoney, 297 F. Supp. 2d at 521.  When calculating a reasonable fee, the district court is obliged "to act as a 'fiduciary . . . a guardian of the rights of absent class members."  Id. (quoting City of Detroit v. Grinnell Corp., 560 F.2d 1093, 1099 (2d Cir.1977)).

Case law requires that this Court apply hourly rates that are "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  Luciano v. Olsten Corp., 109 F.3d 111, 116 (2d Cir. 1997) (internal quotation marks omitted).  "It is well-established that the 'prevailing community' the district court should consider . . . is the 'district in which the court sits.'"  Id.; see also New Leadership Committee v. Davidson, 23 F. Supp. 2d 301, 304 (E.D.N.Y. 1998).  "The burden is on the applicant to produce satisfactory evidence in addition to the attorney's own affidavits showing that the requested rates are at the prevailing market level."  Paulino v. Upper West Side Parking Garage, Inc., No. 96 Civ.

4910, 1999 WL 325363, at *3 (S.D.N.Y. May 20, 1999) (citing <u>Blum v. Stenson</u>, 465

U.S. 886, 896 n. 11 (1984)); <u>see also</u> <u>New Leadership Committee</u>, 23 F. Supp. 2d at 304

(declining to consider affidavits supporting requested hourly rate where parties submitted

such evidence for the first time in objecting to Magistrate Judge's report and

recommendation). "The court may also look to attorneys' fees granted in other cases and

rely on its own knowledge of similar cases to determine a reasonable rate." <u>Paulino</u>,

1999 WL 325363, at *3.

As stated, Lead Counsel requests hourly attorney rates ranging from $235 (the

hourly rate Ankur Kapoor for 2005) to $725 (the hourly rate of Lloyd Constantine, Esq.,

for 2006) and hourly paralegal rates ranging from $100 to $125, with most attorney hours

billed at hourly rates falling between $260 and $530.  Mahoney Declaration ¶ 5.  Lead

Counsel also seeks an hourly rate of $125 for 6.25 hours billed by Alee Scott, who is

described as a "Law Clerk," and an hourly rate of $175 for the services of Jeffrey

Shaman, who, though a lawyer, served "in his capacity as an expert in technology and

document management."  <u>Id.</u> ¶ 5 n.1.

Case law makes clear that the most of these hourly rates fall at the high end of the

billing rate spectrum.  <u>See</u> <u>In re Independent Energy Holdings</u>, 2003 WL 22244676, at *9

(partner rates ranging from $650 to $695 and associate rates ranging from $300 to $425

are "high" but "not extraordinary"); <u>Moon v. Gab Kwon</u>, No. 99 Civ. 11810 (GEL), 2002

WL 31512816, at *2 (S.D.N.Y. Nov. 8, 2002) (hourly paralegal rate of $100); <u>Marathon</u>

<u>Ashland Petroleum</u>, No. 00 Civ. 2935 JSMKNF, 2003 WL 21355216, at *2 (S.D.N.Y.

June 10, 2003) ($99 per hour for paralegal work).

The second inquiry is whether Lead Counsel billed a reasonable number of hours in furtherance of these efforts.

As stated, Lead Counsel seeks reimbursement for 2,785.75 attorney and paralegal hours billed from October 2005 to June 2006 – the approximate equivalent of two professionals working full time on the case for that nine month period.  Ms. Mahoney's Declaration asserts that "[a]ll of the work performed by our attorneys and staff was conducted effectively, efficiently, and economically . . . to avoid unnecessary expenditures of time and expense." Mahoney Declaration ¶ 4.

