UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

IN RE VISA CHECK/MASTERMONEY                    MASTER FILE NO. CV-96-5238
ANTITRUST LITIGATION                            (Gleeson, J.)

-----------------------------------------------------x

## REPORT AND RECOMMENDATION

In this antitrust action, a class of approximately five million merchants alleged,
among other things, that defendants Visa U.S.A. Inc. ("Visa") and MasterCard
International Incorporated ("MasterCard") were illegally tying their debit products to
their credit cards, in violation of the Sherman Act.  On June 4, 2003, the plaintiffs entered
into preliminary settlement agreements with the defendants, agreements that provided,
among other things, for the creation of a $3.05 billion settlement fund.  By Opinion and
Order dated December 19, 2003, the Honorable John Gleeson approved both settlements
(collectively, the "Settlement Agreements"), awarded Class Counsel $220,290,160.44 in
attorneys' fees, and authorized reimbursement of costs in the amount of $18,716,511.44.
See In re: Visa Check/MasterMoney Antitrust Litigation, 297 F. Supp. 2d 503 (E.D.N.Y.
2003), aff'd, 396 F.3d 96 (2d Cir. 2005).

By Order dated February 17, 2004, Judge Gleeson appointed me Special Master
to issue reports and recommendations regarding referred disputes arising out of or
relating to the Visa and MasterCard Settlement Agreements.  By Order dated September
8, 2004, Judge Gleeson referred to me for report and recommendation "any applications
for reimbursement of fees, costs and expenses incurred by plaintiffs' []lead counsel,
Constantine & Partners [], in administering the Visa Settlement and the MasterCard
Settlement."

On May 5, 2008, Jeffrey I. Shinder, Esq., managing partner of Constantine Cannon LLP (hereinafter "Lead Counsel") submitted a Declaration in support of Lead Counsel's "application for an award of attorneys' fees billed in connection with services rendered to the Class . . . from January 2008 through March 2008, and for the reimbursement of costs and expenses incurred by the Class during that same time period." Declaration of Jeffrey I. Shinder in Support of Supplemental Application for Fees and Reimbursement of Costs and Expenses ("Shinder Declaration") ¶ 1. Lead Counsel's Fee Petition requests an award of legal fees in the amount of $46,998.75 and reimbursement of costs and expenses in the amount of $334,611.62. Id. ¶¶ 5, 9.

For the reasons set forth below, I respectfully recommend that this Court award Lead Counsel $42,298.88 in legal fees, an amount equal to 90% of the fee award Lead Counsel has requested. I further respectfully recommend that this Court authorize an additional payment of $334,611.62, consisting of payment of (1) $24,267.21 for the fees and expenses of the law firm of Brown Rudnick Berlack Israels LLP ("Brown Rudnick"); (2) $36,679.96 for the fees and expenses of the law firm of Orrick; (3) $67,283.25 for the fees and expenses of CRA International, Inc. ("CRA"); (4) $22,256.32 for the fees and expenses of N & A Consulting LLC ("Noblett"); (5) $182,160.00 for the fees of Cannonade Capital LLC ("Cannonade"); (6) $1,014.26 for the fees of Apco Worldwide ("Apco"); and (6) $950.62 for Lead Counsel's miscellaneous costs and expenses (document scanning, facsimile, Federal Express, photocopies, messenger service, offsite storage, PACER research, postage, telephone, travel).

## BACKGROUND

In a complaint filed on October 5, 1996, the named plaintiffs "alleged that the
defendants' practice of requiring merchants who accepted defendants' credit cards to also
accept their debit products . . . was an illegal tying arrangement, in violation of section 1
[of the Sherman Act]." In re: Visa Check/MasterMoney Antitrust Litigation, 297 F.
Supp. 2d 503, 507 (E.D.N.Y. 2003). They "further alleged that, through these tying
arrangements and other anticompetitive conduct, the defendants attempted to monopolize
the debit card market, in violation of section 2 [of the Sherman Act]." Id. This Court
certified the Class by Order dated February 22, 2000. Id. The Second Circuit affirmed
on October 17, 2001. Id. at 507-08.

After motion practice, and on the brink of trial, the plaintiffs entered into
preliminary settlement agreements with each of the defendants. Id. at 508. These
Settlement Agreements provided, among other things, for "the creation of a $3.05 billion
settlement fund." Id. at 508. With respect to the question of attorneys' fees, the
Settlement Agreements stated, among other things, as follows:

> On or before August 18, 2003, Plaintiffs' Co-Lead Counsel shall
> file a Fee and Expense Application for distribution from the Gross
> Settlement Fund of a Fee Award consisting of an award of Plaintiffs'
> attorneys' fees and reimbursement of costs and expenses. Plaintiffs' Co-
> Lead Counsel reserves the right to make additional applications for fees,
> costs, and expenses incurred in obtaining Final Settlement Approval and
> administering the Settlement.

Visa Settlement Agreement ¶ 14; see also MasterCard Settlement Agreement ¶ 14
(same).

Notice of the Settlement Agreements was mailed to Class Members. That notice,
which was dated June 13, 2003, stated (among other things):

> [O]n August 18, 2003, Class Counsel will file a petition for
> payment of attorneys' fees, costs and expenses, and may, from time to
> time thereafter, petition the Court for reimbursement of fees, costs and
> expenses from the Settlement Funds, including fees incurred by Class
> Counsel and the Administrator while providing Notice to the Class and
> while administering the Settlement Funds (including the plan of allocation
> and distribution).

June 13, 2003 Notice ¶ 17.

On August 18, 2003, Lead Counsel sought this Court's approval of the Settlement

Agreements and plan of allocation. Visa Check/MasterMoney, 297 F. Supp. 2d at 506-

07. Lead Counsel also sought an award of attorneys' fees in the amount of $609 million

and reimbursement of expenses. Id. On September 25, 2003, this Court "held a fairness

hearing in [the] ceremonial courtroom to hear arguments of th[e Objectors] and any

others that might be raised." Id. at 509. On December 19, 2003, this Court issued an

Opinion and Order approving the Settlement Agreements, awarding Class Counsel

$220,290,160.33 in attorneys' fees, and authorizing the reimbursement of costs in the

amount of $18,716,511.44. See id. at 526, aff'd, 396 F.3d 96 (2d Cir. 2005).

On February 17, 2004, this Court appointed me Special Master to issue reports

and recommendations regarding referred disputes arising out of or relating to the Visa

and MasterCard Settlement Agreements. By Order dated September 8, 2004, this Court

referred to me for report and recommendation "any applications for reimbursement of

fees, costs and expenses incurred by plaintiffs' co-lead counsel, Constantine & Partners

and Hagens Berman, in administering the Visa Settlement and the MasterCard

Settlement." By order dated February 9, 2005, this Court ordered Lead Counsel to

publish the details of all supplemental requests for reimbursement of fees and expenses

on the webpage that is dedicated to this litigation.

By order dated November 14, 2006, this Court required Lead Counsel, in advance of future fee applications, to submit a budget to me "setting forth [Lead Counsel's] expected fees and disbursements." By letter to this Court dated December 29, 2006, I directed Lead Counsel to submit fee applications on an annual basis, as well as an annual budget. By letter dated October 10, 2007, Lead Counsel requested a "modification of [the] December 29, 2006 Order requiring that all fee submissions . . . be made on a yearly basis." Lead Counsel requested "the right to make quarterly petitions to the Special Master" instead. This Court granted the request.

