UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

IN RE                                                    :        **MASTER FILE NO.**
                                                         :        **CV-96-5238**
VISA CHECK/MASTERMONEY ANTITRUST         :        **(Gleeson, J.) (Orenstein M.J.)**
LITIGATION                                               :

---------------------------------------------------------------x

This Document Relates To:                          :
All Actions                                                :
                                                         :
---------------------------------------------------------------x


# MEMORANDUM IN SUPPORT OF LEAD COUNSEL'S MOTION TO APPROVE THE SECURITIZATION OF THE MASTERCARD SETTLEMENT ACCOUNT PAYMENTS


Respectfully submitted,


**Constantine Cannon LLP**
    Robert L. Begleiter (RB-7052)
    Jeffrey I. Shinder (JS-5719)
    Jason J. Enzler (JE-2475)
450 Lexington Avenue, 17th Floor
New York, NY 10017
Telephone:  (212) 350-2700
Facsimile:  (212) 350-2701
E-Mail:  rbegleiter@constantinecannon.com

*Co-Lead Counsel for the Plaintiff Class*

**Hagens Berman Sobol Shapiro LLP**
    George W. Sampson (GS-8973)
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
E-Mail:  George@hbsslaw.com

*Co-Lead Counsel for the Plaintiff Class*

## TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................1

II. BACKGROUND ...................................................................................5

  A. Securitization First Was Presented to the Court in the MasterCard
     Settlement and the Plan of Allocation.....................................................6

  B. Securitization Efforts Subsequent to the Amended Plan of Allocation ...........9

    1. *Early Efforts* .............................................................................9

    2. *Rating from S&P and Preparation of Securitization Documents* ...................10

    3. *The Court Appoints an Independent Expert*...........................................11

    4. *Current Market Conditions*..............................................................12

    5. *Barclays Capital and Citigroup Replace JPMorgan* ................................13

III. SECURITIZATION IS IN THE BEST INTEREST OF CLASS CLAIMANTS ...........14

  A. Class Claimants Benefit Financially from Securitizing Future Payments ..............14

  B. Many Class Claimants May Never Receive Future Payments ...........................16

  C. The Cost of Annual Distributions Exceeds the Cost of Securitization ..................18

  D. Securitization Eliminates Class Claimants' Risk of MasterCard Failing
     to Make Future Payments ...................................................................19

IV. THE COURT SHOULD ENTER THE PROPOSED ORDER ...............................19

  A. Steps to Completion and Distribution of Proceeds to Class ............................21

  B. A Court Order Is Required to Complete the Securitization ..............................21

  C. Maximum Discount Rate....................................................................23

V. CONCLUSION ...................................................................................25

## I.   **INTRODUCTION**

Constantine Cannon LLP and Hagens Berman Sobol Shapiro LLP ("Lead Counsel")

respectfully submit this Memorandum in Support of Lead Counsel's Motion to Approve the

Securitization of the MasterCard Settlement Account Payments.  At this time, four annual

installments of $100 million each (the "Future Payments") are due from MasterCard

International Incorporated ("MasterCard") from 2009 through 2012 pursuant to the settlement

agreement with MasterCard ("Settlement Agreement").[1]  Lead Counsel has determined that

securitizing the Future Payments at a market rate discount and distributing the proceeds would be

in the best interests of the Plaintiff Class Members who filed approved claims and signed

releases in this litigation ("Class Claimants").  Pursuant to the Settlement Agreement and the

Amended Plan of Allocation,[2] Lead Counsel respectfully moves the Court to issue an order[3]

permitting Lead Counsel to securitize the remaining Future Payments under the terms set forth in

this memorandum and accompanying papers ("Securitization").

Securitization was contemplated since the settlement of the case in 2003.  At that time,

Lead Counsel appreciated that Class Claimants might benefit from a securitization by

accelerating the payments due, albeit at a discount.  What was perceived as a benefit to Class

Claimants in 2003 is now an urgent need.  It is no secret that merchants – especially the smaller

merchants – are in acute distress; facing the financial pincers of substantially diminished sales

and a credit crunch unprecedented in modern times.  The approximately 700,000 Class

---

[1]    MasterCard and Defendant Visa U.S.A. Incorporated ("Visa") paid $1.85 billion into the settlement funds, with an additional amount of $1.2 billion due between now and December 2012.  Approximately $1,429,840,000 was distributed to Class Claimants from December 19, 2005 to December 23, 2008.  *See* Declaration of Robert L. Begleiter, Esq., dated March 5, 2009 ("Begleiter Decl." or "Begleiter Declaration") at ¶ 5.

[2]    The Plan of Allocation was amended in August 2005.  Because the provisions regarding securitization were not modified, this memorandum refers to the Plan of Allocation and Amended Plan of Allocation interchangeably. The Amended Plan of Allocation is Begleiter Declaration as Exhibit C.

[3]    Lead Counsel's Proposed Order is annexed to the Begleiter Declaration as Exhibit N.

1                                                      112475.1

Claimants – ranging in size from large retailers such as named Plaintiffs Wal-Mart, Sears, Circuit City, The Limited, and Safeway, to very small businesses and sole proprietorships – would benefit from securitization as each would receive a lump-sum payment in the near future rather than four annual payments reflecting any distributions of residual amounts. Given the increased danger of Class Claimants going out of business in this recession, there is a substantial advantage to Class Claimants in accelerating the distributions.

It is undeniable that the vast bulk of Class Claimants need and want the cash payments now that would result from the Securitization. According to a recent survey of 100 retailers, half said they have experienced a tightening of credit by their lenders. A February 2, 2009 Bloomberg article reports tight credit conditions have continued, citing a U.S. Federal Reserve report stating that a majority of U.S. banks made it tougher for consumers and businesses to obtain credit in the past three months. During recent interviews with Class Claimants conducted by Lead Counsel's advisor, Joshua J. Slovik of Cannonade Capital LLC, Lead Counsel confirmed that the tight credit conditions are having a significant impact on Class Claimants. Those interviewed responded unanimously that they want the Securitization to proceed and to receive the Securitization proceeds as soon as possible. Even if the ultimate discount rate would be higher than the rate obtainable prior to the credit crises, the benefit to Class Claimants would, in the view of Lead Counsel, more than offset this increase.

