UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
IN RE                                                            :   MASTER FILE NO:
VISA CHECK/MASTERMONEY ANTITRUST  :   CV-96-5238
LITIGATION                                                    :   (Gleeson, J.) (Orenstein, M.J.)
-----------------------------------------------------------------x
This Document Relates To                               :
All Actions:                                                      :
                                                                       :
-----------------------------------------------------------------x

# DECLARATION OF ROBERT L. BEGLEITER, ESQ.

Pursuant to 28 U.S.C. § 1746, Robert L. Begleiter declares as follows:

1.  I am an attorney admitted to practice in the State of New York and in the United States District Court for the Eastern District of New York. I am a member of Constantine Cannon LLP, Co-Lead Counsel along with Hagens Berman Sobol Shapiro LLP (together, "Lead Counsel") for the Plaintiff Class in this action. This declaration is submitted in support of Lead Counsel's Motion to Approve the Securitization of the MasterCard Settlement Account Payments.

2.  The Plaintiff Class in this case included both named Plaintiffs (Wal-Mart, Circuit City, Sears, The Limited, Safeway, Burlington Coat Factory, Payless Shoe Source, three major retail trade associations, and several smaller merchants) and the millions of United States merchants who accepted Visa and/or MasterCard for payment during the class period, October 25, 1992 through June 21, 2003. Approximately 700,000 Class Members filed approved claims in this action ("Class Claimants").

3.  MasterCard International Incorporated ("MasterCard") and the Plaintiff Class executed a settlement agreement, dated June 4, 2003, ("Settlement Agreement"), a true a correct copy of which is annexed hereto as Exhibit A. Final settlement approval occurred on June 1,

2005, after all appeals were exhausted and the time to seek further review in the United States Supreme Court had expired. At that point, Lead Counsel could begin the process of mailing claim forms to Class Members.

4. To date, MasterCard and Visa U.S.A. Incorporated ("Visa") have partially satisfied their obligations under the settlement agreements, including payment of $1.85 billion made into the settlement funds (MasterCard paid six installments totaling $625 million and Visa paid six installments totaling $1.225 billion). Visa and MasterCard are obligated to pay an additional $1.2 billion into the settlement funds between now and December 2012.

5. The table below reflects the dates and amounts of distributions made through approximately 823,300 checks to Class Claimants:

| DATE OF DISTRIBUTION | AMOUNT DISTRIBUTED |
| --- | --- |
| December 19, 2005 | $52,729,595.18 |
| June 28, 2006 | $609,990,110.38 |
| December 23, 2006 | $317,281,533.80 |
| December 21, 2007 | $185,947,129.93 |
| December 23, 2008 | $257,308,370.08 |
| Distributions made under specific Court orders between December 19, 2005 and December 23, 2008 | $6,587,797.15 |
| **TOTAL** | $1,429,844,536.52 |

6. The Plaintiff Class had no obligations under the settlement agreements with Visa or MasterCard.

**Commencement Of The Securitization Process**

7. In approximately May and June of 2003, Lead Counsel determined after meetings

with its advisor, Joshua J. Slovik at Cannonade Capital, LLC, that a securitization would be an appropriate way to convert MasterCard's unpaid payment obligations ("Future Payments") into lump-sum payments. During the next few months, Lead Counsel and its advisor met with eight large investment banks (*i.e.*, underwriters) to discuss the feasibility of a securitization. Six of those banks provided preliminary information on proceeds, fees and expenses, timing, structure, residual, the credit ratings process, required assistance from MasterCard, and other issues related to such a securitization.

8. Lead Counsel submitted the Plan of Allocation to the Court for approval on August 18, 2003. The Plan of Allocation includes provisions allowing for and delineating the process of a securitization of the settlement funds. The Plan of Allocation was amended on August 16, 2005 (the "Amended Plan of Allocation"), however, the securitization provisions remained unchanged. True and correct copies of the Plan of Allocation and the Amended Plan of Allocation are annexed hereto as Exhibits B and C, respectively.

