UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IN RE                                                      :    MASTER FILE NO:
VISA CHECK/MASTERMONEY ANTITRUST  :    CV-96-5238
LITIGATION                                              :    (Gleeson, J.) (Orenstein, M.J.)
------------------------------------------------------------x
This Document Relates To:                          :
All Actions                                                :
                                                               :
------------------------------------------------------------x

## DECLARATION OF JOSHUA J. SLOVIK

Pursuant to 28 U.S.C. § 1746, Joshua J. Slovik declares as follows:

1. I am Managing Director of Cannonade Capital LLC, the financial advisor retained by Constantine Cannon LLP and Hagens Berman Sobol Shapiro LLP ("Lead Counsel") in connection with the settlements in the above-captioned action. I am fully familiar with the facts stated herein. This declaration is submitted in support of Lead Counsel's Motion to Approve the Securitization of the MasterCard Settlement Account Payments (the "Motion").

2. In July 2003, a preliminary Request for Proposal was prepared and circulated to certain large investment banks (*i.e.*, underwriters) that specialize in securitizations. In the weeks following, Lead Counsel and I approached eight such banks to discuss on a preliminary basis whether the Securitization (as defined in the accompanying Memorandum In Support Of Lead Counsel's Motion To Approve The Securitization Of The MasterCard Settlement Account Payments (the "Memorandum") was feasible. Six of these underwriters provided preliminary information on proceeds, fees and expenses, timing, structure, residual, the credit ratings process, required assistance from Defendant MasterCard International Incorporated ("MasterCard"), and other issues related to the Securitization.

3. Immediately following final settlement approval, Lead Counsel discussed

initiating the Securitization process with me.

4.  At a number of sessions beginning in November 2005, Lead Counsel and I re-interviewed six investment banks, focusing on their credentials to work on a securitization and their involvement, if any, in MasterCard's planned IPO. As a result of these interviews and follow-up discussions, Lead Counsel selected Deutsche Bank Securities Inc. ("Deutsche Bank") and Bear Stearns & Co. ("Bear Stearns") as underwriters for the Securitization subject to the negotiation of an engagement letter and the receipt of Court approval. Both firms began working on the Securitization shortly after being selected.

5.  The underwriters have two main roles. As "Structuring Agents," they assist the issuer in developing the best approach to structure future cash flows and to obtain the highest ratings for the securities being issued. As "Placement Agents," they act as broker-dealers placing newly issued securities directly with investors on behalf of the issuer.

6.  On August 22, 2007, MasterCard, the underwriters, and I participated in a conference call with Standard and Poor's ("S&P") to review the ratings process and requirements.

7.  From August 2007 through December 2007, Deutsche Bank and I worked with S&P to secure a rating, however, S&P was unwilling to rate the Securitization without significant representations and warranties from MasterCard. I did not believe that we would be able to secure this cooperation from MasterCard.

8.  In December 2007, Bear Stearns and I began discussing an alternative approach to securing a credit rating from S&P. This approach positioned the remaining MasterCard settlement payments as an existing, recognized corporate obligation of MasterCard instead of emphasizing the MasterCard Settlement Agreement as a stand-alone obligation. In this manner,

112474.1

the remaining payments were to be analyzed relative to MasterCard's existing corporate debt (that was already rated by S&P). In January 2008, Bear Stearns contacted S&P to discuss this approach. In March 2008, at a time when there were unfavorable conditions in the debt market, Deutsche Bank resigned from the transaction, and Bear Stearns became the sole underwriter.

9. From January 2008 through June 2008, Bear Stearns, JP Morgan Securities Inc. ("JP Morgan") (which entered into an agreement to acquire Bear Stearns in March 2008, completed the acquisition in May 2008, and was successor under the engagement letter) and I worked with S&P to secure a rating for the Securitization. Various issues were addressed, including those related to structure, expenses, disbursements, possible challenges to the Settlement Agreement and claims to the settlement payment amounts, and MasterCard's willingness to provide information during the life of the Securitization notes.

10. In order to obtain the investment grade rating vital to effectuating the Securitization, S&P required assurances that the Settlement Agreement and the Judgment in this case would afford adequate protection to investors in case of a default by MasterCard and that the Settlement Agreement would be enforceable by potential investors. S&P also required evidence that a dispute with the United States Government was resolved and that no new entities could disrupt the Settlement Agreement. Finally, since S&P's rating of the Securitization would be based on the underlying rating of MasterCard's business, it also required assurances from MasterCard reflecting MasterCard's commitment to continue providing information necessary for maintaining a rating of MasterCard until payment of the final installment. The resolution of these issues, taking in excess of fifteen months, occurred in late 2008.

11. On June 10, 2008, S&P confirmed a preliminary rating of BBB+ (the same as MasterCard's corporate credit rating) for the securities to be offered in the Securitization,

contingent upon approval of the final set of the documents necessary to complete the transaction and no change in MasterCard's rating.

12. I, along with the underwriters, have managed the process by which Brown Rudnick LLP (counsel for Lead Counsel) and Orrick, Herrington & Sutcliffe LLP (counsel for the underwriters) have prepared the required documentation and opinions that will be executed and delivered on or prior to the closing date of the Securitization.

13. In addition, Lead Counsel and I have provided the independent expert appointed by the Court on March 20, 2008 to evaluate the Securitization, Professor Bernard Black of the University of Texas Law School and McCombs School of Business (the "Independent Expert"), with background information, relevant documents provided to S&P, drafts of the Offering Memorandum and the Indenture, analyses of distribution expenses and estimated transaction expenses, and responses to a several inquiries regarding accounting treatment and securitization economics. The Independent Expert has also been updated regarding the status of the Securitization and current developments.

14. Conditions in the credit market likely precluded the effectuation of the Securitization during the last quarter of 2008 at an acceptable discount.

