UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
IN RE                                                                              :   MASTER FILE NO:
VISA CHECK/MASTERMONEY ANTITRUST         :   CV-96-5238
LITIGATION                                                                  :   (Gleeson, J.) (Orenstein, M.J.)
---------------------------------------------------------------x
This Document Relates To                                          :
All Actions:                                                                     :
                                                                                        :
---------------------------------------------------------------x

## DECLARATION OF NEIL L. ZOLA

Pursuant to 28 U.S.C. § 1746, Neil L. Zola declares as follows:

1. I am President and Chief Operating Officer of The Garden City Group, Inc. ("GCG"), the Class Notice and Claims Administrator (the "Administrator") for the above-captioned action, as authorized by this Court's Consent Order For Providing Notice to Members of the Certified Class entered on June 21, 2002 (the "Notice of Pendency Order"), and the Stipulation and Order for Providing Notice of Settlement of Class Action to Members of the Certified Class entered on June 13, 2003 (the "Notice of Settlement Order"). I am fully familiar with the facts stated herein. This Declaration is submitted in support of Lead Counsel's Motion to Approve the Securitization of the MasterCard Settlement Account Payments.

2. To my knowledge GCG has distributed settlement checks to approximately 700,000 Class Members in this action.

3. A consideration that favors the securitizations of the remaining settlement payments due from MasterCard International, Incorporated ("MasterCard") and Visa U.S.A.,

Incorporated ("Visa") and a distribution shortly thereafter to Class Members is the increased effectiveness and inherent fairness to Class Members resulting from the securitizations.

4. Based on statistics maintained by the United States Post Office National Change of Address System, over 40 million Americans change their addresses annually. This statistical information strongly suggests that over the remaining four-year period, it is very likely that a significant number of Merchants who are Class Members will move or go out of business.

5. For example, in its December 2007 report on the small business economy, the Small Business Administration states that 564,900 businesses closed during the 2005 to 2006 time period. *See* OFFICE OF ADVOCACY, U.S. SMALL BUSINESS ADMINISTRATION, THE SMALL BUSINESS ECONOMY DATA YEAR 2006 at 295 (2007). Further, in its analysis of the survival rate for new business (updated in September 2008), the U.S. Small Business Administration's Office of Advocacy found that only 44 percent of new employer establishments survive at least four years and only 31 percent survive at least seven years.

6. Based on these statistics, certain Class Members will forfeit a piece of their full distribution if required to wait for four years for their final payment because it is likely that many claimants will have dissolved by the end of the payment term. Moreover, the smaller Class Members would likely be the most impacted because they are more likely to go out of business and to not have forwarding addresses. A windfall would be created for those larger businesses that weather difficult economic times and stay afloat for the remaining four-year period.

7. For the four distributions made to date, in which each Merchant has received at least one check, 27,580 checks remain uncashed. While this is a low percentage of checks

relative to the 700,000 that have been mailed, it still represents in absolute terms a large number of merchants who have forfeited their settlement relief. And the numbers were only reduced to this level based on extensive outreach authorized by Lead Counsel. These numbers will certainly grow during the next four years.

8. Another benefit of the Securitization is that there are several categories of annual costs that would not be incurred.

9. By limiting the number of mailings, the Class would avoid incurring the costs of printing each check, stuffing the checks in envelopes, and mailing the checks to Class Members – costs that necessarily will be incurred every year for each of the additional distributions.

10. The Class would also avoid the costs of postage that necessarily would be incurred every year. Based on trends of increasing postage costs, it is likely that these costs will increase between now and 2012.

11. There are also incidental services that would be required every year and that will be time consuming and costly. For example, every check distribution will require a recalculation of the pro rata distribution formula because the number of claimants will necessarily change each year, rendering the prior year's calculation irrelevant.

12. Lead Counsel and GCG will no doubt be inundated with special requests every year about where to send checks or how to split them up, for example, in the case of the dissolution, merger, or acquisition of a business. Therefore, throughout the life of the process of distributing the funds to the Class Members, GCG will be fielding calls from Class Members, processing change of address forms, reissuing checks, and providing other routine customer

services. In light of the number of claimants at issue here, the time devoted to such tasks will be considerable.

13. The Class Merchants that go out of business will require additional follow-up, either in terms of handling uncashed checks, reissuing checks to a surviving entity or individual, and following up with change-of-address services. The reissuance of checks is more time-consuming and, thus, more costly than the original check distribution.

14. Finally, while GCG cannot foresee or predict the impact of inflation on all administration costs, it is likely that costs and prices will increase over the remaining payout term.

15. If the remaining payments are not securitized, five additional distributions to the Claimants are currently planned. But if we do not have to make these five additional distributions, the savings resulting from eliminating the above delineated costs could easily exceed $5 million – and ultimately the actual additional savings incorporating all costs may even approach $10 million. Of course, GCG would take steps to eliminate duplicative tasks, combine tasks where appropriate, and look for ways to provide the best service possible at the lowest costs possible without comprising the integrity of the administration program.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Dated: Melville, NY
October 6, 2008

/s/ NEIL L. ZOLA