UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x

IN RE VISA CHECK/MASTERMONEY            MASTER FILE NO. CV-96-5238
ANTITRUST LITIGATION                    (Gleeson, J.) (Mann, M.J.)

----------------------------------------------------x

# Report of Independent Expert

## Professor Bernard Black
*University of Texas Law School*
*McCombs School of Business, University of Texas*

6 March 2009

## I. Scope of Report and Qualifications

I have been appointed by Judge Gleeson to act as an Independent Expert to advise the Court on the advisability and terms of a proposed securitization ("MasterCard securitization") of the remaining funds from the Settlement between the Plaintiff Class (the "Class") and MasterCard International Inc. ("MasterCard").

I am Professor of Law and Hayden W. Head Regents Chair for Faculty Excellence at the University of Texas Law School, director of the Center for Law, Business and Economics at the University of Texas Law School, and Professor of Finance at the University of Texas, McCombs School of Business. I have taught courses in, among other subjects, Corporate Finance, Corporations, and Securities and Capital Markets Regulation. I consider myself to be familiar with the practice of securitization, from my teaching, from my research, from expert witness assignments, and from my experience as a practicing lawyer.

I am an author or coauthor of Ronald Gilson & Bernard Black, *The Law and Finance of Corporate Acquisitions* (2d ed. 1995 and supplement 2003-2004); Bernard Black, Reinier Kraakman & Anna Tarassova, *Guide to the Russian Law on Joint Stock Companies* (1998); Bernard Black, *Fundamentals of Negotiating and Drafting Acquisition Agreements* (ALI-ABA 1998); and a large number of professional articles, principally in the areas of law and finance, corporate governance, corporate acquisitions, corporate finance, and corporate and securities law. These are listed in my CV, which has been provided separately.

I have been at the University of Texas since 2004. Prior to that, I taught at Stanford Law School from 1998-2004, where I was George E. Osborne Professor of Law, and at Columbia Law School from 1988-1998, where I was Associate Professor of Law (1988-1991) and Professor of Law (1991-1998). I served as Counsel to Commissioner Joseph Grundfest of the Securities and Exchange Commission from 1987-1988 and practiced law from 1983-1987 in the mergers and acquisitions group at Skadden, Arps, Slate, Meagher & Flom. From 1982-1983, I was a law clerk to Judge Patricia M. Wald of the United States Court of Appeals for the District of Columbia Circuit. I received a J.D. degree from Stanford Law School in 1982.

I have had no prior involvement in this litigation, am not an investor in MasterCard, Visa, Citigroup, Barclays, or Standard and Poor's, and have not previously worked with Lead Class Counsel on other matters. I have served in a similar role in one prior suit -- I was a special master to Judge Shira Scheindlin in Union Carbide Corp. v. Montell N.V., 27 F. Supp. 2d 414 (S.D.N.Y. 1998). I am being compensated for my work at my customary hourly rate of $800.

## II. Background and Documents Reviewed

In preparing this report, I have reviewed the following sources of information:

(i) Settlement Agreements between the Class and MasterCard and Visa;

(ii) Amended Plan of Allocation for the settlement proceeds (Aug. 16, 2005), approved by the Court ("Plan of Allocation"), including detailed plans for a possible securitization in Section 11 of the Plan of Allocation;

Independent Expert Report on MasterCard securitization by Prof. Bernard S. Black, Visa/MasterCard Litigation
page 2

(iii) Engagement agreement dated January 12, 2009, between Class Counsel and Barclays Capital Inc. ("Barclays") and Citigroup Global Markets Inc. ("Citi") as co-placement and structuring agents, ("the Joint Arrangers");

(iv) Engagement agreement dated March 8, 2008, between Lead Class Counsel and Standard & Poor's (S&P), as rating agency for the proposed securitized notes (the "Notes");

(iv) Materials provided to S&P in connection with their evaluation of the Notes;

(v) S&P rating of MasterCard unsecured debt and accompanying report (Nov. 30, 2007); S&P indicative rating of BBB+ for the Notes (June 2008);

(v) a draft offering memorandum for the Notes (February 2009) and a draft Trust Indenture for the Notes;

(vi) the discussion of securitization in the Allocation Declaration by Prof. Franklin Fisher (Aug. 14, 2003);

(vii) an estimate of transaction costs for the securitization provided to me by Cannonade Capital, the financial advisor to Lead Class Counsel;

(viii) draft memorandum from Lead Class Counsel in support of a motion for approval of the MasterCard securitization, and supporting affidavits (February 2009); and

(ix) other materials and information provided to me by Lead Class Counsel and their financial advisor.

