```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
IN RE:                                           :    MASTER FILE NO. CV-96-5238
                                                 :
VISA CHECK/MASTERMONEY                           :    (Gleeson, J.) (Orenstein, M. J.)
ANTITRUST LITIGATION                             :
This Document Relates To                         :
                                                 :
ALL ACTIONS                                      :
-------------------------------------------------X
```

# OPPOSITION TO ENTERPRISE'S MOTION TO MODIFY
# THE AMENDED PLAN OF ALLOCATION

Respectfully submitted,

**CONSTANTINE CANNON LLP**
Robert L. Begleiter (RB-7052)
Jeffrey I. Shinder (JS-5719)
Jason J. Enzler (JE-2475)
450 Lexington Avenue, 17th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701

*Lead Counsel for the Plaintiff Class*

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ........................................................................... 1

II.  STATEMENT OF FACTS .................................................................................. 2

    A.   Signature Debit and Credit Claims Administration ................................. 3

        1.   *Timing of Filing of Claims* ........................................................... 5

        2.   *Deficient or Incomplete Claims* .................................................. 5

        3.   *Challenges and Consolidations* .................................................. 6

    B.   PIN Debit Claims Administration ............................................................ 7

    C.   The Enterprise Claim ................................................................................ 8

III. ARGUMENT ...................................................................................................... 11

    A.   It Would Be Unfair to the Vast Majority of Claimants to Alter the Amended Plan to Account for Interest Payments After Claims Have Been Paid ............................................................... 11

    B.   Enterprise Should Not Be Compensated for Its Delay ............................ 14

    C.   Interest Calculations Would Not Be Simple and Would Delay Payments ........... 15

IV.  CONCLUSION .................................................................................................. 17

115013.2

Constantine Cannon LLP, Lead Counsel for the Plaintiff Class, respectfully submits this opposition to Enterprise Rent-A-Car Company's motion to modify the Amended Plan of Allocation to require "interest payments" to class members. That motion essentially asks:

> Of the 700,000 claims in this case, many were submitted at different times, submitted incomplete, or involved claim challenges not supported promptly with documentation. Despite this, the majority of claims were paid within a seven-month period. Should interest be paid to treat class members as though all claims were filed or paid on the same date? Alternatively, should interest be paid to certain class members based on select criteria, such as the filing date of claims?

Lead Counsel respectfully asks the Court to answer both questions in the negative. The first option would be unfair to the majority of class members who timely filed their claims and, to the extent necessary, promptly provided documentation to support their requests for inclusion of additional data in their claims calculations or to support their challenges to claim amounts. This option would also produce illogical results, allowing, for example, class members who did not file their claims until 2008 to be paid interest as if their claims were filed in 2005. The second option is no better, for it would require a difficult determination of what factors should be used to determine eligibility for interest payments, and then would invite a case-by-case application of those factors to thousands of claims. This would be especially burdensome and costly now that virtually all claims have been paid and might delay the distribution of residual monies in the settlement funds.

## I. PRELIMINARY STATEMENT

Enterprise argues that distributions of claims payments were spread out over more than three years in this case, and class members therefore were treated unfairly because some received their payments earlier than others. In order to treat all class members fairly, Enterprise asserts that interest must be paid to all class members who received payments any time after the first distribution in December 2005. Enterprise also contends it was penalized for exercising its rights

115013.2

under the Amended Plan. Neither contention is correct. <u>First</u>, the vast majority of claims were paid in a discreet period between 2006 and 2007. <u>Second</u>, most payment delays were due to individual circumstances of class members. And <u>third</u>, Enterprise's payment was "delayed" due to its own incomplete filings.

Class members have been treated fairly in the administration of settlement fund distributions. The same claim forms and deadlines for filing those forms were mailed to millions of class members. Each class member could file a claim with information as complete or incomplete as that class member elected. Each class member could challenge its claim award and was notified that a challenge would delay payment. And each class member challenging its claim was provided with options for supporting that challenge with different types of documents.

To modify the Amended Plan now, after all but three claims have been paid, would be unfair and would complicate the distribution process. Implementing Enterprise's suggested amendment would be unfair because class members completed the claims process based on the Amended Plan and the choices then available. And at the expense of this majority, the modification would reward class members who failed to file their claims, resolve inadequate claim submissions, or provide supporting documentation for challenges of claims promptly.

