UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

IN RE VISA CHECK/MASTERMONEY  MASTER FILE NO. CV-96-5238
ANTITRUST LITIGATION     (Gleeson, J.) (Mann, M.J.)

-----------------------------------------------------x


# Supplemental Report of Independent Expert
## (on proposal for MasterCard prepayment)

## Professor Bernard Black
*University of Texas Law School*
*McCombs School of Business, University of Texas*

14 July 2009

Excerpt from Plan of Allocation
page 2

## I.  Scope of Report and Qualifications

I was appointed by Judge Gleeson to act as an Independent Expert to advise the Court on the advisability and terms of a proposed securitization ("MasterCard Securitization") of the remaining funds from the Settlement between the Plaintiff Class (the "Class") and MasterCard International Inc. ("MasterCard").  In March 2009, I delivered a report containing my opinion that, if completed at an appropriate interest rate, the MasterCard Securitization would be advantageous to the Class.  Judge Gleeson subsequently approved the Securitization proposal.

Lead Class Counsel then undertook the securitization marketing process.  As that process neared completion, MasterCard approached Lead Class Counsel (Constantine Cannon) with a proposal to prepay its remaining obligations in the underlying litigation settlement (four payments of $100 million each, due in four installments on Dec. 22 of 2009, 2010, 2011, and 2012).  After negotiations, MasterCard agreed to make a single payment of $335 million on Sept. 30, 2009 ("Prepayment Proposal").  The prepayment amount is 83.75% of the face amount of the litigation settlement payments.

In this Supplemental Report, I address whether the MasterCard prepayment is advantageous to the Class, *compared to* completing the MasterCard Securitization, and conclude that it is.  I also continue to hold the opinion, stated in my initial Report, that the Securitization is advantageous to the Class, relative to no securitization.

My qualifications and other background information are stated in my initial Report and are not repeated here.  I participated in the negotiations with MasterCard over the terms of the proposed prepayment, as an advisor to Lead Class Counsel.

## II.  Background and Documents Reviewed

In preparing this Supplemental Report, I have reviewed the following additional sources of information:

(i)  Prepayment Agreement between the Class and MasterCard;

(ii) various  analyses of the discount rate implicit in the prepayment amount, and the "securitization-equivalent" discount rate (taking into account differences in expenses between the prepayment implied by the prepayment, prepared by Cannonade Capital, the financial advisor to Class Counsel;

(iii)  other materials and information provided to me by Lead Class Counsel and their financial advisor.

I have also held discussions with Robert Begleiter at Constantine Cannon; Joshua Slovik at Cannonade Capital; and Robin Wilcox, the Special Master for this litigation.  I asked a number of questions, received all of the documents and other information that I requested, and believe that the information available to me forms a sound basis for the opinions expressed below.  Capitalized terms used in this Supplemental Report but not defined here have the meanings given to them in my initial report.

Excerpt from Plan of Allocation
page 3

## III.  Expert Opinions

### A.    Assumptions

In order to compare the Securitization with the Prepayment, I need to make several assumptions about the timing of the payments, and the additional expenses that would be incurred to complete the Securitization.  Lead Class Counsel has confirmed that these assumptions are reasonable.

*Timing of securitization*.  I assume that the Securitization would be completed on July 31, 2009.

*Timing of distribution to the Class*.  To reduce mailing costs, Lead Class Counsel has arranged for a single annual payment to the Class, after payments have been received from both Visa and MasterCard.  Visa has made its payments on Sept.30 of each year (even though its legal obligation is only to make the payments by December 22.  MasterCard has made its payments on December 22 of each year.  Thus, the annual payment has been made toward the end of the each year.

I initially assume that Lead Class Counsel would continue to follow this practice, Visa would make its 2009 payment on Sept. 30, 2009, and checks would be mailed promptly thereafter.  The proceeds of the Securitization would be held in a bank account, earning essentially zero interest due to current market rates, from July 31 until Sept. 30, 2009.  Thus, the Securitization proceeds would be distributed to the Class at the same time under either the Securitization or the Prepayment  -- I assume this will be Sept. 30, 2009.  Below, I also consider an alternate assumption, under which the Securitization proceeds are distributed when received (assumed to be July 31, 2009).

