EXHIBIT A

# CONSTANTINE | CANNON

Robert L. Begleiter
Attorney at Law
212-350-2707
rbegleiter@constantinecannon.com

NEW YORK | WASHINGTON

March 5, 2009

***PRIVILEGED AND CONFIDENTIAL***

By ECF

The Honorable John Gleeson
United States District Court Judge
For the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re: *Visa Check/MasterMoney Antitrust Litigation, (CV-96-5238)(JG)(JO)*

Dear Judge Gleeson:

  Lead Counsel respectfully submits for the Court's approval the attached engagement letter (the "Agreement") entered into between Lead Counsel and underwriters Barclays Capital Inc. ("Barclays") and Citigroup Global Markets Inc. ("Citi") (collectively, the "Underwriters"), attached as Exhibit A.[1] Under the terms of the Agreement, the Agreement is effective only after Court approval. Lead Counsel hereby requests that approval.

  This Agreement was entered into for the purpose of securitizing the MasterCard International Inc. ("MasterCard") Net Settlement Fund (the "Settlement Fund"). In accordance with Section 11 of the August 16, 2005 Amended Plan of Allocation for the Settlement Fund (the "Amended Plan") and as a result of the process described below, Lead Counsel believes that it may be in the best interests of the Class Claimants (*i.e.* those Class Members who filed approved claims) to securitize the Settlement Fund. Once the securitization of the Settlement Fund is complete, Lead Counsel anticipates securitizing the Visa U.S.A. Inc. ("Visa") Net Settlement Fund.

  The Settlement Agreements in this case require Visa and MasterCard to make installment payments to their respective Settlement Funds Accounts (as defined in the Settlement Agreements) through December 22, 2012. As discussed in the Amended Plan at Section 11.2, in

---

[1] The Court previously approved the engagement letters of Deutsche Bank Securities Inc. and Bear Stearns & Co. Inc. to act as underwriters in the securitization of the Net Settlement Funds in this case. *See* August 29, 2006 Order. As described more fully below, these two engagement letters are no longer in force, and Lead Counsel therefore requests the Court's approval of this Agreement as a substitute for the previously approved engagement letters. This Agreement is identical in most parts to those terms set forth in the previously approved engagement letters.

112426.1

# CONSTANTINE | CANNON

Hon. John Gleeson
March 5, 2009
Page 2

NEW YORK | WASHINGTON

a securitization, the unpaid installments due to each Settlement Fund Account would be assigned to a trust or other entity (each, an "Issuer"). Separate Issuers would be created for the Visa securitization and the MasterCard securitization. The Underwriters, hired by Lead Counsel and acting as underwriters on behalf of each Issuer, will structure the securities to be issued by each Issuer and to be sold to investors.[2] The securities will be secured by the right to the Settlement Fund resulting from future payments by MasterCard to the Settlement Fund Account. The goal of this structuring will be to convert the MasterCard obligations into securities that will be treated as market instruments, thereby maximizing the proceeds to Class Claimants.

If successful, this securitization would result in Class Claimants being paid upfront by the purchasers of these securities for the stream of payments that MasterCard is required to make through 2012. Since these securities represent a claim on the future payments to be made by MasterCard, they will be sold at a discount to the face value of the Issuer's holdings (*i.e.*, the sum of future installments). The discount will be determined based on then-current interest rates, market conditions and other factors related to MasterCard's creditworthiness.

*Replacement of Bear Stearns with Barclays and Citi*

On August 29, 2006, the Court approved the engagement letters of Deutsche Bank Securities Inc. ("Deutsche Bank") and Bear Stearns & Co. Inc. ("Bear Stearns") to act as underwriters in the securitization of the Net Settlement Funds in this case. *See* August 29, 2006 Order. In March 2008, Deutsche Bank terminated its engagement as underwriter.

In May 2008, JP Morgan Securities Inc. ("JP Morgan") acquired Bear Stearns and assumed all obligations under the previously approved engagement letter. Following receipt of a preliminary rating indication from Standard and Poor's ("S&P") in June 2008, Lead Counsel intensified its efforts to complete the structuring of the securitization with the Bear Stearns team that was in the process of being integrated into JP Morgan. In September, 2008 JP Morgan informed Lead Counsel that as part of its realignment after acquiring Bear Stearns, JP Morgan was no longer interested in pursuing the securitization unless Lead Counsel agreed to increase JP Morgan's potential fees substantially from the amount originally agreed upon in the engagement letter with Bear Stearns. In the view of Lead Counsel, increasing the fees was not in the best interests of Class Claimants, and the engagement letter with JP Morgan was terminated.

Following JP Morgan's termination, Lead Counsel interviewed three potential banks and selected Barclays and Citi as the replacement underwriters for the securitization. Lead Counsel has agreed with the Underwriters on fees that are similar to those in the engagement letter with Bear Stearns that has already been approved by the Court.

---

[2] The offer of the securities will be made pursuant to an exemption from the Securities Act of 1933, either Rule 144A under that Act or Section 4(2). Thus, the Underwriters technically will not be "underwriters" for '33 Act purposes nor will the placement of the securities be an "underwriting."

