# CONSTANTINE | CANNON

**Jeffrey I. Shinder**
Jason J. Enzler
Attorneys at Law
(212) 350-2709
**jshinder@constantinecannon.com**
**jenzler@constantinecannon.com**

NEW YORK | WASHINGTON

April 1, 2011

**BY ECF AND BY HAND DELIVERY**

The Honorable John Gleeson
United States District Court Judge
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:     *Visa Check/MasterMoney Antitrust Litigation* (CV-96-5238)(JG)

Dear Judge Gleeson:

      Lead Counsel respectful submits this letter to request that the Court approve the plan set forth below to require class members to cash their settlement checks by June 15, 2011 so we may conclude the case and make a *cy pres* donation of funds remaining in the settlement account. Based on our evaluation of the funds remaining after the most recent distribution in December 2010 and of the anticipated costs of concluding the case, we have concluded that another distribution to the class would not be efficient or economically feasible.

December 2010 Distribution and Remaining Funds

      On November 18, 2010, Your Honor approved our request to make a distribution to class members in December 2010 of roughly $87.8 million in interest payments and residual funds. *See* Order, dated Nov. 18, 2010 (minute entry).[1] As part of that order, Your Honor also directed Lead Counsel to file a written submission proposing how we would conclude this case and dispose of any funds left in the settlement account. *Id.* Pursuant to that order, we submitted a letter outlining two alternative tracks for concluding the case depending on the amount of funds remaining after the December 2010 distribution, including funds returned to the settlement account from uncashed checks. Letter from J. Shinder, Lead Counsel, to The Honorable John Gleeson, dated Nov. 29, 2010 (Dkt. No. 1585).

---

[1] This second distribution of residual funds followed the roughly $1.1 billion distribution of residual funds in December 2009. *See* Order Approving Residual Distribution, dated Nov. 6, 2009 (Dkt. No. 1540); Letter from J. Shinder, Lead Counsel, to The Honorable John Gleeson, dated Sept. 22, 2010, at 1 (Dkt. No. 1577) (Lead Counsel's letter requesting a cut-off for cashing checks from the first residual distribution).

193548.1

CONSTANTINE | CANNON

Hon. John Gleeson
April 1, 2011
Page 2

Lead Counsel and the claims administrator completed the most recent distribution in early December 2010. *See* Affidavit of Neil L. Zola, dated March 31, 2011, ("Zola Affidavit") at ¶ 4 (submitted with this letter). More than 554,000 checks, totaling roughly $87.8 million, were mailed to class members. *Id.* As of March 30, 2011, more than 502,000 of these checks amounting to more than $86.5 million had been cashed, or roughly 98.5% of the funds distributed in December 2010. *Id.* at ¶¶ 4, 10.

As with previous distributions, the claims administrator has undertaken extensive efforts over the last three months to follow up with class members whose checks from the December 2010 distribution were not cashed. *Id.* at ¶ 5. These efforts included:

- In late December 2010, the claims administrator called class members with the 100 highest-valued checks that remained uncashed. All of those checks have now been cashed. *Id.* at ¶ 6.

- In early January 2011, the claims administrator called class members with the next 100 highest-valued checks that remained uncashed, making multiple phone calls and researching new contact information when class members were not immediately located. Almost all of those checks have now been cashed. *Id.* at ¶ 7.

- In early February 2011, the claims administrator mailed roughly 60,700 reminder postcards to all class members with uncashed checks and conducted new address searches for all class members with undeliverable checks. These efforts were also successful, and by the end of February, over 495,000 checks totaling more than $85.6 million had been cashed. *Id.* at ¶ 8.

- In March 2011, the claims administrator began calling class members with uncashed checks amounting to $5,000 or more. This process continues to date. *Id.* at ¶ 9.

Because of these efforts, approximately 8,900 checks have been reissued and cashed, totaling more than $1.2 million. *Id.* at ¶ 10. Roughly 150,000 checks have been cashed since the claims administrator began following up with class members in late December. *Id.* at ¶¶ 6, 12.

Check-Cashing Deadline and Publication Campaign

Approximately 52,000 checks from the December 2010 distribution, worth about $1.3 million combined, remain uncashed. *Id.* at ¶¶ 12. To maximize participation in the December 2010 distribution, Lead Counsel proposes to implement a final publication campaign as we have with previous distributions. Consistent with that precedent, this outreach effort would include issuing press releases and placing notices in select newspapers and on various websites, including the case website, advising class members of the need to cash their checks and of the

193548.1

CONSTANTINE | CANNON

Hon. John Gleeson
April 1, 2011
Page 3

conclusion of this case. *See id.* at ¶ 11; Zola Exhibit A (proposed publication plan attached to the Zola Affidavit).

In order to allow time for the publicity campaign to provide adequate notice to class members to cash their checks, Lead Counsel requests that the Court set June 15, 2011 as the final date by which all checks must be cashed. This would allow class members a total of six months since the December 2010 distribution to request that their checks be reissued and to cash their checks, which is consistent with the timeframe provided for cashing checks in Paragraph 12.4 of the Amended Plan of Allocation. We believe that this fairly balances the goal of maximizing participation in the distribution with the need to wind-up this case. If approved by the Court, we will advise class members of the June 15 cut-off in the notices published as part of the publicity campaign, and on the case website as well.