I believe that a total of 2,785.75 hours, though high, is not an unreasonable amount of time to devote to the at times complex tasks that Lead Counsel undertook on behalf of the class during this time period.  See id. (Lead Counsels' efforts "included work devoted principally to ensuring compliance with the Settlement Agreements, investing and securitizing the Settlement Funds, and relating to administering the claims process and the distribution of the Settlement Funds to Class members").  I also, however, believe that, when combined with the hourly rates requested by Lead Counsel – which, as stated above, fall at the high end of the billing rate spectrum – the resulting fee request is higher than is reasonable under the circumstances and therefore that it merits a reduction of 10%.  See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 124 (2d Cir. 2005) ("In approving the district court's fee award, we recognize the sacrifice and commitment plaintiffs' counsel made to its clients *while preserving as much as possible for those who were harmed*." (emphasis added)); New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983) (noting that various courts "have endorsed percentage cuts as a practical means of trimming fat from a fee

application"); Mahoney Declaration ¶ 27 n.4 (noting that, on behalf of the Class, Lead Counsel successfully negotiated with Brown Rudnick for a 10% reduction in that firm's legal fees).

In my opinion, the six Goldberger factors support such a result. See Wal-Mart Stores, 396 F.3d at 121 ("[T]he 'Goldberger factors' ultimately determine the reasonableness of a common fund fee."). These factors include:

> (1) the time and labor expended by counsel;
>
> (2) the magnitude and complexities of the litigation;
>
> (3) the risk of the litigation . . . .;
>
> (4) the quality of representation;
>
> (5) the requested fee in relation to the settlement; and
>
> (6) public policy considerations.

Id. (citing Goldberger, 209 F.3d at 50).

I believe that the first, second, fourth and sixth Goldberger factors – the time and labor expended by counsel, the magnitude and complexity of the litigation, the quality of the representation, and public policy considerations – weigh in favor of a significant award. Lead Counsel, a skilled and reputable law firm, devoted a significant number of hours to representing the class' interests during this time period. In addition, the tasks that Lead Counsel undertook were clearly complex. Finally, there is, in my opinion, "commendable sentiment in favor of providing lawyers with sufficient incentive" to zealously advocate for the interests of class members even after the litigation has settled. See Goldberger, 209 F.3d at 51.

I also, however, believe that the remaining two <u>Goldberger</u> factors – the risk of litigation and the relationship of the fee to the settlement – weigh in favor of ordering a 10% reduction to Lead Counsel's fee request.  I do not believe that there is or was a significant risk that Lead Counsel might not be compensated for its efforts on behalf of the Class.  In addition, although the settlement that Lead Counsel obtained on behalf of the Class was significant, so, too, was Lead Counsel's initial fee award.

For the reasons described above, I respectfully recommend that this Court award Lead Counsel $747,516.37 in legal fees, an amount that is the equivalent of 90% of the fee award Lead Counsel has requested.

### *Brown Rudnick*

Lead Counsel also seeks reimbursement of $158,283.83 for legal fees and expenses it paid to the law firm of Brown Rudnick for work that firm performed on behalf of the Class during two different time periods:  "from May 16, 2003 through August 21, 2003 and from December 16, 2005 through May 31, 2006."  <u>Id.</u> ¶¶ 27, 28. Ms. Mahoney notes that this figure reflects a 10% reduction, negotiated by Lead Counsel, to Brown Rudnick's legal fees for the period from December 16, 2005 through May 31, 2006 – the time period during which "approximately 75% of the unreimbursed time and expenses were incurred."  <u>Id.</u> ¶ 27 & n.4.  Lead Counsel did not negotiate a 10% reduction to Brown Rudnick's legal fees for the period from May 16, 2003 through August 21, 2003.  <u>Id.</u> ¶ 27.

According to Ms. Mahoney, Brown Rudnick "was [initially] retained by Lead Counsel . . . in connection with the drafting of certain provisions of the Settlement Agreements to facilitate securitization (or monetization) of the payments to be made by

defendants and to assist Lead Counsel in managing a process to hire an underwriter for the securitization." Id. ¶ 26.  She states that, on January 27, 2006, "Lead Counsel entered into a second retainer agreement with Brown Rudnick retaining that firm to represent the class as 'Issuer's Counsel' in the intended securitization." Id.