By letter dated October 10, 2007, Mr. Shinder provided Lead Counsel's Projected Budget for the period July 2007 through June 2008. See Ex. A to Oct. 10, 2007 Ltr. from Jeffrey Shinder, Esq. to Special Master Robin Wilcox ("Projected Budget"). The Projected Budget anticipated the following fees and expenses for the period July 2007 through June 2008:

| SOURCE | PROJECTED AMOUNT |
|---|---|
| **Constantine Cannon Fees** | **$200,000** |
| **Counsel**<br>    Brown Rudnick | **$500,000-$700,000** |
| **Consulting**<br>    CRA International, Inc.<br>    N & A Consulting LLC<br>    Apco Worldwide<br>    Cannonade Capital LLC<br>**Consulting Total** | $219,000<br>$117,773<br>$15,000<br>$175,000 - $225,000<br>**$526,773 - $576,773** |
| **Miscellaneous Expenses** | **$50,000** |
| **Total** | **$1,276,773 - $1,526,773** |

For the period from July 2007 through December 2007, this Court has awarded legal fees in the amount of $116,302.50 and reimbursement of costs and expenses in the amount of $354,494.73.

On May 5, 2008, Jeffrey I. Shinder, Esq., managing partner of Constantine Cannon, P.C. (hereinafter "Lead Counsel") submitted a Declaration in support of Lead Counsel's "application for an award of attorneys' fees billed in connection with services rendered to the Class . . . from January 2008 through March 2008, and for the reimbursement of costs and expenses incurred by the Class during the same time period." Shinder Declaration ¶ 1.[1] The fees and expenses for which Lead Counsel seeks payment fall into the following categories (id. ¶¶ 5, 9):

| SOURCE | AMOUNT | |
|---|---|---|
| **Constantine Cannon Fees** | | **$46,998.75** |
| **Counsel** | | |
| Brown Rudnick | $24,267.21 | |
| Orrick | $36,679.96 | |
| | | **$60,947.17** |
| **Consulting** | | |
| CRA International, Inc. | $ 67,283.25 | |
| N & A Consulting LLC | $22,256.32 | |
| Cannonade Capital LLC | $182,160.00 | |
| Apco Worldwide | $1,014.26 | |
| **Consulting Total** | | **$272,713.83** |
| **Miscellaneous Expenses** | | |
| Document Scanning | $1.10 | |
| Facsimile | $135.00 | |
| Federal Express | $18.19 | |
| Photocopies | $92.40 | |
| Messenger Service | $7.95 | |
| Offsite Storage | $338.70 | |
| PACER Research | $14.56 | |

---

[1] Mr. Shinder's declaration stated that, "on or about May 5, 2008," "Lead Counsel [would] post [his] Declaration . . . on the case website (www.inrevisacheckmastermoneyantitrust litigation.com)" Shinder Declaration ¶ 53.

| Postage | $3.22 |
|---------|-------|
| Telephone | $94.50 |
| Travel | $245.00 |
| | **$950.62** |

## ANALYSIS

### *Lead Counsel's Legal Fees*

Lead Counsel seeks a fee award of $46,998.75 for a total of 103.5 attorney and paralegal hours that it devoted to this litigation from January 2008 through March 2008. Shinder Declaration ¶ 5. According to Mr. Shinder, the work for which Lead Counsel seeks a fee award "included efforts dedicated primarily to administering the claims process (including handling Class Member appeals, disputes, and concerns, and working with and overseeing the efforts of the Claims Administrator, The Garden City Group, regarding Class Member distributions, challenges, and consolidations); continuing to prepare the groundwork for securitizing the Settlement Funds (including briefing Special Master Wilcox on progress, obtaining an independent securitization expert, engaging Standard & Poor's to obtain a rating, and releasing Deutsche Bank as underwriter); preparing for the upcoming PIN debit claims process; and ensuring compliance with the Settlement Agreements." Id. ¶ 4.[2]

In my opinion, the above-described efforts provided a significant benefit to the Class. I therefore respectfully recommend that this Court find that Lead Counsel is entitled to an award of reasonable attorneys' fees for this time period. See Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000) (noting that, in common fund

---

[2] Lead Counsel asserts that, "[u]sing the criteria that Lead Counsel and its outside auditor used in conjunction with the August 18, 2003 Petition for Fees and Reimbursement for Costs and Expenses, [Lead Counsel] audited Constantine Cannon's time records for the January-March 2008 period," and, as a result of the audit, "cut fees in the amount of $230.00, which reflects a total deduction of .50 hours." Shinder Declaration ¶ 7.

cases, "the attorneys whose efforts created the fund are entitled to a reasonable fee – set

by the court – to be taken from the fund" in order to "prevent[] unjust enrichment of

those benefiting from a lawsuit without contributing to its cost"); Olick v. Parker &

Parsley Petroleum Co., 145 F.3d 513, 516 (2d Cir. 1998) (district court did not abuse its

discretion by granting class counsel's supplemental fee request for time spent defending

settlement).

If this Court agrees with my recommendation, the next inquiry regards the

reasonableness of the requested amount.

Lead Counsel's fee request employs the lodestar method, pursuant to which the

district court "'scrutinizes the fee petition to ascertain the number of hours reasonably

billed and then multiplies the figure by an appropriate hourly rate.'" In re Independent

Energy Holdings PLC Securities Litigation, No. 00 Civ. 6689 SAS, 2003 WL 22801724,

at *1 (S.D.N.Y. Nov. 24, 2003) (quoting Goldberger, 209 F.3d at 47). "[T]he key

consideration in awarding fees is what is reasonable under the circumstances." Visa

Check/MasterMoney, 297 F. Supp. 2d at 521. When calculating a reasonable fee, the

district court is obliged "to act as a 'fiduciary . . . a guardian of the rights of absent class

members." Id. (quoting City of Detroit v. Grinnell Corp., 560 F.2d 1093, 1099 (2d Cir.

1977)).

The first inquiry is whether Lead Counsel billed a reasonable number of hours in

furtherance of its efforts on behalf of the Class during this time period. As stated, Lead

Counsel seeks reimbursement for 103.5 attorney and paralegal hours billed from January

to March 2008 – the approximate equivalent of one professional spending approximately

two and one-half weeks on the case for that three-month period. Mr. Shinder asserts:

"The work performed by our attorneys and staff has been largely under my supervision. It has been conducted effectively, efficiently, and economically, and to avoid unnecessary expenditures of time and expense." Shinder Declaration ¶ 4.

In my opinion, a total of 103.5 hours is not an unreasonable amount of time to devote to the at times complex tasks that Lead Counsel undertook on behalf of the class during this time period.