The Securitization is now ready to proceed. Working with Joshua Slovik, JP Morgan Securities Inc. ("JP Morgan"), Barclays Capital Inc. and Citigroup Global Markets Inc. ("Barclays Capital" and "Citigroup," collectively the "Bankers"), and their counsel, Orrick, Herrington & Sutcliffe LLP, and counsel retained to represent Lead Counsel, Brown Rudnick LLP, Lead Counsel has substantially completed the structuring and voluminous documentation needed for the Securitization. At this time, all issues delaying the Securitization have been

resolved, including disputes with the U.S. Government and with MasterCard that threatened to derail the process, as well as the completion of MasterCard's initial public offering and securing a preliminary rating from Standard & Poor's ("S&P").

Key to proceeding with the Securitization was receiving an investment grade rating by a major rating agency, in this case, S&P, the agency rating MasterCard. After lengthy discussions among Lead Counsel, Lead Counsel's advisor, JP Morgan, MasterCard, and S&P, S&P issued a favorable preliminary rating in June 2008 for the Securitization. S&P gave the Securitization a preliminary BBB+ rating, the same investment grade rating that S&P rates MasterCard. In other words, S&P preliminarily rated the Securitization to be as creditworthy as MasterCard's corporate debt. Because the market prices an investment, in large part, on the rating it receives, achieving this credit rating would result in higher proceeds to Class Claimants than if S&P concluded the Securitization would be significantly riskier than MasterCard's corporate debt.

Another key to proceeding with the Securitization is the state of the credit markets. The market for investment grade securitizations shut down in 2008. However, recent issues of debt rated at credit levels comparable to the Securitization's preliminary rating have been completed. Based on discussions with the Bankers, Lead Counsel believes that conditions in the credit markets have improved sufficiently, and the Securitization now can be done at an acceptable rate. And since the Bankers would be compensated based on the percent of proceeds from the sale of the Securitization, they are motivated to maximize the proceeds to Class Claimants. Lead Counsel would work to confirm market conditions are acceptable prior to marketing the securities so the Securitization would be priced based on acceptable rates.

As an extra precaution, Professor Bernard Black of the University of Texas at Austin, the Independent Expert appointed by the Court, has been asked to review the Securitization and to advise the Court on whether the Securitization proposal is consistent with the Settlement

Agreement and in the best interests of Class Claimants.  Since his appointment on March 20, 2008, Professor Black has been monitoring the Securitization efforts.  The Independent Expert indicated that he will shortly file his report.

The Proposed Order submitted with this motion contains certain conditions necessary for the Securitization to be completed, including that Lead Counsel possess authority to execute the documents required for the Securitization and that the investors possess legal claim and enforcement rights related to the Future Payments upon completion of the Securitization.

The Proposed Order also addresses the fact that S&P's final rating will not be received until near the time the Securitization is marketed, and therefore no one can know what the final rating will be until that time.  No one can predict the interest rate of the U.S. Treasury debt that will form the basis for the discount rate on the Securitization nor the market conditions that impact the incremental interest required over the U.S. Treasury rate.  For these reasons, Lead Counsel cannot know what the discount rate will be when and if the Court grants this motion.  In order to satisfy any due process concerns, the maximum discount rate at which Lead Counsel would be authorized to complete the transaction is provided in redacted form in Part IV.C.  If the Court grants this motion and Lead Counsel, after consulting with the Independent Expert, determines the Securitization should not be completed even if it would be at a rate equal to or less than the maximum rate approved by the Court, Lead Counsel will so notify the Court.

Should the Securitization of the Future Payments be completed, Lead Counsel intends to securitize the future payments due from Visa, as well.  Lead Counsel determined it would be more cost effective to attempt first the securitization of either MasterCard or Visa rather than to attempt both simultaneously.  The MasterCard Securitization was pursued first because MasterCard went public before Visa, and executing a securitization during an initial public offering essentially would have been impossible.  Lead Counsel will evaluate the estimated

112475.1

timing to complete the Visa securitization and may elect to combine the proceeds from both

securitizations and make only one distribution to Class Claimants in order to reduce costs.

Distribution of any residual funds would be made in accordance with the recommendation of the

Independent Expert and the Amended Plan of Allocation.

## II.   **BACKGROUND**

On the eve of trial in April 2003, the Plaintiff Class preliminarily settled its lawsuit

against MasterCard.[4] *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 102 (2nd Cir.

2005). The Court preliminarily approved the Settlement Agreement on June 13, 2003. *See id.* at

102-103, 102 n.4. The Settlement Agreement and the Plan of Allocation for disbursement of the

MasterCard settlement proceeds contemplate securitization of the unpaid installments due to the

Plaintiff Class from MasterCard and paid into the settlement fund (the "Settlement Fund"). As

required by both documents, Lead Counsel now advises the Court of the terms and conditions of

the proposed Securitization and seeks approval of that proposal.

In settling the underlying litigation, Visa and MasterCard agreed to pay Plaintiff Class

Members $3.05 billion spread over ten annual installments from 2003 through 2012. *See In re*

*Visa Check/Mastermoney Antitrust Litigation*, 297 F.Supp.2d 503, 508 (E.D.N.Y. 2003)

(explaining that MasterCard's payments will total $1.025 billion over the ten-year time period).

Under the Amended Plan of Allocation and Settlement Agreement, distributions of damages

were to reflect amounts related to overcharges for signature debit, credit card, and PIN debit

transactions. As set forth in the Amended Plan of Allocation, distributions for overcharges of

signature debit and credit were to occur first, then distributions for PIN debit overcharges, and

finally a distribution of any residual amount.