9. After final settlement approval, Lead Counsel discussed initiating the securitization process of the MasterCard Future Payments (the "Securitization") with its advisor, and upon approval of the Amended Plan of Allocation, Lead Counsel and its advisor began the securitization process. These efforts included retaining a structuring and placement agent, hiring specialized counsel, structuring the transaction, negotiating cooperation with MasterCard, navigating the Standard and Poor's ("S&P") rating process, and completing the documents necessary to effectuate the Securitization.

10. Beginning in November 2005, Lead Counsel interviewed six investment banks, focusing on their securitization experience and their involvement, if any, in MasterCard's planned initial public offering. As a result of these interviews and follow-up discussions, Lead

112164.8

Counsel selected Deutsche Bank Securities Inc. ("Deutsche Bank") and Bear Stearns & Co. ("Bear Stearns") as Structuring and Placement Agents (as defined in the accompanying Declaration of Joshua J. Slovik, dated March 4, 2009 (the "Slovik Decl.")) for the Securitization subject to the negotiation of an engagement letter and the receipt of Court approval. Both firms began working on the Securitization soon after being selected.

11.     In June 2006, Lead Counsel informed the Court of the selection of Deutsche Bank and Bear Stearns to act as the Structuring and Placement Agents. Pursuant to an order dated August 29, 2006 (the "August 2006 Order"), the Court approved the engagement of Deutsche Bank and Bear Stearns as the Structuring and Placement Agents. A true and correct copy of the August 26 Order is annexed hereto as Exhibit D.

**Dispute With The Government**

12.     On January 27, 2006, after Lead Counsel began discussions with S&P, the U.S. Department of Justice, Antitrust Division, filed consolidated claims on behalf of Government agencies and instrumentalities to participate in the distribution of the settlement funds. Lead Counsel opposed this claim, and a briefing schedule was set by the Court. The dispute over the Government's application was briefed in the spring of 2006 and argued before the Special Master in June 2006.

13.     Lead Counsel was unable to obtain a preliminary indication of a credit rating for the Securitization in June 2006 because of the dispute with the Government. MasterCard threatened to petition the Court to re-open and reform the Settlement Agreement if the Court ruled that the United States had no claim against the settlement fund, and the United States then instituted its own suit against MasterCard. Under the shadow of that threat, Lead Counsel was unable to make certain representations to the investment community with respect to the finality

112164.8

of the settlement that were required to proceed with the Securitization.

14. Lead Counsel and the Government participated in several negotiation sessions, many of which were mediated by the Special Master. The parties settled the dispute and Lead Counsel resumed work on the Securitization in January 2007. The Court approved the settlement between Lead Counsel and the Government in February 2007, which became final at the end of April 2007 when the time to appeal the Court's decision expired.

**Obtaining S&P's Rating Of The Securitization And New Underwriters**

15. Following a May 7, 2007 meeting with Deutsche Bank, Bear Stearns, and Lead Counsel's advisor, Lead Counsel decided to move forward with the Securitization, focusing initially on securitizing the MasterCard settlement payments because MasterCard had already completed its public offering while Visa had not.

16. The Securitization could not go forward without an investment grade rating by a major rating agency, in this case, S&P. In order to give such a rating, S&P requires, *inter alia*, assurance that the Settlement Agreement and the Judgment afford adequate protection to investors and that the dispute with the Government has been resolved, as well as assurances that MasterCard will continue to provide information needed by S&P to maintain a rating of MasterCard until payment of the final installment.

17. A list of information needed from MasterCard as required by the credit rating agencies was communicated to MasterCard in June 2007. Initially, MasterCard refused to provide all of the information, but that dispute was resolved, and Lead Counsel proceeded with its Securitization efforts, using S&P to rate the transaction.

18. On or about June 10, 2008, S&P confirmed a preliminary rating of BBB+ (the same as MasterCard's own corporate credit rating) for the securities to be offered in the

Securitization, contingent upon approval of the final versions of the documents related to the Securitization, no change in MasterCard's rating, and on receiving an acceptable letter of support from MasterCard detailing the information MasterCard would provide in the event MasterCard's existing credit rating is withdrawn before the Securitization matures in 2012.