15. The credit markets for BBB+ or BBB rated debt (the same rating as the preliminary S&P rating of the Securitization) have reopened on a limited basis. During January, 2009, seventeen new BBB rated debt issuance transactions were completed. The proceeds of these sales total in excess of $17.0 billion.

16. Barclays Capital Inc. and Citigroup Global Markets Inc. (together, the "Bankers"), ultimately replaced JP Morgan as underwriters for the Securitization. I have conducted formal conversations with the Bankers with respect to the likelihood of successfully

completing the Securitization at an acceptable discount rate in the near future. Both firms anticipate a window of opportunity to do so based on their current views of the capital markets and on other transactions they are currently completing, as well as their views on the structuring, positioning, and marketing of this particular transaction. Currently, debt issuances from financial institutions are not finding buyers in the market. However, the Bankers believe that because MasterCard is primarily a transaction switching (processing) network company with only indirect exposure to consumer credit risk, liquidity risk, or interest rate risk, the Securitization could be completed in the near future provided the appropriate structuring, positioning, and marketing of the securities. This is dependent on the markets continuing their current trend, which could be short lived.

17. I have interviewed twenty-four Class Claimants (as defined in the Memorandum), ranging from four of the largest in the Plaintiff Class to twenty small, single-shop merchants, and was told by all that, assuming the Securitization is completed at a market discount rate, they were interested in the Securitization proceeding and in getting the funds as soon as possible.

18. I have reviewed projections and analyses from the claims administrator, Garden City Group, that compare the cost of maintaining the current process (*i.e.*, no Securitization) with the potential costs of the Securitization under a number of scenarios. Under all likely scenarios, the cost savings from securitizing the remaining payments due exceeds or largely offsets the costs of the Securitization.

19. Disclosure of the discount rate or the minimally acceptable pricing may be adverse to the Bankers' marketing efforts and therefore to the best interests of Class Claimants.

20. The Bankers have informed me that the pricing of the Securitization would be based on MasterCard's creditworthiness, with certain premiums added to reflect deal-specific

issues. This pricing is made up of three components.

21. The first component is the rate on the relevant U.S. Treasuries (that mature on approximately the same date as the average life of the remaining payments from MasterCard are due). The second component is incremental interest (or a spread over U.S. Treasuries) to compensate investors for the additional inherent risk associated with any corporate debt versus U.S. Treasuries. This spread is based on similar outstanding issues (in rating and industry). The sum of these two components is, approximately, MasterCard's cost of unsecured debt.

22. Finally, the third component is a premium reflecting the uniqueness of this Securitization. According to the Bankers, investors in the Securitization will demand a premium to MasterCard's cost of debt based on deal-specific factors. These factors may include the fact that this would be a first-of-a-kind securitization, the Securitization notes would be illiquid and difficult to sell prior to maturity, the Securitization would not be MasterCard's direct obligation to investors, and MasterCard does not currently have any debt outstanding that can be readily used to establish the base rate.

23. The Bankers have informed me that investors in the Securitization will require a Court order assuring them Lead Counsel possesses authority to execute the required Securitization agreements and the investors will have legal claim to and enforcement rights related to the Future Payments (as defined in the Memorandum). Likewise, investors will seek assurances that they will possess the power to receive, and if required enforce, all rights related to the Future Payments as conveyed by Class Claimants.

24. The Bankers also have informed me that investors will require assurances from this Court that MasterCard will make the Future Payments as set forth in Paragraph 3 of the

Settlement Agreement, dated June 4, 2003 (the "Settlement Agreement"),[1] and that MasterCard, even if MasterCard believes that it is in its best interest, may not request Class Claimants to work with MasterCard to establish a discount rate for making prepayments once the Securitization is effectuated.

25. According to the Bankers, once the marketing of the Securitization is completed, Lead Counsel would be presented with the coupon on the notes (discount rate) at which investors would be willing to participate in the Securitization. These pricing indications usually expire within twenty-four hours. The Bankers have informed me that securing pricing indications valid for a longer period of time would be a significant variation from the standard marketing process and likely would reduce the proceeds to Class Claimants.

26. The Bankers have stated they would like to play a similar role in the securitization of the Visa U.S.A. Incorporated settlement funds, which would be a larger transaction.

27. The Bankers have also informed me that investors will seek assurances that if the Court issues an order permitting the Securitization, that no further action or notice would be required before Lead Counsel completes the Securitization.

28. Based on my conversations with the Bankers, I have concluded that disclosure of a minimally acceptable price would lead investors to bid lower than they might otherwise. This would be adverse to the Bankers' marketing efforts and could result in lower proceeds to Class Claimants.

29. **REDACTED:** I have had a number of discussions with the Bankers regarding the potential discount rate. I also have reviewed information regarding current market conditions, completed debt issuances in the BBB range and the other factors affecting the potential discount

---

[1] A true and correct copy of the Settlement Agreement is annexed as Exhibit A to the Declaration of Robert L. Begleiter, Esq., dated March 5, 2009.

rate, and provided information to Lead Counsel. Based on this information, Lead Counsel has set the maximum discount rate at which it would approve the sale of the Securitization at a spread over U.S. Treasuries of ▮▮▮▮, or ▮▮▮▮. At today's U.S. Treasury rate, the maximum rate would be ▮▮▮▮. A transaction completed at this maximum rate would result in proceeds from the sale of the Securitization of approximately ▮▮▮▮ (as compared to four annual payments of $100 million though 2012, not $400 million presently).

WHEREFORE, I respectfully request that the Court grant Lead Counsel's Motion and authorize Lead Counsel to complete the Securitization.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Dated: March 4, 2009
San Francisco, CA

_____
Joshua J. Slovik

92362.3