I have also held discussions with Lead Class Counsel (Constantine Cannon), principally Robert Begleiter and Jeffrey Schinder; Joshua Slovik at Cannonade Capital; the Special Master for this litigation, Robin Wilcox at Kramer Levin et al., and Judge Gleeson; and more limited discussions with representatives of JP Morgan at the time when they were expected to be the placement and structuring agent.

I asked numerous questions, received all of the documents and other information that I requested, and believe that the information available to me forms a sound basis for the opinions expressed below.

## III. Summary of Expert Opinions

### A. Procedural Fairness

The MasterCard securitization was developed through procedures which were reasonably designed to (i) minimize transaction costs; (ii) in this and other ways, to maximize the present value of the securitization proceeds to the Class; and (iii) to ensure horizontal equity between larger and smaller Class members. The principal differences from the originally contemplated procedures are: (i) delay in the offering, due to reasons which were not anticipated when the Plan of Allocation was approved; (ii) separate offerings for MasterCard and Visa instead of a single offering; and (iii) use of

Independent Expert Report on MasterCard securitization by Prof. Bernard S. Black, Visa/MasterCard Litigation
page 3

a single rating agency for the MasterCard securitization instead of two rating agencies. The procedures otherwise substantially conform to those set forth in the Plan of Allocation.

I consider the time delays from the time of the settlement to the time of the securitization to be reasonable under the circumstances. In any event, these delays do not affect my opinion on whether a securitization is currently desirable. I consider sequential securitization and use of a single rating agency to be beneficial to the Class.

In my opinion, the MasterCard securitization is fair to the Class members from a procedural point of view.

## B. Substantive Fairness of the MasterCard Securitization

Under the settlement agreement, MasterCard is required to make four additional annual payments of $100M each. Without the securitization, these payments will be forwarded to class members as received, As a result of the securitization, the purchasers of the Notes will, in effect, purchase this stream of four payments from the Class. The Class members will receive a single large payment soon after completion of the securitization, reflecting a large fraction of the purchase price, and a small payment in four years reflecting residual funds left in the Class account after all payments have been received from MasterCard and Visa and all expenses have been provided for.

The principal direct transaction costs involve the fees paid to the Joint Arrangers, S&P, securities counsel to Lead Class Counsel and the Joint Arrangers, Cannonade Capital, and Lead Class Counsel. These fees are at customary market rates for the services provided. There may also be indirect transaction costs due to the unusual nature of the securitization, which may lead investors in the Notes to insist on a higher discount rate than for a more plain vanilla offering.

In my opinion, the MasterCard securitization, standing alone, is fair to the Class from a financial point of view. It is roughly financially neutral for a small number of large, well-capitalized merchants, and is financially advantageous for all other merchants. The degree of financial advantage, as a fraction of the expected proceeds, increases as merchant size decreases. The financial gains are potentially large for financially constrained merchants, especially during the current period of economic distress.

## C. Additional Value from Dual Securitization

Lead Counsel, on advice from the Joint Arrangers, expects that, if the MasterCard securitization is completed, it can be followed in short order by a securitization of the payments from Visa, on terms similar to the MasterCard securitization. I consider this expectation to be reasonable.

There are important transaction cost savings to the Class from securitizing both settlement funds, and corresponding benefits to the Class from securitizing both the MasterCard and Visa payments. Assuming the Visa securitization can be completed on similar terms to the MasterCard securitization, the dual securitization should be financially advantageous to all Class members. The

degree of financial advantage, as a fraction of the expected proceeds, will likely increase as merchant size decreases.

Completion of the MasterCard securitization can be seen as creating an option to also complete the Visa securitization. This real option has substantial value to the Class. In my opinion, including the value of this option, completion the MasterCard securitization is financially advantageous to all members of the Class. The degree of financial advantage, as a fraction of the expected proceeds, increases as merchant size decreases, and is potentially large for financially constrained merchants.