## II.   STATEMENT OF FACTS

The Plaintiff Class in this case are the millions of merchants that used Visa or MasterCard payment systems from 1992-2003.[1] In 2003, class members reached settlement agreements with the two defendants requiring, among other things, the defendants' payment of $3.05 billion to class members over a ten-year period in exchange for the release of claims for damages from overcharges on signature debit, credit card, and PIN debit transactions. *See In re*

---

[1] Lead Counsel assumes that the Court is fully familiar with the underlying facts of this case, a matter under the jurisdiction of the Court for approximately thirteen years, and therefore does not include a full recitation of facts.

*Visa Check/Mastermoney Antitrust Litigation*, 297 F.Supp.2d 503, 508 (E.D.N.Y. 2003). On August 18, 2003, Lead Counsel submitted a plan to the Court for distributing those funds. Declaration of Robert L. Begleiter, Esq., dated March 5, 2009, (Docket No. 1442, submitted in support of securitization motion) (Begleiter Decl.) at ¶ 8. This Plan of Allocation included detailed directions for distributions, but did not include provisions for interest payments to class members paid later than others. *Id.*, Exh. B (Plan of Allocation). After a fairness hearing, the Court approved the settlement agreements and Plan of Allocation on December 19, 2003, which became final on June 1, 2005 after all appeals were exhausted and the time to seek further review expired. *See In re Visa Check/Mastermoney Antitrust Litigation*, 297 F.Supp.2d 503; Begleiter Decl. at ¶ 3.

On August 16, 2005, the Plan of Allocation was amended (the Amended Plan) to account for modifications necessary to calculate class members' share of the settlement funds due to a lack of data available from MasterCard, to expedite the process for calculating class members' PIN debit claims, and to ensure that class members who filed approved claims received payments fairly in light of the ten-year schedule for the defendants' settlement payments. *See* Begleiter Decl. at ¶ 8; Letter from Lead Counsel to Court, June 23, 2005 (Docket No. 1167)

A. **Signature Debit and Credit Claims Administration**

As required by the Amended Plan, the Claims Administrator (Garden City Group) mailed approximately eight million claim forms to merchants by September 29, 2005. Most forms contained estimated cash payments related to each recipient's signature debit and credit card (Signature Debit) transactions (VM1 claim forms). Class members were required to review the estimated cash payments and file their claims by November 28, 2005. Class members receiving claim forms without estimated cash payments (due to the lack of data for those class members)

3

were required to submit a claim form and data reflecting annual Visa and MasterCard sales by that date (VM2 claim forms). Class members also were notified that they had thirty days, until October 29, 2005, to challenge their estimated claims. Affidavit of Neil L. Zola, dated June 8, 2009, (Zola Aff. or Zola Affidavit) at ¶¶ 4, 7, 7 n.4.[2]

The deadline for filing claims was extended two times, first to December 28, 2005, and again to September 15, 2008. *Id.* at ¶ 7. Likewise, the deadline for challenging estimated claims was amended each time the claims deadline was amended. Because each new claims deadline allowed for filing new claims, challenges of estimated cash payments for those new claims were not restricted to the original challenge deadline. Instead, challenge deadlines were tied to the dates of individual estimated cash payments for class members, with challenges due within thirty days of those dates. Begleiter Decl. at ¶ 8, Exh. C (Amended Plan of Allocation at ¶ 7.1).

The Claims Administrator has paid 676,951 Signature Debit claims for a total value of $1.38 billion. Most were paid between June 2006 and December 2007. During those eighteen months, 96% of Signature Debit claims (651,918 claims) were paid, representing more than 91% ($1.26 billion) of the Signature Debit payout. And more than 88% of Signature Debit claims were paid in a seven-month period in 2006, totaling $1 billion, nearly 3/4 of the total amount paid for Signature Debit. Zola Aff. at ¶¶ 5-6.

Only 4% of Signature Debit claims were paid outside of this eighteen-month time period: almost 3.5% in December 2005, and less than 0.5% in 2008 (the year Enterprise was paid).[3] *Id.* at ¶¶ 5, 11. As expected with a class numbering in the millions, thousands of individual issues contributed to different payment dates. *Id.* at ¶ 6.