*Class cost of capital*.  The Securitization involved delayed payout of funds held in reserve accounts and also funds which were kept as residual equity and not securitized, to ensure that the Securitization Notes are treated as debt for tax purposes.  These "deferred amounts" will be paid after the final MasterCard payment on Dec. 22, 2012 – I assume they will be paid at year-end 2012.

To compare the Securitization to the Prepayment, I need to determine the present value of the deferred payments at Sept. 30, 2009.  I therefore need to assume a cost of capital for the Class.  I assume that 1% per month is a reasonable Class cost of capital.  This is above the cost of capital for some large, well-capitalized merchants, but likely below the cost of capital for many smaller merchants.  However, the deferred payment is about $21 million, which is much less than the upfront payment of around $330 million.  Thus, a different Class cost of capital would not greatly change the Securitization present value, and would not change my conclusion that the Prepayment is advantageous to all merchants, compared to the Securitization.[1]

---

[1]  A higher cost of capital implies a smaller present value for the deferred payments, and  thus for the Securitization.

Excerpt from Plan of Allocation
page 4

*Avoided securitization expenses*.  Many of the expenses for the Securitization had already been incurred by the time MasterCard made its prepayment proposal.  Some had not, and could be avoided.  The Securitization structure contemplates $1.7 million in various expenses during the Securitization period.  I assume that these amounts would have been spent.  It also contemplates two reserve accounts that total $13 million:  a litigation reserve of $8 million and an enforcement reserve of $5 million.  I assume that these amounts will not be spent, and will be distributed at year-end 2012.  Finally, Cannonade Capital has estimated that completing the securitization would cost an additional $500,000 in legal and other expenses, which I assume would have been spent.

*Expected interest rate on the Securitization Notes*.  The rate at which the Notes could be issued is not known.  I am advised by Cannonade Capital that the interest rate was likely to be in the range of 9-10%, measured as a bond-equivalent yield.  Below, I consider a range from 8% to 11.5%.

*Market interest rate on short-term cash holdings*.  At present, market interest rates on bank deposits are close to zero.  To simplify the analysis, I will assume these rates are zero; using actual current rates would only slightly change the numbers reported below.  However, it is possible, even likely, that interest rates will rise over the next three years.  If so, this would increase the amount of the deferred payment to be made at year-end 2012, but not by enough to change my conclusion that the Prepayment is advantageous to all merchants, compared to the Securitization.

## B.    Prepayment Advantages Holding Discount Rate Constant

The Prepayment has several important advantages to the Class compared to the Securitization at a comparable discount rate.

*Faster payment to the Class*.  Under the settlement agreement, MasterCard is required to make four annual payments of $100 million each, on December 22, 2009, 2010, 2011, and 2012.  Under the MasterCard Securitization, if completed, the Class would, in effect, sell most of this stream of payments to investors.  The Class would receive two distributions.  There would be an initial large distribution, on the order of $320 million, depending on the interest rate in the Securitization), soon after the Securitization closes.  I will initially assume that this payment will be made at Sept. 30, 2009.  There will also be a second smaller distribution, expected to be about $21 million, of funds left in the Class account after all payments are received from MasterCard and Visa and all expenses have been provided for.  I assume this payment will be made at Dec. 31, 2012.  The second, deferred payment arises from the need, in the Securitization, to create and hold reserves ($13 million) and an equity account ($8 million).  These funds would be held in interest-bearing accounts, but short term market interest rates are currently close to zero and are far below the Class members' cost of capital.  Thus, the present value of the deferred payment to the Class is less than the principal amount.

The Prepayment will not require this partial deferral.  The full amount of the Prepayment, net of expenses, can be paid promptly to the Class.  This increases the present value of the payment.  Put differently, the effective interest rate paid by the Class on the

Excerpt from Plan of Allocation
page 5

Securitization Notes, taking into account the delayed payment of these funds, is higher than the rate received by the Note purchasers.  I estimate this difference below.