112426.1

# CONSTANTINE | CANNON

Hon. John Gleeson
March 5, 2009
Page 3

NEW YORK | WASHINGTON

*Summary of the Engagement Letter Agreement*

The attached Agreement describes the process by which securities, backed by the obligation of MasterCard to make payments into the Settlement Fund, are to be placed by private placement (whether under Rule 144A promulgated under the Securities Act of 1933 or Section 4(2) of the Securities Act of 1933). As noted above, the terms of the Agreement are substantially identical in most parts to those set forth in the engagement letters with Deutsche Bank and Bear Stearns previously approved by the Court.

Following is a summary of the major terms of the Agreement:

1. Compensation

The Agreement provides that the Underwriters are entitled to a Structuring Fee, a Placement Fee and a Break-up Fee. *See* Agreement at ¶ 8. As is customary in the securities industry, the Structuring Fee is to be paid to the Underwriters only in the case that the securitization is completed.

Structuring Fee: The Structuring Fee compensates the Underwriters for their efforts in "structuring" the conversion of the unpaid stream of payments into marketable securities by constructing the most efficient offering. The Underwriters seek to obtain a credit rating from S&P, to set the terms of the securities and to prepare the offering memorandum and other transaction documents.

If the securitization is completed (under Rule 144A or under Section 4(2) of the 1933 Securities Act) the Underwriters will be paid a total of 0.35% of the proceeds from the sale of the securitization securities.

Placement Fee: The Placement Fee compensates the Underwriters for their efforts in selling the securities to investors. The fees paid to the Underwriters will total 0.35% of the proceeds from the sale of the securitization securities.

*In the previous engagement letters with Deutsche Bank and Bear Stearns, Lead Counsel agreed that if it "determines that it is unable to complete a Rule 144A securitization, and instead completes the securitization pursuant to Section 4(2), the total fees paid to the Underwriters will increase from 0.50% of the principal amount of the securities issued to 0.75%." Lead Counsel has been advised that it now appears that the securitization can be completed only as a Section 4(2) transaction. Therefore, total fees to the Underwriters have not changed, and in fact, have been slightly reduced.*

Break-up Fee: The Break-up Fee compensates the Underwriters in the event that MasterCard elects to prepay its obligations (with the Court's approval), thus eliminating

112426.1

# CONSTANTINE | CANNON

Hon. John Gleeson
March 5, 2009
Page 4

the need for the securitization. If MasterCard prepaid its obligations prior to the Underwriters actually marketing the securities, the Underwriters would each be entitled to $1 million for their efforts. *There is no change in this fee from the previously approved engagement letter. In addition, Class Claimants are not obligated to pay Deutsche Bank or JP Morgan any break-up fees under the previous engagement letters or the current Agreement.*

### 2. Litigation Reserve Accounts

Lead Counsel has been informed that it is customary to indemnify underwriters in case of litigation related to the issuance of securitization securities. This indemnification usually is granted by the firm issuing the securities. Since this is not feasible in this case, Lead Counsel has negotiated three reserves to satisfy the Underwriters' concerns regarding potential litigation.

The Agreement specifies that upon successful execution of the securitization, $8 million be held in litigation reserve accounts to reimburse the Underwriters for any losses, claims, damages or liabilities, subject to certain conditions described therein. Lead Counsel also has agreed to grant a first priority security interest in the Litigation Reserve Account that is called for in the Amended Plan of Allocation. Finally, all deposits into the residual accounts also will be available in case of litigation. *See* Agreement at ¶6.

*The former Agreement called for $12 million or two percent of the proceeds to be deposited into the Litigation Reserve Account. The current agreement increases the reserves to approximately $16 million and grants access to the existing Litigation account. These funds are owned by Class Claimants and are only used in the event of litigation.*

### 3. Potential Conflicts

The Agreement obligates the Underwriters to implement its customary conflicts management procedures. *See* Agreement at ¶15.

*This is not as strong as the previous Agreement, which barred any business with MasterCard without Lead Counsel's approval. Since the MasterCard IPO has taken place, Lead Counsel no longer views this as a necessary restriction.*

### 4. Court Approval

As noted above, the Agreement is effective only after Court approval, as is the obligation to pay fees, expenses and compensation. *See* Agreement at ¶5.

112426.1

# CONSTANTINE | CANNON

Hon. John Gleeson
March 5, 2009
Page 5

NEW YORK | WASHINGTON

    The Agreement, which was negotiated at arms-length, is fair and in the best interest of Class Claimants. Lead Counsel respectfully requests that the Court approve the Agreement. This letter application and the Agreement are being posted on the *In re VisaCheck* website.

Respectfully submitted,

Robert L. Begleiter

Attachment

cc:    Chip Lewis, Barclays Capital Inc.
        Gerald F. Keefe, Citigroup Global Markets Inc.

112426.1

# EXHIBIT A

January 12, 2009

Constantine Cannon LLP
450 Lexington Avenue, 17th Floor
New York, NY 10017
Attention: Robert L. Begleiter, Esq.

Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Attention: George W. Sampson, Esq.