<u>Anticipated Amount of Funds Remaining After the Proposed Check-Cashing Deadline</u>

Just under $3 million remained in the settlement account as of March 30, 2011. *Id.* at 12. Almost half, roughly $1.3 million, is from December 2010 distribution checks that have not been cashed. *Id.* The claims administrator estimates that approximately $200,000 will be cashed between now and the proposed June 15 cut-off. *Id.* at ¶ 14. In addition, approximately $1.1 million will be needed to cover administrative costs and fees, as set forth in the chart enclosed with this letter as Attachment 1. *See also,* Zola Affidavit at ¶ 13. The majority of these expenses relate to three areas:

- Almost $300,000 is for costs and fees already incurred and submitted to the Special Master for approval.[2]

- Roughly $585,000 is for costs and fees associated with the claims administrator's December 2010 distribution efforts, proposed publication campaign, handling of check reissue requests, and efforts to close the settlement administration.

- Document destruction, pursuant to the protective orders in effect, accounts for another major component. For example, we estimate that Lead Counsel, alone, possesses upwards of 2,650 boxes of materials, as well as an estimated 5,000 pounds of materials, at two off-site storage locations. The cost of destroying just these documents could easily total $55,000 based on estimates provided by the off-site storage venders. Those costs include costs for retrieving the boxes from storage, vender removal fees, and

---

[2] Requests for payment of these costs and fees were submitted on August 5, 2010 (for costs and fees incurred from April through June 2010), October 29, 2010 (for costs and fees incurred from July through September 2010), and January 28, 2011 (for costs and fees incurred from October through December 2010).

CONSTANTINE | CANNON

NEW YORK | WASHINGTON

Hon. John Gleeson
April 1, 2011
Page 4

shredding costs.  Likewise, the approximately $20,000 in anticipated costs for Charles River Associates and Palma Advisors LLC relate entirely to document destruction.

*See* Attachment 1.  In light of these expenses and the anticipated check cashing over the next two months, we estimate that there will be about $1.7 million remaining after the proposed June 15 deadline expires.  Zola Affidavit at ¶ 14.

<u>Proposal to Donate Projected Remaining Funds</u>

The projected residual of $1.7 million is only a miniscule percentage (0.07%) of the roughly $2.61 billion distributed to date.  *Id.* at ¶ 15.  According to the claims administrator, a distribution of such a small amount to such a large class would not be economically feasible because the cost of the distribution may exceed 50% of the total funds.  *Id.*  For example, if the more than 500,000 class members who cashed their December 2010 checks were eligible for an additional distribution, that distribution would not exceed $900,000 due to the costs associated with making such a distribution.  *Id.*  Furthermore, the vast majority of class members (roughly 450,000) would receive checks for less than $1.00, and only 1.4% (about 7,100 merchants) would receive checks above $5.00.  *Id.*  We believe that such an insignificant benefit to the class is overwhelmingly outweighed by other concerns, such as the interests of finality and freeing up judicial resources.

Accordingly, and consistent with Paragraph 12.7 of the Amended Plan of Allocation, should the Court set June 15 as the deadline for cashing checks, we respectfully request that the Court also order that any residual funds left in the settlement account as of that date be donated to a charity or cause related to the merchant community to be approved by the Court.  We are currently considering some options and will make recommendations to the Court well in advance of the June deadline.  If approved, Lead Counsel will advise the Court soon after the June 15 deadline as to the amount that will be donated before making the donation.

We are available at Your Honor's convenience should the Court have any questions.

Respectfully submitted,

Jeffrey I. Shinder
Jason J. Enzler

Attachments

cc:    Robin Wilcox, Special Master (by electronic mail)

193548.1

## ATTACHMENT 1:  OUTSTANDING AND FUTURE EXPENSES
(amounts rounded up to the nearest $10)

| Entity | Costs and Fees Invoiced and Submitted to Court But Not Yet Approved[1] | Anticipated Costs and Fees To Be Submitted Before Close of Settlement Funds | Sum |
|---|---|---|---|
| Constantine Cannon LLP | $226,810 | $90,000[2] | $316,810 |
| Garden City Group, Inc. | $0 | $585,000[3] | $585,000 |
| Cannonade Capital LLC | $52,560 | $40,000 | $92,560 |
| Charles River Associates | $15,660 | $20,000 | $35,660 |
| Palma Advisors LLC | $4,720 | $1,530 | $6,250 |
| Special Master | $0 | $50,000[4] | $50,000 |
|  |  |  |  |
| SUM |  |  | $1,086,280 |

---

[1] These requests for payment of costs and fees were submitted on August 5, 2010 (for costs and fees incurred from April through June 2010), October 29, 2010 (for costs and fees incurred from July through September 2010), and January 28, 2011 (for costs and fees incurred from October through December 2010).

[2] Of the $90,000 of Constantine Cannon's anticipated costs, $55,000 is for costs of document destruction required under the various protective orders in effect in this case.  Those costs include costs for retrieving the boxes from storage, vender removal fees, and shredding costs.  The remaining amount concerns fees already incurred but not yet submitted to the Special Master, settlement compliance issues which arise from time to time, and winding up the litigation and ensuring compliance with the protective orders.

[3] This amount includes approximately $205,000 the claims administrator has incurred in fees and costs in connection with its December 2010 distribution efforts since January 1, 2011.  *See* Affidavit of Neil L. Zola, dated March 31, 2011, at ¶ 13.  The remaining costs relate to the claims administrator's handling of check reissue requests, efforts to close the settlement administration, and proposed publication campaign.  *Id.* and Zola Exhibit A (attached to the Zola Affidavit) (reflecting the publication campaign's projected cost as roughly $150,000).

[4] The Special Master advised us that about $32,000 of this amount is for work already performed but for which invoices have not been submitted.

193547.1