Because I believe that these efforts provided a significant benefit to the Class, I respectfully recommend that this Court find that Lead Counsel is entitled to reimbursement of the fees it paid to Brown Rudnick for work that firm did from May 16, 2003 through August 21, 2003 and from December 16, 2005 through May 31, 2006.  See Olick v. Parker & Parsley Petroleum Co., 145 F.3d 513, 516 (2d Cir. 1998) (district court did not abuse its discretion by granting class counsel's supplemental fee request for time spent defending settlement); In re Sterling Foster & Co., Inc., Sec. Litig., 238 F. Supp. 2d 480, 490 (E.D.N.Y. 2002) ("Class Counsel are entitled to reimbursement for reasonable litigation expenses.").

Assuming this Court agrees with my recommendation, the next inquiry regards amount.  "[T]he key consideration in awarding fees is what is reasonable under the circumstances." Visa Check/MasterMoney, 297 F. Supp. 2d at 521.  When calculating a reasonable fee, the district court is obliged "to act as a 'fiduciary . . . a guardian of the rights of absent class members." Id. (quoting City of Detroit v. Grinnell Corp., 560 F.2d 1093, 1099 (2d Cir.1977)).

Ms. Mahoney states that Brown Rudnick's billing rates "range from $184.50/hour to $648/hour," with "[t]he bulk of the work . . . done by Brian Gallogly (at rates of $335/hour (in 2003) and $436.50/hour (in 2005 and 2006))." Id. ¶ 28.  Although Lead Counsel does not describe Brown Rudnick's experience or qualifications, the firm's

webpage reveals that Mr. Gallogly, a partner in the firm's Providence, Rhode Island

office, "focuses his practice on public and structured finance transactions":

> He has represented various issuers and underwriters in public and
> private tax-exempt and taxable debt financings, including the
> securitization of new asset classes. He recently served as counsel in
> several transactions in which legal fee awards payable to certain law firms
> were securitized. He also has served as issuer's counsel to finance the
> privatization of several military housing projects located on Air Force,
> Army and Navy bases.

See http://www.brownrudnick.com/bio/bio.asp?ID=86.

The above-described experience may or may not predate Mr. Gallogly's work in

connection with this litigation. Either way, given the relevant case law, the hourly rates

that Brown Rudnick has charged do not seem unreasonable to me. See In re Independent

Energy Holdings PLC, No. 00 Civ. 6689 (SAS), 2003 WL 22244676, at *9 (S.D.N.Y.

Sep. 29, 2003) (partner rates ranging from $650 to $695 and associate rates ranging from

$300 to $425 are "high" but "not extraordinary"); Moon v. Gab Kwon, No. 99 Civ.

11810 (GEL), 2002 WL 31512816, at *2 (S.D.N.Y. Nov. 8, 2002) (hourly paralegal rate

of $100); Marathon Ashland Petroleum, No. 00 Civ. 2935 JSMKNF, 2003 WL

21355216, at *2 (S.D.N.Y. June 10, 2003) ($99 per hour for paralegal work). In addition,

Brown Rudnick's billable hours – 328.2, according to Ms. Mahoney – constitute, in my

opinion, a reasonable amount of time to devote to the complex tasks that Brown Rudnick

undertook on behalf of the Class during these time periods.

In my opinion, however, an analysis of the reasonableness of the number of hours

billed and hourly rates requested should not end the inquiry. As stated above, Lead

Counsel negotiated with Brown Rudnick for a 10% reduction to legal fees paid for work

done on behalf of the Class from December 16, 2005 through May 31, 2006. In my

opinion, this Court should apply a similar 10% reduction to the legal fees Lead Counsel

paid to Brown Rudnick for work done on behalf of the Class from May 16, 2003 through

August 21, 2003.

In my opinion, the six Goldberger factors support such a result. I believe that the

first, second, fourth and sixth Goldberger factors – the time and labor expended by

counsel, the magnitude and complexity of the litigation, the quality of the representation,

and public policy considerations – weigh in favor of a significant award. There is, in my

opinion, "commendable sentiment in favor of providing lawyers with sufficient

incentive" to undertake the complex task of competently representing the financial

interests of absent class members in class actions that, like this one, culminate in the

creation of a sizeable common fund. See Goldberger, 209 F.3d at 51.