The second inquiry concerns the hourly rates requested by Lead Counsel. Case law requires that this Court apply hourly rates that are "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Luciano v. Olsten Corp., 109 F.3d 111, 116 (2d Cir. 1997) (internal quotation marks omitted). "It is well-established that the 'prevailing community' the district court should consider . . . is the 'district in which the court sits.'" Id.; see also New Leadership Committee v. Davidson, 23 F. Supp. 2d 301, 304 (E.D.N.Y. 1998). "The burden is on the applicant to produce satisfactory evidence in addition to the attorney's own affidavits showing that the requested rates are at the prevailing market level." Paulino v. Upper West Side Parking Garage, Inc., No. 96 Civ. 4910, 1999 WL 325363, at *3 (S.D.N.Y. May 20, 1999) (citing Blum v. Stenson, 465 U.S. 886, 896 n. 11 (1984)); see also New Leadership Committee, 23 F. Supp. 2d at 304 (declining to consider affidavits supporting requested hourly rate where parties submitted such evidence for the first time in objecting to Magistrate Judge's report and recommendation). "The court may also look to attorneys' fees granted in other cases and rely on its own knowledge of similar cases to determine a reasonable rate." Paulino, 1999 WL 325363, at *3.

Lead Counsel requests hourly attorney rates ranging from $345 (Michelle Peters, Esq.'s hourly rate) to $700 (the hourly rate of Stephen Cannon, Esq.) and an hourly paralegal rate of $170. Shinder Declaration ¶ 5. Case law makes clear that these hourly rates fall at the high end of the billing rate spectrum. See In re Independent Energy Holdings, 2003 WL 22244676, at *9 (partner rates ranging from $650 to $695 and associate rates ranging from $300 to $425 are "high" but "not extraordinary"); Moon v. Gab Kwon, No. 99 Civ. 11810 (GEL), 2002 WL 31512816, at *2 (S.D.N.Y. Nov. 8, 2002) (hourly paralegal rate of $100); Marathon Ashland Petroleum, No. 00 Civ. 2935 JSMKNF, 2003 WL 21355216, at *2 (S.D.N.Y. June 10, 2003) ($99 per hour for paralegal work).

The question is whether, when the number of hours for which Lead Counsel seeks compensation is combined with the hourly rates requested by Lead Counsel – which, as stated above, fall at the high end of the billing rate spectrum – the resulting fee request is higher than is reasonable under the circumstances. In my opinion, it is. As I have done in prior Reports and Recommendations, I therefore respectfully recommend that this Court reduce Lead Counsel's fee by 10%. See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 124 (2d Cir. 2005) ("In approving the district court's fee award, we recognize the sacrifice and commitment plaintiffs' counsel made to its clients *while preserving as much as possible for those who were harmed.*" (emphasis added)); New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983) (noting that various courts "have endorsed percentage cuts as a practical means of trimming fat from a fee application").

- 10 -

In my opinion, the six <u>Goldberger</u> factors support such a result. <u>See</u> <u>Wal-Mart</u> <u>Stores</u>, 396 F.3d at 121 ("[T]he 'Goldberger factors' ultimately determine the reasonableness of a common fund fee."). These factors include:

> (1) the time and labor expended by counsel;
>
> (2) the magnitude and complexities of the litigation;
>
> (3) the risk of the litigation . . . .;
>
> (4) the quality of representation;
>
> (5) the requested fee in relation to the settlement; and
>
> (6) public policy considerations.

<u>Id.</u> (citing <u>Goldberger</u>, 209 F.3d at 50).

In my view, the first, second, fourth and sixth <u>Goldberger</u> factors – the time and labor expended by counsel, the magnitude and complexity of the litigation, the quality of the representation, and public policy considerations – weigh in favor of a significant award. Lead Counsel, a skilled and reputable law firm, devoted a significant number of hours to representing the class' interests during this time period. In addition, the tasks that Lead Counsel undertook were clearly complex. Finally, there is, in my opinion, "commendable sentiment in favor of providing lawyers with sufficient incentive" to zealously advocate for the interests of class members even after the class action has settled. <u>See</u> <u>Goldberger</u>, 209 F.3d at 51.

However, the remaining two <u>Goldberger</u> factors – the risk of litigation and the relationship of the fee to the settlement – weigh in favor of ordering a 10% reduction to Lead Counsel's fee request. I do not believe that there is or was a significant risk that Lead Counsel might not be compensated for its efforts on behalf of the Class. In

addition, although the results that Lead Counsel has obtained on behalf of the Class have

been significant, so, too, was Lead Counsel's initial fee award.

For the reasons described above, I respectfully recommend that this Court award

Lead Counsel $42,298.88 in legal fees, an amount that is the equivalent of 90% of the fee

award Lead Counsel has requested.

*Brown Rudnick*

Lead Counsel also seeks payment of $24,267.21 for legal fees and expenses of the

law firm of Brown Rudnick for work that firm performed and expenses that firm incurred

in connection with this litigation from January through March 2008.  Id. ¶ 42.  Mr.

Shinder explains (id. ¶¶ 43-45 (footnote omitted)):

> Brown Rudnick was [initially] retained by Lead Counsel on
> behalf of the Class on January 27, 2006, to represent the
> class as "Issuer's Counsel" in the intended securitization of
> the payments to be made by Visa and MasterCard.
>
> Brown Rudnick's efforts in February and March
> 2008 including researching case law regarding the
> enforceability of court-approved settlement agreements in
> the event that either defendant beached its settlement
> obligations; and preparing a memorandum regarding the
> remedies that would be available to the Class in the event
> of such a breach (in response to an issue raised by Standard
> & Poor's as part of its due diligence in rating the
> transaction).
>
> Brown Rudnick has submitted invoices containing
> dated entries (by individual) for time expended, with
> descriptions of the tasks undertaken, and itemized
> expenses.  Brown Rudnick expended a total of 46.60 hours
> in February and March 2008.  The billing rates in the
> submitted invoices range from $184.50/hour to
> $643.50/hour.  The majority of the work billed was
> performed at a rate of $211.50/hour (22.90 hours), followed
> by rates of $513.00/hour (8.80 hours), $643.50/hour (8.70
> hours), $301.50 (3.60 hours), $594.00/hour (2.40 hours),
> and $184.50/hour (0.20 hours).  The total fees of

> $17,504.10 reflect the ten-percent discount that Lead
> Counsel previously negotiated with Brown Rudnick, and
> that Brown Rudnick has continued to apply to its legal fees
> in this representation.  In addition, Brown Rudnick billed
> $6,763.11 in expenses ($6,797.52 less an adjustment of
> $34.41 on the invoice for March 2008 services rendered),
> largely relating to legal research undertaken.

In my opinion, the above-described efforts provided a significant benefit to the

Class.  I therefore respectfully recommend that this Court find that Lead Counsel is

entitled to reimbursement of the fees it paid to Brown Rudnick for work that firm did on

behalf of the Class from January to March 2008.  See Olick v. Parker & Parsley

Petroleum Co., 145 F.3d 513, 516 (2d Cir. 1998) (district court did not abuse its

discretion by granting class counsel's supplemental fee request for time spent defending

settlement); In re Sterling Foster & Co., Inc., Sec. Litig., 238 F. Supp. 2d 480, 490

(E.D.N.Y. 2002) ("Class Counsel are entitled to reimbursement for reasonable litigation

expenses.").

The next inquiry regards amount.  In my opinion, 46.60 is not an unreasonable

amount of time to devote to the tasks that Brown Rudnick undertook during this time.