---

[4]      The Plaintiff Class in this case includes both named Plaintiffs (Wal-Mart, Circuit City, Sears, The Limited, Safeway, Burlington Coat Factory, Payless Shoe Source, three major retail trade associations, and several smaller merchants) and millions of U.S. merchants who accepted Visa and/or MasterCard for payment during the Class Period, October 25, 1992 through June 21, 2003. *See* Begleiter Decl. at ¶ 2.

112475.1

To date, Visa and MasterCard have partially satisfied their obligations under the settlement agreements, including payment of $1.85 billion made into the settlement funds. Visa and MasterCard are obligated to pay an additional amount of $1.2 billion into the settlement funds between now and December 2012.[5] See Begleiter Decl. at ¶ 4. Thus far, $1,429,844,536.52[6] has been distributed to Class Claimants through approximately 823,300 checks between December 19, 2005 and December 23, 2008, reflecting distributions for damages related to PIN debit and signature debit and credit overcharges. See id. at ¶ 5. The Plaintiff Class had no obligations under the Settlement Agreement. See id. at ¶ 6.

## A.    Securitization First Was Presented to the Court in the MasterCard Settlement and the Plan of Allocation

The Settlement Agreement requires Class Claimants to apply for Court approval to securitize payments to be made to the Settlement Fund. The Settlement Agreement further provides that MasterCard shall not oppose any such application and shall provide "reasonable cooperation [to Class Claimants] limited to reasonably cooperating in providing information necessary for credit rating purposes." See id. at ¶ 3; Exhibit A at ¶ 3(f).

Pursuant to the June 13, 2003 Stipulation and Order Concerning Notice of Settlement of Class Action, Lead Counsel notified Plaintiff Class Members of the details of the Settlement Agreement, including that Lead Counsel may securitize the Settlement Fund. Over 8.1 million copies of the notice were mailed, and a notice of the settlement was published in national circulation and trade press estimated to reach over 150 million targets. See September 18, 2003

---

[5]    MasterCard has paid six such installments, or $625 million, and Visa has paid six installments, or $1.225 billion, into the settlement funds. See Begleiter Decl. at ¶ 4.

[6]    The following represent the different dates and corresponding distribution amounts for the major distributions: $52,729,595.18 on December 19, 2005; $609,990,110.38 on June 28, 2006; $317,281,533.80 on December 23, 2006; $185,947,129.93 on December 21, 2007; and $257,308,370.08 on December 23, 2008. An additional $6,587,797.15 was distributed during this time period to various Class Claimants due to specific Court orders. See Begleiter Decl. at ¶ 5.

112475.1

Status Report Concerning Notice of Settlement to Members of the Certified Class, available at http://www.inrevisacheckmastermoneyantitrustlitigation.com/4dz.pdf.

In May and June of 2003, Lead Counsel determined a securitization would be an appropriate way to convert MasterCard's unpaid payment obligations into lump-sum payments. *See* Begleiter Decl. at ¶ 7.  In July 2003, a preliminary request for proposal was prepared and circulated to large investment banks specializing in securitizations.  In the following weeks, Lead Counsel and its advisor approached eight banks to discuss the feasibility of the Securitization. Six of those banks provided preliminary information on proceeds, fees and expenses, timing, structure, residual, the credit ratings process, required assistance from MasterCard, and other issues related to the Securitization. *See id.* at ¶ 7; Slovik Decl. at ¶ 2.

On August 18, 2003, Lead Counsel submitted the Plan of Allocation to the Court for approval. *See* Begleiter Decl. at ¶ 8; Exhibit B.  The Plan of Allocation provides a detailed description of the process and potential benefits of securitizing the settlement payments.  The Plan of Allocation notes that because the Settlement Agreement requires MasterCard to make installment payments through December 22, 2012, Class Claimants will not receive the full amounts of their claims until 2013. *See id.*; Exhibit B at ¶ 11.1.  As a result, securitization of unpaid installments due to the Settlement Fund was presented as beneficial to Class Claimants in a number of ways, including the reduction of administrative costs and the risk that inflation will erode the settlement's value. *Id.*; Exhibit B at ¶ 11.3.

Plaintiff Class Members were given the opportunity to review and to object to the Settlement Agreement and the Plan of Allocation.  In order for Class Members to have an informed opportunity to object, the Settlement Agreement, Plan of Allocation, and related documents were made available on the case website and could be requested by Class Members from the Court or Lead Counsel.  All objections were due by September 5, 2003.

The Court held a fairness hearing on September 25, 2003.  Eighteen Class Members objected to the Settlement Agreement, only three of whom voiced concern about a securitization. On December 19, 2003, the Court rejected all objections to the securitization provisions and approved the Settlement Agreement without modifying any of the terms.  *See In re Visa Check/Mastermoney Antitrust Litigation*, 297 F.Supp.2d at 518-23.

The first of the three securitization-related objectors requested that any motion seeking approval for securitization of the Settlement Fund be published on the case website – which Lead Counsel agreed that it intended to do.  *Id.* at 518 n.18.  The second objector was concerned that if Lead Counsel failed to pursue a securitization of the unpaid settlement payments, Lead Counsel would unfairly receive its fees first, to the detriment of Class Members who would be forced to await payment of their claims.  The Court dismissed this objection.  *Id.* at 519-20 ("The harm to the Class in waiting for compensatory relief would be *de minimis* . . . the proposed securitization of the Net Settlement Funds is no reason not to approve the settlements.").  The third objection was based on the perceived risks in the securitization process.  The Court also rejected this objection.  *Id.* at 520 n.22 ("This argument is unpersuasive; the point of securitization is to make the Net Settlement Funds *more* secure.  Moreover, Lead Counsel must obtain prior approval of the Court before consummating any such transaction.").

On January 4, 2005, the Second Circuit affirmed the Court's approval of the Settlement Agreement.  *See Wal-Mart Stores, Inc.*, 396 F.3d 96.  Final settlement approval occurred on June 1, 2005 after all appeals were exhausted and the time to seek further review in the U. S. Supreme Court expired.  At that point, Lead Counsel could begin mailing claim forms to Class Members. *See* Begleiter Decl. at ¶ 3.