19. On September 3, 2008, MasterCard informed me of an agreement with S&P as to MasterCard's continuing obligations. Annexed hereto as Exhibit E is a true and correct copy of the Letter from Michael Ellison, MasterCard Assistant Corporate Treasurer, to S&P, dated September 3, 2008. The letter outlines MasterCard's agreement to either maintain a credit rating with S&P and allow S&P to use MasterCard's corporate rating to rate the Securitization or, in the event MasterCard does not maintain an S&P credit rating, to provide S&P with the information necessary to allow S&P to rate independently the Securitization. In return, MasterCard will receive reasonable reimbursement of costs associated with the rating process.

20. On September 18, 2008, I provided MasterCard with a draft Obligor Letter Agreement, which sets forth MasterCard's agreement to cooperate by providing information necessary to obtain a credit rating from S&P in exchange for reasonable reimbursement of costs. The draft Obligor Letter also notes MasterCard's awareness that upon completion of the Securitization, the Plaintiff Class will assign all of its right, title, and interest to receive Future Payments to a trust, to which MasterCard will continue to make Future Payments. Counsel for MasterCard represented to me that MasterCard will sign the Obligor Letter once the Closing Date of the transaction (as defined in the Obligor Letter) is known. Annexed hereto as Exhibit F is a true and correct copy of the draft Obligor Letter that MasterCard represented it will sign.

21. Since receiving the preliminary rating from S&P, Lead Counsel has authorized its advisor to initiate the preparation of documents necessary to complete the Securitization. Mr.

112164.8

Slovik managed the process by which Brown Rudnick LLP (counsel for Lead Counsel) and Orrick, Herrington & Sutcliffe LLP (counsel for the underwriters) prepared the required documentation and opinions. In conjunction with filing this motion, Lead Counsel will submit the documents necessary to complete the Securitization and the Proposed Order (described below) to S&P for receipt of a final credit rating.

22. In the spring of 2008, JP Morgan Securities Inc. ("JP Morgan") acquired Bear Stearns and became successor to the engagement letter with Bear Stearns. JP Morgan subsequently informed me in the fall of 2008 that as part of its realignment after acquiring Bear Stearns, JP Morgan was no longer interested in pursuing the Securitization unless Lead Counsel agreed to increase JP Morgan's potential fees from the amount originally agreed upon in the engagement letter with Bear Stearns. JP Morgan terminated its involvement in the Securitization after Lead Counsel declined JP Morgan's demand.[1] JP Morgan did not receive any fees in connection with this work and is not entitled to receive any fees in the future.

23. Lead Counsel and its advisor interviewed three potential investment banks in September 2008 and selected Barclays Capital Inc. and Citigroup Global Markets Inc. (together, the "Bankers") as the replacement Structuring and Placement Agents for the Securitization. Subject to Court approval, Lead Counsel agreed with the Bankers on fees substantially similar to those in the engagement letter with Bear Stearns that has already been approved by the Court. The engagement letter with the Bankers is being submitted to the Court concurrently with this Motion.

**The Court Appoints An Independent Expert**

24. To aid the Court in evaluating the Securitization, on September 17, 2007, the

---

[1] Deutsche Bank resigned from the Securitization in March 2008. Like JP Morgan, Deutsche Bank did not receive any fees in connection with its work and is not entitled to receive any fees in the future.

112164.8

Special Master ordered Lead Counsel to submit a proposed statement of work for an independent expert advising on the Securitization in conjunction with a recommendation to the Court for the appointment of such an expert.[2] A true and correct copy of that order is annexed hereto as Exhibit G. On January 11, 2008, Lead Counsel requested the Court to name an independent expert to advise the Court on the Securitization, and on March 20, 2008, the Court appointed Professor Bernard Black as the Independent Expert. True and correct copies of Lead Counsel's January 11, 2008 request and the Court's March 20, 2008 Order are annexed hereto as Exhibits H and I, respectively.