## D.  Limitations on Opinion

I have assumed, and have not separately verified, the accuracy of the information provided to me by Lead Class Counsel and their financial advisor. I also assume that the securitization is completed during a period of normal credit market conditions, that the Notes will receive an investment grade rating, and the Notes can be issued at an interest rate consistent with that rating. With regard to the risk of change in market conditions, I understand that I will have an opportunity to reaffirm, modify, or withdraw this opinion at the time of the fairness hearing on the securitization before Judge Gleeson; and will have a further opportunity to reaffirm or withdraw this opinion at the time of pricing of the Notes.

## IV.  Procedural Fairness

The possibility of securitization of the settlement funds was contemplated at the time of settlement in 2004. Detailed procedures for a potential securitization of the settlement funds are specified in the Plan of Allocation. These procedures are reproduced as an Appendix to this Report. I have reviewed these procedures, and consider them to be reasonably designed to lead to a successful securitization and to limit the transaction costs of the securitization.

With the exceptions discussed below, the procedures actually followed substantially conform to those set forth in the Plan of Allocation. The most important difference is the substantial delay in completing the securitization, compared to the time frame contemplated in 2005. The principal reasons for that delay were an objection by the U.S. Government to the settlement, which was resolved only in early 2007; and turmoil in the securitization markets during 2007 and 2008, which would have impacted the pricing and possibly the viability of the securitization.

A second difference is that the MasterCard and Visa securitizations were originally expected to be part of a single offering, and are now expected to be sequential.

A third change involves the use of a single rating agency, S&P, rather than both S&P and Moody's. Only S&P currently rates MasterCard's public debt. Lead Class Counsel judged that it was not desirable to seek a rating from Moody's. The principal reasons included concern that it might not be feasible to obtain a rating from Moody's, in light of MasterCard's limited obligation under its

Independent Expert Report on MasterCard securitization by Prof. Bernard S. Black, Visa/MasterCard Litigation
page 5

Settlement Agreement to cooperate in a securitization effort, the cost to the class of obtaining a second rating (if feasible), and the limited potential benefit from a second rating in a lower interest rate on the Notes. I concur in the judgment to obtain a rating only from S&P.

In my opinion, the procedures followed in the MasterCard securitization are fair to the Class from a procedural point of view. In addition, the Class members had an opportunity to object to the securitization plan prior to the Court's approval of the Plan of Allocation, and did not do so. This supports my conclusion on procedural fairness.

## V. Substantive Fairness

One can understand the Class members as having involuntarily lent money to MasterCard (through the overcharges which led to the settlement), and understand MasterCard as repaying that loan by making periodic payments over time. One can understand the securitization as a sale by the Class of those promised payments to the Note purchasers.

An assessment of the fairness of the MasterCard securitization from a financial point of view ("financial fairness") involves comparing (i) the present value to the Class members of the payments the Class will receive by selling this stream of periodic payments to the Note purchasers; to (ii) the present value to the Class members of that stream of payments.[1]

In Section A, I initially assume that the Notes will trade in an efficient market, put aside the direct and indirect transaction costs of the securitization, and discuss the simple economics of the MasterCard securitization (though even these are not so simple). I also initially consider the MasterCard securitization on its own, without regard to possible later securitization of the Visa payments. I discuss the impact of the current economic downturn in Section B, direct transaction costs in Section C, dual securitization in Section D, departures from market efficiency in Section E, and market condition risk in Section F.

## A. Analysis in Efficient Market Without Issuance Transaction Costs

The present value to the Class members of the payments the Class will receive from the securitization ("Securitization PV") is simple. Putting aside a small adjustment because a fraction of the payment will be deferred for several years, the Securitization PV equals the sale price of the Notes. In my opinion the size of the Notes offering is sufficient so that the Notes should trade in a reasonably efficient market. Thus, their sale price should approximately equal the present value to a diversified investor of the stream of payments promised by MasterCard. That value will reflect market interest rates when the Notes are sold, the risk of default by MasterCard, the liquidity of the Notes (which is expected to be limited), and the unusual nature of litigation settlement payments,

---

[1] For convenience, I will use the term "present value" to refer to value at the time of completion of the MasterCard securitization.

which might raise risks not present for direct MasterCard debt. I will refer to the discount rate that would be assigned by fully informed, diversified investors to the stream of MasterCard payments as the "MasterCard discount rate."