---

[2] The VM1 and VM2 forms are attached as Exhibits A and B, respectively, to the Zola Affidavit.

[3] Only three claims remain to be paid, all in various stages of appeal. Zola Aff. at ¶ 12.

### 1. *Timing of Filing Claims*

For example, the Claims Administrator received approximately 280,000 claims after November 28, 2005, the initial deadline for filing claims. And the Claims Administrator received 18,295 claims after the amended deadline for filing claims of December 28, 2005. In fact, the Claims Administrator received more than 10,000 claims on September 15, 2008 – the day of the final deadline set by the Court. *Id.* at ¶ 7. The dates different claims were received affected the dates payments for those claims would be made. A claim filed in 2007, for example, could not have been paid in 2006. Likewise, none of the 280,000 claims filed after November 28, 2005 could have been paid in the December 2005 distribution, though this is the date from which Enterprise believes all interest payments should be calculated.

### 2. *Deficient or Incomplete Claims*

Similarly, the Claims Administrator received approximately 30,600 claims that were deficient for various reasons. The wide-ranging deficiencies included instances where class members:

(i)   failed to sign claim forms;
(ii)  failed to provide contact information;
(iii) provided inadequate information for when Visa or MasterCard were accepted;
(iv)  failed to complete Section B (requiring information about the merchant);
(v)   submitted blank claim forms;
(vi)  provided inadequate information regarding PIN Debit acceptance;
(vii) submitted a VM2 claim, but not information necessary for estimating transaction counts and therefore, award amounts;
(viii) failed to provide information regarding U.S. based sales;
(ix)  indicated that it did not accept Visa or MasterCard during the damages period; or
(x)   used a third-party filer who failed to provide proof of authorization to act as agent.

*Id.* at ¶ 8.

In accordance with the Amended Plan, the Claims Administrator sent deficiency letters to all class members who did not properly complete their claims, advising each of the deficiency or

5

115013.2

deficiencies of its claim and explaining how the class member could cure its claim. These class members then had sixty days to cure the deficient conditions. Many class members did not meet this sixty-day deadline, even further delaying their payments. *Id.*

### 3. *Challenges and Consolidations*

The two most time-consuming aspects of administering the claim process were handling challenges and consolidations. The complexity of this process has been detailed in several affidavits previously submitted to the Court. *Id.* at ¶ 9.

Consolidating claims proved useful for certain merchants due to the way in which data is stored on the database used for generating claims estimates. The Visa Transactional Database (the VTD), used to identify class members' Visa card transaction volumes and generate the estimated cash payments for claims, maintains the data, including data for class members operating or owning multiple locations, at the store or merchant location level. Merchants operating numerous locations, such as Enterprise, could request a consolidation claim to prevent the receipt of individual claim forms for each location found in the VTD. Consolidation of claims data could become complicated because of, among other things, the large quantity of data involved and changes in card acceptance arrangements for which many class members could not provide complete records. Many merchants reported their data in different formats that those used by the VTD and acquirer bank merchant data, further complicating the process. Declaration of Michael H. McCormack, dated June 8, 2009, (McCormack Decl.) at ¶ 6.

In each estimated claim or consolidation determination, the class member could appeal the Claims Administrator's determination. Zola Aff. at ¶ 9. Claim challenges could also become time-consuming. For example, some class members who filed claims in challenged states because the Visa and MasterCard annual sales volumes included in the claims differed from the

class members' processor statements or internal records. McCormack Decl. at ¶ 7. In other cases, challenges of certain merchants that were often bought and sold multiple times by either a franchisor or a franchisee involved time consuming and difficult documentation review, which was exacerbated by the fact that the Claims Administrator was required to review and interpret whatever information class members provided to support those challenges. Zola Aff. at ¶ 9 n.5. In some instances, class members could first seek consolidation, then challenge the consolidation results, and then appeal the Claims Administrator's challenge determination. *Id.* at ¶ 9.

Class members were notified that payments would be delayed if they challenged their estimated claims. Instructions provided with each claim form and the claim form itself stated:

> **Please Note: By checking the "I DISAGREE" box [and challenging the Estimated Cash Payment of your claim], you will not receive your Cash Payment until your challenge has been determined.**

*Id.* at ¶¶ 4, Exh. A, and 10, Exh. C (the consolidation claim form, or VMC form).