*Reduced expenses*.  The Prepayment Proposal will avoid the need for a securitization trust and accompanying annual expenses, as well as the risk that litigation or other expenses would deplete the reserve accounts.  It will also avoid the estimated $500,000 in legal and other expenses needed to complete the Securitization.

*Real option to complete Visa prepayment*.  The MasterCard Securitization creates a real option to also complete a Visa securitization.  This real option has large value to the Class.  There are several sources of value.  First, if both the MasterCard and Visa payments can be either securitized or prepaid, the Class could avoid large check mailing expenses at least for 2010 and 2011.  It could also be possible to reduce mailing costs in 2012, by making larger upfront payments to smaller merchants, and making the final payments to a limited group of larger merchants.  Second, a Visa securitization would involve lower direct transaction costs than the MasterCard Securitization.  Some of the MasterCard work, including the legal work in designing the securitization structure and developing an offering memorandum, would carry over to a Visa securitization.  Most of these savings will still exist, even if the MasterCard Prepayment replaces the MasterCard Securitization.  Third, the precedent of the MasterCard Securitization could lead to a lower interest rate on the Visa Securitization, controlling for risk.  I will call this the "Securitization Real Option."

A MasterCard Prepayment, instead of the Mastercard Securitization, preserves most of the value of the Securitization Real Option, and creates a second real option, involving prepayment by both MasterCard and Visa.  I am advised by Cannonade Capital that there is reason to believe that Visa has the cash to prepay its obligation to the Class and might find it advantageous to do so, at an appropriate discount rate.  I will call this second option the "Prepayment Real Option."

If Visa were to prepay its obligation to the Class (I assume this would occur on Sept. 30, 2009), a single payment could be made to the Class at that time.  The costs that would be associated with Visa's and MasterCard's remaining payments, including the need for a future mailing to the Class in 2012, would largely or completely go away.  In effect, just as the MasterCard Securitization creates a real option to complete a Visa securitization, completing the MasterCard Prepayment creates a real option to also complete a Visa prepayment, and further reduce mailing and other costs.

*Risk of a failed securitization effort.*  Based on information from the investment bankers for the MasterCard Securitization, Class Counsel is optimistic that the Securitization can be completed, and that the interest rate on the Notes will be well below the maximum rate authorized by the Court.  However, there is a small risk that the securitization might fail to attract sufficient demand to be completed at all, and a larger risk that weak demand might result in a higher interest rate on the Securitization notes than is currently expected.[2]

---

[2]  I view the risk of outright failure of the MasterCard Securitization to be small.  Regardless of demand from other investors, if MasterCard finds it attractive to prepay the entire amount it owes, for a single payment of $335 million, it would likely also be interested in buying the Notes, potentially all of them, at an effective price lower than this.  This would be a form of self-help prepayment, but without the advantages to the

Excerpt from Plan of Allocation
page 6

## C.      Expected Value and Discount Rates

*Prepayment present value*.  For convenience in comparative analysis, all present values in this Supplemental Report are measured at the prepayment date of September 30, 2009.  Rates are reported as true economic "annual yields" unless otherwise specified.  When appropriate, I also report rates as bond-equivalent yields, which is how corporate and government bond yields are commonly reported.[3]  I compute present values without taking into account expenses that would be incurred in either the Securitization or the Prepayment scenarios, and without assigning any value to either the Securitization Real Option or the Prepayment Real Option.  Under these assumptions, the present value to the Class of the $335 million MasterCard Prepayment is, very simply, $335 million.

*Securitization present value*.  The present value of the MasterCard Securitization depends on the interest rate on the Notes.  Table 1 shows this present value under different assumptions about the interest rate.  The first column shows the assumed rate, stated in customary form as a bond-equivalent yield.  The second column shows the equivalent annual yield.  The third column shows the present value of the Securitization, taking into account the upfront payment by the Note investors, the extra expenses needed for the Securitization as compared to the Prepayment, and the loss of present value due to making the initial payment from receipt at July 31, 2009 until September 30, 2009, and payment of the deferred amount only on Dec. 31, 2012.  The assumed rates run from 8% to 11.5% in 0.5% increments.  The table also includes a row for the "breakeven rate", at which the Securitization would have the same present value as the Prepayment.