Gentlemen:

    This letter agreement ("Engagement Agreement") confirms the engagement, pursuant to the terms and conditions hereof, by Constantine Cannon LLP ("Constantine") and Hagens Berman Sobol Shapiro, LLP ("Hagens Berman", and together with Constantine, the "Client"), solely in their capacity as Co-lead Counsel for the Members of the Class (the "Plaintiffs' Class") in the Litigation (as defined below), of Barclays Capital Inc. ("Barclays") and Citigroup Global Markets Inc. ("Citi") as exclusive co-Placement Agents, joint Structuring Agents, joint Bookrunning Managers and joint Arrangers (in such capacity, the "Joint Arrangers") in connection with the issuance in a transaction commonly referred to as a "securitization" by a special purpose corporation, trust or other entity (an "Issuer") of securities backed or secured by, or representing an interest in, obligations owing from MasterCard International ("MasterCard") to Plaintiffs' Class. The obligations arise under a settlement agreement of the *In Re: Visa Check/Mastermoney Antitrust Litigation* (the "Litigation") between the Plaintiffs' Class and MasterCard, under the terms of which settlement agreements MasterCard agreed, among other things, to pay to the Plaintiffs' Class $1.025 billion over ten years (the "MasterCard Obligations," or the "Settlement Assets").

    The parties hereto agree as follows:

    1.   **Securities.** The securities to be issued by the Issuer are referred to herein as the "Securities", and the placement thereof (whether under Rule 144A promulgated under the Securities Act of 1933 ("Rule 144A"), Section 4(2) of the Securities Act of 1933 ("Section 4(2)") or other private placement) is herein referred to as the "Securitization". The Joint Arrangers and the Client, working together, shall determine the manner in which the Securities are issued and/or resold to investors (i.e., under Section 4(2) or Rule 144A).

    2.   **Joint Arrangers.** Subject to the terms hereof, the Client hereby designates Barclays and Citi as exclusive co-Placement Agents, Joint Structuring Agents and Joint Bookrunning Managers in connection with the structuring and distribution of the Securities. It is contemplated that four $100 million outstanding MasterCard Obligations will be securitized and, in connection with the offering of the Securities, Barclays and Citi will be identified on the offering materials as Joint Lead Placement Agents and will be listed in alphabetical order from left to right on such offering materials. The Client agrees that no other Arranger other than Barclays and Citi will be engaged with respect to the Securitization. Each Joint Arranger will be entitled with respect to the Securitization to the (i) Structuring Fee and (ii) Placement Fee, and with respect to a prepayment of the MasterCard Obligations by MasterCard, a Break-up Fee as outlined in Section 8 below (and in such case no Structuring Fee or Placement Fee shall be paid to the Joint Arrangers).

Barclays/Citi Engagement Letter 12-04-08.doc

This Engagement Agreement is not a commitment or agreement, express or implied, on the part of Barclays or Citi in any capacity, to purchase or place any of the Securities or to commit any capital. Notwithstanding any other provisions hereof, neither Barclays nor Citi shall have any obligation, express or implied, to act as a Joint Arranger, a Joint Bookrunning Manager, a Placement Agent or in any other capacity with respect to the Securitization if, in its sole judgment, it deems it inadvisable, impracticable or not in its business interest.

3. **Responsibilities.** The Joint Arrangers hereby accept the engagement and agree to:

a) advise and consult with the Client and Client's counsel regarding the structure of the Securitization contemplated hereby;

b) prepare, with the assistance of the Client and Client's counsel, any communications necessary to arrange for the Securitization, including presentations to the rating agencies, whether in the form of letter, circular, notice or otherwise (subject, in the case of presentations to the rating agencies, to the primacy of the Joint Arranger selected by the Client to be primary interface with the rating agencies);

c) assist the Client and Client's counsel in the preparation of an offering document (an "Offering Document") for the Securitization and the issuance of the Securities which will be drafted by Client's counsel and which will describe the Client, MasterCard, the Settlement Assets and the Securities;

d) advise the Client in the selection and terms of engagement of any necessary service providers to be engaged by the Client directly or in conjunction with the Securitization (e.g., trustee, servicer, etc.);

e) assist the Client in obtaining credit ratings on the Securities from one or more nationally recognized statistical rating agencies (collectively, the "Rating Agencies") in connection with the Securitization, including, but not limited to, the preparation of informational material;

f) advise the Client with respect to cash reserve accounts, financial guarantees, subordination, overcollateralization or other forms of credit enhancement, or a combination of the foregoing, if applicable;

g) assist the Client and Client's counsel in coordinating efforts to achieve timely and efficient documentation and closing of the Securitization;

h) serve as joint bookrunning managers (in such capacity, "Joint Bookrunning Managers") and/or Placement Agents in connection with the sale of the Securities for the Securitization, subject to, among other things, the conditions specified in Section 11 hereof; and

i) advise and assist the Client in any other matter reasonably requested by the Client to facilitate the closing of the Securitization.

4. **Cooperation; Information.** Client shall reasonably cooperate with the Joint Arrangers in their efforts to consummate the Securitization (the "Proposed Transaction"). Such cooperation shall include providing all relevant information relating to the Client, any Issuer and any affiliate thereof (collectively, the "Issuer Entities") and the Settlement Assets which any of the Joint Arrangers reasonably deem to be appropriate and providing the Joint Arrangers with reasonable access to the appropriate representatives, accountants, and other advisors of the Issuer Entities (collectively, the