I also, however, believe that the remaining two Goldberger factors – the risk of

litigation and the relationship of the fee to the settlement – weigh in favor of ordering a

10% reduction to all of Brown Rudnick's legal fees. I do not believe that there is or was

a significant risk that Brown Rudnick might not be compensated for its efforts on behalf

of the Class. In addition, given that there is no indication that Brown Rudnick's efforts

extended beyond the limited issue of providing advice and support regarding the

securitization of the common fund created by the Settlement Agreements, I do not believe

that the size of that fund weighs in favor of a greater award.

For the reasons set forth above, I respectfully recommend that, with respect to the

work done by Brown Rudnick during the period from December 16, 2005 through May

31, 2006, this Court authorize reimbursement in the amount Lead Counsel has requested

– an amount that already reflects a 10% reduction, negotiated by Lead Counsel, to Brown

Rudnick's legal fees. With respect to payments made to Brown Rudnick for the period from May 16, 2003 through August 21, 2003, I respectfully recommend that this Court authorize payment of an amount that reflects a similar 10% reduction. Because a reduction for the May 16, 2003 through August 21, 2003 period is not currently reflected in Lead Counsel's reimbursement request, I hereby order Lead Counsel, within 10 business days following service of this Report and Recommendation, to file with this Court an amended request for reimbursement for Brown Rudnick's fees and expenses, one in which the 10% reduction already applied to Brown Rudnick's legal fees for the period from December 16, 2005 through May 31, 2006 is also applied to its legal fees for the period from May 16, 2003 through August 21, 2003.

### Objectors' Counsel

Lead Counsel also seeks reimbursement for payments it made to Objectors' counsel. The combined total of these payments – made to Lawrence F. Schonbrun, Esq., Stephen F. Helfand, Esq., and Johnson, Rasmussen, Robin – is $36,362.08.

Because these payments were made pursuant to Court order, see Mahoney Declaration ¶ 25 (citing orders), I respectfully recommend that this Court order reimbursement of the amounts requested.

### Noblett & Associates

The first expense entry under the Consulting category is for the amount of $230,825.73 paid to Noblett & Associates for work done and expenses incurred by Mr. McCormack in connection with his assistance with the distribution process. Mahoney Declaration ¶¶ 7, 19. According to Ms. Mahoney, "[t]he total number of hours expended

by Mr. McCormack in this representation during this time frame was 764.84 (reduced from 765.75 incorrectly rounded on the invoices)" at a billing rate of $265. Id. ¶ 16.

Based upon Ms. Mahoney's description, there is, in my opinion, no question but that Mr. McCormack's efforts benefited the Class. See id. ¶ 18 (Mr. McCormack "interface[s] directly with merchants that have submitted consolidated claim forms to ensure that their consolidation captures all of their store locations and divisions"; "undertake[s] necessary research when presented by a merchant with a complicated claim, particularly when resolution of the issues related to the claim would benefit from his expertise and knowledge regarding who acquirers capture merchant information"; and "continues to work with the Oasis database in order to facilitate the ongoing distribution process"). Given the complicated tasks for which Lead Counsel sought Mr. McCormack's assistance, and given his prior experience, the number of hours he billed and his hourly rate seem reasonable to me. Accordingly, I respectfully recommend that this Court authorize reimbursement of the $230,825.73 Lead Counsel paid to Noblett & Associates. See Sterling Foster & Co., 238 F. Supp. 2d at 490 ("Class Counsel are entitled to reimbursement for reasonable litigation expenses." (citing Miltland Raleigh-Durham, 840 F. Supp. at 239)).

*Apco Worldwide*

Lead Counsel seeks reimbursement for $21,423.70 it paid to Apco for work done and expenses incurred from August of 2005 through April of 2006. Id. ¶¶ 20, 21. Ms. Mahoney describes Apco as a "a public relations firm" that "periodically distributed merchant advisories and/or press releases to keep the Class informed of pertinent developments, like those relevant to the distributions to class members, in both Spanish

and English," thereby "facilitat[ing] Lead Counsel's efforts to keep the Class apprised of material events in the case." Id. ¶ 21.