The hourly rates (described above) that Brown Rudnick has charged also appear

reasonable to me.  See In re Independent Energy Holdings PLC, No. 00 Civ. 6689 (SAS),

2003 WL 22244676, at *9 (S.D.N.Y. Sep. 29, 2003) (partner rates ranging from $650 to

$695 and associate rates ranging from $300 to $425 are "high" but "not extraordinary").

I therefore respectfully recommend that this Court order reimbursement of the entire

requested amount.

In my opinion, the six Goldberger factors support such a result.  I believe that the

second, fourth and sixth Goldberger factors – the magnitude and complexity of the

litigation, the quality of the representation, and public policy considerations – weigh in favor of a significant award. There is, in my opinion, "commendable sentiment in favor of providing lawyers with sufficient incentive" to undertake the complex task of competently representing the financial interests of class members once settlement has resulted in the creation of a significant common fund. See Goldberger, 209 F.3d at 51.

The remaining three Goldberger factors do not, in my opinion, weigh in favor of a significant award. Nevertheless, as stated, Lead Counsel has negotiated a 10% deduction in Brown Rudnick's fees. In my opinion, that reduction adequately accounts for these factors. I therefore respectfully recommend that this Court authorize payment in the amount of $24,267.21 for Brown Rudnick's fees and expenses.

<em>Orrick</em>

In May 2006, Lead Counsel entered into engagement agreements with underwriters Bear Stearns and Deutsche Bank to "assess whether it is in the best interests of the Class to securitize the Settlement Fund payments to be made by Visa and MasterCard." This Court approved the engagement of these firms on August 29, 2006. Shinder Decl. ¶ 47 n.7. Orrick was thereafter retained as Underwriters' Counsel, "as is customary in connection with securitizations." Id. "Pursuant to the engagement agreements with the underwriters, Lead Counsel on behalf of the Class is responsible for all reasonable legal fees and expenses incurred by counsel in connection with the preparation, execution and delivery of the engagement agreements; the evaluation of the possible consummation of the securitization; and the negotiation and preparation of documentation with respect to the securitization." Id.

Orrick billed Lead Counsel $37,188.46 in counsel expenses during the January-March 2008 time period, "reflect[ing] the total amount billed by Orrick for work performed on behalf of the Class as Underwriters' Counsel during the period of September 2007 through March 2008 and expenses billed in connection with that work." Id. ¶ 47. During the September 2007 through March 2008 time period,

> Orrick focused its efforts on reviewing and analyzing the settlement agreement, plan of allocation, and related materials; reviewing and commenting on proposed indenture provisions; reviewing and commenting on draft communications with the Court, Visa, and MasterCard regarding securitization; reviewing and commenting on the rating agency presentation and advising with regard to the deal structure reflected therein (including, among other things, tax advice); advising and conducting research in response to rating agency comments including, among other things, questions regarding the enforceability of the settlement agreements; and participating in conferences and teleconferences with the underwriters, Lead Counsel, Brown Rudnick, and Cannonade.

Id. ¶ 48.

From September 2007 through March 2008, Orrick expended a total of 53.95 hours at billing rates ranging from $400/hour to $940/hour, with the majority of the work billed by Orrick "performed at a rate of $654.44/hour (31.00 hours), followed by rates of $530.00/hour (8.10 hours), $400/hour (6.80 hours), $940/hour (5.40 hours), $810.00/hour ($3.10 hours) and $690.00/hour (0.30 hours)." Id. "The total fees of $31,585.05 reflect at ten-percent discount that Orrick has agreed to apply to its legal fees in this representation." Id. ¶ 49. Orrick also incurred $5,603.41 in expenses, "largely relating to legal research undertaken." Id.

After reviewing Orrick's invoice to ensure that the efforts being undertaken were for the benefit of the Class, Lead Counsel "reduced its request for expenses paid to Orrick

by $508.50 in fee deductions (including a deduction of 0.75 hours that corresponded to time entries pertaining to billing or legal fees (totaling $565.00 less ten percent))." Id. ¶ 50. "This recalculation results in a request for payment of $36,679.96 for the expenses billed to Lead Counsel by Orrick during the September 2007 - March 2008 time period." Id.[3]

In my opinion, Orrick's efforts provided a significant benefit to the Class.  I therefore respectfully recommend that this Court authorize the payment of fees for work that Orrick performed on behalf of the Class during this time period.  See Olick v. Parker & Parsley Petroleum Co., 145 F.3d 513, 516 (2d Cir. 1998) (district court did not abuse its discretion by granting class counsel's supplemental fee request for time spent defending settlement); In re Sterling Foster & Co., Inc., Sec. Litig., 238 F. Supp. 2d 480, 490 (E.D.N.Y. 2002) ("Class Counsel are entitled to reimbursement for reasonable litigation expenses.").

The next inquiry regards amount.  In my opinion, 53.95 is a reasonable amount of time to devote to the complex tasks that Orrick undertook during this time period. Although Orrick's hourly rates are on the high side, given the complexity of the tasks that Orrick undertook during this time period, and given that Orrick has already applied a 10% reduction to its fees, I believe that the resulting fee request is a reasonable one.

I believe that the second, fourth and sixth Goldberger factors – the magnitude and complexity of the litigation, the quality of the representation, and public policy considerations – weigh in favor of an award in this amount.  As I state above, there is

---

[3] In a footnote, Lead Counsel explains that Orrick calculated its total fees by rounding downward its actual fees and expenses.  "Because Lead Counsel was required to make deductions from Orrick's invoice, . . . [Lead Counsel] made those deductions from the actual total fees and expenses . . . ."  Shinder Decl. ¶ 47 n.6.

"commendable sentiment" in favor of providing competent counsel with "sufficient incentive" to undertake the complex task of competently representing the financial interests of class members once settlement has resulted in the creation of a significant common fund.  See Goldberger, 209 F.3d at 51.

I do not believe that the remaining three Goldberger factors favor a significant award.  Nevertheless, as with Brown Rudnick, I believe that the 10% reduction that already has been applied to Orrick's fees adequately accounts for these factors.  I therefore respectfully recommend that this Court authorize payment to Orrick in the amount of $36,679.96 for fees and expenses.

*CRA International, Inc.*

Lead Counsel also requests payment of $67,283.25 for work that CRA performed on behalf of the Class from January 19, 2008 through April 11, 2008, as well as expenses billed in connection with that work.  Shinder Declaration ¶¶ 15, 21.  According to Lead Counsel, CRA "has provided the expert economic analysis for the Class during this litigation, and Lead Counsel has continued to utilize that expertise since the Settlement Agreements were reached."  Id. ¶ 16.  Lead Counsel asserts that "CRA has continued to work closely with Lead Counsel regarding implementation of the Plan of Allocation and the distribution of the Settlement Funds to Class Members, and to perform multiple functions in connection with the Plan of Allocation and the distribution."  Id.  During the time period at issue here:

> CRA has continued to work closely with the Claims Administrator to
> assist with the distribution process, primarily by further implementing the
> transaction methodology for the PIN debit portion of the distribution
> (which CRA developed and understands well), and estimating Class
> Members' PIN debit purchase volumes and distributions.  Each of these
> tasks has been engaged in for the benefit of the Class, and [Lead Counsel]

> anticipate[s] that CRA will continue to play an important role in the distribution.

Id. ¶ 17.