**B.**   **Securitization Efforts Subsequent to the Amended Plan of Allocation**

The Amended Plan of Allocation details the process for effectuating the Securitization. *Id.* at ¶ 8; Exhibit C at ¶¶ 11.7-11.15. Under the Amended Plan of Allocation, the selection of investment bankers and the work on the Securitization were to occur after approval of the Settlement Agreement by the Court. *Id.*; Exhibit C at ¶ 11.5. Upon the Court's approval of the Amended Plan of Allocation, Lead Counsel and its advisor began work to execute the Securitization. These efforts included retaining investment bankers to act as Structuring and Placement Agents,[7] hiring specialized counsel, structuring the transaction, negotiating cooperation with MasterCard, navigating the Standard and Poor's ("S&P") rating process, and completing the documents necessary to effectuate the Securitization. *See id.* at ¶ 9.

**1.**   ***Early Efforts***

Immediately following final settlement approval, rumors of MasterCard's initial public offering were circulating. On September 15, 2005, MasterCard formally announced its proposed sale of securities to the public. *See* MasterCard, Inc., SEC Registration Statement (Form S-1), (Sept. 15, 2005). At a number of sessions beginning in November 2005, Lead Counsel and its advisor re-interviewed six investment banks, focusing on their securitization experience and their involvement, if any, in MasterCard's planned public offering. *See id.* at ¶ 10; Slovik Decl. at ¶ 4.

As a result of these interviews and follow-up discussions, Lead Counsel selected Deutsche Bank Securities Inc. ("Deutsche Bank") and Bear Stearns & Co. ("Bear Stearns") as Structuring and Placement Agents for the Securitization subject to the negotiation of an engagement letter and receipt of Court approval. Both firms began working on the Securitization soon after being selected. *See* Begleiter Decl. at ¶ 10; Slovik Decl. at ¶ 4. In June 2006, Lead

---

[7]        The investment bankers (*i.e.*, the Bankers) have two main roles, defined as follows: (a) "Structuring Agent," assisting the issuer in developing the best approach to structure future cash flows and to obtain the highest ratings for the securities being issued, and (b) "Placement Agent," a broker-dealer placing newly issued securities directly with investors on behalf of the issuer. *See* Slovik Decl. at ¶ 5.

112475.1

Counsel notified the Court of the selection of Deutsche Bank and Bear Stearns. The Court approved the agreements on August 29, 2006. *See* Begleiter Decl. at ¶ 11; Exhibit D.

In order to obtain the investment grade rating necessary to effectuate the Securitization, S&P required assurances that the Settlement Agreement and the Judgment would afford adequate protection to investors in case of a default by MasterCard and that provisions of the Settlement Agreement requiring MasterCard to make payments would be enforceable by potential investors. S&P also required evidence that a dispute with the U.S. Government regarding whether the Government would participate in the distribution of the settlement funds was resolved and that no new entities could disrupt the Settlement Agreement. Finally, since S&P's rating of the Securitization would be based on the underlying rating of MasterCard's business, it also required assurances from MasterCard reflecting MasterCard's commitment to continue providing information necessary for maintaining a rating of MasterCard until payment of the final installment. Resolution of these issues, lasting in excess of fifteen months, occurred toward the end of 2008. *See id.* at ¶¶ 12-20; Slovik Decl. at ¶¶ 6-10.

## 2. *Rating from S&P and Preparation of Securitization Documents*

From January 2008 to March 2008, Lead Counsel's advisor and Bear Stearns worked with S&P to secure a preliminary rating for the Securitization. Lead Counsel's advisor and JP Morgan (which acquired Bear Stearns in March 2008) continued this work with S&P from early March 2008 through June 2008. Various issues were addressed, including those related to structure, expenses, disbursements, possible challenges to the Settlement Agreement and claims to settlement payment amounts, and MasterCard's willingness to provide information during the life of the Securitization notes. *See* Slovik Decl. at ¶ 9. On or about June 10, 2008, S&P confirmed a preliminary rating of BBB+ (the same as MasterCard's corporate credit rating) for the securities to be offered in the Securitization, contingent upon approval of the final set of

10

documents necessary to complete the Securitization and no change in MasterCard's rating. *See id.* at ¶ 11; Begleiter Decl. at ¶ 18.

Following receipt of the preliminary rating from S&P, Lead Counsel authorized its advisor to initiate the preparation of documents necessary to complete the Securitization. Lead Counsel's advisor managed the process by which Brown Rudnick LLP (counsel for Lead Counsel) and Orrick, Herrington & Sutcliffe LLP (counsel for the Bankers) prepared the required documentation and opinions that would be executed and delivered on or prior to the closing date of the Securitization. *See* Begleiter Decl. at ¶ 21; Slovik Decl. at ¶ 12.  Finally, in a September 3, 2008 letter, MasterCard agreed to provide information in order to enable S&P to continue to rate the Securitization in case MasterCard no longer maintains a credit rating. *See* Begleiter Decl. at ¶ 19; Exhibit E.