25. Since that time, Lead Counsel and its advisor have provided the Independent Expert with background information, relevant documents provided to S&P, drafts of the Securitization's Offering Memorandum and the Indenture, analyses of distribution expenses and estimated transaction expenses, and responses to a several inquiries regarding accounting treatment and securitization economics. The Independent Expert also has been updated regarding the status of the Securitization and current developments, and he is expected to submit his report under separate cover.

**Securitization Is In The Best Interests Of Class Claimants**

26. The rights of Class Claimants to receive the Future Payments can be viewed as if Class Claimants currently hold MasterCard debt in the form of MasterCard's obligation to make the Future Payments to the Class. By completing the Securitization, Class Claimants essentially would be selling this debt to outside investors at a discount rate equal to the interest rate on the Securitization's notes.

27. To best understand the merits of the Securitization one must compare the

---

2   In the August 2006 Order approving the engagement of Deutsche Bank and Bear Stearns as the Structuring and Placement Agents, the Court also stated that an independent expert may be appointed to evaluate any proposed securitization. *See* Exhibit D.

112164.8

difference between the cost of Class Claimants existing sources of funding (debt and interest) and the discount rate (including all expenses) that would be applied to the settlement payments as reflected in the pricing of the Securitization. An additional factor to be considered is that given the tightening of credit by their lenders and the increased danger of Class Claimants going out of business in this recession, there is a substantial advantage to Class Claimants in accelerating the distributions.

28. Lead Counsel's advisor informed me that the Bankers would price the Securitization based on MasterCard's creditworthiness, with certain premiums added to the interest rate on the Securitization notes to reflect the difference between those notes and direct MasterCard debt and deal-specific issues. This pricing is made up of three components.

29. The first component is the rate on the relevant U.S. Treasuries (that mature on approximately the same date as the average life of the remaining payments from MasterCard are due). *See* Slovik Decl. at ¶ 21.

30. The second component is incremental interest (or a spread over U.S. Treasuries) to compensate investors for the additional inherent risk associated with MasterCard's corporate debt versus U.S. Treasuries (which are risk free). This spread is based on similar outstanding issues (in rating and industry). The sum of these two components is approximately MasterCard's cost of unsecured debt. *See* Slovik Decl. at ¶ 21.

31. The third component is a premium reflecting the uniqueness of this Securitization. According to the Bankers, investors in the Securitization will demand a premium to MasterCard's cost of debt based on deal-specific factors. These factors may include the fact that this would be a first-of-a-kind securitization, the Securitization notes would be illiquid and difficult to sell prior to maturity, the Securitization would not be MasterCard's direct obligation

to investors, and MasterCard does not currently have any debt outstanding that can be readily used to establish MasterCard's cost of unsecured debt. *See* Slovik Decl. at ¶ 22.

32. According to a recent article posted at CNNMoney.com which reports that the consulting firm BDO Seidman recently surveyed chief financial officers at 100 retailers, and half of those retailers said they have experienced a tightening of credit by their lenders. The article also reports that "the trickle-down effect of this is that many retailers will have less holiday inventory, hire fewer additional labor and they are also making the decision to cut back on extended store hours." Annexed hereto as Exhibit J is a true and correct copy of that article.

33. Annexed hereto as Exhibit K is a true and correct copy of a February 2, 2009 Bloomberg article reporting that tight credit conditions have continued and citing a U.S. Federal Reserve report stating that a majority of U.S. banks made it tougher for consumers and businesses to obtain credit in the past three months. Obtaining funds from the settlement with MasterCard at an earlier date also would enable Class Claimants either to avoid incremental borrowing or to use the funds as they see fit.

34. The current deepening recession adds to the danger there will be an increased rate of Class Claimants going out of business. Annexed hereto as Exhibit L is a true and correct copy of an article in the New York Times reporting that Circuit City, a named plaintiff and one of the largest merchants in the Class, filed for bankruptcy in November 2008 and announced that it will go out of business. That same article reports that several other large merchants filed for bankruptcy in just the past year alone.