The value of the current non-securitized stream of payments by MasterCard to each Class member is more complex. This value will depend on the interest rate that the merchant should use to discount these payments to present value. That interest rate, in economic theory, should be the *marginal* cost of the capital the Class member needs to fund the loan to MasterCard.

If the MasterCard payments were a significant portion of a merchant's cash flow and the accounting for these payments were transparent to investors, one might expect the marginal cost to the merchant to obtain the capital lent to MasterCard to equal the MasterCard discount rate. This would be strictly true under the strong "perfect and complete capital markets" assumptions, which underlie the Modigliani-Miller capital structure irrelevance theorem. In fact, however, the MasterCard payments are a tiny portion of each merchant's cash flow, on the order of 0.001% of revenue.

Moreover, the manner in which merchants account for the payments is not transparent to investors, partly because of the small size of the payments. Cannonade Capital confirmed with several large merchants that they treated current year payments as a reduction to expense on the income statement and do not record future payments as an asset on the balance sheet. Thus, the only trace of the payments is a slight increase in current year operating profits.

In my opinion, it is unlikely that outside investors in a particular merchant will fully adjust their views of the riskiness of that merchant's cash flows to reflect the riskiness of the tiny portion of those cash flows represented by the MasterCard payments. If outside investors do not adjust their views of the riskiness of a merchant's cash flows at all, the merchant's marginal cost of capital will equal the weighted average cost of capital (WACC) for the remainder of the merchant's business. Partial adjustment is possible -- in which case the marginal cost of the capital needed to fund the loan to MasterCard will be in between the merchant's WACC and the MasterCard discount rate.

The failure of investors to fully adjust for the difference in risk between cash flows from MasterCard and a merchant's other cash flows, creates the potential for a merchant's marginal cost for the capital needed to fund the loan to MasterCard to be either greater or less than the MasterCard discount rate, and thus for the merchant to lose or gain from the securitization.

The position of a large, well-capitalized merchant is likely to be similar to that of a diversified investor. If the merchant is not financially constrained (and does not expect to be constrained during the payment period), or the merchant's WACC is comparable to the MasterCard discount rate, the value of the MasterCard payments to the merchant will be similar to their value to

investors in the Notes, so that the merchant would not have a significant gain or loss from the securitization. I will refer to these merchants as "well-capitalized."[2]

   If a merchant has a WACC significantly above the interest rate on the Notes, which is true for the vast majority of the Class members, the failure of the merchant's marginal cost of capital to fully reflect the riskiness of the MasterCard cash flows is likely to produce a financial gain from the securitization. The gain will be proportional to the difference between the MasterCard discount rate and the merchant's WACC.

## B. Issuance During an Economic Downturn

   There can be additional gains from securitization if a merchant is financially constrained and unable to borrow at the margin. The gains from loosening financial constraints can be large, relative to the amount of the payments. These gains are likely to be especially important in the current recession. Many retailers are under financial stress; many banks are limiting or reducing their lending, and a number of retailers have already gone bankrupt. Retailers which have gone bankrupt have generally been unable to obtain "debtor in possession" financing, and have been forced to liquidate.

   The spread between a BBB or BBB+ rated financial instrument, such as the Notes, and Treasury securities of comparable maturity, is relatively wide by historical standards. So, quite likely, is the spread needed to compensate for the limited liquidity of the Notes and for the differences in default risk between litigation payments and ordinary, unsecured MasterCard debt. This does not directly affect my opinions. The Class members take market borrowing rates as given. The question for them is whether they gain or lose by lending to MasterCard at market rates versus obtaining the agreement of others to do so, through the securitization. That depends on the difference between their own WACC and the interest rate on the Notes, and the difference between their own value of liquidity and the value assigned by investors in the Notes. Both their private value and the public value reflected in the interest rate on the Notes will be affected by the same general economic factors.

## C. Allowing for Direct Transaction Costs

---

   [2] If investors do not adjust their assessments of the riskiness of merchants' cash flows to reflect the riskiness of the MasterCard payments, then a merchant with a WACC significantly lower than the interest rate on the Notes could, in principle, be slightly better off by continuing to lend to MasterCard than by selling the stream of MasterCard payments to the Note investors. This possibility applies to a handful of merchants, and the dollar amounts are a small fraction of the present value of the MasterCard payments. Moreover, the large merchants who might plausibly be in this position will be eligible to purchase the Notes and thus could avoid any loss, other than transaction costs (which I discuss below), by purchasing the Notes when they are offered. I understand that Cannonade Capital has made inquiries with several major merchants, who have indicated that they support the securitization and do not plan to purchase Notes. This response suggests that the possibility addressed in this footnote is not important in practice.