As with other Signature Debit payments, most challenges and consolidation claims were paid between June 2006 and December 2007. 93% (4,134 claims) of consolidation claims were paid during this eighteen-month period. And more than 73% of the 1,629 challenge claims were paid during the same period. Most of these claims that were not paid by December 2007 involved a problem, delay, or deficiency in the challenge or consolidation request. *Id.* at ¶ 10. Only three claims remain unpaid, all as appeals of challenge determinations.[4] *Id.* at ¶ 12.

### B.   PIN Debit Claims Administration

The most recent class-wide distribution in December 2008 was the first time that payments for PIN debit claims were made. This is because calculating PIN debit payments was only possible after a hard deadline for accepting Signature Debit claims had passed, which

---

[4] One of these three challenges, appealed to the Court in August 2008, has been tentatively resolved and a settlement agreement is pending before the Court. Zola Aff. at ¶ 12 n.9.

115013.2

occurred on September 15, 2008. Of the 121,847 payments made in this distribution, less than 1.5% of the paid claims were for Signature Debit claims. And over 2/3 of those Signature Debit claims could not have been paid earlier because they were filed after the previous distribution in December 2007. *Id.* at ¶ 11.

### C. The Enterprise Claim

Enterprise filed its claim, a request for consolidation, on December 21, 2005 through a third-party claims preparer group, Spectrum Settlement Recovery. The consolidation request not only was submitted after the original claims filing deadline, but was also deficient. Enterprise did not provide the documentation required to complete the consolidation until June 5, 2006, more than six months after the original claims filing deadline and more than five months after Enterprise submitted its consolidation request. *Id.* at ¶ 13.

After reviewing documentation for thousands of different locations, the Claims Administrator mailed a VMC form to Spectrum on September 22, 2006 for the Enterprise claim. The VMC form was the result of hundreds of hours of work by the Claims Administrator and Mike McCormack, Lead Counsel's expert, to locate all data attributable to Enterprise in the VTD (Visa Transactional Database) to maximize Enterprise's claim. The Claims Administrator and Mr. McCormack also spent many hours discussing the claim with Spectrum and Enterprise during the fall of 2006. Notwithstanding those efforts, Enterprise felt additional locations in the VTD were not being located by the Claims Administrator or Mr. McCormack. *Id.* at ¶ 14; McCormack Decl. at ¶¶ 8-9.

Knowing its claim payment would be delayed, Enterprise challenged its estimated award on October 13, 2006. Zola Aff. at ¶ 14 n.10. On October 26, 2006, Mr. McCormack requested that Spectrum provide Enterprises' annual Visa or MasterCard sales in order to perform more

detailed calculations of the claim to assess the challenge. Spectrum never provided this information. *Id.* at ¶ 14; McCormack Decl. at ¶ 9. Mr. McCormack had used such data to resolve other challenges involving instances where the class members felt that their claims did not adequately capture some of their transaction volumes. McCormack Decl. at ¶¶ 7, 10.

In the beginning of 2007, the Claims Administrator and Mr. McCormack continued to search the database and perform further data analysis to locate additional records in the VTD attributable to Enterprise. Again, on January 24, 2007, Mr. McCormack requested that Enterprise provide its annual Visa and MasterCard sales volumes or monthly processing statements for at least the latter half of the class period in order to substantiate an increased cash payment – a similar request asked of many other merchants challenging their awards. *Id.* at ¶¶ 7, 10-11; Zola Aff. at ¶ 15. In late March 2007, Spectrum informed Mr. McCormack and the Claims Administrator that Enterprise was searching for Visa and MasterCard statements. In late April 2007, Spectrum informed the Claims Administrator and Mr. McCormack that Enterprise was continuing its search. Despite these and other requests, Enterprise did not provide this information, significantly delaying resolution of its challenge. Meanwhile, the Claims Administrator and Mr. McCormack had been attempting to substantiate an increased payment via other methods. McCormack Decl. at ¶ 12; Zola Aff. at ¶ 15.

After exhausting all efforts to increase the amount of the Enterprise claim, on May 17, 2007, the Claims Administrator rejected Enterprise's challenge. The challenge was rejected on the bases that a search of the VTD for additional transactions produced no supplemental records. Zola Aff. at ¶ 16.