### Table 1.  Securitization Interest Rate and Present Value
(amounts in $ millions)

| Bond-Equivalent Yield on Securitization Notes | Annual Yield on Securitization Notes | Present Value at Sept. 30, 2009 |
|---|---|---|
| 8% | 8.16% | $336.7 |
| **8.28%** | **8.45%** | **$335.0** |
| 8.5% | 8.68% | 333.7 |
| 9% | 9.2% | 330.7 |
| 9.5% | 9.7% | 327.7 |
| 10% | 10.3% | 324.8 |
| 10.5% | 10.8% | 321.9 |
| 11% | 11.3% | 319.0 |
| 11.5% | 11.8% | 316.1 |

As Table 1 indicated, the Securitization would be preferred to the Prepayment only for Note interest rates lower than 8.28% (bond-equivalent yield).  Taking into account the

---

Class of an actual prepayment.

[3]  Suppose that a bond is quoted as paying an 8% yield (implicitly, a bond-equivalent yield).  This means that the bond pays 4% interest, twice a year.  Including the implicit semi-annual compounding, since the first interest payment can be reinvested when received for the rest of the year, the economic yield will be $y_{annual} = (1 + y_{bond-equiv}/2)^2 - 1$, or 8.16%

other advantages of the Prepayment, including the risk of non-completion, the risk of additional expenses which might deplete the reserve accounts, and the value of the Prepayment Real Option, the true breakeven rate would be lower than this.  The 8.28% rate is well below the range of interest rates which are considered achievable at this time.

Therefore, in my opinion, the Prepayment is preferable to the Securitization.

## D.      Earlier Payment of Securitization Proceeds

I have thus far assumed that the Securitization would be completed on July 31, 2009, but the proceeds would be held for 2 months and distributed together with a Visa payment on Sept. 30, 2009.  This delay reduces the administrative expenses associated with mailing checks, and thus increases the raw dollars paid to class members.  However, in all likelihood, deferral will not maximize the present value of those payments.  At a Class cost of capital of 1% per month, each month of delay in paying the Securitization proceeds reduces the present value of those proceeds by about $3.3 million.  The effective cost of two months of delay is likely to substantially exceed the cost of an additional mailing.

Cannonade Capital estimates incremental mailing and related costs at about $2/check, or about $1.4 million.  Even if this estimate is low, there are large gains in present value from mailing the Securitization proceeds to the Class as soon as they are received.  If this approach were followed, the breakeven rate under the analysis above, at which the Securitization would produce the same $335 million in present value as the Prepayment (still measured at Sept. 30, 2009) would increase to 9.11 bond-equivalent yield (9.32% annual yield).

It is possible that the Securitization could achieve this low a rate, but uncertain. Taking into account uncertainty about the Securitization interest rate and the other advantages of the Prepayment discussed above, it is my opinion that the Prepayment would be preferable to the Securitization even if the Securitization proceeds were distributed promptly to the Class.

## E.      Limitations on Opinions

I have assumed, and have not separately verified, the accuracy of the information provided to me by Lead Class Counsel and Cannonade Capital.  I also assume that the securitization is completed during a period of normal credit market conditions, that the Notes will receive an investment grade rating, and the Notes can be issued at an interest rate consistent with that rating.  With regard to the risk of change in market conditions, I understand that I will have an opportunity to reaffirm, modify, or withdraw this opinion at the time of the fairness hearing on the securitization before Judge Gleeson; and will have a further opportunity to reaffirm or withdraw this opinion at the time of pricing of the Notes.

## IV.  Procedural Fairness

The possibility of securitization of the settlement funds was contemplated at the time of settlement in 2004.  Detailed procedures for a potential securitization of the settlement

Excerpt from Plan of Allocation
page 8

funds are specified in the Plan of Allocation. These procedures are reproduced as an Appendix to this Report. I have reviewed these procedures, and consider them to be reasonably designed to lead to a successful securitization and to limit the transaction costs of the securitization.