2

"Representatives"). Such cooperation shall also include the preparation of any necessary informational memoranda or similar documents and complying with any reasonable requests for information or other reasonable requests that any Joint Arranger may make. The Client, on behalf of the Plaintiffs' Class, represents, warrants and covenants to the Joint Arrangers that all information provided and to be provided by them or the Representatives in connection with this Engagement Agreement and/or the Proposed Transaction will not contain any untrue statement of a material fact or omit to state a material fact that is necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were made or are made. The Client acknowledges, agrees and confirms that (i) the Joint Arrangers will rely solely on such information in the performance of the services contemplated by this Engagement Agreement without assuming responsibility for independent investigation or verification thereof and (ii) the Joint Arrangers assume no responsibility for the accuracy or completeness of such information or any information regarding the Issuer Entities, MasterCard or the Settlement Assets. Client agrees to advise the Joint Arrangers of all developments materially affecting the Issuer Entities or any of the information provided by Issuer Entities, its affiliates or the Representatives in connection with this Engagement Agreement and/or the Proposed Transaction. In addition, the Client will not, and will ensure that each Issuer Entity will not, directly or indirectly, make any offer or sale of any of the Securities or any securities of the same or similar class as the Securities, the result of which would cause the offer and sale of the Securities to fail to be entitled to the exemptions from registration afforded by the Securities Act of 1933, as amended.

The foregoing provisions notwithstanding, the Joint Arrangers acknowledge and agree that (i) the Joint Arrangers shall not have access to such representatives, accountants, and other advisors of the individual or corporate members of the Plaintiffs' Class, and (ii) information regarding MasterCard under the MasterCard Obligations to which Client has access may be limited to information which is generally available to the public or which MasterCard is willing or compelled to provide, and the Joint Arrangers may have access to information regarding MasterCard that is not available to Client.

5. Court Approval. Client acknowledges that they are engaging the Joint Arrangers on behalf of the Plaintiffs' Class and, upon execution of this Engagement Agreement, the Client shall promptly request approval from the United States District Court for the Eastern District of New York (the "Court") of this Engagement Agreement and all the terms hereof (the "Engagement Agreement Order") and in connection with seeking the Engagement Agreement Order, Client shall use its best efforts to seek the Court's approval for the payment of all indemnification, reimbursement, contribution, reasonable fees, expenses and compensation as set forth in Sections 6, 7, 8 and 12, as applicable. In the event that MasterCard prepays its obligations on a discounted basis agreed to by the Client, the Client shall, prior to such prepayment, use its best efforts to seek Court approval for the payment of all indemnification, reimbursement, contribution, reasonable fees, expenses and compensation incurred to date on the applicable Proposed Transaction pursuant to Sections 6, 7, 8 and 12, as applicable, including those amounts payable to each of the Joint Arrangers, and such payment shall, subject to Court approval, be made on the closing date of such prepayment. Other than Sections 3 and 14 hereof (which shall become effective on the date the Engagement Agreement Order is obtained by the Client), the effective date of this Engagement Agreement shall be the date this engagement letter is signed by all parties. This Engagement Agreement is subject to the condition subsequent of approval by the Court under the Engagement Agreement Order.

6. Litigation Related Expenses. The Client agrees to (a) indemnify and hold harmless each of the Joint Arrangers for any and all losses, claims, damages, expenses or liabilities ("Claims") to which each of the Joint Arrangers may become subject (i) related to or arising out of any untrue statement or alleged untrue statement of a material fact contained in any information provided by the Client in connection with the Proposed Transaction, or any omission or alleged omission to state in any such information a material fact necessary to make the statements therein in light of the circumstances under

3

which they were made not misleading or (ii) arising in any manner out of or in connection with the rendering of services by the Joint Arrangers hereunder (including, without limitation, the offer and sale of the Securities), except that this clause (ii) shall not apply with respect to any Claims that are finally judicially determined to have resulted directly from the gross negligence, bad faith or willful misconduct of the Joint Arrangers alone, and (b) reimburse the Joint Arrangers promptly upon demand for any legal or other expenses reasonably incurred by them in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuits, investigations, claims or other proceedings arising in any manner out of or in connection with the rendering of services by the Joint Arrangers hereunder (including, without limitation, in connection with the enforcement of this Engagement Agreement (provided, however, that such lawsuit, investigation, claim or other proceeding is not filed or initiated by the Client)), provided, however, that in the event a final judicial determination is made to the effect specified in subparagraph (a) above, Client shall not be obligated for such reimbursement if any such reimbursement shall have theretofore been made and provided, however, that the Client's obligation to any Covered Person (as defined below) under this Section 6 for any Claim is limited exclusively to amounts held in the Litigation Reserve Account (defined below).

The Client agrees that the provisions set forth above shall apply whether or not the Joint Arrangers are a formal party to any such lawsuits, claims or other proceedings, and that such commitments shall extend upon the terms set forth in this paragraph to any controlling person, affiliate, director, officer, employee or agent of each of the Joint Arrangers (each, with the Joint Arrangers, a "Covered Person"). The Client further agrees that, without the prior written consent of each of the Joint Arrangers, which consent shall not be unreasonably withheld, it will not enter into any settlement of a lawsuit, claim or other proceeding arising out of the transactions contemplated by this Engagement Agreement unless such settlement includes an explicit and unconditional release from the party bringing such lawsuit, claim or other proceeding of all Covered Persons, does not include any findings of fact or culpability as to the Covered Party and the parties agree that the terms of such settlement shall remain confidential.