According to Ms. Mahoney, "the total number of hours expended by Apco in this representation during this time frame was 8.75, 8.0 hours of which was completed at the associate billing rate of $170/hour and .75 hours of which was completed by Kent Jarell, Senior Vice President Crisis Team, at $415/hour." Id. ¶ 20. "The bulk of the amounts contained in Apco's invoices derives from expenses that Apco incurred in connection with advertising and wire service disbursements on behalf of the Class." Id.

In my opinion, the foregoing services unquestionably benefited the Class. I therefore respectfully recommend that this Court order reimbursement for the $21,423.70 it paid to Apco. See Sterling Foster & Co., 238 F. Supp. 2d at 490 ("Class Counsel are entitled to reimbursement for reasonable litigation expenses." (citing Miltland Raleigh-Durham, 840 F. Supp. at 239)).

*Charles River Associates*

Lead Counsel also requests that it be reimbursed for an amount of $263,454.41 to cover payments it made to CRA.

According to Ms. Mahoney, CRA "provided the expert economic analysis for this Class during this case." Mahoney Declaration ¶ 13. She states that "CRA has continued to work closely with Lead Counsel regarding implementation of the plan of allocation and the distribution of the Settlement Funds to the Class Members" (id.):

> CRA continues to perform multiple functions connected to the plan and the distribution. For example, CRA has analyzed data to enable class members to estimate their likely distributions. CRA has also conducted analysis to estimate the amount of the potential residual of the Settlement Funds. CRA has continued to work closely with the Claims Administrator to assist with the distribution process, for example, by developing a

statistical program to check the accuracy of the amounts of the initial
distribution by the Claim Administrator.  CRA has also assisted in the
drafting of descriptions for the case website, www.inrevisacheckmaster
moneyantitrustlitgation.com.  CRA has worked and continues to work
with the Claims Administrator and merchants regarding challenges to the
amount of the merchants' distributions.

Ms. Mahoney states that the payments Lead Counsel made to CRA "reflects work
done on behalf of the Class from September 3, 2005 through June 9, 2006." Id. ¶ 12.
According to Ms. Mahoney, "[t]he total number of hours expended by CRA in this
representation during this time frame was 846.60." She further states that CRA's billing
rates "ranged from $105/hour for support staff to $530/hour for the supervisory work of
Vice President Craig Romaine," with "[t]he vast majority of the work . . . done by
Stephen Kletter, a Principal at CRA (at rates ranging from $365/hour to $385/hour)," and
with "Mr. Kletter's effort . . . significantly assisted by work completed by
associates/analysts (at rates ranging from $175/hour to $185/hour)." Id.

I do not doubt that CRA's efforts provided a significant benefit to the Class, and
therefore that some reimbursement for the CRA expense is warranted.  Nevertheless, as I
previously stated in my March 6, 2006 Report and Recommendation, I have some
lingering concerns about CRA's billing rates, which seem high by lawyer standards. See
In re Independent Energy Holdings PLC, No. 00 Civ. 6689 (SAS), 2003 WL 22244676,
at *9 (S.D.N.Y. Sep. 29, 2003) (partner rate of $650/hour and associate rates ranging
from $300 to $425 are "high" but "not extraordinary").  Lead Counsel nowhere states that
they are at the prevailing level for the relevant market, nor has it provided any evidence
that would support a finding that they are.  Because of this concern, I respectfully
recommend that this Court award reimbursement for an amount equal to 90% of the
reimbursement amount Lead Counsel has requested for CRA, for a total reimbursement

amount of $237,108.96. See Sterling Foster & Co., 238 F. Supp. 2d at 490 ("Class

Counsel are entitled to reimbursement for *reasonable* litigation expenses." (emphasis

added)); In re Bausch & Lomb Securities Litigation, 183 F.R.D. 78, 89 (W.D.N.Y. 1988)

("[a]ttorneys are clearly not entitled to reimbursement of expenses where the request is

for an amount which is excessive or otherwise noncompensable"); cf. New York State

Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983) (noting

that various courts "have endorsed percentage cuts as a practical means of trimming fat

from a fee application").