During this time period, Lead Counsel was billed $67,455.75 in fees and expenses by CRA. Id. ¶ 15. "CRA expended a total of 179.60 hours (constituting a deduction of 1.50 hours from the 181.10 hours that CRA set forth in its invoices . . .) in this representation." Id. ¶ 19. Its billing rates ranged from an hourly rate of $115 for support staff to $420/hour for the work of Stephen Kletter, a Principal at CRA. Id. "The majority of the work during this period was performed by Mr. Kletter (136.10 hours at a rate of $420/hour) and CRA economic associates (41.25 hours at a rate of $235/hour)." Id. After reviewing CRA's invoices, Lead Counsel reduced its request for expenses by $172.50, "representing a deduction in fees (constituting 1.50 hours at a rate of $115/hour) for work done in connection with preparing invoices." Id. ¶ 21. "With the 1.50 hour deduction, Lead Counsel seeks reimbursement for $67,283.25." Id.

Clearly, CRA's efforts provided a significant benefit to the Class. The majority of the CRA hours for which Lead Counsel seeks reimbursement were billed at rates ranging from $235/hour to $420/hour, which do not seem unreasonable to me. I therefore respectfully recommend that this Court authorize payment of $67,283.25, the entire amount requested.

*N & A Consulting LLC*

Lead Counsel seeks payment of the amount of $22,256.32 for work done and expenses incurred by Michael McCormack of N & A Consulting LLC on behalf of the Class from January through March 2008.  Shinder Declaration ¶¶ 22-23, 27.

Lead Counsel retained Mr. McCormack "to provide consulting services in support of the Plan of Allocation." Id. ¶ 23.  Before joining Noblett, "Mr. McCormack worked in merchant acquiring for the Wells Fargo bank." Id.  At Wells Fargo, Mr. McCormack "developed an expertise concerning the various ways that acquirers and Visa capture and maintain merchant data" – an expertise that, according to Lead Counsel, "has proven critical to the execution of the Plan of Allocation and continues to provide a tremendous benefit to the Class." Id. ¶ 23.  Mr. Shinder explains (id. ¶ 24):

> During the January-March 2008 time frame, Mr. McCormack has continued to interface directly with Class Members that have submitted consolidated claim forms to ensure that their consolidation captures all of their store locations and divisions.  He has continued to undertake necessary research when presented by Class Members with disputed or complicated claims (particularly when resolution of the issues related to those claims would benefit from his expertise and knowledge regarding how acquirers capture merchant information).  Mr. McCormack has continued to work directly with Lead Counsel and the Claims Administrator to ensure that each Class Member receives its optimal amount through the distribution process, and he has continued to work with the Visa Transactional Database in order to facilitate the ongoing distribution process.  Each of these tasks has been for the benefit of the Class.  [Lead Counsel] continue[s] to anticipate that Noblett, through Mr. McCormack's efforts, will remain an important part of the distribution team for the foreseeable future.

For the months of January, February and March 2008, Lead Counsel was billed $22,449.52 in fees by N&A. Id. ¶ 22.  Lead Counsel requests payment of that amount less $193.20, representing "$214.25 in fee deductions (including a deduction of 0.75 hours that corresponded to time entries not pertaining to this case, offset by an increase of

$26.00 to correct a miscalculation caused by a billing rate error on the invoice for March 2008 services rendered) and $4.95 in expense deduction (to account for a calculation error in telephone charges)," for a total of $22,256.32. Id. ¶ 27 (footnote omitted).

Based upon Lead Counsel's description, there is, in my opinion, no question but that Mr. McCormack's efforts benefited the Class. As in prior billing cycles, given the complicated tasks for which Lead Counsel sought Mr. McCormack's assistance, and given his prior experience, the number of hours he billed and his hourly rate seem reasonable to me. Accordingly, I respectfully recommend that this Court authorize payment of $22,256.32, the entire amount requested by Lead Counsel on behalf of Noblett. See Sterling Foster & Co., 238 F. Supp. 2d at 490 ("Class Counsel are entitled to reimbursement for reasonable litigation expenses." (citing Miltland Raleigh-Durham, 840 F. Supp. at 239)).

*Cannonade Capital LLC*

Lead Counsel seeks payment of the amount of $182,160.00 for work done by Cannonade on behalf of the Class from January to March 2008. Shinder Declaration ¶¶ 28, 33.

According to Lead Counsel, "Joshua Slovik is the sole individual from Cannonade who has performed work on behalf of the Class." Id. ¶ 29. Lead Counsel describes Mr. Slovik's efforts during this time period as follows (id. ¶ 30):

> Mr. Slovik has focused his efforts in two areas: (a) managing the Settlement Funds, including reviewing and recommending investment alternatives, monitoring account performance and market conditions, assisting the preparation of and reviewing the quarterly tax returns, and monitoring and processing account disbursements; and (b) attempting to advance the securitization of the payments to the Class, including (i) working with Bear Stearns to develop and alternative strategy for engaging Standard & Poor's to obtain a rating; (ii) evaluating Deutsche

Bank's performance and participating in managing its resignation
(including assisting in resolving Deutsche Bank's issues relating to
payment of Orrick's fees); (iii) preparing presentations for and attending
meetings and participating in teleconferences with Standard & Poor's
(including with regard to developing an acceptable structure for the
securitization (i.e., residuals, interest income, clearly delineating
responsibility for expenses, etc.); reviewing and editing assumptions
incorporated into the Cash Flow model; addressing concerns regarding the
potential for and implication of a MasterCard default; addressing the need
for a debt-for-tax treatment of the securitization notes, while minimizing
the cost to the Class; and negotiating the Standard & Poor's engagement
letter); (iv) working with the independent expert regarding the process to
date and major issues relating to the securitization, reviewing and
evaluating the expert's suggestions regarding pricing of securities,
providing financial analysis related to the rationale for pursuing the
securitization, and evaluating the impact on individual Class Members; (v)
reviewing MasterCard's operating results and analyst reports; and (vi)
reviewing overall market conditions related to the securitization.

"The total number of hours expended by Mr. Slovik in this representation during

the January – March 2008 time frame was 303.60." Id. ¶ 32.  Based upon Lead

Counsel's description, it is, in my opinion, clear that Mr. Slovik's efforts benefited the

Class.  Given the complicated tasks Lead Counsel has relied upon Mr. Slovik to perform,

the number of hours he billed seem reasonable to me.

That leaves the question of Mr. Slovik's hourly rate.  In its fee and expense

application for October through December 2007, Lead Counsel sought reimbursement for

Mr. Slovik at an hourly rate of $600/hour – representing a $200/hour increase in his

hourly rate from earlier fee applications.  With respect to this request, I stated:

> Lead Counsel's justification for this increase is two-fold.  First,
> Lead Counsel maintains that the securitization process has been
> more complicated and taken longer than was anticipated at the time
> his hourly rate was first negotiated.  Second, Lead Counsel asserts
> that at the time it renegotiated Mr. Slovik's rate, Lead Counsel had
> grown more pessimistic about the possibility that securitization
> would be successful – and therefore that Mr. Slovik would receive
> a success fee – than it was when Mr. Slovik's compensation
> package was initially negotiated.