### 3.     *The Court Appoints an Independent Expert*

To aid the Court in evaluating the Securitization, the Special Master ordered Lead Counsel to submit a proposed statement of work for an independent expert advising on the Securitization in conjunction with a recommendation to the Court for the appointment of such an expert. *See id.* at ¶ 24; Exhibit G.   This order followed an order of the Court approving the engagement of the Structuring and Placement Agents and stating that the Court may appoint an independent expert to evaluate any proposed securitization. *See id.* at ¶ 11; Exhibit D.  On January 11, 2008 and in response to the aforementioned orders, Lead Counsel requested the Court to name an independent expert to advise the Court on the Securitization when settlement with the U.S. Government regarding the Government's participation in the distribution of the settlement funds appeared imminent. *See id.* at ¶ 24; Exhibit H.  After a recommendation by the Special Master, the Court appointed as Independent Expert Professor Bernard Black of the University of Texas Law School and McCombs School of Business to advise the Court on the

112475.1

advisability and terms of the Securitization. *See id.*; Exhibit I. In appointing Professor Black as

Independent Expert, the Court stated:

> As Independent Expert, Professor Black's duties shall include all tasks necessary
> or appropriate for him to prepare a written report and recommendation advising
> the Court on whether a securitization proposal or proposals to be presented by
> Lead Counsel are consistent with the Settlement Agreement and are in the best
> interest of the Class as a whole. These tasks include, but are not limited to,

> [1.]   becoming familiar with the Settlement Agreements with MasterCard
> International and Visa U.S.A., the Amended Plan of Allocation, other
> materials related to the settlements, and the securitization proposal
> submitted by Lead Counsel;
> [2.]   evaluating the process through which Lead Counsel solicited bids from
> investment banks for the securitization;
> [3.]   providing advice to Lead Counsel with regard to the securitization
> proposal; and
> [4.]   assessing the fairness of the proposal from a financial point of view.

*Id.* (paragraph format altered from original).

Since then, Lead Counsel and its advisor provided the Independent Expert with

background information, relevant documents provided to S&P, drafts of the Securitization's

Offering Memorandum and the Indenture, analyses of distribution expenses and estimated

transaction expenses, and responses to a several inquiries regarding accounting treatment and

securitization economics. The Independent Expert also has been updated regarding the status of

the Securitization and current developments and is expected to submit his report under separate

cover. *See id.* at ¶ 25; Slovik Decl. at ¶ 13.

### 4.   *Current Market Conditions*

As outlined above, almost all obstacles to the Securitization have been resolved.

Developments in the credit market, however, have delayed temporarily the effectuation of the

Securitization. Recently, the Bankers have advised Lead Counsel that the credit markets for

BBB+ (BBB+ is the preliminary rating S&P gave to the Securitization) have reopened on a

limited basis. During January 2009, sixteen new BBB (including BBB+ and BBB-) debt

112475.1

issuance transactions were completed. The proceeds of these sales total approximately $16 billion. Currently, debt issuances from financial institutions are not finding buyers in the market. However, the Bankers believe that because MasterCard is primarily a transaction switching (processing) network company with only indirect exposure to consumer credit risk, liquidity risk, or interest rate risk, the Securitization could be completed in the near future provided the appropriate structuring, positioning, and marketing of the securities. This is dependent on the markets continuing their current trend, which could be short lived. *See* Slovik Decl. at ¶¶ 14-16.

For this reason, Lead Counsel intends to complete the preparation for the Securitization documentation and the ratings process with S&P and then wait until a favorable opportunity to effectuate the Securitization arises. As such, Lead Counsel requests the Court to authorize the Securitization with the safeguards of (1) Court approval of the maximum discount rate with which the Securitization may be completed and (2) the provision that, even if a rate equal to or lesser than the maximum approved rate is obtainable, if Lead Counsel determines after consultation with the Independent Expert that the Securitization would not be in the best interests of Class Claimants, Lead Counsel may elect not to complete the Securitization upon providing notice of such a determination to the Court. *See* Begleiter Decl. at ¶¶ 21, 41.

### 5.    *Barclays Capital and Citigroup Replace JP Morgan*

JP Morgan informed Lead Counsel that as part of its realignment after acquiring Bear Stearns, JP Morgan was no longer interested in pursuing the Securitization unless Lead Counsel agreed to increase JP Morgan's potential fees from the amount originally agreed upon in the engagement letter with Bear Stearns. JP Morgan terminated its involvement in the Securitization

13

112475.1

after Lead Counsel declined that demand.  JP Morgan did not receive any fees in connection with this work and is not entitled to receive any fees in the future.[8]  *See id.* at ¶ 22.

Lead Counsel and its advisor interviewed three potential banks and selected Barclays Capital and Citigroup (*i.e.* the Bankers) as the replacement Structuring and Placement Agents for the Securitization.  Subject to Court approval, Lead Counsel agreed with the Bankers on fees substantially similar to those in the engagement letter with Bear Stearns that has already been approved by the Court.  Lead Counsel is simultaneously submitting the revised engagement letter with the Bankers for Court approval. *See id.* at ¶ 23.

## III.   SECURITIZATION IS IN THE BEST INTERESTS OF CLASS CLAIMANTS

The rights of Class Claimants to receive the Future Payments can be viewed as if Class Claimants currently hold MasterCard debt in the form of MasterCard's obligation to make the Future Payments to the Class.  By completing the Securitization, Class Claimants essentially would be selling this debt to outside investors at a discount rate equal to the interest rate on the Securitization's notes. *See id.* at 26.  Lead Counsel analyzed the costs and benefits and concluded the Securitization would be beneficial to Class Claimants for four main reasons.

### A.   Class Claimants Benefit Financially from Securitizing Future Payments

To best understand the merits of the Securitization one must compare the difference between the cost of Class Claimants existing sources of funding (debt and interest) and the discount rate (including all expenses) that would be applied to the settlement payments as reflected in the pricing of the Securitization. An additional factor to be considered is that, given the tightening of credit by their lenders and the increased danger of Class Claimants going out of

---

[8]   Deutsche Bank elected to terminate its involvement in the Securitization efforts in March 2008.  Like JP Morgan, Deutsche Bank did not receive any fees for its work and is not entitled to receive any fees in connection with the Securitization in the future. *See* Begleiter Decl. at ¶ 22.

112475.1

business in this recession, there is a substantial advantage to Class Claimants in accelerating the distributions. *See id.* at ¶ 27.