35. Bankruptcy filings are expected to increase. Annexed hereto as Exhibit M is a true and correct copy of a Wall Street Journal article reporting that merchants anticipate "a wave of post-holiday bankruptcy filings."

112164.8

36. A review of the required tax reporting to Class Claimants that would be required after the Securitization is completed has not yet been completely resolved, but it is not expected to result in a significant increase in costs. Lead Counsel will notify the Court once the actual costs of any incremental required tax reporting become known.

**The Proposed Order**

37. Should the Court grant this motion, Lead Counsel requests the Court to approve the Proposed Order, which is annexed hereto as Exhibit N. In granting this motion and issuing the Proposed Order, the Court will provide a procedure for effectuating the Securitization and a method to ensure that Class Claimants obtain a favorable rate for the Securitization. The Proposed Order provides that:

i. Lead Counsel may proceed with the Securitization;

ii. Lead Counsel is authorized and has the authority to act as binding representative of the Class to complete the Securitization, including but not limited to the power to create the "Trust" (a Delaware statutory trust into which Lead Counsel will cause the sale and assignment of the rights to receive all Future Payments and all rights and interests related thereto), and that documents executed by Robert L. Begleiter or Jeffrey I. Shinder on behalf of Constantine Cannon LLP and by George W. Sampson on behalf of Hagens Berman Sobol Shapiro LLP that relate to the Securitization shall constitute legal, valid, and binding obligations of and be enforceable against the Class;

iii. the conveyance of the Class' rights to receive the Future Payments and the related rights and interests will constitute an absolute sale in that the Class will transfer immediately all rights and interests to receive the Future Payments upon completion of the Securitization;

iv. the transfer by Lead Counsel to the Trust of control over withdrawals from the Settlement Fund will not conflict with the requirement of the Settlement Agreement requiring Lead Counsel's signature for all requests for withdrawals from the Settlement Fund;

v. the Trust will, effective as of the conveyance of the Class' rights, have the right to enforce all rights and powers related to the Future Payments granted to the Class under the Settlement Agreement and the Amended Plan of Allocation, including the power to seek relief from this Court pursuant to

11

112164.8

    Paragraph 43 of the Settlement Agreement to compel MasterCard to fulfill its payment obligations;

vi. Lead Counsel may complete the Securitization at a rate equal to or lesser than the maximum rate set forth in the Declaration of Joshua J. Slovik, but if, after consulting with the Independent Expert, Lead Counsel determines that the Securitization should not be completed despite obtaining a discount rate equal to or lesser than that maximum rate, Lead Counsel shall not complete the Securitization and shall so notify the Court; and

vii. other than the order granting this motion, notice provided to the Class on the case website and to the parties appearing in this action by mail is sufficient and adequate such that no additional action or notice is required prior to completing the Securitization.

38. In order to securitize the Future Payments, Court approval of the Securitization is required under both the Settlement Agreement and the Amended Plan of Allocation. The second and third points of relief also are necessary to effectuate the Securitization because investors will require a Court order assuring them Lead Counsel possesses authority to execute the required Securitization agreements and the investors will have legal claim to and enforcement rights related to the Future Payments. Likewise, the fourth and fifth requested items of relief are necessary because they would provide investors with assurances that they will possess the power to receive, and if required enforce, all rights related to the Future Payments as conveyed by Class Claimants.

39. At the conclusion of the Bankers' marketing of the Securitization, Lead Counsel would be presented with the pricing indication (*i.e.* the discount rate) at which investors are willing to participate in the Securitization. These pricing indications usually expire within twenty-four hours and would not be valid for the time required for Class Claimants' objections to be heard. Securing pricing indications valid for a longer period of time would be a significant variation from the standard marketing process and likely would reduce the proceeds to Class Claimants. Therefore, Court approval of the Securitization and the maximum rate at which the

112164.8

Securitization may be completed is required before Lead Counsel can learn the actual discount rate required to sell the entire Securitization to investors.