Independent Expert Report on MasterCard securitization by Prof. Bernard S. Black, Visa/MasterCard Litigation
page 8

The MasterCard securitization will, of course, involve transaction costs. Total transaction costs are approximately $4.6 million (about 1.5% of estimated proceeds). These costs are equivalent to a reduction in the implied rate of return on lending money to MasterCard of 37 basis points per year. In my opinion, these costs are reasonable, and are comparable to the transaction costs that one would expect in another offering of securitized notes. The largest cost is the fees charged by the Joint Arrangers. Those fees were established through a competitive search based on both fee and ability to complete this nonstandard transaction.

Transaction costs reduce the net proceeds to the Class from the securitization, and hence make the securitization a slightly worse deal for all merchants than it would be with no transaction costs. However, the transaction costs are small enough, as a fraction of estimated proceeds, so that they do not significantly affect my conclusion that the securitization will be neutral to positive for large merchants (perhaps slightly negative for the very largest), but positive for everyone else, and increasingly positive the smaller a merchant is.

## D. Dual Securitization

The MasterCard securitization presents important challenges for Lead Class Counsel, the Joint Arrangers, and the rating agency. In form, it is a securitization. However, most securitizations involve packaging the obligations of a number of issuers. The MasterCard securitization involves only a single issuer. Thus, in substance, it is similar to a simple purchase of MasterCard debt. I am not aware of similar securitizations of litigation payments or other payments by a single issuer.

The MasterCard securitization, however, can become a template for securitization of the Visa settlement payments, which are twice the size of the MasterCard payments. Lead Class Counsel expects that the MasterCard securitization will be followed by a Visa securitization.

The Visa securitization is likely to have important advantages to the Class. First, because it will be a second offering of its kind, it may achieve somewhat better market pricing than the MasterCard securitization. Some transaction costs should be somewhat lower as well, since there is a model to follow. More importantly, if both settlements are securitized, it will no longer be necessary to mail annual checks to approximately 700,000 merchants, at an estimated annual cost of about $8 million based on experience to date. Instead, there will be two mailings, one shortly after the Visa securitization for the bulk of the proceeds from both securitizations, and a second at the end, for residual funds. This can significantly reduce mailing costs. In addition, it currently appears feasible to pay all but the largest 1-2% of merchants in full initially, and make a residual payment only to the largest merchants. This will largely eliminate the mailing cost for the final payment.[3]

---

[3] Inquiries made to the Garden City Group, which conducts the mailings, have produced substantially smaller savings estimates. The basis for those smaller estimates is unclear. I consider the estimates in text to be reasonable.

Independent Expert Report on MasterCard securitization by Prof. Bernard S. Black, Visa/MasterCard Litigation
page 9

The potential savings in mailing costs exceeds the expected transaction costs of both securitizations. This will increase the financial advantage of the securitizations to most Class members, and should make them financially advantageous to the well-capitalized merchants as well.[4]

While completion of the Visa securitization cannot be ensured, its likely completion can be understood as a type of "real option," created by completing the MasterCard securitization, which has important value to the Class. Thus, in my opinion, a significant fraction of the transaction cost and other savings from a dual securitization are properly attributable to the creation of this option, and thus to the MasterCard securitization.

## E. Market Efficiency Risk

The analysis above assumes that the Notes will trade in a reasonably efficient market. There are, however, several reasons why this might not be fully correct. First, the Notes are a novel instrument. They are a securitization in form, but unsecured MasterCard debt in substance.

Second, MasterCard's obligation is to make litigation settlement payments to the Class, rather than to make principal and interest payments to investors as an issuer. It is possible that the Notes will carry a slightly higher interest rate because investors will not be entirely sure of the differences in enforceability between the well-understood obligation to pay principal and interest on general unsecured debt, and the less-well-understood obligation to make litigation payments. The two types of obligations should carry similar risk, and would carry equal seniority in bankruptcy. However, investors in the Notes might have some uncertainty in this regard.