During the summer of 2007, Spectrum provided a sampling of Enterprise's merchant card processor statements for various locations and for incongruent time periods. The Claims

Administrator and Mr. McCormack analyzed these materials, but were unable to locate any supporting data for revising the claim, which they informed Spectrum of in July 2007. By August 2007, and after additional analysis, Mr. McCormack reported to Spectrum that the sample statements apparently were captured already in the data included in the claim. McCormack Decl. at ¶ 13.

At this point, and as an alternative to using Visa and MasterCard sales figures, Mr. McCormack discussed with Spectrum whether Enterprise could provide its overall total sales revenue figures inclusive of all payment tender types. Mr. McCormack would have been able to use that information to perform an alternate analysis to determine whether the claim should be revised. Spectrum informed Mr. McCormack that it would discuss the request with Enterprise. McCormack Decl. at ¶¶ 7, 10, 14. Ultimately, Enterprise's challenge was resolved based on this exact data – though such a resolution was impossible to reach until Enterprise provided it one year later, in September 2008. McCormack Decl. at ¶ 17.

On October 9, 2007, Spectrum appealed the Claims Administrator's challenge determination. Zola Aff. at ¶ 16. In yet another attempt to find documentation to support Enterprise's challenge, Mr. McCormack again requested in November 2008 that Enterprise provide its total annual retail sales figures for as many years as possible during the class period. Spectrum informed Mr. McCormack that it would consider this request, but did not supply the annual sales figures. McCormack Decl. at ¶ 16.

Lead Counsel rejected the Enterprise appeal on February 6, 2008, because Enterprise failed to provide, at that time, any reasonable basis to raise Enterprise's allocation without additional supporting data. *Id.* at ¶ 17; Zola Aff. at ¶ 17. On May 2, 2008, Enterprise filed with the Court its appeal of Lead Counsel's determination. Mem. in Support of Enterprise Appeal

(Docket No. 1405). After full briefing, Enterprise and Lead Counsel appeared before the Special Master for a hearing on August 12, 2008. Enterprise and Lead Counsel agreed to adjourn the hearing in order to attempt to resolve the dispute. 8/12 Hrg. Tr. at 38:6-24.

Soon after the hearing, Enterprise and Lead Counsel settled the dispute, increasing Enterprise's award. The revised award accepted by Enterprise was calculated using the annual sales revenue that Enterprise provided to Lead Counsel in September 2008. This was the same sales revenue Mr. McCormack first requested from Enterprise one year earlier. McCormack Decl. at ¶ 17.

## III. ARGUMENT

There is no dispute that Lead Counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). Lead Counsel has never retreated from its earlier representations to ensure that the payments to class members be "fair and equitable."[5] There is a difference, though, in treating class members equally – applying the administrative process uniformly, providing equal opportunities to file claims or pursue challenges – on the one hand, and treating all class members as if their claim histories were identical, on the other.

### A. It Would Be Unfair to the Vast Majority of Claimants to Alter the Amended Plan to Account for Interest Payments After Claims Have Been Paid

Enterprise proposes that all class member who filed approved claims (Claimants) and received payment after the December 2005 distribution should receive interest for their claim payments as though they had received their payments in December 2005. Mem. at 2. Enterprise's explanation for this contention:

---

[5] *See* Enterprise Mem. at 10, 10 n.17 (hereinafter "Mem."). Nor does Lead Counsel oppose the idea of the time-value of money. Enterprise's citations of cases or Lead Counsel's filings and expert, however, are somewhat of a red herring. Those cases do not involve modifications to intricate class-action settlement distribution plans, much less such plans that have been substantially executed. Citations of the Amended Plan or Lead Counsel's expert involve statements made regarding securitization of the settlement funds. Neither provide a basis for ignoring the causes underlying *why* class members received payments at different times.

115013.2

1) The "Claims Administrator has made payments to class members at vastly different times over the past several years." Mem. at 12.

2) "For the reasons [regarding the time-value of money], this disparity had the effect of inconsistent treatment of class members." Mem. at 12.

3) "As a result, the later-paid class members have not been treated fairly and equitably when compared with the earlier paid class members." Mem. at 13.