With the exceptions discussed below, the procedures actually followed substantially conform to those set forth in the Plan of Allocation. The most important difference is the substantial delay in completing the securitization, compared to the time frame contemplated in 2005. The principal reasons for that delay were an objection by the U.S. Government to the settlement, which was resolved only in early 2007; and turmoil in the securitization markets during 2007 and 2008, which would have impacted the pricing and possibly the viability of the securitization.

A second difference is that the MasterCard and Visa securitizations were originally expected to be part of a single offering, and are now expected to be sequential.

A third change involves the use of a single rating agency, S&P, rather than both S&P and Moody's. Only S&P currently rates MasterCard's public debt. Lead Class Counsel judged that it was not desirable to seek a rating from Moody's. The principal reasons included concern that it might not be feasible to obtain a rating from Moody's, in light of MasterCard's limited obligation under its Settlement Agreement to cooperate in a securitization effort, the cost to the class of obtaining a second rating (if feasible), and the limited potential benefit from a second rating in a lower interest rate on the Notes. I concur in the judgment to obtain a rating only from S&P.

In my opinion, the procedures followed in the MasterCard securitization are fair to the Class from a procedural point of view. In addition, the Class members had an opportunity to object to the securitization plan prior to the Court's approval of the Plan of Allocation, and did not do so. This supports my conclusion on procedural fairness.

## V. Substantive Fairness

One can understand the Class members as having involuntarily lent money to MasterCard (through the overcharges which led to the settlement), and understand MasterCard as repaying that loan by making periodic payments over time. One can understand the securitization as a sale by the Class of those promised payments to the Note purchasers.

An assessment of the fairness of the MasterCard securitization from a financial point of view ("financial fairness") involves comparing (i) the present value to the Class members of the payments the Class will receive by selling this stream of periodic payments to the Note purchasers; to (ii) the present value to the Class members of that stream of payments.[4]

In Section A, I initially assume that the Notes will trade in an efficient market, put aside the direct and indirect transaction costs of the securitization, and discuss the simple

---

[4] For convenience, I will use the term "present value" to refer to value at the time of completion of the MasterCard securitization.

Excerpt from Plan of Allocation
page 9

economics of the MasterCard securitization (though even these are not so simple). I also initially consider the MasterCard securitization on its own, without regard to possible later securitization of the Visa payments. I discuss the impact of the current economic downturn in Section B, direct transaction costs in Section C, dual securitization in Section D, departures from market efficiency in Section E, and market condition risk in Section F.

## A. Analysis in Efficient Market Without Issuance Transaction Costs

The present value to the Class members of the payments the Class will receive from the securitization ("Securitization PV") is simple. Putting aside a small adjustment because a fraction of the payment will be deferred for several years, the Securitization PV equals the sale price of the Notes. In my opinion the size of the Notes offering is sufficient so that the Notes should trade in a reasonably efficient market. Thus, their sale price should approximately equal the present value to a diversified investor of the stream of payments promised by MasterCard. That value will reflect market interest rates when the Notes are sold, the risk of default by MasterCard, the liquidity of the Notes (which is expected to be limited), and the unusual nature of litigation settlement payments, which might raise risks not present for direct MasterCard debt. I will refer to the discount rate that would be assigned by fully informed, diversified investors to the stream of MasterCard payments as the "MasterCard discount rate."

The value of the current non-securitized stream of payments by MasterCard to each Class member is more complex. This value will depend on the interest rate that the merchant should use to discount these payments to present value. That interest rate, in economic theory, should be the *marginal* cost of the capital the Class member needs to fund the loan to MasterCard.

If the MasterCard payments were a significant portion of a merchant's cash flow and the accounting for these payments were transparent to investors, one might expect the marginal cost to the merchant to obtain the capital lent to MasterCard to equal the MasterCard discount rate. This would be strictly true under the strong "perfect and complete capital markets" assumptions, which underlie the Modigliani-Miller capital structure irrelevance theorem. In fact, however, the MasterCard payments are a tiny portion of each merchant's cash flow, on the order of 0.001% of revenue.