The Client and the Joint Arrangers agree that if any indemnification and/or reimbursement sought pursuant to the preceding paragraphs is judicially determined to be unavailable for a reason other than the gross negligence, bad faith or willful misconduct of the Joint Arrangers alone, then, whether or not the Joint Arrangers are the Covered Persons, the Client and the Joint Arrangers shall contribute to the Claims for which such indemnification and/or reimbursement is held unavailable: (i) in such proportion as is appropriate to reflect the relative benefits to the Client on the one hand, and the Joint Arrangers on the other hand, in connection with the transactions to which such indemnification or reimbursement relates; or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect, not only the relative benefits referred to in clause (i) above, but also the relative faults of the Client on the one hand, and the Joint Arrangers on the other hand, as well as any other equitable considerations; provided, however, that in no event shall the amount to be contributed by (I) the Joint Arrangers pursuant to this paragraph exceed the amount of the fees actually received by the Joint Arrangers hereunder (exclusive of amounts paid for reimbursement of expenses paid under this Section 6 and Section 7) and (ii) the Client pursuant to this paragraph exceed the total of the amounts contained in the Litigation Reserve Account.

The Client agrees that, subject to final approval by the Court, on or prior to the date of the closing of the Securitization, it will (i) deposit $8,000,000 into a segregated account (the "Litigation Reserve Account") that will be available solely for the benefit of any Covered Person under this Agreement and (ii) execute documentation providing the Joint Arrangers with a first priority security interest in the Litigation Reserve Account and which the Client may use to pay any Claim to any Covered Person under this Section 6. The amounts held in the Litigation Reserve Account (including interest

4

earned on the initial deposit described above) shall not be pledged as collateral for the Securities. The Client also agrees that it will, on each date that amounts are deposited into the residual account ("Residual Account") established under the Indenture to be entered into by the Issuer in connection with the Issuance of the Securities (the "Indenture"), transfer such amounts received into the Litigation Reserve Account (and such amounts shall be subject to the Joint Arrangers' security interest and be available for the payment of Claims described in this Section 6).

No Covered Person will be liable to the Client in relation to the Proposed Transaction or this Engagement Agreement, save to the extent that a court in the United States finds in a final non-appealable judgment that the Client has suffered a loss directly caused by the gross negligence or wilful default of such Covered Person.

7. **Expenses.** Client will be responsible for, and subject to final approval by the Court, shall pay upon demand and upon being provided reasonably satisfactory documentation therefor, all reasonable out-of-pocket fees and expenses incurred by any and all of the Joint Arrangers, or any affiliate thereof, and their respective agents and representatives, in connection with the preparation, execution and delivery of this Engagement Agreement, such party's evaluation of the possible consummation of the Proposed Transaction and the negotiation and preparation of definitive documentation with respect to the Proposed Transaction, including but not limited to all reasonable legal fees and expenses incurred by counsel to be mutually agreed upon and retained by the Joint Arrangers with the consent of the Client (which shall not unreasonably withheld) and travel expenses; provided, however, that such counsel shall provide the Joint Arrangers and Client with an invoice on a monthly basis of its legal fees and expenses incurred to date. Customary and ordinary expenses for any amounts which, in the aggregate, are reasonably expected (on a pre-incurrence basis) to exceed $25,000, excluding legal fees and expenses and expenses incurred by the Joint Arrangers in connection with the Securitization shall require Client's prior written approval. Should the Proposed Transaction not be consummated for any reason whatsoever, Client shall nonetheless be responsible for, and shall, subject to final approval by the Court, pay upon demand and upon being provided reasonably satisfactory documentation therefor, all such reasonable out-of-pocket fees and expenses of each of the Joint Arrangers, or any affiliate thereof, and the reasonable out-of-pocket fees and expenses of any and all third party credit enhancement providers, independent accountants and trustees, including, in the case of each of the foregoing entities, their respective agents and representatives, in each case, engaged either by the Joint Arrangers with the prior written consent, if applicable, of Constantine on behalf of Client, or engaged by the Client. The Joint Arrangers shall have no liability whatsoever to any third party credit enhancement providers, independent accountants and trustees, including, in the case of each of the foregoing entities, their respective agents and representatives.

8. **Compensation.** Subject to final approval by the Court, as compensation for acting as Joint Arranger and Joint Bookrunning Manager in connection with the Securitization pursuant to a private placement under Rule 144A or under Section 4(2) (subject to the terms hereof), the Client shall pay to each of the Joint Arrangers the sum of (x) a structuring fee (the "Structuring Fee") equal to the product of (i) 0.35% *times* (ii) the principal amount (as of the closing date) of the Securities issued *times* (iii) 50%, and (y) a placement fee (the "Placement Fee") equal to the product of (i) 0.35% *times* (ii) the principal amount (as of the closing date) of the Securities issued *times* (iii) 50%, in each case, non-refundable and payable in immediately available funds on the closing date of the Securitization.

In the event that MasterCard prepays its obligations (other than as contemplated by the immediately following paragraph) on a discounted basis agreed to by the Client, each of the Joint Arrangers shall be entitled to a payment in an amount equal to $333,000. Such payment is payable on the closing date of such prepayment.

5

In the event that the Joint Arrangers have distributed an Offering Document to potential investors and are marketing the Securities, and during such marketing effort MasterCard prepays its obligations on a discounted basis agreed to by the Client, each of the Joint Arrangers shall be entitled to a payment in an amount equal to $1,420,000 (and such payment shall be in lieu of the $333,000 payment described in the preceding paragraph), payable on the closing date of such prepayment. (Each amount identified in this paragraph and the preceding paragraph is referred to herein as a "Break-up Fee" and collectively as the "Break-up Fees".) The payment of all Break-Up Fees shall be subject to final approval by the Court.