*Remaining Costs and Expenses*

Lead Counsel's remaining unreimbursed costs and expenses – a combined total of

$82,447.89 – fall into the following categories:

| ACTIVITY | AMOUNT |
|---|---|
| FedEx | $570.47 |
| Hotel | $472.53 |
| Lexis | $6,719.68 |
| Messenger | $369.63 |
| Offsite Storage | $451.05 |
| Online Research | $546.56 |
| Photocopies | $32,318.01 |
| Service of Court Papers | $255.00 |
| Special Master | $25,053.91 |
| Telephone | $4,793.54 |
| Travel & Transportation | $675.09 |

| Westlaw | $10,222.42 |
|---------|-----------|

I respectfully recommend that this Court reimburse Lead Counsel for all of the foregoing expenses.  See In re Sterling Foster, 238 F. Supp. 2d at 490 ("Class Counsel are entitled to reimbursement for reasonable litigation expenses." (citing Miltland Raleigh-Durham, 840 F. Supp. at 239)).

## CONCLUSION

For the reasons set forth above, I respectfully recommend that this Court award Lead Counsel $747,516.37 in legal fees, an amount equal to 90% of the fee award Lead Counsel has requested.

With respect to Lead Counsel's request for reimbursement of payments made to the law firm of Brown Rudnick for work the firm completed on behalf of the Class from December 16, 2005 through May 31, 2006, I respectfully recommend that this Court authorize reimbursement for the amount Lead Counsel has requested – an amount that already reflects a 10% reduction, negotiated by Lead Counsel, to Brown Rudnick's legal fees.  With respect to payments made to Brown Rudnick for work that law firm performed during the period from May 16, 2003 through August 21, 2003, I respectfully recommend that this Court authorize payment of an amount that reflects a similar 10% reduction.  Because a reduction for the May 16, 2003 through August 21, 2003 period is not currently reflected in Lead Counsel's reimbursement request, I hereby order Lead Counsel, within 10 business days following service of this Report and Recommendation, to file with this Court an amended request for reimbursement for amounts paid to Brown Rudnick, a request in which the 10% reduction already applied to Brown Rudnick's legal

fees for the period from December 16, 2005 through May 31, 2006 is also applied to the firm's legal fees for the period from May 16, 2003 through August 21, 2003.

Lastly, I respectfully recommend that this Court authorize payment of $608,168.36, consisting of (1) reimbursement of $36,362.08 for payments Lead Counsel made, by order of Court, to Objectors' counsel; (2) reimbursement of the $230,825.73 Lead Counsel has requested for payments made to Noblett & Associates, (3) reimbursement of the $21,423.70 that Lead Counsel has requested for payments made to Apco Worldwide; (4) reimbursement of $237,108.96 for payments made to Charles River Associates, an amount that equals 90% of Lead Counsel's requested reimbursement amount; and (5) reimbursement of $82,447.89 for Lead Counsel's remaining costs and expenses (FedEx, hotel, Lexis, messenger, offsite storage, online research, photocopies, service of court papers, Special Master fees and expenses, telephone, travel and transportation).

Pursuant to Paragraph (g) of Judge Gleeson's February 17, 2004 Order, objections to the Special Master's report and recommendation must be filed within "ten business days, following service."

Robin M. Wilcox

Dated:  September 26, 2006
         New York, New York

- 29 -

TRANSMISSION VERIFICATION REPORT

```
                                    TIME  : 09/26/2006 10:23
                                    NAME  :
                                    FAX   : 2124960999
                                    TEL   : 2124960909
```

```
DATE,TIME            09/26  10:13
FAX NO./NAME         912123502701
DURATION             00:10:01
PAGE(S)              30
RESULT               OK
MODE                 STANDARD
                     ECM
```

TRANSMISSION VERIFICATION REPORT

```
                                    TIME : 09/26/2006 10:37
                                    NAME :
                                    FAX  : 2124960999
                                    TEL  : 2124960909
```

```
DATE,TIME          09/26  10:29
FAX NO./NAME       917186132456
DURATION           00:07:42
PAGE(S)            30
RESULT             OK
MODE               STANDARD
                   ECM
```