I am persuaded that the first of these concerns – the delays in the securitization process – warrants an increase in Mr. Slovik's hourly rate. I am less convinced by Lead Counsel's second justification for the increase, in large part because it is my understanding, based upon conversations with Mr. Begleiter and Mr. Shinder, that Lead Counsel has recently become more optimistic about the likelihood of securitization than it was when it renegotiated a $200/hour increase.

In light of the foregoing, I respectfully recommend that this Court authorize payment of $76,150 for Cannonade's expenses, which represents reimbursement at an hourly rate $500. I further respectfully recommend that this Court grant Mr. Slovik leave to seek reimbursement of an additional $100/hour for this time period in the event that securitization does not come to fruition and he therefore does not receive a success fee for his efforts.

This Court adopted my recommendation.

Thereafter, by letter dated August 5, 2008 and attached, without exhibits, hereto, Mr. Slovik wrote to "clarify the reason for the increase [he] sought in the hourly rate as well as present certain market data to support the $600 hourly rate." For the reasons set forth in Mr. Slovik's letter, I am persuaded that Mr. Slovik is entitled to payment at a rate of $600/hour. I therefore respectfully recommend that this Court approve an hourly rate of $600 for Mr. Slovik. Based upon this recommendation, I further respectfully recommend that this Court authorize payment of $182,160.00 for work done by Cannonade on behalf of the Class from January to March 2008.

*Apco Worldwide*

Lead Counsel seeks payment of $1,014.26 for its media consultant, Apco, for work done and expenses incurred from January 2008 through March 2008. Shinder Declaration ¶ 38. Lead Counsel describes Apco as "a public relations firm that was hired by Lead Counsel to assist the class." Id. ¶ 35. "During the relevant time period and at

Lead Counsel's direction, Apco distributed a merchant advisory (in both Spanish and English) to inform the Class regarding the distribution of cash payments in late December 2007," thereby "facilitat[ing] Lead Counsel's efforts to keep the Class apprised of material events in the case" and, as such, "benefit[ing] the Class." Id.

Lead Counsel asserts that, during this time frame, Apco expended 0.75 hour in this representation "at a junior associate billing rate of $175/hour and $883.01 in expenses in connection with preparing the merchant advisory for release over the news wires." Id. ¶ 37.

In my opinion, the foregoing services unquestionably benefited the Class. I therefore respectfully recommend that this Court order payment of the entire $1,014.26 requested. See Sterling Foster & Co., 238 F. Supp. 2d at 490 ("Class Counsel are entitled to reimbursement for reasonable litigation expenses." (citing Miltland Raleigh-Durham, 840 F. Supp. at 239)).

*Miscellaneous Costs and Expenses*

Lead Counsel's miscellaneous costs and expenses – a combined total of $950.62 – fall into the following categories:

| ACTIVITY | AMOUNT |
|---|---|
| Document Scanning | $1.10 |
| Facsimile | $135.00 |
| Federal Express | $18.19 |
| Photocopies | $92.40 |
| Messenger Service | $7.95 |
| Offsite Storage | $338.70 |
| PACER Research | $14.56 |
| Postage | $3.22 |
| Telephone | $94.50 |
| Travel | $245.00 |

I respectfully recommend that this Court reimburse Lead Counsel for all of the foregoing expenses.  See In re Sterling Foster, 238 F. Supp. 2d at 490 ("Class Counsel are entitled to reimbursement for reasonable litigation expenses." (citing Miltland Raleigh-Durham, 840 F. Supp. at 239)).

## CONCLUSION

For the reasons set forth above, I respectfully recommend that this Court award Lead Counsel $42,298.88 in legal fees, an amount equal to 90% of the fee award Lead Counsel has requested.  I further respectfully recommend that this Court authorize an additional payment of $334,611.62, consisting of payment of (1) $24,267.21 for the fees and expenses of the law firm of Brown Rudnick Berlack Israels LLP; (2) $36,679.96 for the fees and expenses of the law firm of Orrick; (3) $67,283.25 for the fees and expenses of CRA International, Inc.; (4) $22,256.32 for the fees and expenses of N & A Consulting LLC; (5) $182,160.00 for the fees of Cannonade Capital LLC; (6) $1,014.26 for the fees of Apco Worldwide; and (6) $950.62 for Lead Counsel's miscellaneous costs and expenses (document scanning, facsimile, Federal Express, photocopies, messenger service, offsite storage, PACER research, postage, telephone, travel).[4]

---

[4] For the period from July 2007 through December 2007, this Court awarded legal fees in the amount of $116,302.50 and reimbursement of costs and expenses in the amount of $354,494.73.  If this Court adopts the foregoing recommendations, the total fees and expenses awarded for the period from July 2007 through March 2008 will be $847,707.73 -- less than three-quarters of Lead Counsel's fee and expense projection for the period July 2007 through June 2008. See Projected Budget (anticipating that total fees and expenses for period July 2007 through June 2008 will fall between $1,276,773 and $1,526,773).

Pursuant to Paragraph (g) of Judge Gleeson's February 17, 2004 Order, objections

to the Special Master's report and recommendation must be filed within "ten business

days, following service."

Robin M. Wilcox

Dated: October 20, 2008
          New York, New York

# ATTACHMENT

# Cannonade Capital LLC

**Joshua Slovik**
Managing Director
Jslovik@gmail.com

August 4, 2008

<u>BY E-MAIL</u>

Robin M. Wilcox
Special Master
459 Columbus Avenue, #603
New York, NY  10024

Re:   *Visa Check/MasterMoney Antitrust Litigation,* (CV-96-5238)(JG)(RLM)

Dear Special Master Wilcox:

In your Report and Recommendation dated June 20, 2008, you recommended that I be reimbursed at an hourly rate of $500 with the Court granting leave to seek an additional $100/hour for this time period in the event that the securitization is not completed.  This amounted to a reduction of $100/hour from the new rate I negotiated with Constantine Cannon (that was subject to review by you and approval by the Court).  In this letter I would like to clarify the reason for the increase I sought in the hourly rate as well as present certain market data to support the $600 hourly rate.

## BACKGROUND

Prior to the settlement of the antitrust lawsuits, I informally provided financial advice to Lloyd Constantine and Bob Begleiter mainly related to the potential securitization of the Settlement Agreement payments.  After the Settlement I understand that Constantine Cannon and Hagens Berman interviewed a number of financial advisory firms, including mine, to act as advisor to the Class.  At the time (June 2003) it was assumed that the engagement would last less than nine months.  My understanding is that all the other firms proposed compensation based on a percentage of funds under management or a percent of the total fund.  In all cases it was at least several million.  After hearing from Co-Lead Counsel that they preferred an hourly rate with a success fee, I was engaged at the rate of $400/hour with a success fee that would gross up my firm's total compensation to $400,000.  At the time we estimated that the success fee would amount to approximately $150,000.

From the beginning we encountered significant delays related to obtaining access to information, representations and warranties.  Following that, MasterCard and Visa announced their plans for IPOs.  After providing investment advice for much longer than anticipated, in

September 2005 Constantine Cannon and Hagens Berman signed a revised engagement letter that increased my firm's compensation to $800,000 with an implied $400,000 success fee.