The Bankers informed Lead Counsel that the Securitization's pricing would be based on MasterCard's creditworthiness and premiums added to the interest rate on the Securitization notes to reflect the difference between those notes and direct MasterCard debt and deal-specific issues. This pricing is made up of three components. The first component is the rate on relevant U.S. Treasuries (that mature on approximately the same date as the average life of the remaining payments from MasterCard are due). The second component is incremental interest (or a spread over U.S. Treasuries) to compensate investors for the additional inherent risk associated with MasterCard's corporate debt versus U.S. Treasuries (which are risk free). This spread is based on similar outstanding issues (in rating and industry). The sum of these two components is approximately MasterCard's cost of unsecured debt. *See id.* at ¶¶ 28-30; Slovik Decl. at ¶ 20-21.

Finally, the third component is a premium for the uniqueness of this Securitization and certain other issues that must be added to the other two components. According to the Bankers, investors in the Securitization would likely demand a premium to MasterCard's cost of debt based on deal-specific factors. These factors may include the fact that this would be a first-of-a-kind securitization, the Securitization notes would be illiquid and difficult to sell prior to maturity, the Securitization would not be MasterCard's direct obligation to investors, and MasterCard does not currently have any debt outstanding that can be readily used to establish MasterCard's cost of unsecured debt. *See* Begleiter Decl. at ¶ 31; Slovik Decl. at ¶ 22.

In the current financial environment, access to debt or equity financing is limited for many Class Claimants. According to a recent article posted at CNNMoney.com, consulting firm BDO Seidman recently surveyed chief financial officers at 100 retailers, and half of those retailers said they have experienced a tightening of credit by their lenders. The article notes that

15

"the trickle-down effect of this is that many retailers will have less holiday inventory, hire fewer additional labor and they are also making the decision to cut back on extended store hours." *See* Begleiter Decl. at ¶ 32; Exhibit J. A February 2, 2009 Bloomberg article reports tight credit conditions have continued, citing a U.S. Federal Reserve report stating that a majority of U.S. banks made it tougher for consumers and businesses to obtain credit in the past three months. *See id.* at ¶ 33; Exhibit K.

To confirm Lead Counsel's view that the Securitization done at a market rate would still be in the best interests of Class Claimants, Lead Counsel's advisor interviewed twenty-four Class Claimants, ranging from four of the largest merchants to twenty single-shop merchants. Those interviewed responded unanimously that they want the Securitization to proceed and to receive the Securitization proceeds as soon as possible. Some Class Claimants reserved their support to a transaction completed at a market discount rate. *See* Slovik Decl. at ¶ 17. The Proposed Order accounts for this concern, requesting that the Securitization be subject to Court approval of the maximum discount rate at which Lead Counsel would be authorized to complete the transaction and the requirement that Lead Counsel determines that a transaction with a rate equal to or lesser than such a maximum discount rate would be appropriate under the circumstances.

Based on the above and on discussions with Class Claimants, Lead Counsel believes the benefits associated with the Securitization would by far exceed the costs for practically all Class Claimants. Obtaining the funds at an earlier date also would enable Class Claimants either to avoid incremental borrowing or to use the funds as they see fit. *See* Begleiter Decl. at ¶ 33.

### B.   Many Class Claimants May Never Receive Future Payments

The Claims Administrator, Garden City Group, stated that a consideration favoring the Securitization would be its financial effectiveness and inherent fairness for Class Claimants. *See* Zola Decl. at ¶ 3. Based on statistics maintained by the U.S. Post Office National Change of

16

Address System, over forty million Americans change their addresses annually. *See id.* at ¶ 4. The Small Business Administration ("SBA") reported that during the 2005-2006 time period, 564,900 businesses closed. In its analysis of the survival rate for new businesses (updated in September 2008), the SBA found that only 44% of new employer establishments survive at least four years, and only 31% survive at least seven years. *See id.* at ¶ 5. This strongly suggests that over the remaining approximately four-year period, a significant number of Class Claimants may not survive or remain at their present locations long enough to receive their allocation of the remaining settlement payments.

The current deepening recession adds to the danger there will be an increased rate of Class Claimants going out of business. And it is not just small merchants facing business closures. Circuit City, a named plaintiff and one of the largest merchants in the Class, filed for bankruptcy in November 2008 and has announced that it will go out of business. *See* Begleiter Decl. at ¶ 34. Several other large merchants filed for bankruptcy in just the past year alone, *see id.* at ¶ 34, and such filings are only expected to increase. The Wall Street Journal reports that merchants anticipate "a wave of post-holiday bankruptcy filings." *See id.* at ¶ 35; Exhibit M. Not only would the Securitization ensure that Class Claimants receive their payments, but it also would allow them to receive their payments now, during a recession, when merchants need the money most.

Without the Securitization, Class Claimants that dissolve may be lost in the administrative process and forfeit payments toward the end of the settlement distribution life cycle. This would adversely affect smaller Class Claimants in particular, which are more likely to go out of business. This, in turn, would create a windfall for larger Class Claimants that are more likely to weather difficult economic times and stay afloat for the next four years. *See* Zola Decl. at ¶ 6.

112475.1

**C.      The Cost of Annual Distributions Likely Exceeds the Cost of Securitization**

Based on information Lead Counsel received from Garden City Group, several categories of costs associated with distributing the Future Payments would need to be repeated every year without the Securitization. *See id.* at ¶ 8. These costs include the labor and cost of printing each check, stuffing it in an envelope, and mailing it to Class Claimants. *See id.* at ¶ 9. Postage costs would necessarily be incurred every year, and it is likely these costs will increase between now and 2012. *See id.* at ¶ 10. Every check distribution would require a recalculation of the pro rata distribution formula contemplated in the Amended Plan of Allocation because the number of claimants would change each year, making the prior year's calculation irrelevant. *See id.* at ¶ 11.

Lead Counsel will be inundated every year with special requests about where to send checks or how to split them up, for example, in the case of the dissolution, merger, or acquisition of a business. Throughout the process of distributing the Future Payments to existing Class Claimants, Garden City Group will be fielding calls from Class Members, processing change-of-address forms, reissuing checks, and providing other routine customer service. *See id.* at ¶ 12. For Class Claimants that go out of business, Garden City Group will need to perform additional follow-up, either handling uncashed checks, reissuing checks to a surviving entity or individual, or following up with change-of-address services. The reissuance of checks is more time-consuming and more costly than the original check distribution process. *See id.* at ¶ 13. While Garden City Group cannot predict the impact of inflation on all administrative costs, it is likely that such costs will increase over the remaining payout term. *See id.* at ¶ 14.