40. Lead Counsel has concluded that disclosure of a minimally acceptable price would lead investors to bid lower than they might otherwise. This would be adverse to the Bankers' marketing efforts and could result in lower proceeds to Class Claimants.[3] In the Proposed Order, Lead Counsel balances these alternatives and the time required for due process with the Bankers' need to move quickly to complete the Securitization successfully. Specifically, Class Claimants will require time to review the Securitization proposal and an opportunity to object to the proposal. The Court and the Special Master also will need time to review the Securitization and any possible objections from Class Claimants. To maximize proceeds to Class Claimants, Lead Counsel asks the Court to review the Securitization proposal and rule on whether it can proceed before the Bankers begin marketing the Securitization.

41. Lead Counsel has determined that, subject to receiving an investment grade rating from S&P, the Securitization would be in the best interests of the Class Claimants. Upon learning the discount rate and all other final terms of the Securitization, or at a later time that Lead Counsel believes is appropriate, Lead Counsel would make a final determination that the Securitization is in the best interests of Class Claimants. Only in that case would Lead Counsel proceed with the Securitization. Following receipt of S&P's final credit rating, and contingent on the receipt of an investment grade rating equal to or lesser than the Court-approved rate, Lead Counsel would review market conditions with the Bankers, its advisor, and the Independent Expert in order to make a final determination regarding commencing the marketing of the

---

[3] Accordingly, and pursuant to the Court's direction, the Slovik Declaration and the memorandum supporting the instant motion, both of which contain pricing information for the Securitization, have been filed under seal. Redacted versions of these documents — with only the four relevant figures redacted — have been publicly filed. No text has been redacted.

13

112164.8

Securitization. If Lead Counsel, after consulting with the Independent Expert, believes that market conditions are adverse, Lead Counsel would not allow the Bankers to initiate the marketing process and would so inform the Court. This is the sixth point of relief requested in the Proposed Order.

42. The seventh and final point of relief is necessary to assure investors that this Proposed Order is all that is required for the Court to grant Lead Counsel the authority to effectuate the Securitization. This point seeks to clarify that by providing notice to Class Claimants on the case website and to all parties appearing in this action by mail, no further action or notice would be required before Lead Counsel completes the Securitization. Lead Counsel intends to post certain information regarding the Securitization on the case website and also to disclose the nature of the Securitization in certain trade periodicals that it has used in the past to relay information to Class Claimants. The information in the trade periodicals will direct Class Claimants to the website for additional information. By utilizing the website and the trade periodicals, Lead Counsel is seeking to avoid the costs associated with printing and mailing notice to all Class Claimants.

43. Since the Bankers would be compensated based on the percent of proceeds from the sale of the Securitization, they are motivated to maximize the proceeds to Class Claimants. According to Lead Counsel's advisor, the Bankers have stated they would like to play a similar role on the Visa securitization which would be a larger transaction. While the Bankers are only retained to execute the MasterCard Securitization, the successful execution of this transaction likely will cause Lead Counsel to seek to retain the bankers for the Visa transaction as well. Lead Counsel believes that these incentives, in addition to the Bankers' track record, professionalism, and the potential publicity and scrutiny this transaction would generate will

112164.8

result in optimal execution by the Bankers.

44.     Lead Counsel will post all motion papers on the case website and also will disclose the nature of the Securitization in trade periodicals that it has used in the past to relay information to Class Claimants. The information in the trade periodicals will direct Class Claimants to the website for additional information. By utilizing the website and the trade periodicals, Lead Counsel is seeking to avoid the costs associated with printing and mailing notice to all Class Claimants. A Merchants Advisory in Spanish regarding the Securitization will also be posted on the case website.

WHEREFORE, I respectfully request that the Court grant Lead Counsel's Motion and authorize Lead Counsel to complete the Securitization.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Dated: March 5, 2009
      New York, NY

_____
Robert L. Begleiter