Third, MasterCard is a financial institution, and many financial institutions are currently under substantial stress. Given the nature of MasterCard's principal business, it may not be significantly affected by the current economic downturn, but investors might be concerned about a largereffectthan in fact should be expected.

Fourth, there may be some general investor suspicion of securitizations, as a result of downgrades and defaults during the last two years on many complex mortgage-backed and other asset-backed securitizations. This concern was the principal reason for the decision by Class Counsel not to seek to complete the Notes offering during 2008. It is helpful that the Notes will be a relatively simple pass-through of MasterCard risk, with no tranching of that risk into different classes of Notes, the Class members retain the residual risk of administration expenses, and MasterCard is not itself experiencing significant financial distress.

---

[4] I noted in an earlier footnote the potential for a small loss, as a percentage of the present value of expected payments, for a handful of the best capitalized merchants. If both securitizations are completed, this possibility disappears. These merchants will be eligible to purchase the Notes. They can do so if they consider themselves to be disadvantaged by the securitization. This will put them in the same position as they are currently, save for transaction costs. If total transaction costs are negative due to reduced mailing costs, then even these merchants should only be helped, not harmed, by the dual securitization.

These potential inefficiencies might result in the Notes carrying a somewhat higher interest rate than in a fully efficient, fully informed market. Put differently, the Note purchasers might be somewhat overcompensated, relative to the actual risk of MasterCard default.

The magnitude of any market inefficiency can only be roughly estimated. An educated guess is that any market inefficiency cost will be of the same rough magnitude as the direct transaction costs of the offering. Moreover, well-capitalized merchants, who are the only ones for whom the securitization is not clearly advantageous, can avoid this cost by becoming Note purchasers.

## F.  Additional Risks During Uncertain Market Conditions

I expect the Notes to be issued at an interest rate somewhat higher than direct debt of a similarly risky issuer – for example, direct unsecured debt of MasterCard with similar duration. This is partly because the Notes could have modestly higher default risk than direct MasterCard Debt, partly because they will likely be less liquid than direct MasterCard debt, and partly due to their greater complexity, which imposes learning and uncertainty costs on Note purchasers. Other sources of such a spread are possible, including the market inefficiency costs discussed in the previous section. The first two sources of this "Notes versus MasterCard direct debt" spread reflect the value to the Class of the current stream of payments. That stream of payments is likely to be modestly riskier than direct MasterCard debt, and is effectively illiquid. Learning and uncertainty costs can be understood as a kind of indirect transaction cost.

My opinion assumes normal market conditions, and under these conditions, I would expect the "indirect transaction cost" component of the Notes-versus-MasterCard-debt spread, as well as any unspecified additional sources, to be limited in amount, and to be captured in the discussion above of market inefficiency risk.

However, market conditions are somewhat uncertain, and could change rapidly. It is possible that this indirect transaction cost source of spread could become large enough to affect my overall opinion on the fairness of the securitization to the Class.

Unfortunately, it is difficult to estimate this cost in advance, and it could change rapidly if market conditions change. Moreover, I am advised that it will likely be infeasible for the Court to itself retain discretion to make a last minute decision on whether to proceed with the offering, based on actual market conditions at the time of pricing. Thus, in my judgment, it would be advisable for the Court, as part of an overall decision on the fairness of the securitization to the Class, to leave some discretion for Lead Class Counsel or another decisionmaker to defer or even cancel the Notes offering, if at the time of pricing, the Notes-versus-MasterCard direct debt spread is sufficiently large. In this regard, I understand that I will have an opportunity to reaffirm or withdraw this opinion at the time of pricing of the Notes.

I have also been advised by Cannonade Capital of the maximum spread over Treasury securities of comparable duration that the Lead Arrangers currently expect will be necessary to place the Notes. This spread combines a number of elements. As discussed above, many of these

Independent Expert Report on MasterCard securitization by Prof. Bernard S. Black, Visa/MasterCard Litigation
page 11

elements are currently borne by the Class members.  An actual spread over Treasuries hich does not
exceed this maximum is consistent with my current opinion on fairness.