The crucial piece missing, though, is an analysis of *why* claims were paid at different times and *whether* class members who were provided the same opportunities, but acted in vastly different manners, should nevertheless be treated as having identical claim histories. Enterprise does assert that "most, if not all, of the reasons for the disparities in payment dates among class members were outside the control of Lead Counsel." Mem. at 12 n.22. But Enterprise fails to attribute the reasons for the pay disparities to their actual causes, which most often were the different dates on which claims were filed, inadequacies with the claims, or Claimants' delays in providing documentation to support their challenges. *See, e.g., infra* at 5-8.

To support its request, Enterprise cites situations where Claimants challenged their estimated cash payments, proposing that it is "inherently unfair" if class members must make a choice between challenging claims despite the knowledge that payment will be delayed (and the time-value of money therefore lost) or accepting claims that may be incorrect in order to ensure earlier payment. Mem. at 14. But this argument assumes facts contrary to the record. Many Claimants challenged their estimated cash payments, but did not receive an increased award because the data showed that no upward adjustment was warranted. Zola Aff. at ¶ 9 n.6. Likewise, there is nothing in the record to suggest that class members believed their claims were undervalued but chose not to submit challenges. If anything, the record suggests that Claimants who believed their claims were undervalued filed challenges. *See, e.g., id.* at 9-10; McCormack Decl. at ¶ 7. Despite the number of challenges and the wide-ranging complications requiring

time-intensive efforts, most challenges were resolved and paid by the end of 2007. Zola Aff. at ¶ 10.

On this same point, Enterprise then asserts that Claimants who challenged their claim estimates "were subordinated to the end of the payment line." Mem. at 14. This is simply not reflected in the claims administration history. Again, most Claimants who challenged their claims received payments in 2006 or 2007, along with the majority of other Claimants. The vast majority of challenges or consolidation requests that were not paid by December 2007 involved a problem, delay, or deficiency. Zola Aff. at ¶ 5-6, 10. Even the more complicated challenges that required Mr. McCormack's input were resolved efficiently because the challenging Claimants supplied promptly documentation supporting their challenges. McCormack Decl. at ¶ 7.

In addition to this argument, Enterprise states that there were "a number of class members" who did not challenge their claims but still received late payments. Mem. at 15. Without additional information as to these class members, Lead Counsel cannot respond fully to this assertion. What is known, however, is that due to Claimants filing their claims later, filing incomplete claims, or failing to provide requested information in a timely manner, a very small minority of class members received payments outside of the June 2006 – December 2007 time period. Zola Aff. at ¶¶ 3, 5-8, 10-11.

Moreover, to modify the Amended Plan as Enterprise requests would lead to unfair, if not absurd, results. For example, there is no rational basis why the 10,000 claims filed on September 15, 2008 should receive interest payments as though they were filed in 2005. Those Claimants waited to file their claims until the last day (and received payments three months later – more quickly even than some Claimants paid in 2006). And this is just one example.

115013.2

Perhaps recognizing the problems posed by paying interest to all Claimants paid after the December 2005 distribution, Enterprise suggests that the interest payments could be limited to those Claimants who "filed their claims on a timely basis." Mem. at 3 n.2. But this does not resolve the problem. In one sense, only claims filed before the original November 2005 deadline might be "timely," in which case even Enterprise's claim would not be eligible for interest payments. In another sense, all claims filed before the final, Court-ordered deadline of September 15, 2008 could be considered timely. But all Claimants met this deadline, so all Claimants would be eligible for interest payments – in which case Enterprise's alternative solution is not really an alternative at all.

### B. Enterprise Should Not Be Compensated for Its Delay

To the extent the Court is willing to treat Enterprise's motion as a request solely to pay interest to Enterprise, that request should be rejected. First, Enterprise was paid two years after submitting its challenge, but its challenge was resolved because it finally submitted the documentation requested one year earlier. Enterprise should not receive interest for its own delay. Second, if Enterprise were to receive interest payments, then the Court will be inviting similar challenges from any number of the 700,000 Claimants with different claim histories. The last option would result in a delay of payments of residual settlement funds to Claimants until such challenges were resolved – which could take years.

Enterprise submitted its consolidation request on December 21, 2005. That request, late according to the original deadline, was also deficient. These deficiencies were not cured until more than five months after Enterprise submitted its consolidation request. Zola Aff. at ¶ 13.