Moreover, the manner in which merchants account for the payments is not transparent to investors, partly because of the small size of the payments. Cannonade Capital confirmed with several large merchants that they treated current year payments as a reduction to expense on the income statement and do not record future payments as an asset on the balance sheet. Thus, the only trace of the payments is a slight increase in current year operating profits.

In my opinion, it is unlikely that outside investors in a particular merchant will fully adjust their views of the riskiness of that merchant's cash flows to reflect the riskiness of the tiny portion of those cash flows represented by the MasterCard payments. If outside investors do not adjust their views of the riskiness of a merchant's cash flows at all, the merchant's marginal cost of capital will equal the weighted average cost of capital (WACC)

for the remainder of the merchant's business.  Partial adjustment is possible -- in which case the marginal cost of the capital needed to fund the loan to MasterCard will be in between the merchant's WACC and the MasterCard discount rate.

The failure of investors to fully adjust for the difference in risk between cash flows from MasterCard and a merchant's other cash flows, creates the potential for a merchant's marginal cost for the capital needed to fund the loan to MasterCard to be either greater or less than the MasterCard discount rate, and thus for the merchant to lose or gain from the securitization.

The position of a large, well-capitalized merchant is likely to be similar to that of a diversified investor.  If the merchant is not financially constrained (and does not expect to be constrained during the payment period), or the merchant's WACC is comparable to the MasterCard discount rate, the value of the MasterCard payments to the merchant will be similar to their value to investors in the Notes, so that the merchant would not have a significant gain or loss from the securitization.  I will refer to these merchants as "well-capitalized."[5]

If a merchant has a WACC significantly above the interest rate on the Notes, which is true for the vast majority of the Class members, the failure of the merchant's marginal cost of capital to fully reflect the riskiness of the MasterCard cash flows is likely to produce a financial gain from the securitization**.**  The gain will be proportional to the difference between the MasterCard discount rate and the merchant's WACC.

## B.  Issuance During an Economic Downturn

There can be additional gains from securitization if a merchant is financially constrained and unable to borrow at the margin.  The gains from loosening financial constraints can be large, relative to the amount of the payments.  These gains are likely to be especially important in the current recession.  Many retailers are under financial stress; many banks are limiting or reducing their lending, and a number of retailers have already gone bankrupt.  Retailers which have gone bankrupt have generally been unable to obtain "debtor in possession" financing, and have been forced to liquidate.

The spread between a BBB or BBB+ rated financial instrument, such as the Notes, and Treasury securities of comparable maturity, is relatively wide by historical standards.  So, quite likely, is the spread needed to compensate for the limited liquidity of the Notes and for the differences in default risk between litigation payments and ordinary, unsecured

---

[5] If investors do not adjust their assessments of the riskiness of merchants' cash flows to reflect the riskiness of the MasterCard payments, then a merchant with a WACC significantly lower than the interest rate on the Notes could, in principle, be slightly better off by continuing to lend to MasterCard than by selling the stream of MasterCard payments to the Note investors.  This possibility applies to a handful of merchants, and the dollar amounts are a small fraction of the present value of the MasterCard payments.  Moreover, the large merchants who might plausibly be in this position will be eligible to purchase the Notes and thus could avoid any loss, other than transaction costs (which I discuss below), by purchasing the Notes when they are offered.  I understand that Cannonade Capital has made inquiries with several major merchants, who have indicated that they support the securitization and do not plan to purchase Notes.  This response suggests that the possibility addressed in this footnote is not important in practice.

MasterCard debt.  This does not directly affect my opinions.  The Class members take market borrowing rates as given.  The question for them is whether they gain or lose by lending to MasterCard at market rates versus obtaining the agreement of others to do so, through the securitization.  That depends on the difference between their own WACC and the interest rate on the Notes, and the difference between their own value of liquidity and the value assigned by investors in the Notes.  Both their private value and the public value reflected in the interest rate on the Notes will be affected by the same general economic factors.