9. **Exclusivity.** On and after the date hereof (a) Client will not, and will ensure that each Issuer Entity will not, directly or indirectly, through any representative or otherwise, solicit or entertain offers from, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any person other than the Joint Arrangers relating to the Proposed Transaction or any transactions similar to the Proposed Transaction, and (b) Constantine, on behalf of Client, will immediately notify the Joint Arrangers upon its knowledge of any contact of the type referred to in (a) above involving any Issuer Entity or the Representatives regarding any such offer or proposal or any related inquiry. For the avoidance of doubt, but without limitation to any other provision hereof, Client agrees that, except as otherwise permitted under Section 9 hereof, Client will not commence or participate in any transaction or arrangement with any party (other than Barclays and Citi, acting as Joint Arrangers and Joint Bookrunning Managers as contemplated herein) if such transaction or arrangement is the Proposed Transaction or substantially similar to the Proposed Transaction, unless Client first obtains the written consent of both Joint Arrangers and Joint Bookrunning Managers with respect thereto. Notwithstanding the foregoing, the Joint Arrangers acknowledge that the Client has retained at its sole cost and expense Carmonade Capital LLC (i.e., Joshua Slovik) as its financial advisor and Brown Rudnick LLP ("Brown Rudnick") as its counsel for the Proposed Transaction.

10. **Entire Agreement and Prior Documents.** This Engagement Agreement constitutes the entire understanding among the parties hereto with respect to the Proposed Transaction, supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the Proposed Transaction, and cannot be amended or modified except in writing executed by each of the parties hereto. Except as otherwise provided herein, nothing contained herein, and no action or inaction by any of the Joint Arrangers, or any affiliate thereof in connection with the Proposed Transaction, shall in any way alter or diminish any of the rights, remedies, privileges or entitlements which any of the Joint Arrangers, or any affiliate thereof shall have under applicable law.

11. **No Commitment.** It is agreed that (a) this Engagement Agreement does not constitute a letter of intent to pursue the Proposed Transaction, or an offer by or a commitment of the Joint Arrangers or any affiliate thereof to consummate the Proposed Transaction, underwrite and/or place any of the Securities, or provide any other financing arrangement, and (b) the Proposed Transaction and the performance of the services by Barclays and Citi hereunder are subject in all respects to the satisfaction, in their sole discretion, of the following conditions: (i) satisfactory completion of each of the Joint Arranger's due diligence and receipt of all internal approvals, (ii) satisfactory completion of the Offering Document and the execution of documentation satisfactory to the Joint Arrangers, (iii) receipt of all appropriate legal opinions, including a 10b-5 disclosure opinion, in each case delivered from external counsel and in a format reasonably acceptable to the Joint Arrangers, (iv) receipt of all required governmental and other approvals (including required approvals of the Court), (v) there not having occurred any material adverse change or any development involving a prospective material adverse change in the business, operations, condition (financial or otherwise) or prospects of MasterCard or Issuer Entities, whether or not arising in the ordinary course of business, or with respect to the Settlement Assets or the beneficial interests therein, which would, in the judgment of the Joint Arrangers or, exercised in its respective sole and absolute discretion, make it inadvisable or impracticable to proceed with the Proposed

6

Transaction, (vi) there not having occurred any material adverse change in general economic, political, or financial conditions, or in the credit and debit card payment processing industry or business in particular, which, in the judgment of each of the Joint Arrangers exercised in its sole and absolute discretion, would make it inadvisable or impracticable to proceed with the Proposed Transaction and (vii) the accuracy and completeness of all representations the Client makes to the Joint Arrangers and all information furnished to the Joint Arrangers by or on behalf Client, and the Client's compliance with the terms of this Engagement Letter.

12. **Survival and Termination.** This Engagement Letter shall terminate upon the earlier of (i) the closing of the Proposed Transaction and (ii) the date upon which either party terminates this Engagement Agreement for any reason by giving the other party at least 10 days' written notice; provided that if only one of the Joint Arrangers terminates its engagement hereunder, this Engagement Agreement shall continue to be in full force and effect between the Client and the non-terminating Joint Arranger. If the Securitization proceeds with only the remaining Joint Arranger, all fees and compensation described in Sections 8 and 12 will accrue solely to the non-terminating Joint Arranger. However if another Arranger is engaged to replace the terminating Joint Arranger, the allocation of fees and compensation described in Sections 8 and 12 between the non-terminating Joint Arranger and the new Arranger will be subject to the written consent of the non-terminating Joint Arranger (such consent not to be unreasonably withheld). Further, for the avoidance of doubt, if either or both of the Joint Arrangers terminates its engagement hereunder, the provisions of Sections 4, 6, 7, 12, 13, 14 and 21 shall survive such termination with respect to the terminating Joint Arrangers. Provided, however, subject to final approval by the Court, if within one year of the date of the termination by the Client pursuant to clause (ii) above, MasterCard prepays their obligation on a discounted basis agreed to by the Client or the Client executes the Securitization or an alternative form of financing for the Settlement Assets, each of the Joint Arrangers shall be entitled to a payment in an amount equal to $1,000,000 payable on the closing date of such prepayment or financing, unless the Client specifies in a written notice to the Joint Arrangers that it terminated the engagement because of an inability of the Joint Arrangers to close the Securitization due to the degree of assistance and cooperation in the due diligence, disclosure and rating agency process by MasterCard and the Client subsequently executes the Securitization or an alternative form of financing for the Settlement Assets within one year of the date of termination with the same degree of assistance and cooperation from MasterCard as offered to the Joint Arrangers; in such event, the Joint Arrangers and the Client may negotiate a reasonable fee to be paid to the Joint Arrangers for its efforts in the Proposed Transaction, the payment of which shall also be subject to final approval by the Court. In the event that this Engagement Letter terminates because of the closing of the Proposed Transaction, Sections 4, 6, 7, 8, 12, 13, 14 and 21 shall survive such termination. In the event the Client terminates this Engagement Agreement pursuant to clause (ii) above, the provisions of Sections 4, 6, 7, 8, 12, 13, 14 and 21 shall survive such termination.