Following that, the transaction was further delayed by approximately one year by the filing of the Government's claim to participate in the distribution. Shortly after the claim was resolved and MasterCard's IPO was completed, the debt market effectively shut down. Five years after the initial engagement started my firm negotiated a new engagement letter with Constantine Cannon and Hagens Berman.

The new (2007) engagement letter sought to address the extensive delays, the additional efforts related to the complexities involving MasterCard's limited cooperation and the new unfavorable conditions in the debt capital markets. Specifically many issues were unforeseen including:

1. The need to enter into complex and drawn out negotiations with MasterCard regarding its cooperation which resulted in the need to develop a new structure without standard representations and warranties as S&P refused to rate the securitization prior to these changes.

2. Difficulty in retaining and maintaining the services of underwriters.

3. The condition of the debt capital markets that required the development of a significantly more complex structure and necessitated more intense negotiations with our underwriter.

As a result of the above, the complexity of the transaction increased and the ratio of hourly compensation to the success fee declined. The above issues, and the tasks performed to advance the securitization, require senior level attention and do not allow for leveraging with more junior level employees as in a law firm.

It is for these reasons that investment bankers typically get paid based on a monthly retainer with a success fee (which was my preferred way of structuring payment for this engagement but was rejected by both Co-Lead Counsel).

## MARKET RATES / LODESTAR

In attempting to provide support for the $600/hour rate and $400,000 success fee for the MasterCard securitization, I reviewed a number of sources for market rates. It appears that the only readily available source for advisors' fees that are reviewed and approved by a Court are in Chapter 11 cases. Therefore, I reviewed compensation in those cases as well as rates charged in this securitization.

The only published research I found on Financial Advisors fees was published in *American Bankruptcy Law Journal* 141-74 (2008): Rise of the Financial Advisors: An Empirical Study of the Division of Professional Fees in Large Bankruptcies by Lynn Lopucki and Joseph Doherty -- UCLA School of Law.  In that paper, financial advisors fees, "for the purpose of this study, includes all court-awarded fees of financial advisors regardless of the party employing the advisor." The study focused on fees reviewed by the Courts in 2004 and noted the hourly rates for the most senior members of the advisory team.  I have summarized the info in the flowing chart (Note: I have excluded Fee Examiners, Claims Consultants, Actuarial Experts, Telecom Consultants, Communications Consultants and all firms billing less than $200,000):

| CompanyName | Firms | Court Ordered | Prof. Hours | Highest Hourly Rate | |
|---|---|---|---|---|---|
| Global Crossing | Ernst & Young | $ 2,998,007 | 5,937 | $ 1,500 | |
| US Airways | KPMG | 2,680,589 | 9,097 | $836 | |
| Global Crossing | Pricewaterhouse | 2,000,439 | 6,875 | $785 | |
| Spectrasite | Ernst & Young | 192,178 | 930 | $784 | |
| Warnaco | Deloitte & Touche | 7,182,592 | 33,168 | $750 | |
| US Airways | FTI Consulting | 8,001,431 | 24,329 | $737 | |
| US Airways | Ernst & Young | 2,396,374 | 5,604 | $700 | |
| Conseco | Huron Consulting | 1,641,887 | 4,632 | $700 | |
| Warnaco | Huron Consulting | 478,876 | 1,228 | $700 | |
| Kmart | Pricewaterhouse | 12,756,532 | 48,539 | $687 | |
| National Steel Co | Deloitte Consulting | 1,214,953 | 3,480 | $675 | |
| Genuity Inc. | Deloitte & Touche | 990,550 | 3,033 | $660 | |
| Metromedia | KPMG | 2,808,406 | 10,386 | $650 | |
| Kmart | Ernst & Young | 1,165,504 | 2,804 | $650 | |
| Inacom | Pricewaterhouse | 200,017 | 606 | $649 | |
| Hayes Lemmerz | Alix Partners | 16,694,303 | 34,181 | $640 | |
| Conseco | Watson Wyatt | 1,986,580 | 4,550 | $635 | |
| Kmart | FTI Policano Manzo | 7,701,974 | 20,976 | $625 | |
| Polaroid | Kroll Zolfo | 3,499,100 | 9,349 | $625 | U |
| Warnaco | BDO Seidman | 2,411,313 | 12,359 | $625 | C |
| Global Crossing | Arthur Andersen | 2,126,663 | 7,987 | $625 | L |
| Inacom | Deloitte Consulting | 443,085 | 1,654 | $625 | A |
| Kmart | AP Services | 12,759,233 | 37,091 | $620 | |
| Genuity Inc. | AP Services | 5,126,948 | 12,323 | $620 | S |
| Guilford Mills | Deloitte & Touche | 434,985 | 1,044 | $620 | T |
| Kmart | KPMG | 9,353,945 | 24,723 | $600 | U |
| Global Crossing | Huron Consulting | 4,891,089 | 18,558 | $600 | D |
| Integrated Health | BDO Seidman | 427,432 | 1,244 | $600 | Y |
| Bethlehem Steel | Pricewaterhouse | 1,487,595 | 8,212 | $595 | |
| National Steel Co | Ernst & Young | 2,047,009 | 9,416 | $589 | 2 |
| Genuity Inc. | Alvarez Marsal | 434,146 | 992 | $550 | 0 |
| Hayes Lemmerz | Deloitte & Touche | 393,800 | 1,029 | $550 | 0 |
| Guilford Mills | Nightingale | 1,960,650 | 4,174 | $525 | 4 |
| Sunbeam | Zolfo Cooper | 574,511 | 1,761 | $510 | |
| Metals USA | Pricewaterhouse | 1,089,848 | 5,306 | $500 | |
| Metromedia | J.H. Cohn | 2,507,539 | 7,984 | $495 | |
| Guilford Mills | Grant Thornton | 250,203 | 1,108 | $453 | |
| Metromedia | Ernst & Young | 850,586 | 3,351 | $451 | |
| Global Crossing | Brattle Group | 1,470,615 | 5,698 | $410 | |
| | | Average | $ | 645 | |

Including all relevant advisory work in 2004 the average hourly rate for the senior professionals was $645/hour. Only 11 of 39 firms billed below $600/hour.  In the above referenced study, the authors note that "that controlling for all of the determinants shown in Model IV of Table 9, financial advisors' fees are rising at the rate of about 25% per year." Incorporating this trend into the findings would significantly increase the average hourly rate for the senior most financial professionals most of which were accounting firms that while billing hourly often also negotiated a success fee.

I was able to verify the above with a quick review of publically available information including:

- Ernst & Young billing in New Century Holdings (Aug. 4, 2007 through March 31, 2008) where three professionals billed hours:

| | | | |
|---|---|---|---|
| Richard Magnuson -- Partner | $630 | 50.6 hours | $31,878 |
| Alan Munro – Partner | $630 | 1.0 hours | $630 |

- FTI Consulting Inc. billing in People's Choice Home Loans (September 1, 2007 through Nov. 20, 2007

| | | | |
|---|---|---|---|
| Greenspan, Ronald -- Senior Managing Director | $675 | 5.8hours | $3.915 |
| Linsk, Michael -- Managing Dir | $590 | 1.2hours | $708 |

- Kroll Zolfo Cooper MAGI LLC 2003

    Managing Directors        $625 -$725

    KZC reserves the right to seek court approval for additional compensation…

The investment banks providing services billed on a monthly basis always with a success fee.