Garden City Group estimates that the savings from the Securitization could easily exceed $5 million – and may even approach $10 million – under all likely scenarios. The review of continuing tax reporting obligations after the Securitization is completed, has not yet been resolved but is not expected to significantly increase costs. Lead Counsel will notify the Court

112475.1

as the costs of such tax reporting obligations become known. *See* Begleiter Decl. at ¶ 36. The cost savings from securitizing the Future Payments would either exceed the costs of the Securitization or largely offset these costs. *See* Slovik Decl. at ¶ 18.

### D. Securitization Eliminates Class Claimants' Risk of MasterCard Failing to Make Future Payments

The Securitization would transfer the rights and the exposure relating to MasterCard's payment of the Future Payments to investors. As the Court previously noted, the Securitization would make the receipt by Class Claimants of settlement funds more certain. *See In re Visa Check/Mastermoney Antitrust Litigation*, 297 F.Supp.2d at 520 n.22. Under the proposed Securitization, the investors would assume the risk related to any failure by MasterCard to make payments, eliminating for Class Claimants the risks related to MasterCard's survival – or indeed any other factor that would result in MasterCard's failure to make any of the Future Payments.

## IV. THE COURT SHOULD ENTER THE PROPOSED ORDER

Lead Counsel has determined that, subject to receiving an investment grade rating from S&P and the Securitization pricing at a discount rate equal to or lesser than the maximum rate set forth below, securitizing the Future Payments would be in the best interests of Class Claimants. *See* Begleiter Decl. at ¶ 41. In conjunction with filing this motion, Lead Counsel will submit the documents necessary to complete the Securitization and the Proposed Order to S&P for receipt of a final credit rating. *See id.* at ¶ 21. Following receipt of S&P's final credit rating, and contingent on the receipt of an investment grade rating, Lead Counsel would review market conditions with the Bankers, its advisor, and the Independent Expert in order to make a final determination regarding commencing the marketing of the Securitization. If Lead Counsel, after consulting with the Independent Expert, believes that market conditions are adverse, Lead Counsel would not allow the Bankers to initiate the marketing process and would so inform the Court. *See id.* at ¶ 41.

19

Should the Court grant this motion, Lead Counsel requests the Court to approve the

Proposed Order. In granting this motion and issuing the Proposed Order, the Court will provide

a procedure for effectuating the Securitization and a method to ensure that Class Claimants

obtain a favorable rate for the Securitization. The Proposed Order provides that:

i.    Lead Counsel may proceed with the Securitization;

ii.   Lead Counsel is authorized and has the authority to act as binding representative of the Class to complete the Securitization, including but not limited to the power to create the "Trust" (a Delaware statutory trust into which Lead Counsel will cause the sale and assignment of the rights to receive all Future Payments and all rights and interests related thereto), and that documents executed by Robert L. Begleiter or Jeffrey I. Shinder on behalf of Constantine Cannon LLP and by George W. Sampson on behalf of Hagens Berman Sobol Shapiro LLP that relate to the Securitization shall constitute legal, valid, and binding obligations of and be enforceable against the Class;

iii.  the conveyance of the Class' rights to receive the Future Payments and the related rights and interests will constitute an absolute sale in that the Class will transfer immediately all rights and interests to receive the Future Payments upon completion of the Securitization;

iv.   the transfer by Lead Counsel to the Trust of control over withdrawals from the Settlement Fund will not conflict with the requirement of the Settlement Agreement requiring Lead Counsel's signature for all requests for withdrawals from the Settlement Fund;

v.    the Trust will, effective as of the conveyance of the Class' rights, have the right to enforce all rights and powers related to the Future Payments granted to the Class under the Settlement Agreement and the Amended Plan of Allocation, including the power to seek relief from this Court pursuant to Paragraph 43 of the Settlement Agreement to compel MasterCard to fulfill its payment obligations;

vi.   Lead Counsel may complete the Securitization at a rate equal to or lesser than the maximum rate set forth below, but if, after consulting with the Independent Expert, Lead Counsel determines that the Securitization should not be completed despite obtaining a discount rate equal to or lesser than that maximum rate, Lead Counsel shall not complete the Securitization and shall so notify the Court; and

vii.  other than the order granting this motion, notice provided to the Class on the case website and to the parties appearing in this action by mail is sufficient and adequate such that no additional action or notice is required prior to completing the Securitization.

*See id.* at ¶ 37.

20

112475.1

A.    **A Court Order Is Required to Complete the Securitization**

In order to securitize the Future Payments, Court approval of the Securitization is required under both the Settlement Agreement and the Amended Plan of Allocation. *See id.* at ¶ 3; Exhibit A at ¶ 3(f); *id.* at ¶ 8; Exhibit C at ¶ 11.17. The second and third points of relief also are necessary to effectuate the Securitization because investors will require a Court order assuring them Lead Counsel possesses authority to execute the required Securitization agreements and the investors will have legal claim to and enforcement rights related to the Future Payments. Likewise, the fourth and fifth requested items of relief are necessary because they would provide investors with assurances that they will possess the power to receive, and if required enforce, all rights related to the Future Payments as conveyed by Class Claimants. *See id.* at ¶ 38; Slovik Decl. at ¶ 23-24.

B.    **Procedure to Approve the Securitization Discount Rate**

At the conclusion of the Bankers' marketing of the Securitization, Lead Counsel would be presented with the pricing indication (*i.e.* the discount rate) at which investors are willing to participate in the Securitization. These pricing indications usually expire within twenty-four hours and would not be valid for the time required for Class Claimants' objections to be heard. Securing pricing indications valid for a longer period of time would be a significant variation from the standard marketing process and likely would reduce the proceeds to Class Claimants. Therefore, Court approval of the Securitization and the maximum rate at which the Securitization may be completed is required before Lead Counsel can learn the actual discount rate that is required to sell the entire Securitization to investors. *See* Begleiter Decl. at ¶ 39; Slovik Decl. at ¶ 25.