## Conclusion

The MasterCard securitization is procedurally fair.  Subject to the concern with an adverse
change in market conditions discussed in the previous section, it should be advantageous to the Class
as a whole from a financial point of view.  On its own, the MasterCard securitization is financially
advantageous to smaller merchants and roughly financially neutral for well-capitalized merchants.
Including the value of the real option to complete the Visa securitization, the MasterCard
securitization is financially advantageous for all merchants.  The degree of financial advantage, as a
fraction of the expected proceeds, increases as merchant size decreases.  The financial gains are
potentially large for financially constrained merchants.

Respectfully submitted,

*Bernard S. Black*

Bernard S. Black
March 6, 2009

Excerpt from Plan of Allocation
page 12

## Appendix. Securitization Procedures

**Source:** Plan of Allocation (August 2005, § 11.

### 11. Securitization of Settlement Funds

11.1 The Settlement Agreements require Visa and MasterCard to make installment payments to the Settlement Funds through December 22, 2012. As a result, if the Settlement Funds are not securitized, Class Members with Approved Claims will not receive the full amount of their claims until 2013. As discussed in the accompanying Fisher Allocation Declaration, it may be in the interest of the Class Members to receive their payments as quickly and in as few distributions as possible. To this end, Lead Counsel has evaluated the option of converting Visa and MasterCard's unpaid installments to a lump-sum payment in a process referred to as a "securitization." The total lump-sum received as a result of securitization would be less than the full $3,050,000 (net of expenses) to be paid over time by Visa and MasterCard, but will reflect the greater value to the Class of receiving all the amounts due at once.

11.2 If there were a securitization process in this case, the unpaid installments due to the Settlement Funds by Visa and MasterCard would be assigned to a trust. Securities representing the value of the trust's holdings (*i.e.*, the unpaid installments) would be issued in much the same way as corporate bonds are offered to investors. Third-party investors would purchase these financial instruments at a discount that represents the interest they would earn on their investment. The securitization is structured (*e.g.*, number of bonds, maturity dates, amortization etc.) and the obligations are sold by large banks acting as underwriters.

11.3 A securitization of the Visa and/or MasterCard unpaid installments would benefit the Class in a number of significant ways.

(a) The Class will save significant costs of administration by allowing the Claims Administrator to distribute settlement checks to Class Members with Approved Claims in the near-term. Absent a securitization, Class Members with Approved Claims would not receive their last payment until at least 2013, and the Settlement Funds would bear the cost of as many as 9 distributions. The savings related to reducing the distributions from 9 to 2 could save the Settlement Fund as much as $100,000,000. *See* Declaration of Neil Zola dated August 13, 2003. This far exceeds the costs related to securitization.

(b) A larger initial check, in place of a series of smaller checks over a number of years, may benefit Class Members. (*See* Fisher Allocation Declaration.)

(c) Securitization would reduce the risk that the value of the settlement will be eroded by inflation. Although inflation is now low, no one can predict what the rate will be between 2006 or 2007, when annual payments to Class Members are likely to begin, and 2013, when the last payment is likely to be made. (*See* Fisher Allocation Declaration.)

(d) The credit risk that Visa and MasterCard do not make the payments would be eliminated. (*See* Fisher Allocation Declaration.)

Excerpt from Plan of Allocation
page 13

11.4   Lead Counsel have held meetings with their advisors and with potential underwriters and have determined that a securitization of Visa's and MasterCard's obligations would be an appropriate way to convert unpaid obligations set forth in Paragraph 3(a) of the Settlement Agreements into lump-sum payments.

11.5   Following Settlement Approval by this Court, Lead Counsel will distribute a request for a proposal ("RFP") to securitize the Settlement Agreements to potential underwriters. The RFP will request that each potential underwriter provide information including, but not limited to, the potential underwriters' relevant experience, pricing, fees and willingness to commit resources and capital to achieve a successful cost-effective securitization.

Based on their responses to the RFP, Lead Counsel will invite approximately 12 potential underwriters to present their qualifications and discuss pricing and fees in person. At least two additional rounds of interviews will be conducted as the field is narrowed and independent research will be collected over a period of approximately two weeks. At the end of that period (approximately four to six weeks), Lead Counsel will determine whether securitization is in the best interests of the Class.

11.6   Lead Counsel shall retain specialized counsel to assist in the proposed securitization.

11.7   Upon completion of the selection of the underwriters, Lead Counsel, along with the underwriters and Lead Counsel's advisors intend to seek the reasonable assistance of Visa and MasterCard to obtain information customarily available in securitizations of these sizes and relative complexity, as agreed to in the respective Settlement Agreements with Visa and MasterCard.