Like other Claimants challenging their estimated awards, Enterprise challenged its estimated award knowing at that time its payment would be delayed pending the resolution of its challenge. *Id.* at ¶ 14 n.10. Within two weeks of that challenge, Enterprise was requested

14

115013.2

(through its claim-filing agent, Spectrum) to provide annual Visa and MasterCard sales figures so that a more detailed evaluation of the Enterprise claim could be completed. No such data was provided. McCormack Decl. at ¶ 9.

In fact, over the course of two years, Enterprise, through its claim-filing agent, failed to provide annual data to support its challenge, such as total sales revenue or merchant card sales figures, despite repeated requests. *Id.* at ¶¶ 9, 11-12, 14-16; Zola Aff. at ¶¶ 14-15. Instead, Lead Counsel, the Claims Administrator, and Mr. McCormack engaged in hundreds of hours of work – at the expense of other Claimants – to find some basis for increasing Enterprise's award. *See, e.g.,* Zola Aff. at ¶ 14. Finally, one year after the first request for total sales revenue, Enterprise, through its counsel for this matter, provided Lead Counsel with those annual sales figures. Preliminary settlement of the dispute was reached within weeks of that exchange. McCormack Decl. at ¶ 17.

There is no reason to reward Enterprise with interest payments for its delay when its challenge was resolved with the exact data initially requested, but not provided, until a year later.

But should the Court be so inclined to do so, then there may be no reason why other Claimants should not be allowed to submit individualized requests for interest payments. In that case, each request would need to be analyzed and briefed regarding the merits of the request.

### C. Interest Calculations Would Not Be "Simple" and Would Delay Payments

Contrary to Enterprise's assertion, interest payments would not be "simple" to compute. As explained above, it would be unfair and arbitrary to provide all Claimants with the benefit of interest as though their claims were paid on the same date, ignoring completely the different circumstances – many of them caused, for better or worse, by the Claimants themselves. Consequently, ensuring fairness in the calculation of interest payments would require a series of

115013.2

difficult intertwining judgments. The Claims Administrator would have to calculate these interest payments on hundreds of thousands of claims, each claim possibly requiring a separate calculation depending on what parameters would be deemed relevant. Zola Aff. at ¶ 19.

While many claims contained no deficiencies or atypical conditions, there are tens of thousands of claims that may have to be manually reviewed in order to determine from which date the interest should accrue. For example, if a claim was filed in December of 2005, but was deficient because the class member did not sign the claim form until June of 2006, a decision would have to be made as to when the interest calculation would begin. And that is the most basic example. *Id.*

How should payments to the Government be treated? The Government was not paid for a claim, but rather, reached a settlement agreement with class members on December 29, 2006. *See* Agreement with Respect to U.S. Gov. Merchant Claims (Docket No. 1332). The Court would need to decide whether interest payments qualify as "additional or residual distributions" under Paragraph 4 of that agreement, entitling the Government to interest, or whether the Government is ineligible for interest payments because of the terms regarding the non-residual settlement payments. *See id.* at ¶¶ 2-4.

There would be many other situations calling into question when the calculation of interest should begin that are less prevalent, yet more complex. For example, claims filed in 2007 and paid in 2007 presumably would be treated differently than claims filed in 2007 and paid in 2008. Although, if the claim in 2007 was a consolidation that was not paid in 2007 due to a deficiency in the filing, presumably a different calculation would be required. These and potentially hundreds of other permutations would need to be examined before any interest calculation could be derived. Zola Aff. at ¶ 19.

IV. **CONCLUSION**

For the foregoing reasons, Lead Counsel respectfully requests the Court to reject Enterprise's request to alter the Amended Plan.

Respectfully submitted,

Dated: June 8, 2009  
New York, NY

By: _____s/Jeffrey I. Shinder_____  
**CONSTANTINE CANNON LLP**  
Robert L. Begleiter (RB-7052)  
Jeffrey I. Shinder (JS-5719)  
Jason J. Enzler (JE-2475)  
450 Lexington Avenue, 17th Floor  
New York, NY 10017  
Telephone: (212) 350-2700  
Facsimile: (212) 350-2701

*Lead Counsel for the Plaintiff Class*

115013.2