## C.  Allowing for Direct Transaction Costs

The MasterCard securitization will, of course, involve transaction costs.  Total transaction costs are approximately $4.6 million (about 1.5% of estimated proceeds).  These costs are equivalent to a reduction in the implied rate of return on lending money to MasterCard of 37 basis points per year.  In my opinion, these costs are reasonable, and are comparable to the transaction costs that one would expect in another offering of securitized notes.  The largest cost is the fees charged by the Joint Arrangers.  Those fees were established through a competitive search based on both fee and ability to complete this nonstandard transaction.

Transaction costs reduce the net proceeds to the Class from the securitization, and hence make the securitization a slightly worse deal for all merchants than it would be with no transaction costs.  However, the transaction costs are small enough, as a fraction of estimated proceeds, so that they do not significantly affect my conclusion that the securitization will be neutral to positive for large merchants (perhaps slightly negative for the very largest), but positive for everyone else, and increasingly positive the smaller a merchant is.

## D.  Dual Securitization

The MasterCard securitization presents important challenges for Lead Class Counsel, the Joint Arrangers, and the rating agency.  In form, it is a securitization.  However, most securitizations involve packaging the obligations of a number of issuers.  The MasterCard securitization involves only a single issuer.  Thus, in substance, it is similar to a simple purchase of MasterCard debt.  I am not aware of similar securitizations of litigation payments or other payments by a single issuer.

The MasterCard securitization, however, can become a template for securitization of the Visa settlement payments, which are twice the size of the MasterCard payments.  Lead Class Counsel expects that the MasterCard securitization will be followed by a Visa securitization.

The Visa securitization is likely to have important advantages to the Class.  First, because it will be a second offering of its kind, it may achieve somewhat better market pricing than the MasterCard securitization.  Some transaction costs should be somewhat lower as well, since there is a model to follow.  More importantly, if both settlements are

Excerpt from Plan of Allocation
page 12

securitized, it will no longer be necessary to mail annual checks to approximately 700,000 merchants, at an estimated annual cost of about $8 million based on experience to date. Instead, there will be two mailings, one shortly after the Visa securitization for the bulk of the proceeds from both securitizations, and a second at the end, for residual funds. This can significantly reduce mailing costs. In addition, it currently appears feasible to pay all but the largest 1-2% of merchants in full initially, and make a residual payment only to the largest merchants. This will largely eliminate the mailing cost for the final payment.[6]

The potential savings in mailing costs exceeds the expected transaction costs of both securitizations. This will increase the financial advantage of the securitizations to most Class members, and should make them financially advantageous to the well-capitalized merchants as well.[7]

While completion of the Visa securitization cannot be ensured, its likely completion can be understood as a type of "real option," created by completing the MasterCard securitization, which has important value to the Class. Thus, in my opinion, a significant fraction of the transaction cost and other savings from a dual securitization are properly attributable to the creation of this option, and thus to the MasterCard securitization.

### E.  Market Efficiency Risk

The analysis above assumes that the Notes will trade in a reasonably efficient market. There are, however, several reasons why this might not be fully correct. First, the Notes are a novel instrument. They are a securitization in form, but unsecured MasterCard debt in substance.

Second, MasterCard's obligation is to make litigation settlement payments to the Class, rather than to make principal and interest payments to investors as an issuer. It is possible that the Notes will carry a slightly higher interest rate because investors will not be entirely sure of the differences in enforceability between the well-understood obligation to pay principal and interest on general unsecured debt, and the less-well-understood obligation to make litigation payments. The two types of obligations should carry similar risk, and would carry equal seniority in bankruptcy. However, investors in the Notes might have some uncertainty in this regard.

Third, MasterCard is a financial institution, and many financial institutions are currently under substantial stress. Given the nature of MasterCard's principal business, it

---

[6] Inquiries made to the Garden City Group, which conducts the mailings, have produced substantially smaller savings estimates. The basis for those smaller estimates is unclear. I consider the estimates in text to be reasonable.

[7] I noted in an earlier footnote the potential for a small loss, as a percentage of the present value of expected payments, for a handful of the best capitalized merchants. If both securitizations are completed, this possibility disappears. These merchants will be eligible to purchase the Notes. They can do so if they consider themselves to be disadvantaged by the securitization. This will put them in the same position as they are currently, save for transaction costs. If total transaction costs are negative due to reduced mailing costs, then even these merchants should only be helped, not harmed, by the dual securitization.

may not be significantly affected by the current economic downturn, but investors might be concerned about a larger effect than in fact should be expected.