13. **Construction.** THIS ENGAGEMENT AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW (OTHER THAN NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401 AND 5-1402). ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF THIS ENGAGEMENT AGREEMENT OR CONDUCT IN CONNECTION WITH THIS ENGAGEMENT AGREEMENT IS HEREBY WAIVED. EACH PARTY HERETO HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL AND NEW YORK STATE COURTS LOCATED IN MANHATTAN, NEW YORK IN CONNECTION WITH ANY DISPUTE RELATED TO THIS ENGAGEMENT AGREEMENT OR ANY OF THE MATTERS CONTEMPLATED HEREBY.

14. **Confidentiality and Information Sharing.**

(a) Notwithstanding anything herein to the contrary, each party (and any employee, representative, or other agent of each party) may disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the Proposed Transaction and all materials of any kind (including opinions and other tax analyses) that are provided to each party relating to such U.S. tax treatment and U.S. tax structure, other than any information for which nondisclosure is reasonably necessary in order to comply with any applicable federal and state securities laws.

(b) To the extent not inconsistent with clause (a) above, it is hereby agreed that each of the Joint Arrangers and any affiliate thereof may disclose any information related to this Engagement Agreement, the Issuer Entities, their affiliates, the Settlement Assets or the beneficial interests therein, the Proposed Transaction and any other matters contemplated hereby or thereby only (i) to its and its affiliates' officers, directors, employees, partners, members, agents, accountants, attorneys and other professional advisors and any rating agencies, financial insurers, sureties, or any other potential participant in a risk syndication transaction, (ii) to actual and prospective investors, (iii) to the other parties to the Proposed Transaction, (iv) to the extent required by law or applicable regulation, (v) pursuant to an order entered or subpoena issued by a court of competent jurisdiction, (vi) as requested by any government or regulatory or self-regulatory body having or claiming authority to oversee any aspect of such party's business or that of its affiliates, (vii) for evidentiary purposes in any relevant action, proceeding or arbitration to which such party or any of its officers, directors or shareholders or any of its affiliates or officers, directors, or shareholders of any such affiliate is a party, (viii) to the extent that such information becomes publicly available other than by reason of a disclosure by either of the Joint Arrangers in violation of this Section 14, (ix) for purposes of establishing a "due diligence" defense, (x) to the extent such information was or becomes available to either of the Joint Arrangers on a non-confidential basis from a source other than Client or the Issuer Entities, (xi) to the extent such information has been independently acquired or developed by or for either of the Joint Arrangers without violating any of their obligations under this Engagement Agreement or (xii) pursuant to Section 20 hereof. In addition, information with respect to this Engagement Agreement and the Proposed Transaction may only be disclosed by the Joint Arrangers to MasterCard to the extent necessary to facilitate the closing of the Proposed Transaction and with the prior written consent of the Client (not to be unreasonably withheld).

15. **Matters Relating to Engagement.** Client acknowledges that the Joint Arrangers have been retained solely to provide the services set forth in this Engagement Agreement. In rendering such services, the Joint Arrangers shall act as independent contractors and not in any fiduciary capacity, and any duties of the Joint Arrangers arising out of its engagement hereunder shall be owed solely to Client.

Client further acknowledges and agrees that:

(a) the Joint Arrangers have been engaged solely to act as an Arranger in connection with the Proposed Transaction and that no fiduciary relationship between Client, on the one hand, and the Joint Arrangers, on the other hand, has been created in respect of any of the transactions contemplated by this Engagement Agreement, irrespective of whether the Joint Arrangers have advised or is advising the Client on other matters, provided however, that the foregoing does not negate the Joint Arrangers' responsibilities and obligations as an Arranger for the Proposed Transaction as contemplated by this Engagement Agreement;

(b) the pricing of the Securities will be established following discussions and arms-length negotiations with the Joint Arrangers, and Client is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated by this letter; and

8

(c)    It has been advised that the Joint Arrangers are full-service brokerage firms and they or their affiliates may (i) provide financing or other services to parties whose interest may conflict with those of the Client or the Plaintiffs' Class, (ii) provide financing and structuring services similar to the Proposed Transaction to other parties

The Client waives any claim against the Joint Arrangers based on a conflict of interest that might arise due to such roles described in (c) above. In addition, the Joint Arrangers may, whether by virtue of the types of relationships described herein or otherwise, at the date hereof or at any time hereafter, be in possession of information regarding MasterCard that is or may be material in the context of this Proposed Transaction and that may or may not be publicly available or known to the other party. The Joint Arrangers' role in the Proposed Transaction does not create any obligation on the part of the Joint Arrangers or any of their affiliates to disclose to the Client any such relationship or information (whether or not confidential).