- Houlihan Lokey advising Eagle Pitcher – 2005

ι. *Monthly Fees:* In consideration of Houlihan Lokey's acceptance of this engagement, the Company shall pay Houlihan Lokey a non-refundable monthly fee in the amount of $200,000 (the "Monthly Fee", which shall be earned upon Houlihan Lokey's receipt thereof), upon the execution of this Engagement Agreement and upon each monthly anniversary of the Effective Date of this Engagement Agreement.

ɔ. *Transaction Fees:* In addition to all other fees payable hereunder, Houlihan Lokey shall earn, upon consummation of each Transaction: (i) during the term of this Engagement Agreement, and/or (ii) during the periods set forth in Section I of the Standard Terms of Engagement, a cash Transaction Fee ("Transaction Fee") equal to the amounts specified in Exhibit A attached hereto.

- Lazard Frères & Co. advising New Century Holdings -- 2007

From the report of the Fee Auditor :

*We note that Lazard is seeking $6,025,000 in fees for the Application Period, during which it recorded a total of 2,800.8 hours of activities devoted to these bankruptcy cases. Thus, for this period, Lazard's imputed hourly rate is $2,151.17.*

*Lazard's approved compensation structure includes a $200,000 monthly advisory fee, but all such fees are to be credited toward any transaction fees that might be earned. Because the transaction fees sought by Lazard exceed the monthly advisory fees for the four months of the Application Period, Lazard does not include any monthly fees in calculating the total compensation ($6,025,000) for which it seeks interim approval. The Application states that Lazard has already earned a transaction fee equal to $4.25 million by virtue of the consummation of a "Sale Transaction" as defined in the retention order.* **CONCLUSION** *Thus we recommend approval of fees totaling $6,025,000.00 and expenses in the amount of $56,516.02 for Lazard's services from April 2, 2007, through July 31, 2007.*

- Miller Buckfire advising Citation Corporation -- 2007

In this case where management was unhappy with the financial advisor's performance the lodestar concept was introduced:

*The bankruptcy court approved fees in the amount of $2,137,500 (of a requested $3.5 million) which amounted to a fee of $ 750.00 per hour. Review of total compensation by United States Court of Appeals for the Eleventh Circuit which affirmed the bankruptcy court's determination of a reasonable fee as follows:*

*Debtors argued the services provided were much less extensive than originally expected and, as a result, Miller Buckfire's fee should be reduced...*

*As for Miller Buckfire's fee, the bankruptcy court thoroughly reviewed 16 factors (footnote) provided by statute and relevant precedent, and found 1) the services originally anticipated were not actually required; 2) the hours expended were slightly excessive; and 3) the resulting hourly rate was also excessive." The bankruptcy court considered all the factors including the lodestar, which requires a court to find a reasonable rate and then multiply that rate by the hours actually expended to benefit the estate to calculate an appropriate fee. The bankruptcy court approved fees in the amount of $2,137,500.00 which amounted to a fee of $ 750.00 per hour.*

*Footnote: The factors the bankruptcy court considered are: (1) Sufficiency of the fee application; (2) Independent review of the application; (3) Nature, extent, and value of the services; (4) Time and labor required; (5) Novelty of the work; (6) The skill required; (7) The preclusion of other employment; (8) The professional's customary fee; (9) Any fixed or contingent fee; (10) Time limitations imposed by the Court; (11) Amount involved and results obtained; (12) Experience, reputation and ability of the professionals; (13) The undesirability of the case; (14) The Nature and length of the professional relationship; (15) Awards in similar cases; (16) Determination of the lodestar.*

*The ultimate issue is whether it is appropriate for a bankruptcy court to consider, as one of many factors, a lodestar analysis in determining what Miller Buckfire earned when it reviews fees under § 330. Miller Buckfire takes the position that, as an investment bank who historically has charged a fixed fee, a lodestar method of analysis is always inappropriate. When looking at § 330, however, the statute instructs the court to look at: "the nature, the extent, and the value of such services," as well as the time spent on such services, and the cost of comparable services in other cases. 11 U.S.C. § 330(a)(1), (3) (emphasis added). Specifically, the relevant factors in making such a determination include:*
*(A) the time spent on such services;*
*(B) the rates charged for such services;*
*(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;*
*(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed;*
*(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.11 U.S.C. 330(a)(3).*

*Four of the five required statutory factors either explicitly or implicitly direct a bankruptcy court to examine the amount of time spent on either the project as a whole or to examine the time spent on individual units of the professional's work. The lodestar method is one way, but certainly not the only way, to ensure every unit of the professional's work is valuable to the completion of the Chapter 11 case. Therefore, it is appropriate, but not required, for a bankruptcy court to use a lodestar analysis to review an investment bank's fees for reasonableness.*

A third category of data points I believe is relevant is the hourly rate of other professionals working on the securitization:

- Independent Expert is billing the Class at a rate of $800/hour

- The structuring fee for JP Morgan is 25bps or approximately $3,150,000 million. This fee (separate from the distribution and sales and marketing fee) includes

structuring, documenting and passing the transaction through the ratings agency. For most of the process, JP Morgan had a vice president working on the deal for about 1/3 of his availability (he is processing three other deals) and a managing Director available as required (probably 10%-15% of his availability). Based solely on hours spent, I believe that there is no doubt that I have spent more time and contributed more to all the components of the transaction.

- Vice president Craig Romaine of CRA bills out at the rate of $565/hour.

- Brown Rudnick – Class Counsel bills at the following rates (actual rate/before discount):

  o Ron Borod            $738/hour -- $820/hour
  o Ken Goldberg         $607.50/hour-- $675/hour
  o John Narducci        $810/hour -- $900/hour

- Orrick, Herrington – Underwriters Counsel bills at the following rates (actual rate/before discount):

  o Michael Petronio     $654.44/hour -- $730/hour
  o Joshua Raff          $940/hour --  $1,045/hour
  o Scott Stengel        $690/hour --  $765/hour

Finally, in your Report and Recommendation you state that "…partner rates ranging from $650 to $695 … are "high" but "not extraordinary".

## CONCLUSION

Therefore, I believe that based on the:

1. approved rates for accountants            2004: avg. $645/hour (high $1,500)

2. approved rates for Investment Bankers      $200,000/month, 2,151/hour, $750/hour

3. rates of other professionals on this transaction $800, $565,$738,$608,$810,$655,$940,$690

4. ranges for partners in your report         $650 to $695

and based on the following criteria:

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed;

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.11 U.S.C. 330(a)(3).

the hourly rate for my services (including the success fee) appears reasonable if not low. Co-Lead Counsel negotiated aggressively to reach the fee arrangement that was agreed to and therefore having my hourly rate further reduced amounts, in my opinion, to a renegotiation.

Around the same time that the revised agreement was signed Deutsche Bank resigned from the securitization because of their belief that it could not be completed. I believe that when the securitization is concluded, my performance and contribution of value to the Class will be viewed as exceptional under very difficult circumstances. Therefore, I respectfully request that you reconsider the cut of my hourly rate and accept the rate of $600/hour.

I am, of course, available should you have any questions.

Very truly yours,

Joshua Slovik

cc:    Jeffrey Shinder –Constantine Cannon
       George Sampson – Hagens Berman