Lead Counsel has concluded that disclosure of a minimally acceptable price would lead investors to bid lower than they might otherwise. This would be adverse to the Bankers'

21                                                      112475.1

marketing efforts and could result in lower proceeds to Class Claimants.  In the Proposed Order,

Lead Counsel balances these alternatives and the time required for due process with the Bankers'

need to move quickly to successfully complete the Securitization.  Specifically, Class Claimants

will require time to review the Securitization proposal and an opportunity to object to the

proposal.  The Court and the Special Master also will need time to review the Securitization and

any possible objections from Class Claimants.  To maximize proceeds to Class Claimants, Lead

Counsel asks the Court to review the Securitization proposal and rule on whether the

Securitization can proceed before the Bankers begin marketing the Securitization.  *See* Begleiter

Decl. at ¶ 40; Slovik Decl. at ¶ 28.

Upon learning the discount rate (and assuming that such a rate would be equal to or lesser

than the maximum rate approved by the Court) and all other final terms of the Securitization, or

at a later time that Lead Counsel believes is appropriate, Lead Counsel would make a final

determination that the Securitization is in the best interests of Class Claimants.  Only in that case

would Lead Counsel proceed with the Securitization.  If Lead Counsel determines, after

consultation with the Independent Expert, that the Securitization at such a Court-approved rate

would not be in the best interests of Class Claimants, Lead Counsel would not complete the

Securitization and would so notify the Court.  This is the sixth point of relief requested in the

Proposed Order.  *See* Begleiter Decl. at ¶ 41.

Since the Bankers would be compensated based on the percent of proceeds from the sale

of the Securitization, they are motivated to maximize the proceeds to Class Claimants.  *See id.* at

¶ 43.  The Bankers also have stated they would like to play a similar role in the securitization of

the Visa settlement funds, which would be a larger transaction.  *See id.*; Slovik Decl. at ¶ 26.

While the Bankers are only retained to execute the MasterCard Securitization, the successful

execution of this transaction likely will cause Lead Counsel to seek to retain the bankers for the

112475.1

Visa transaction as well.  Lead Counsel believes that these incentives, in addition to the Bankers'

track record, professionalism, and the potential publicity and scrutiny this transaction would

generate will result in optimal execution by the Bankers.  *See* Begleiter Decl. at ¶ 43.

The seventh and final point of relief is necessary to assure investors that this Proposed

Order is all that is required for the Court to grant Lead Counsel the authority to effectuate the

Securitization.  *See id.* at ¶ 42; Slovik Decl. at ¶ 27.  This point seeks to clarify that by providing

notice to the Plaintiff Class on the case website and to all parties appearing in this action by mail,

no further action or notice would be required before Lead Counsel completes the Securitization.

*See* Begleiter Decl. at ¶ 42.  Lead Counsel intends to post certain information regarding the

Securitization on the case website and also to disclose the nature of the Securitization in certain

trade periodicals that it has used in the past to relay information to Class Members.  The

information in the trade periodicals will direct Class Members to the website for additional

information.  By utilizing the website and the trade periodicals, Lead Counsel is seeking to avoid

the costs associated with printing and mailing notice to all Class Members. *See id.* at ¶ 44.

### C.      <u>Maximum Discount Rate</u>

As outlined above, disclosure of the discount rate or the minimally acceptable pricing

would be adverse to the Bankers' marketing efforts and therefore to Class Claimants' interests in

obtaining the most proceeds from the Securitization.  *See id.* at ¶ 40; Slovik Decl. at ¶ 28.  At the

same time, due process concerns underscore that the Court should be aware of a maximum

discount rate for the Securitization prior to approving the Securitization and issuing the attached

Proposed Order.  For these reasons, Lead Counsel is advising the Court under seal as to the

maximum discount rate at which the Securitization would be completed.

**REDACTION** Lead Counsel's advisor has had a number of conversations with the

Bankers regarding the potential discount rate.  In addition, Lead Counsel's advisor has reviewed

112475.1

information regarding current market conditions, completed debt issuances in the BBB range and the other factors affecting the potential discount rate, and provided information to Lead Counsel. Based on this information, Lead Counsel has set the maximum discount rate at which it would approve the sale of the Securitization at a spread over U.S. Treasuries of ███████. At today's U.S. Treasury rate, the maximum rate would be ██████. A transaction completed at this maximum rate would result in proceeds from the sale of the Securitization of approximately ██████████ (as compared to four annual payments of $100 million though 2012, not $400 million presently). *See* Slovik Decl. at ¶ 29.

Lead Counsel believes that this discount rate reflects a fair transaction and would be favorable to the Class as a whole, given the current market turmoil that retailers are experiencing. Again, because disclosure of this maximum rate could increase the actual discount rate from what it otherwise might be set at in the market, Lead Counsel is filing this section under seal and in a redacted form in the papers made publicly available.

112475.1

## V.   **CONCLUSION**

For the foregoing reasons, Lead Counsel respectfully requests the Court to grant the motion and to provide the relief requested in the Proposed Order.

Respectfully submitted,

Dated: March 5, 2009
     New York, NY

By: _____
**Constantine Cannon LLP**
   Robert L. Begleiter (RB-7052)
   Jeffrey I. Shinder (JS-5719)
   Jason J. Enzler (JE-2475)
450 Lexington Avenue, 17th Floor
New York, NY 10017
Telephone:  (212) 350-2700
Facsimile:  (212) 350-2701
*Co-Lead Counsel for the Plaintiff Class*

**Hagens Berman Sobol Shapiro LLP**
   George W. Sampson (GS-8973)
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
E-Mail:  George@hbsslaw.com
*Co-Lead Counsel for the Plaintiff Class*

112475.1