11.8   The underwriters will develop and present a number of securitization structures (*i.e.*, number of bonds, duration, amortization, etc.) based on maximizing the payout to the Class. These structures will incorporate all the relevant business, financial, accounting, Securities Exchange Commission, tax and legal issues and will be based on the assignment of the payments due to be paid by Visa and MasterCard to a trust.  The trust will sell the securitized obligations in the form of bonds to bondholders and use the payments received from Visa and MasterCard to pay the interest and principal on these bonds. The trust will remit the proceeds from the sale of the securitization bonds (net of underwriter and related fees) to the Class. The review and selection of the appropriate structure by Lead Counsel will occur over approximately 14 days.

11.9   After the selection of the structure for the securitization, the underwriters will prepare drafts of offering memorandums and supporting materials as is customary for these types of securitizations. Along with these drafts, underwriters along with Lead Counsel and their advisors will prepare a presentation of the proposed securitization to the credit rating agencies, Standard & Poor's and Moody's. Preparation of these initial drafts and presentations will be completed over the next approximately 30 days.

11.10   Upon the completion of all the necessary documentation, the proposed securitization will be presented to the credit-rating agencies Standard & Poor's and Moody's.

Excerpt from Plan of Allocation
page 14

After the initial meeting with these agencies, follow up questions from Standard and Poor's and Moody's will be presented to Visa and MasterCard and after a process that could last approximately 60-90 days Lead Counsel will obtain a credit rating for the chosen securitization structure.

11.11  Upon receipt of the credit rating, the underwriters along with Lead Counsel and their advisors will finalize the required documentation and begin marketing the securitization to potential acquirers of the securitization (*i.e.*, bondholders) through a series of meetings over a period of approximately one month.

11.12  Based on market conditions and bondholder interest, the underwriters will propose that the interest rate be set at a level that they believe is required to complete the sale of the entire securitization to bondholders. To eliminate risk to the Class, the underwriters could offer to purchase the entire securitization by setting the interest rate at a specified level. Lead Counsel and their advisors will analyze all alternatives including the option to forego a securitization. Completion of the securitization will take approximately 30 days from the receipt of the credit ratings from Standard & Poor's and Moody's. Lead Counsel will attempt to time the process such that marketing to potential bondholders will occur shortly after Final Settlement Approval.

11.13  Fees and expenses associated with the securitization are made up of underwriter's fees, structuring fees and related expenses. Underwriter's fees are the transactional fees charged by the underwriters for the securities sold to their clients. Based on Lead Counsel's discussions with the banks and its independent review, for a securitization of this anticipated size and credit rating, underwriter fees should range between 45-60 basis points of the total proceeds from the securitization.

11.14  Structuring fees are paid to the lead underwriters for their role in configuring the financial instrument, preparing selling memoranda and other documentation, coordinating information flow and meetings, and other administrative-type assistance required to complete the securitization successfully. Based on Lead Counsel's discussions with the banks and its independent review, securitization fees for a transaction of this size and complexity should total approximately 25 basis points of the total proceeds from the securitization.

11.15  All expenses such as legal, accounting, credit rating related and printing should total approximately $1.5 million - $2 million. Lead Counsel may incur certain structuring fees and other expenses related to the securitization even if Lead Counsel determines not to pursue the securitization or if Visa or MasterCard pre-pay the settlement as described below in Section 11.16.

11.16  As an alternative to securitization, Visa and MasterCard may prepay the unpaid installments at an appropriate discount. Both Visa and MasterCard have requested the opportunity to work with Lead Counsel to establish a mutually agreeable discount rate to apply to pre-payment of the installments, provided that such discussion does not interfere with any effort to sell, assign, securitize or obtain financing using the Settlement Funds to third parties.  Any offer made by Visa or MasterCard would be considered against offers from third parties to securitize the unpaid installments due from Visa and MasterCard.

Excerpt from Plan of Allocation
page 15

11.17 If Lead Counsel determines that either securitization (as discussed in Sections 11.1-11.15) or a pre-payment by Visa or MasterCard (as discussed in Section 11.16) is in the best interest of the Class, it will advise the Court of the terms and conditions of either approach and will seek prior approval of the Court before completing either transaction.