Fourth, there may be some general investor suspicion of securitizations, as a result of downgrades and defaults during the last two years on many complex mortgage-backed and other asset-backed securitizations. This concern was the principal reason for the decision by Class Counsel not to seek to complete the Notes offering during 2008. It is helpful that the Notes will be a relatively simple pass-through of MasterCard risk, with no tranching of that risk into different classes of Notes, the Class members retain the residual risk of administration expenses, and MasterCard is not itself experiencing significant financial distress.

These potential inefficiencies might result in the Notes carrying a somewhat higher interest rate than in a fully efficient, fully informed market. Put differently, the Note purchasers might be somewhat overcompensated, relative to the actual risk of MasterCard default.

The magnitude of any market inefficiency can only be roughly estimated. An educated guess is that any market inefficiency cost will be of the same rough magnitude as the direct transaction costs of the offering. Moreover, well-capitalized merchants, who are the only ones for whom the securitization is not clearly advantageous, can avoid this cost by becoming Note purchasers.

**F.  Additional Risks During Uncertain Market Conditions**

I expect the Notes to be issued at an interest rate somewhat higher than direct debt of a similarly risky issuer – for example, direct unsecured debt of MasterCard with similar duration. This is partly because the Notes could have modestly higher default risk than direct MasterCard Debt, partly because they will likely be less liquid than direct MasterCard debt, and partly due to their greater complexity, which imposes learning and uncertainty costs on Note purchasers. Other sources of such a spread are possible, including the market inefficiency costs discussed in the previous section. The first two sources of this "Notes versus MasterCard direct debt" spread reflect the value to the Class of the current stream of payments. That stream of payments is likely to be modestly riskier than direct MasterCard debt, and is effectively illiquid. Learning and uncertainty costs can be understood as a kind of indirect transaction cost.

My opinion assumes normal market conditions, and under these conditions, I would expect the "indirect transaction cost" component of the Notes-versus-MasterCard-debt spread, as well as any unspecified additional sources, to be limited in amount, and to be captured in the discussion above of market inefficiency risk.

However, market conditions are somewhat uncertain, and could change rapidly. It is possible that this indirect transaction cost source of spread could become large enough to affect my overall opinion on the fairness of the securitization to the Class.

Unfortunately, it is difficult to estimate this cost in advance, and it could change rapidly if market conditions change. Moreover, I am advised that it will likely be infeasible

Excerpt from Plan of Allocation
page 14

for the Court to itself retain discretion to make a last minute decision on whether to proceed with the offering, based on actual market conditions at the time of pricing. Thus, in my judgment, it would be advisable for the Court, as part of an overall decision on the fairness of the securitization to the Class, to leave some discretion for Lead Class Counsel or another decisionmaker to defer or even cancel the Notes offering, if at the time of pricing, the Notes-versus-MasterCard direct debt spread is sufficiently large. In this regard, I understand that I will have an opportunity to reaffirm or withdraw this opinion at the time of pricing of the Notes.

I have also been advised by Cannonade Capital of the maximum spread over Treasury securities of comparable duration that the Lead Arrangers currently expect will be necessary to place the Notes. This spread combines a number of elements. As discussed above, many of these elements are currently borne by the Class members. An actual spread over Treasuries which does not exceed this maximum is consistent with my current opinion on fairness.

## Conclusion

The MasterCard securitization is procedurally fair. Subject to the concern with an adverse change in market conditions discussed in the previous section, it should be advantageous to the Class as a whole from a financial point of view. On its own, the MasterCard securitization is financially advantageous to smaller merchants and roughly financially neutral for well-capitalized merchants. Including the value of the real option to complete the Visa securitization, the MasterCard securitization is financially advantageous for all merchants. The degree of financial advantage, as a fraction of the expected proceeds, increases as merchant size decreases. The financial gains are potentially large for financially constrained merchants.

Respectfully submitted,

*Bernard S. Black*

Bernard S. Black
March 6, 2009