Each Joint Arranger agrees to implement its customary conflicts management procedures, including informational walls and similar restrictions with respect to the banking team engaged on the Securitization if such Joint Arranger is mandated to act as joint lead or co-lead manager for capital markets corporate debt offerings for MasterCard during the period commencing on the date marketing of the Securitization begins and ending on the earlier of the pricing of the Securitization and March 31, 2009 (or such later date as mutually agreed in writing by the parties hereto).

16.   **Not Advisors; Independent Investigation.** Client acknowledges and agrees that (i) the Joint Arrangers and their affiliates are not, and do not hold themselves out to be, advisors as to legal, tax, accounting or regulatory matters in any jurisdiction, (ii) Client is not relying on the advice of the Joint Arrangers for legal, regulatory, financial, tax, accounting or investment matters, but instead the Client shall consult with and rely on the advice of its own professionals and advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the risks, benefits and suitability of the transactions contemplated by this Engagement Agreement, (iii) the Joint Arrangers have not, and will not, make any recommendations, guarantees or representations regarding the expected or projected success, performance, result, consequence or benefit (whether legal, regulatory, financial, accounting or otherwise) of the Proposed Transaction, (iv) the Joint Arrangers are not in the business of providing tax advice and the Client's senior executives at appropriate management positions have been apprised of the disclaimers relating to the tax matters and (v) the Joint Arrangers, and their affiliates shall have no responsibility or liability to Client with respect thereto.

17.   **Notices.** Notice given pursuant to any of the provisions of this Engagement Agreement shall be in writing and be mailed or delivered or faxed (a) to Client, c/o Constantine, at its address appearing above Attention: Messrs. Robert Begleiter and Jeffrey Shinder, with copies to Joshua Slovik and Brown Rudnick, (b) to the Joint Arrangers at their address as set forth on the signature page of this Engagement Agreement, for Barclays Attention: Andrew Lee, Private Placements Group, and for Citi's Attention: Portfolio Manager for Global Securitized Products.

18.   **Brokers.** The Client represents and warrants to the Joint Arrangers that there are no brokers, representatives or other persons which have an interest in compensation due to the Joint Arrangers from any transaction contemplated herein.

19.   **Successors and Assigns.** The benefits of this Engagement Agreement (including the indemnity) shall inure to the benefit of respective successors and assigns of the parties hereto and of the indemnified parties hereunder and their successors and assigns and representatives, and the obligations and liabilities assumed in this Engagement Agreement by the parties hereto shall be binding upon their

9

respective successors and assigns. This Engagement Agreement shall not be assignable by either party without the prior written approval of the other party.

20. **Advertisements.** The Client agrees that the Joint Arrangers have the right to place advertisements in financial and other newspapers and journals at their own expense describing their services to the Client hereunder subject to the prior written approval of the Client, which shall not be unreasonably withheld. The Client also agrees that it will not communicate to third parties or to the public (including but not limited to placing any advertisements) regarding the Securitization prior to the completion of the offering of the Securities and in any event only with the prior written consent of each of the Joint Arrangers, which consent shall be deemed given upon receipt by the Client of a letter from an authorized representative of each of the Joint Arrangers to such effect.

21. **Disclosure.** The Client agrees that it will not disclose to any third party or to the public (including but not limited to placing any advertisements) any information regarding this Engagement Letter, the Proposed Transaction or any other matters contemplated thereby or hereby, or any information provided by the Joint Arrangers in connection with the Proposed Transaction, in each case without the prior consent of each of the Joint Arrangers, which consent shall not be unreasonably withheld; provided that the Client may disclose this Engagement Letter to the Court and may post this Engagement Letter on its website http://www.inrevisacheckmastermoneyantitrustlitigation.com.

22. **Enforceability.** The invalidity or unenforceability of any provisions of this Engagement Agreement shall not affect the validity or enforceability of any other provision of this Engagement Agreement, which shall remain in full force and effect.

23. **Miscellaneous.** This Engagement Agreement may be executed in counterparts, which together shall be considered a single instrument. Delivery of an executed counterpart to this Engagement Agreement by facsimile or PDF shall be effective as delivery of a manually executed counterpart to this Engagement Agreement.

The Joint Arrangers are delighted to accept this engagement and looks forward to working with you on this assignment. Please confirm that the foregoing correctly sets forth our agreement by signing the enclosed duplicate of this Engagement Agreement in the space provided and returning it.

[Signature page to follow.]

10

Very truly yours,

Barclays Capital Inc.

By: _____
Name: Carl Whitley (?)
Title: Managing Director

745 Seventh Ave.
New York, NY 10019


Citigroup Global Markets Inc.

By: _____
Name:
Title:

388 Greenwich Street,
New York, New York 10013

11

Very truly yours,

Barclays Capital Inc.

By: _____
Name:
Title:

745 Seventh Ave
New York, NY 10019

Citigroup Global Markets Inc.

By: _____
Name: GERALD F. KEEFE
Title: AUTHORIZED SIGNATORY

388 Greenwich Street
New York, New York 10013

AGREED AND ACCEPTED:
IN ITS CAPACITY AS CO-LEAD COUNSEL
FOR THE MEMBERS OF THE CLASS

CONSTANTINE CANNON LLP

By: _____
Name:
Title:


HAGENS BERMAN SOBOL SHAPIRO LLP

By: _____
Name:
Title:

12